## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

YIFAN SHEN, ZHIMING XU, XINXI WANG, YONGXIN LIU, and MULTI-CHOICE REALTY, LLC,

*Plaintiffs*,

v.

WILTON SIMPSON, in his official capacity as Florida Commissioner of Agriculture, MEREDITH IVEY, in her official capacity as Acting Florida Secretary of Economic Opportunity, PATRICIA FITZGERALD, in her official capacity as Chair of the Florida Real Estate Commission,

*Defendants*.

Case No. 4:23-cv-208

## **COMPLAINT**

## I.  INTRODUCTION

1.     This lawsuit challenges a new Florida law, SB 264, that imposes discriminatory prohibitions on the ownership and purchase of real property based on race, ethnicity, alienage, and national origin—and imposes especially draconian restrictions on people from China. *See* Laws of Fla. ch. 2023-33, §§ 3–8, at 5–15 (CS for CS for SB 264) (to be codified at Fla. Stat. §§ 692.201–.205). Plaintiffs—four individual Chinese citizens who reside in Florida, and a real estate brokerage firm that principally serves Chinese and Chinese American clients—are subject to

the law's restrictions and its broad effects. They will be forced to cancel purchases of new homes, register their existing properties with the State under threat of severe penalties, and face the loss of significant business. The law stigmatizes them and their communities, and casts a cloud of suspicion over anyone of Chinese descent who seeks to buy property in Florida.

2.      Under this discriminatory new law, people who are not U.S. citizens or permanent residents, and whose "domicile" is in China, will be prohibited from purchasing property in Florida. A similar but less restrictive rule will apply to people whose permanent home is in Cuba, Venezuela, or other "countries of concern." The sole exception to these prohibitions is incredibly narrow: people with non-tourist visas or who have been granted asylum may purchase one residential property under two acres that is not within five miles of any military installation in the state. Notably, there are more than a dozen military installations in Florida, many of them within five miles of city centers like Orlando, Tampa, Jacksonville, Pensacola, Panama City, and Key West. Florida's new law will also impose requirements on people from China and other "foreign countries of concern" to register properties they currently own, at the risk of civil penalties and civil forfeiture. People who own or acquire property in violation of the law are subject to criminal charges, imprisonment, and fines.

3.      This law is unconstitutional. It violates the equal protection and due

process guarantees under the U.S. Constitution; it intrudes on the federal government's power to superintend foreign affairs, foreign investment, and national security; and it recalls the wrongful animus of similar state laws from decades past—laws that were eventually struck down by courts or repealed by legislatures.

4.      In May 1882, more than one hundred and forty years ago, the United States passed the Chinese Exclusion Act, banning all Chinese laborers from immigrating to the country for ten years. The primary reasons for the law's enactment included unwanted ethnic economic competition and the racialized theory that Chinese people were unassimilable pagans. It was the first and only major U.S. law ever implemented to prevent all members of a specific racial group from immigrating to the United States. The law remained in force until 1943, when China became a wartime ally of the United States against Japan.

5.      In May 1913, one hundred and ten years ago, California enacted the "Alien Land Law," barring Asian immigrants from owning land. More than a dozen states, including Florida, followed suit, adopting similar Alien Land Laws restricting Asians' rights to hold land in America. The purpose was to discourage and prevent "non-desirable" Asian immigrants from settling permanently in the United States and its territories.

6.      In 1948, the U.S. Supreme Court held that the 14th Amendment rights

of Fred Oyama, a U.S. citizen and the son of Japanese immigrants, had been violated when the State of California moved to repossess land purchased by Oyama's non-citizen father in Oyama's name while the family was incarcerated in an internment camp. *Oyama v. California*, 332 U.S. 633 (1948).

7.     As a result of the *Oyama* decision and other developments in equal protection case law, most of the country's Alien Land Laws were repealed or struck down in the 1950s. However, Florida's state constitution was the last to contain an alien land law provision until 2018, when voters passed a ballot measure to repeal it.

8.     Through this action, Plaintiffs seek a declaratory judgment that Florida's new discriminatory property law (hereinafter, "Florida's New Alien Land Law") violates the U.S. Constitution and federal statutory law, and an injunction to stop the enforcement of the law against Plaintiffs.

## II.  PARTIES

9.     Plaintiff Yifan Shen is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

10.     Plaintiff Zhiming Xu is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

11.     Plaintiff Xinxi Wang is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

12.     Plaintiff Yongxin Liu is an individual and natural person, as well as a citizen of the People's Republic of China, lawfully residing in Florida.

13.     Plaintiff Multi-Choice Realty, LLC is a limited liability corporation organized under Florida law, with its principal place of business in Florida.

14.     Defendant Wilton Simpson is the Florida Commissioner of Agriculture and heads the Florida Department of Agriculture and Consumer Services ("FDACS"). Fla. Stat. §§ 20.14(1), 570.01. FDACS is one of the agencies charged with implementing and enforcing Florida's New Alien Land Law. *Id.* § 692.202(3)(a), (6)(b), (9).[1]

15.     Defendant Meredith Ivey is Acting Florida Secretary Economic Opportunity and heads the Florida Department of Economic Opportunity ("DEO"). *Id.* § 20.60(2). DEO is one of the agencies charged with implementing and enforcing Florida's New Alien Land Law. *Id.* §§ 692.203(3)(a), (10), .204(7)(b), (10).

16.     Defendant Patricia Fitzgerald is Chair of the Florida Real Estate Commission ("FREC"). In that role, she may exercise all of FREC's powers, except disciplinary and rulemaking powers. *Id.* § 475.03. FREC is one of the agencies charged with implementing Florida's New Alien Land Law. *Id.* §§ 692.202(5)(c), .203(6)(c), .204(6)(c).

---

[1]   Citations to the provisions of SB 264 are to the statutory sections where it is to be codified.

### III.  JURISDICTION AND VENUE

17.    This Court has subject-matter jurisdiction over this action pursuant to: 28 U.S.C. § 1331 because this action arises under the U.S. Constitution and federal law; 28 U.S.C. § 1343 and 42 U.S.C. § 1983 because this action seeks to redress the deprivation of and infringement upon, under color of state law, rights, privileges, and immunities secured by the U.S. Constitution or federal law providing for the equal rights of all persons within the jurisdiction of the United States; and 42 U.S.C. § 3613 because this action is based upon a violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, which prohibits discrimination in real estate transactions.

18.    There is an actual, present, justiciable controversy between the parties within the meaning of Article III of the U.S. Constitution, as the recent enactment of Florida's New Alien Land Law constitutes a present and continuing infringement of Plaintiffs' federal constitutional and civil rights.

19.    This Court has authority to grant declaratory relief in this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, as well as 28 U.S.C. § 1343, 42 U.S.C. §§ 1983 and 3613, and Rule 57 of the Federal Rules of Civil Procedure.

20.    In addition, this Court has authority to grant injunctive relief in this action under the All Writs Act, 28 U.S.C. § 1651, as well as 28 U.S.C. § 1343,

42 U.S.C. §§ 1983 and 3613, and Rule 65 of the Federal Rules of Civil Procedure.

21.     This Court has personal jurisdiction over Defendants, all of whom are either elected or appointed Florida state officials, working or residing in Florida. The Court's exercise of jurisdiction over Defendants in their official capacities as Florida state government officials is appropriate pursuant to *Ex Parte Young*, 209 U.S. 123 (1909).

22.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because one or more defendants reside in the judicial district in which this Court is based and a substantial part of the events or omissions giving rise to the claims herein occurred in the judicial district in which this Court is based.

## IV.  STATEMENT OF FACTS

### A.     The Enactment of Florida's Alien Land Law and Its Background

23.     Florida's New Alien Land Law was enacted as part of a larger law, Senate Bill 264. This lawsuit raises claims with respect to the portions of SB 264 establishing prohibitions on landownership based on race, ethnicity, color, alienage, and national origin, which are to be codified as Part III of Chapter 692 of the Florida Statutes at Sections 692.201 through 692.205, formally titled, "Conveyances to Foreign Entities."

24.     SB 264 and its companion measure, HB 1355, were introduced in the Florida Senate and House on March 2, 2023. After several amendments in both

chambers, the Legislature passed SB 264 on May 4, 2023.

25.    On May 8, SB 264 was presented in its final form to Governor Ron DeSantis. Within hours, Governor DeSantis signed it into law, along with two other pieces of legislation, SB 258 and SB 846, all of which are focused on restricting the rights of Chinese people based on race, ethnicity, color, alienage, and national origin. Laws of Fla. chs. 2023-32 (CS for CS for SB 258), 2023-34 (CS for CS for SB 846). According to Governor DeSantis, all three bills are purportedly meant to "counteract the malign influence of the Chinese Communist Party in the state of Florida."[2]

26.    That same day, Governor DeSantis held a press conference titled "Stop CCP Influence." At the press conference, Governor DeSantis stated:

> Florida is taking action to stand against the United States' greatest geopolitical threat—the Chinese Communist Party. I'm proud to sign this legislation to stop the purchase of our farmland and land near our military bases and critical infrastructure by Chinese agents, to stop sensitive digital data from being stored in China, and to stop CCP influence in our education system from grade school to grad school. We are following through on our commitment to crack down on Communist China.[3]

27.    Despite the rhetoric, in 2022, Chinese buyers were involved in only 0.1 percent of all real estate purchases in Florida—they purchased only one out of

---

[2]   Press Release, *Governor Ron DeSantis Cracks Down on Communist China* (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china/.
[3]   *Id.*

every 1,000 residential properties sold in the state. Chinese buyers did not even crack the top-ten list of foreign buyers by country in 2022, with Chinese buyers constituting no more than two percent of all foreign buyers.[4]

28.    At his press conference, Governor DeSantis presented no evidence that Chinese buyers of property in Florida are agents of the Chinese Communist Party or have caused harm to national security. Indeed, the State of Florida has failed to identify any nexus between real estate ownership by Chinese citizens in general and purported harm to national security.

29.    Florida's New Alien Land Law severely restricts ownership of real estate by Chinese buyers. Not only are there strict prohibitions regarding foreign ownership and purchases of agricultural land and real property within ten miles of a military installation or critical infrastructure facility, but the new law goes so far as to categorically ban Chinese people from owning and acquiring any kind of real property in Florida, with only narrow exceptions.

30.    The new landownership restrictions will take effect in Florida on July 1, 2023. Laws of Fla. ch. 2023-33 § 12, at 18.

---

[4]    Florida Realtors, *2022 Profile of International Residential Transactions in Florida* at 6–8, https://www.floridarealtors.org/sites/default/files/basic-page/attachments/2023-04/2022%20Profile%20of%20International%20Residential%20Transactions%20in%20Florida.pdf (last accessed May 22, 2023). In 2022, the largest share of foreign buyers in Florida were buyers from Latin America and the Caribbean (45 percent), followed by buyers from North America (21 percent), Europe (18 percent), Asia and Oceania (7 percent), and Africa (1 percent). *Id.* at 7.

**B.**   **The Statutory Scheme for Implementing and Enforcing Florida's New Alien Land Law**

31.    Florida's New Alien Land Law establishes, *inter alia*, prohibitions on landownership in the state based on race, ethnicity, color, alienage, and national origin.

32.    There are two main categories of landownership prohibitions under Florida's New Alien Land Law. The first category applies to certain people from "foreign countries of concern," including China, and prohibits them from owning or acquiring any agricultural land and real property within ten miles of a military installation or critical infrastructure facility, subject to narrow exceptions. The second category of prohibitions is even more restrictive: it applies specifically to certain people from China, singling them out based on race, ethnicity, color, alienage, and national origin and prohibiting them from owning or acquiring any real property in the State of Florida, subject to narrow exceptions.

### i.   *Provisions Targeting "Foreign Principals" from Seven Specific "Foreign Countries of Concern"*

33.    Sections 692.202 and 692.203 of the Florida Statutes prohibit "foreign principals" from specific "foreign countries of concern" from acquiring certain kinds of land in the State of Florida. Specifically, the prohibitions extend to two kinds of land: (i) agricultural land, Fla. Stat. § 692.202(1), and (ii) real property on or within ten miles of any military installation or critical infrastructure facility, *Id.*

§ 692.203(1).

34.    However, "critical infrastructure facility"[5] and "military installation"[6] are so broadly defined under Florida's New Alien Land Law that they bar affected individuals from being able to purchase property across much of the state.

35.    With respect to real estate in both contexts, the law defines the term "foreign country of concern" as: "the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, the Democratic People's Republic of Korea, the Republic of Cuba, the Venezuelan regime of Nicolas Maduro, or the Syrian Arab Republic, including any agency of or any other entity of significant control of such foreign country of concern." *Id.* § 692.201(3).

36.    For each "foreign country of concern," the law prohibits certain persons, called "foreign principals," from landownership. The term "foreign principal" includes "[a]ny person who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States," *Id.* § 692.201(4)(d), and "[a] partnership, association, corporation, organization, or

---

[5]    "Critical infrastructure facility" is defined as "any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons: (a) A chemical manufacturing facility[;] (b) A refinery[;] (c) An electrical power plant as defined in s. 403.031(2)[;] (d) A water treatment facility or waste water treatment plant[;] (e) A liquid natural gas terminal[;] (f) A telecommunications central switching office[;] (g) A gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas[;] (h) A seaport as listed in s. 311.09[;] (i) A space port territory defined in s. 331.303(18)[;] (j) An airport as defined in s. 333.01." Fla. Stat. § 692.201(2).

[6]    "Military installation" is defined as "a base, camp, post, station, yard, or center encompassing at least 10 contiguous acres that is under the jurisdiction of the Department of Defense or its affiliates." Fla. Stat. § 692.201(5).

other combination of persons organized under the laws of or having its principal place of business in a foreign country of concern, or a subsidiary of such entity," *Id.* § 692.201(4)(c).

37. Florida's New Alien Land Law prohibits "foreign principals" from each "foreign country of concern" from "directly or indirectly own[ing], having a controlling interest in, acquir[ing] by purchase, grant, devise, or descent" any agricultural land or real property within ten miles of any military installation or critical infrastructure facility, or any interest therein, "except a de minimus [*sic*] indirect interest." *Id.* §§ 692.202(1), .203(1). The law requires FDACS to adopt rules implementing its provisions regulating agricultural land, *id.* § 692.202(9), and requires DEO to adopt rules implementing the provisions of the law regulating real property on or within ten miles of any military installation or critical infrastructure facility, *id.* § 692.202(10).

38. Exceptions to Florida's New Alien Land Law are limited.

39. Although "foreign principals" may continue to own property subject to the law's restrictions if they acquired it before July 1, 2023, they are prohibited from purchasing any additional agricultural land or real property within ten miles of a military installation or critical infrastructure facility. *Id.* §§ 692.202(2), .203(2).

40. Further, "foreign principals" who owned such property before July 1,

2023, must register their properties. Agricultural property holdings must be registered with FDACS, *id.* § 692.202(3)(a), and real property on or within ten miles of any military installation or critical infrastructure facility must be registered with DEO, *id.* § 692.203(3)(a). Failure to file a timely registration is subject to a civil penalty of $1,000 for each day the registration is late and may result in a lien being placed on the real property for unpaid penalties. *Id.* §§ 692.202(3)(b), .203(3)(b).

41.    Under Florida's New Alien Land Law, if a "foreign principal" acquires agricultural land or real property within ten miles of a military installation or critical infrastructure facility on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, the "foreign principal" must sell, transfer, or otherwise divest itself of such land within three years after acquiring the property. *Id.* §§ 692.202(4), .203(5).

42.    Beyond this, the new law contains only a narrow exception allowing a "foreign principal" who is a natural person with a valid non-tourist visa or who has been granted asylum to purchase one residential real property—and *only if* the property is less than two acres and is not within five miles of a military installation. *Id.* § 692.203(4). There is no exception for purchases of agricultural land.

43.    "Foreign principals" owning or acquiring property in violation of the foregoing prohibitions are subject to civil forfeiture of their property. *Id.*

§§ 692.202(6)(a), .203(7)(a). Under the new law, FDACS is the state agency authorized to initiate a civil action for the forfeiture of agricultural land, *id.* § 692.202(6)(b), and DEO is authorized to initiate a civil action for the forfeiture of real property on or within ten miles of any military installation or critical infrastructure facility, *id.* § 692.203(7)(b).

44.   The law also creates criminal penalties for "foreign principals" who purchase or acquire agricultural land or real property on or within ten miles of any military installation or critical infrastructure facility in violation of the foregoing prohibitions. Such a violation constitutes a second-degree misdemeanor. *Id.* §§ 692.202(7), .203(8).

45.   Likewise, a person who knowingly sells these prohibited kinds of real property or interests therein to "foreign principals" in violation of the new prohibitions commits a second-degree misdemeanor. *Id.* §§ 692.202(8), .203(9).

46.   Second-degree misdemeanors are punishable by up to 60 days' imprisonment and a fine of $500. *Id.* §§ 775.082(4)(b), .083(1)(e).

47.   Finally, the law also imposes new requirements on *all* buyers within the state. At the time of purchase, buyers of agricultural land or real property on or within ten miles of any military installation of critical infrastructure facility are now required to provide an affidavit signed under penalty of perjury attesting, *inter alia*, that the buyer is not a "foreign principal" from a prohibited "foreign country

of concern." *Id.* §§ 692.202(5)(a), .203(6)(a). The law delegates the responsibility for adopting rules to implement this provision to FREC, including rules establishing the form for the affidavit. *Id.* §§ 692.202(5)(c), .203(6)(c).

> ### *ii.   Provisions Targeting Chinese Persons Based on Their Race, Ethnicity, Color, Alienage, and National Origin*

48.     While sections 692.202 and 692.203 prohibit persons from multiple countries, including China, from owning and acquiring certain lands, section 692.204 singles out people from China and imposes even more restrictive limitations on their ownership and acquisition of real property in Florida. Glaringly, section 692.204 imposes significantly harsher criminal punishments do 692.202 and 692.203.

49.     The central feature of the new law is that it broadly prohibits Chinese persons from purchasing or acquiring *any* real property, or interests in real property, within Florida based on their race, ethnicity, color, alienage, and national origin. *See* Fla. Stat. §§ 692.201(6) (defining real property as "land, buildings, fixtures, and all other improvements to land"), .204(1)(a) (imposing a categorical prohibition regarding "real property in this state").

50.     In addition, section 692.204 imposes harsh criminal sanctions on Chinese people who purchase properties in violations of the law—sanctions that are much harsher than those imposed on violators of sections 692.202 and 692.203.

51.     The prohibition applies to any "[a]ny person who is domiciled in the

People's Republic of China and who is not a citizen or lawful permanent resident of the United States." *Id.* § 692.204(1)(a)(4). Under the new law, DEO is responsible for adopting rules to implement this prohibition. *Id.* § 692.204(10).

52.     Like sections 692.202 and 692.203, section 692.204 prohibits these Chinese persons from directly or indirectly owning or having any controlling interest in any real property within the state, "except for a de minimus [*sic*] indirect interest." *Id.* § 692.204(1)(a).

53.     Section 692.204's other provisions—those relating to exceptions to the new law, civil forfeiture proceedings, registration requirements, civil penalties, criminal sanctions, and purchaser disclosure requirements—all mirror those of sections 692.202 and 692.203. The only relevant difference is that the criminal penalties for violating section 692.204 are ***much more severe*** than for violating 692.202 and 692.203.

54.     Violations of the new law by Chinese persons is a third-degree felony, *id.* § 692.204(8), punishable by up to five years' imprisonment and a fine of up to $5,000, *id.* §§ 775.082(3)(e), .083(1)(c).

55.     The sale of real property to a Chinese person in violation of the new law constitutes a first-degree misdemeanor, *id.* § 692.204(9), punishable by up to one year imprisonment and a fine of $1,000, *id.* §§ 775.082(4)(a), .083(1)(d).

**C.**   **The Impact of Florida's New Alien Land Law and the Harm It Is Causing Chinese People in Florida**

56.   Plaintiffs in this action are people living in Florida and a Florida-based real estate company who are currently suffering, or imminently will suffer, the direct impact of Florida's New Alien Land Law.

57.   As detailed below, the individual plaintiffs in this case lawfully reside in Florida but may be considered domiciled in China due to their nonimmigrant visa status under U.S. immigration law.

58.   The term "domicile" is not defined in Florida's New Alien Land Law, but the term typically refers to a person's true, principal, and permanent home. The nature of a nonimmigrant visa, however, is a temporary one and not intended to be a mechanism by which a foreign citizen establishes permanent residency in the United States.[7]

59.   Thus, Plaintiffs, by virtue of having nonimmigrant visas, cannot be said to have established permanent residency in the United States, and therefore it is substantially likely that the State of Florida will deem them to be domiciled in their country of origin, China.

---

[7]   The U.S. Department of Homeland Security states: "A nonimmigrant visa (NIV) is issued to a person with permanent residence outside the United States but wishes to be in the United States on a temporary basis for tourism, medical treatment, business, temporary work, or study, as examples." U.S. Customs and Border Protection, *What is the Difference Between an Immigrant Visa vs. Nonimmigrant Visa?*, https://help.cbp.gov/s/article/Article-72 (last accessed May 22, 2023).

60.     Plaintiff Yifan Shen is neither a citizen nor a permanent resident of the United States but has permission to stay and live in the United States as the holder of a valid H-1B visa, which is a nonimmigrant worker visa. Ms. Shen has lived in the United States for seven years and has lived in Florida for the past four years. She is not a member of the Chinese government or of the Chinese Communist Party. She has a master's degree in science and is working as a registered dietitian in Florida. In April 2023, Ms. Shen signed a contract to buy a single-family home in Orlando to serve as her primary residence. The property, which is a new construction, appears to be located within ten miles of a critical infrastructure facility and within five miles of a military installation. The estimated closing date for Ms. Shen's new property is in December 2023. Because Ms. Shen's closing date is after July 1, 2023, Florida's New Alien Land Law will prevent Ms. Shen from acquiring her new home, specifically, by forcing her to cancel the contract for the purchase and construction of her new property. Fla Stat. §§ 692.203(1), .204(1). Ms. Shen stands to lose all or part of her $25,000 deposit if the law goes into effect and she is forced to cancel the real estate contract.

61.     Plaintiff Zhiming Xu is neither a citizen nor a permanent resident of the United States but has temporary permission to stay and live in the United States as a political asylee. Prior to coming to the United States, Mr. Xu was persecuted by the Chinese government and had to flee to the United States, where he has

applied for political asylum. He is not a member of the Chinese government or of the Chinese Communist Party. He has a bachelor's degree and is managing and repairing short-term rental properties in Florida. Mr. Xu has lived in the United States and Florida for the past four years. In early 2023, Mr. Xu signed a contract to buy a single-family home near Orlando. The property appears to be located within ten miles of a critical infrastructure facility. The estimated closing date for Mr. Xu's property is in September 2023. Because Mr. Xu's closing date is after July 1, 2023, Florida's New Alien Land Law will prevent Mr. Xu from acquiring his new home—specifically, by forcing him to cancel the contract for the purchase of his new property. Mr. Xu stands to lose all or part of his $31,250 deposit if the law goes into effect and he is forced to cancel the real estate contract.

62.     Plaintiff Xinxi Wang is neither a citizen nor a permanent resident of the United States but has permission to stay and live in the United States as the holder of a valid F-1 visa, which is a nonimmigrant visa for international students. Ms. Wang has lived in the United States and in Florida for the past five years. She is not a member of the Chinese government or of the Chinese Communist Party. She is currently pursuing her Ph.D. degree in earth systems science at a Florida university. Ms. Wang owns a home in Miami, which is her primary residence. Ms. Wang is also devoted Christian who worships with a congregation in the Miami area, about ten minutes from her home. As an owner of real property in Florida,

Ms. Wang will be required to register her property with DEO under Florida's New Alien Land Law. Fla. Stat. § 692.204(4). In addition, because Ms. Wang's property appears to be located within ten miles of a critical infrastructure facility, Ms. Wang is further subject to the law's registration requirement. *Id.* § 692.203(3). This registration requirement is burdensome, discriminatory, and stigmatizing to Ms. Wang.

63. Plaintiff Yongxin Liu is neither a citizen nor a permanent resident of the United States but has permission to stay and live in the United States as the holder of a valid H-1B visa, which is a nonimmigrant worker visa. Mr. Liu has lived in the United States for five years and in Florida for four years. He is not a member of the Chinese government or of the Chinese Communist Party. He is an assistant professor at a Florida university in the field of data science. He owns a property close to Daytona Beach, which is his primary residence. As an owner of real property in Florida, Mr. Liu will be required under Florida's New Alien Land Law to register his property with DEO. Fla. Stat. § 692.204(4). In addition, because Mr. Liu's property appears to be located within ten miles of a critical infrastructure facility, Mr. Liu is further subject to the law's registration requirement. *Id.* § 692.203(3). This registration requirement is burdensome, discriminatory, and stigmatizing to Mr. Liu.

64. Mr. Liu also has plans to purchase a second property in the vicinity of

Pelican Bay, Florida, for his and his parents' use as a vacation home. However, Mr. Liu will be prohibited from purchasing a second property under the new law. *Id.* § 692.204(1), (3). Furthermore, there is a substantial likelihood that the second property would be within ten miles of a military installation or critical infrastructure facility, resulting in an additional prohibition on the purchase under the new law. *Id.* § 692.203(1), (2).

65.    Due to Florida's New Alien Land Law, Mr. Liu reasonably fears that real estate agents will refuse to represent him because he is Chinese, that he will be disadvantaged when bidding on property because he is Chinese, and that his search for real estate will be more costly, time-consuming, and burdensome as a result. *See id.* §§ 692.203(8), .204(9).

66.    Plaintiff Multi-Choice Realty, LLC is a real estate brokerage firm that primarily serves Chinese-speaking clients in the United States and China. Multi-Choice Realty is not owned or controlled by the Chinese government or the Chinese Communist Party. In 2022, Multi-Choice Realty was involved in 74 property acquisitions, the vast majority of which were for clients who were Chinese or Chinese Americans. Most of Multi-Choice Realty's existing customers and potential customers will be directly impacted by Florida's New Alien Land Law by being required to register their properties and by being prohibited from acquiring new properties. As a result, Multi-Choice Realty stands to lose more than

one-third of its business due to Florida's New Alien Land Law, which targets Multi-Choice Realty's customer base and prohibits much of its clientele from engaging in further real estate purchases with Multi-Choice Realty.

67.     The swathes of land now off-limits to Chinese persons under Florida's New Alien Land Law are extensive. The prohibitions on property purchases within ten miles of a "critical infrastructure facility" or a "military installation"—both of which are broadly and vaguely defined—will have the net effect of creating "Chinese exclusion zones" that will cover immense portions of Florida, including many of the state's most densely populated and developed areas.

68.     As a result of Florida's New Alien Land Law, there is a substantial likelihood that sellers of real estate will discriminate against Plaintiffs and other people of Chinese descent even for transactions that are permitted, as sellers will seek to broadly avoid Chinese buyers given the criminal penalties imposed for selling property in violation of the new law.

69.     Finally, Florida's New Alien Land Law is having and will have far-reaching stigmatizing effects among people of Chinese and Asian descent in Florida, including Plaintiffs, as Florida law deems them a danger to the United States. This impact is exactly what laws like the Chinese Exclusion Act of 1882 and the California Alien Land Law of 1913 did more than a hundred years ago.

### D.     The Federal Government's Role in Foreign Affairs, Foreign Investment, and National Security

70.     The federal government manages foreign affairs, foreign investment, and national security in the United States, including through two federal regimes: (i) the Committee on Foreign Investment in the United States ("CFIUS"), which has been empowered to review foreign investment transactions, and (ii) the Office of Foreign Assets Control ("OFAC") within the U.S. Treasury Department, which administers and enforces economic regulations and trade sanctions.

### i.     History of CFUIS

71.     CFIUS was established on May 7, 1975 by President Ford through an executive order. E.O. 11858, 40 F.R. 20263. Upon its establishment, CFUIS became the interagency body of the federal executive branch responsible for overseeing issues of national security with respect to direct foreign investment, including real estate transactions. CFUIS was directed to, *inter alia*, monitor trends and developments in foreign investment in the United States, prepare guidance for foreign governments and consult regarding prospective major foreign governmental investments in the United States, review foreign investments that could have major implications for the national security interests of the United States, and consider proposals for new legislation or regulations relating to foreign investment as necessary.

72.     Later, Congress enacted the Exon-Florio amendment to the Defense

Production Act, included in the Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 5021, 102 Stat. 1107, 1425–26. It established a mechanism for the federal executive branch to engage in a retrospective review of foreign investments. On December 27, 1988, President Reagan then delegated that power to CFIUS by executive order, empowering it to conduct reviews, undertake investigations, and make recommendations with respect to foreign investment data and policies. E.O. 12661, 54 F.R. 779. By 1991, the Department of the Treasury promulgated federal regulations implementing the Exon-Florio amendment, which were codified at 31 C.F.R. Part 800.

73.     The next year, Congress amended the Exon-Florio provision with the Byrd Amendment to the National Defense Authorization Act for Fiscal Year 1993, Pub. L. No. 102-484, § 837, 106 Stat. 2315, 2463–65 (1992). The Byrd Amendment broadened CFIUS's duties to investigate certain foreign investments, in particular, those in which the acquirer was controlled or acting on behalf of a foreign government, and those in which the acquisition would result in the control of a person engaged in interstate commerce within the United States that could affect national security.

74.     Eventually, Congress passed, and President Bush signed, the Foreign Investment and National Security Act of 2007 ("FINSA"), Pub. L. No. 110-49, 121 Stat. 246, giving Congress further oversight of CFIUS. FINSA also expanded the

national security prerogatives within CFIUS's purview and required CFIUS to engage in even greater scrutiny of foreign direct investments. It also concretized CFIUS's position as a permanent federal agency by codifying it and granting it statutory authority, including certifying to Congress that a transaction that had been reviewed had no unresolved national security issues and providing Congress with confidential briefings, as well as annual classified and unclassified reports.

75.     Most recently, Congress passed the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. No. 115-232, §§ 1701–28, 132 Stat. 2174–2207, which President Trump signed into law. The impetus for FIRRMA was the concern by many members of Congress over Chinese companies' growing investment in the United States. In response, Congress significantly expanded CFIUS's authority to investigate and review foreign investments. Most notably, CFIUS was granted jurisdiction to review certain real estate transactions by foreign persons, specifically, those in close proximity to a military installation, or to a U.S. government facility or property sensitive to national security. Congress also empowered CFIUS to review changes in foreign investor rights regarding U.S. businesses, as well as transactions in which a foreign government has a direct or indirect substantial interest. FIRRMA further authorized CFIUS to designate some countries as "countries of special concern" based on CFIUS's assessment as to whether that country has demonstrated or

declared a strategic goal of acquiring a type of critical technology or critical infrastructure that would affect U.S. national security interests. In that regard, FIRRMA also formalized CFUIS's use of risk-based assessments to determine whether certain transactions pose threats to national security.

### ii.   History of OFAC

76.   In addition to the CFIUS regime, the U.S. Treasury Department, through OFAC, is heavily involved with administering and enforcing economic and trade sanctions in support of U.S. national security and foreign policy objectives, including those authorized by Congress and the President pursuant to the International Emergency Economic Powers Act of 1977 ("IEEPA"), Pub. L. No. 95-223, §§ 201–08, 91 Stat. 1625, 1626–29. The Division of Foreign Assets Control, OFAC's immediate predecessor, was established under the Treasury Department in 1950. OFAC derives its authority from a variety of federal laws regarding economic sanctions and embargoes, particularly IEEPA.

77.   One of OFAC's primary duties is to prevent "prohibited transactions," which it defines as "trade or financial transactions and other dealings in which U.S. persons may not engage unless authorized by OFAC or expressly exempted by statute." OFAC administers and enforces economic sanctions programs against countries, businesses, and groups of individuals, using the blocking of assets and trade restrictions to accomplish foreign policy and national security goals. It

maintains and regularly updates several sanction lists identifying countries, entities, and individuals considered to be threats to national security.

78.     In sum, the federal government—through statutes, executive orders, executive agencies, and inherent powers—occupies the fields of foreign affairs, foreign investment, national security, and the intersection thereof.

## COUNT ONE

**Violation of the Right to Equal Protection
Under the 14th Amendment and 42 U.S.C. § 1983
(By All Individual Plaintiffs Against All Defendants)**

79.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 69 as though fully set forth herein.

80.     The Equal Protection Clause of the 14th Amendment to the U.S. Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

81.     The Equal Protection Clause protects all persons in the United States, regardless of their race, ethnicity, color, alienage, or national origin, including Plaintiffs.

82.     The Equal Protection Clause prohibits the States from denying any person equal protection of the laws based on the person's race, ethnicity, color, alienage, or national origin. This includes laws that appear neutral on their face but are motivated by discriminatory intent and result in discriminatory practices or

disparate treatment due to race, ethnicity, color, alienage, or national origin.

83.    The new prohibitions on landownership target Plaintiffs, who are Chinese persons. As described above, the State of Florida appears to classify Plaintiffs as "foreign principals" from "foreign countries of concern" pursuant to section 692.201. As such, Plaintiffs are subject to the prohibitions of section 692.202 relating to agricultural lands and section 692.203 relating to real property on or within ten miles of a military installation or critical infrastructure facility.

84.    Similarly, the State of Florida appears to classify Plaintiffs as prohibited "persons" pursuant to section 692.204. As such, Plaintiffs are subject to the prohibitions of section 692.204 relating to all real property and interests therein.

85.    The classifications, prohibitions, penalties, and requirements that Plaintiffs are subject to under Florida's New Alien Land Law are based on Plaintiffs' race, ethnicity, color, alienage, and national origin.

86.    Florida's New Alien Land Law violates the Equal Protection Clause on the following grounds:

     a. The law was enacted with the purpose and intent to discriminate against persons based on race, ethnicity, color, alienage, and national origin, in particular, Chinese persons.

     b. The law makes impermissible classifications based on race, ethnicity,

color, alienage, and national origin that are not justified by a compelling state interest.

c.  The law is not narrowly tailored to meet a compelling state interest.

d.  The law invidiously targets persons based on their race, ethnicity, color, alienage, and national origin, particularly Chinese persons, resulting in discriminatory practices and disparate treatment.

e.  The law deprives Chinese persons from equal protection of the laws, including laws relating to their fundamental rights.

87.  The enactment and imminent enforcement of the new prohibitions on landownership embodied by Florida's New Alien Land Law have caused and will continue to cause ongoing and irreparable harm to Plaintiffs. Plaintiffs have and will continue to be discriminated against and subject to disparate treatment based on their race, ethnicity, color, alienage, and national origin simply because they are Chinese persons within the meaning of the new law.

88.  In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges and immunities granted under the U.S. Constitution and federal law.

## COUNT TWO

### Violation of the Right to Procedural Due Process
### Under the 14th Amendment and 42 U.S.C. § 1983
### (By All Individual Plaintiffs Against All Defendants)

89.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 69 as though fully set forth herein.

90.     The Due Process Clause of the 14th Amendment provides: "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]"

91.     The protections of the Due Process Clause apply to all persons in the United States, regardless of their race, ethnicity, color, alienage, and national origin, including Plaintiffs.

92.     The Due Process Clause protects the fundamental rights and liberty interests of all persons in the United States from unreasonable governmental interference through state action, including that which is arbitrary, irrational, oppressive, discriminatory, and egregious. This entails the right to procedural due process, which consists, at a minimum, of fair notice and an opportunity to be heard.

93.     The new prohibitions on landownership target the individual Plaintiffs, who are Chinese persons. As described above, the State of Florida appears to classify Plaintiffs as "foreign principals" from "foreign countries of

concern" pursuant to section 692.201. As such, Plaintiffs are subject to the prohibitions of section 692.202 relating to agricultural lands and section 692.203 relating to real property on or within ten miles of a military installation or critical infrastructure facility.

94.    Similarly, the State of Florida appears to classify Plaintiffs as prohibited "persons" pursuant to section 692.204. As such, Plaintiffs are subject to the prohibitions of section 692.204 relating to real property and interests therein.

95.    Florida's New Alien Land Law violates the Due Process Clause under the 14th Amendment to the U.S. Constitution on the following grounds:

  a. The law is impermissibly vague, indefinite, and ambiguous because it fails to clearly define "critical infrastructure facility," "military installation," and "domicile," and therefore fails to provide sufficient notice about which properties and persons are subject to its classifications, prohibitions, penalties, and requirements.

  b. The law is impermissibly vague, indefinite, and ambiguous because it fails to provide sufficient notice as to where the ten-mile and five-mile exclusion zones tied to the covered critical infrastructure facilities and military installations begin and end.

96.    The enactment and enforcement of the new prohibitions on landownership embodied by Florida's New Alien Land Law have caused and will

continue to cause ongoing and irreparable harm to Plaintiffs.

97.    In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

## COUNT THREE

**Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.***
**(By All Plaintiffs Against All Defendants)**

98.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 69 as though fully set forth herein.

99.    The Fair Housing Act establishes that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing through the United States." 42 U.S.C. § 3601.

100.    The Fair Housing Act applies to all "dwellings," which are defined as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereof of any such building, structure, or portion thereof." *Id.* § 3602(b).

101.    The protection of the Fair Housing Act extends to all persons in the United States, including Plaintiffs. Specifically, the Fair Housing Act defines "person" as including "one or more individuals, corporations, partnerships,

associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11, receivers, and fiduciaries." *Id.* § 3602(d).

102.   The Fair Housing Act empowers any person who is aggrieved under the law to make a claim. *Id.* § 3613(a). The definition of "aggrieved person" includes any person who either "claims to have been injured by a discriminatory housing practice[,] or believes that such person will be injured by a discriminatory housing practice that is about to occur." *Id.* § 3602(i).

103.   Under the Fair Housing Act, 42 U.S.C. § 3604, it is an unlawful discriminatory housing practice:

> (a) To refuse to sell . . . after the making of a bona fide offer, or to refuse to negotiate for the sale . . . of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, . . . or national origin.

> (b) To discriminate against any person in the terms, conditions, or privileges of sale . . . of a dwelling, or in the provision of services of facilities in connection therewith, because of race, color, . . . or national origin.

> (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale . . . of a dwelling that indicates any preference, limitation, or discrimination based on race, color, . . . or national origin, or an intention to make any such preference, limitation, or discrimination.

> (d) To represent to any person because of race, color, . . . or national origin that any dwelling is not available for

. . . sale . . . when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell . . . any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, . . . or national origin.

104. The Fair Housing Act also makes it "unlawful for any person . . . whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms of conditions of such a transaction, because of race, color, . . . or national origin." *Id.* § 3605(a). This provision relating to "residential real estate-related transaction[s]" includes "[t]he making or purchasing of loans or providing other financial assistance . . . [and] [t]he selling, brokering, or appraising of residential real property."

105. The new prohibitions on landownership target the individual Plaintiffs, who are Chinese persons. As described above, the State of Florida appears to classify Plaintiffs as "foreign principals" from "foreign countries of concern" pursuant to section 692.201. As such, Plaintiffs are subject to the prohibitions of section 692.202 relating to agricultural lands and section 692.203 relating to real property on or within ten miles of a military installation or critical infrastructure facility.

106. Similarly, the State of Florida appears to classify Plaintiffs as

prohibited "persons" pursuant to section 692.204. As such, Plaintiffs are subject to the prohibitions of section 692.204 relating to real property and interests therein.

107.   The classifications, prohibitions, penalties, and requirements that Plaintiffs are subject to under Florida's New Alien Land Law are based on Plaintiffs' race, color, and national origin.

108.   Due to Florida's New Alien Land Law, Plaintiff Multi-Choice Realty is and will be unable to facilitate real estate transactions that would close after July 1, 2023, and that are barred by the law's discriminatory classifications, prohibitions, and penalties.

109.   Florida's New Alien Land Law violates the Fair Housing Act on the following grounds:

   a.   The law establishes a discriminatory housing practice that purports to require or permit action that would violate the Fair Housing Act, and therefore, is presumptively invalid as a matter of law.

   b.   The law discriminates against persons based on their race, color, and national origin, particularly Chinese persons, with respect to dwellings and residential real estate-related transactions.

   c.   The law invidiously targets persons based on their race, color, and national origin, particularly Chinese persons, resulting in discriminatory practices and disparate treatment with respect to

dwellings and residential real estate-related transactions.

110. The enactment and enforcement of the new prohibitions on landownership in Florida's New Alien Land Law have caused and will continue to cause ongoing and irreparable harm to Plaintiffs. Plaintiffs have and will continue to be discriminated against and subject to disparate treatment based on their race, color, and national origin simply because they are Chinese persons within the meaning of the new law.

## COUNT FOUR

**Violation of the Supremacy Clause of the U.S. Constitution
Preemption by Federal Regimes Governing
Foreign Affairs, Foreign Investment, and National Security
(By All Plaintiffs Against All Defendants)**

111. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as though fully set forth herein.

112. The Supremacy Clause of the U.S. Constitution states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution of Laws of any State to the Contrary notwithstanding." U.S. Const., Art. VI, Para. 2.

113. The Supremacy Clause establishes the doctrine of federal preemption, which mandates that federal law preempts state law in any area over which

Congress has expressly or impliedly reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law or objectives.

114.   Pursuant to the Supremacy Clause, Florida's New Alien Land Law is preempted by federal regimes governing foreign affairs, foreign investment, and national security, including CFIUS and OFAC within the U.S. Treasury Department. Under federal law, CFIUS is authorized, *inter alia*, to review foreign investment transactions with respect to national security concerns, as well as to review real estate transactions by foreign persons, specifically, those pertaining to properties in close proximity to military installations, U.S. government facilities, or properties of national security sensitivity. OFAC is responsible for administering and enforcing economic regulations.

115.   It is unquestionable that foreign relations, the power to deal with national security threats posed by foreign countries, and foreign commerce are the exclusive powers of the federal government. Indeed, the U.S. Constitution vests the federal government the primary powers to manage foreign affairs and to regulate foreign commerce. *See, e.g.*, U.S. Const., Art. I, Sec. 10, Cl. 1, 3 (foreign affairs); U.S. Const., Art. I, Sec. 8, Cl. 3 (commerce with foreign nations).

116.   The federal government has long occupied the fields of foreign affairs, foreign investment, national security, and the intersection thereof,

especially with respect to foreign relations with China.

117.   All in all, given the comprehensiveness of federal schemes and the creation of multiple federal agencies to administer the schemes, federal law has "occupied" the entire field, thus precluding any state regulation even if state law is nonconflicting.

118.   The State of Florida explicitly stated its intent to regulate in these areas of foreign affairs and foreign investment, as they bear on national security, when enacting Florida's New Alien Land Law. The governor and legislators have repeatedly emphasized the need to take action "to stand against the United States' greatest geopolitical threat—the Chinese Communist Party."[8] Accordingly, the law violates the Supremacy Clause because it regulates a field exclusively occupied by the federal government, specifically, the intersection between foreign affairs, national security, and foreign investment, including foreign real estate acquisitions. In so doing, the new landownership prohibitions usurp the power vested by the Constitution and by Congress in the federal government to investigate, review, and take actions with respect to foreign investments, including real estate transactions, that raise issues of national security.

119.   In addition, the new landownership prohibitions intrude upon the

---

[8]   Press Release, *Governor Ron DeSantis Cracks Down on Communist China* (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china/.

federal government's power to govern foreign affairs, generally. By characterizing several countries as "foreign countries of concern," and by expressly singling out Chinese people, Florida's New Alien Land Law unconstitutionally seeks to establish its own foreign policy, thereby intruding upon the federal government's exclusive power to govern foreign affairs. *See, e.g.*, *Zschering v. Miller*, 389 U.S. 429 (1968).

120.   The new landownership prohibitions also intrude upon the federal government's power to govern foreign commerce, generally. By prohibiting "foreign principals" from specific "foreign countries of concern" from owning and acquiring land in Florida, the law discriminates against out-of-state individuals and entities based on race, ethnicity, color, alienage, and national origin, in particular, Chinese persons. The new law therefore unduly burdens international commerce, especially with respect to foreign investment.

121.   The enactment and pending enforcement of the new prohibitions on landownership embodied by Florida's New Alien Land Law have caused and will continue to cause Plaintiffs ongoing and irreparable harm.

122.   In implementing and enforcing the provisions of the law, Defendants are acting under color of state law to deprive Plaintiffs and other individuals of their rights, privileges, and immunities granted under the U.S. Constitution and federal law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and:

A.      Declare Florida's New Alien Land Law unconstitutional under the 14th Amendment to the U.S. Constitution because it violates Plaintiffs' rights to equal protection.

B.      Declare Florida's New Alien Land Law unconstitutional under the 14th Amendment to the U.S. Constitution because it violates Plaintiffs' rights to procedural due process.

C.      Declare that Florida's New Alien Land Law violates Plaintiffs' rights under the Fair Housing Act, 42 U.S.C. § 3601 *et seq*.

D.      Declare Florida's New Alien Land Law unconstitutional under the Supremacy Clause of the U.S. Constitution and preempted by federal law.

E.      Preliminarily and permanently enjoin Defendants from implementing and enforcing Florida's New Alien Land Law against Plaintiffs.

F.      Award Plaintiffs reasonable attorneys' fees and their costs of suit.

G.      Grant any other relief this Court deems just and proper.

Respectfully submitted this 22nd day of May, 2023,

 /s/ Nicholas L.V. Warren

Daniel B. Tilley (FBN 102882)
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2707
dtilley@aclufl.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Ashley Gorski*
Patrick Toomey*
Sarah Taitz*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org
ptoomey@aclu.org
staitz@aclu.org

Keliang (Clay) Zhu*
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
(925) 399-5856
czhu@dehengsv.com

Bethany Y. Li*
Elizabeth Koo*
**ASIAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932
bli@aaldef.org
ekoo@aaldef.org

Cody Wofsy*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
Email: cwofsy@aclu.org

*Attorneys for Plaintiffs*

*\* Motion for leave to appear pro hac vice forthcoming*