## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

YIFAN SHEN, *et al.*,

    *Plaintiffs*,

v.

WILTON SIMPSON, *etc., et al.*,

    *Defendants*.

Case No. 4:23-cv-208-AW-MAF

## PLAINTIFFS' EMERGENY MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs move the Court pursuant to Federal Rule of Civil Procedure 65(a) for a preliminary injunction enjoining Defendants from implementing and enforcing a new Florida law, SB 264, which imposes discriminatory prohibitions on ownership and purchase of real property based on alienage, national origin, race, and ethnicity. As fully explained in the following memorandum, Plaintiffs request a ruling on an emergency basis because without this Court's intervention, the law will go into effect on July 1, 2023, and Plaintiffs will be forced to cancel purchases of new homes, register their existing properties with the State under threat of severe penalties, and face the loss of significant business.

For the reasons set forth below, Plaintiffs respectfully request that the Court grant their motion and enjoin implementation and enforcement of SB 264's challenged provisions against Plaintiffs.

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**INTRODUCTION** .................................................................**10**

**STATEMENT OF FACTS** ..................................................**12**

I.    Background .................................................................12

II.   Florida's New Alien Land Law......................................13

III.  Harm to Plaintiffs .......................................................15

**ARGUMENT** .......................................................................**18**

I.    Plaintiffs are likely to prevail on the merits of their claims that SB 264 violates the Constitution and the Fair Housing Act. ....................................18

    A.    SB 264 violates the Equal Protection Clause.................................... 18

    B.    SB 264 violates the Fair Housing Act................................. 25

        1.    SB 264 violates Section 3604(a) of the FHA. ................... 25

        2.    Plaintiffs are "aggrieved persons" under the FHA. ............ 27

    C.    SB 264 violates the Due Process Clause because it is unconstitutionally vague. ................................. 28

        1.    SB 264 is unconstitutionally vague because it provides insufficient notice about which properties are subject to its restrictions. ...................................... 30

        2.    SB 264 is unconstitutionally vague because it provides insufficient notice about which individuals are subject to its restrictions. .............................. 33

        3.    SB 264 permits and encourages arbitrary and discriminatory enforcement.............................. 36

D.      SB 264 is preempted by federal law. .................................................. 37

       1.      Federal law strikes a careful balance in the regulation
of foreign real estate purchases. .......................................... 37

       2.      SB 264 conflicts with the federal regime and foreign
affairs authority. ................................................................. 41

II.     Plaintiffs will suffer irreparable harm as a result of SB 264. ........................48

III.    The balance of equities and the public interest both favor granting
preliminary injunctive relief. ..........................................................................51

**CONCLUSION** ...................................................................................................**52**

## TABLE OF AUTHORITIES

***Pages***

***Cases***

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................... 46

*Bangerter v. Orem City Corp.*,
    46 F.3d 1491 (10th Cir. 1995) .......................................... 26

*Bank of Am. Corp. v. City of Miami*,
    581 U.S. 189 (2017) ........................................................... 27

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*,
    425 F.3d 964 (11th Cir. 2005) .......................................... 49

*Bernal v. Fainter*,
    467 U.S. 216 (1984) ............................................... 18, 19, 24

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985) ........................................................... 19

*Colautti v. Franklin*,
    439 U.S. 379 (1979), *abrogated on other grounds*, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ................... 29

*Connally v. Gen. Constr. Co.*,
    269 U.S. 385 (1926) ........................................................... 36

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) ................................................... passim

*Crumble v. Blumthal*,
    549 F.2d 462 (7th Cir. 1977) ............................................ 27

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ........................................ 51

*Doe v. Wasden*,
    558 F. Supp. 3d 892 (D. Idaho 2021) ................................................ 49

*Ebsco Gulf Coast Dev., Inc. v. Salas as Tr. of Salas Child. Tr. dated*
    *Sept. 28, 2009*,
    No. 3:15-CV-586 (MCR)(EMT), 2016 WL 11189984 (N.D. Fla.
    Sept. 29, 2016) ................................................................................... 48

*Fla. Action Comm., Inc. v. Seminole Cnty.*,
    212 F. Supp. 3d 1213 (M.D. Fla. 2016) ............................................. 29

*Frick v. Webb*,
    263 U.S. 326 (1923) ........................................................................... 24

*Fujii v. State*,
    38 Cal. 2d 718 (1952) ......................................................................... 24

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ........................................................................... 20

*Graham v. Richardson*,
    403 U.S. 365 (1971) ............................................................... 18, 19, 24

*Greater Birmingham Ministries v. Sec'y of State for State of Ala.*,
    992 F.3d 1299 (11th Cir. 2021) ......................................................... 22

*Gresham v. Windrush Partners, Ltd.*,
    730 F.2d 1417 (11th Cir. 1984) .................................................... 49, 50

*Harris v. Mexican Specialty Foods, Inc.*,
    564 F.3d 1301 (11th Cir. 2009) ......................................................... 29

*High Ol' Times, Inc. v. Busbee*,
    673 F.2d 1225 (11th Cir. 1982) ......................................................... 29

*Hill v. Colorado*,
    530 U.S. 703 (2000) ..................................................................... 29, 36

*Hines v. Davidowitz*,
    312 U.S. 52 (1941) ............................................................................. 43

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ................................................................ 20

*Jackson v. Okaloosa Cnty.*,
    21 F.3d 1531 (11th Cir. 1994)................................................ 26, 27

*Johnson v. U.S. Dep't of Agric.*,
    734 F.2d 774 (11th Cir. 1984)................................................ 48

*Juarrero v. McNayr*,
    157 So. 2d 79 (Fla. 1963)..................................................... 34, 35

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006)............................................. 51

*Larkin v. State of Mich. Dep't of Soc. Servs.*,
    89 F.3d 285 (6th Cir. 1996).................................................. 26

*Matter of Cooke*,
    412 So.2d 340 (2019).......................................................... 34

*Minick v. Minick*,
    149 So. 483 (1933)............................................................. 33

*Namba v. McCourt*,
    185 Or. 579 (1949)............................................................. 24

*Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*,
    896 F.2d 1283 (11th Cir. 1990)............................................. 52

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
    715 F.3d 1268 (11th Cir. 2013).................................... passim

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) ............................................. 38, 46

*Rice v. Santa Fe Elevator Corporation Illinois Commerce Comm'n*,
    331 U.S. 218 (1947) ........................................................... 47

*Sackett v. EPA*,
    No. 21-454, 2023 WL 3632751 (U.S. May 25, 2023) ......................... 36

*Schaw v. Habitat for Human. of Citrus Cnty., Inc.*,
  938 F.3d 1259 (11th Cir. 2019) .................................................... 26, 27

*Sec'y, U.S. Dep't of Hous. & Urb. Dev. v. Blackwell*,
  908 F.2d 864 (11th Cir. 1990) ............................................................ 26

*Shaw v. Reno*,
  509 U.S. 630 (1993) .......................................................................... 19

*Siegel v. LePore*,
  234 F.3d 1163 (11th Cir. 2000) ..................................................... 18, 48

*State v. Oakland*,
  129 Mont. 347 (1955) ........................................................................ 24

*Strawser v. Strange*,
  44 F. Supp. 3d 1206 (S.D. Ala. 2015) ............................................... 51

*Swain v. Junior*,
  958 F.3d 1081 (11th Cir. 2020) ......................................................... 51

*Terrace v. Thompson*,
  263 U.S. 197 (1923) .......................................................................... 24

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmties. Project, Inc.*,
  576 U.S. 519 (2015) .......................................................................... 26

*Trafficante v. Metropolitan Life Ins. Co.*,
  409 U.S. 205 (1972) .......................................................................... 25

*United States v. Osorto*,
  995 F.3d 801 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 470 (2021) ................ 47

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ................................................................. 21, 23, 25

*Wollschlaeger v. Governor, Fla.*,
  848 F.3d 1293 (11th Cir. 2017) ......................................................... 28

## *Statutes*

31 C.F.R. § 802.1001 .................................................................................. 41

31 C.F.R. § 802.216 ................................................................................... 39

31 C.F.R. § 802.601 ................................................................................... 40

31 C.F.R. § 802.701 ................................................................................... 40

31 C.F.R. § 802.901 ............................................................................. 40, 44

31 C.F.R. Part 802 ............................................................................... 38, 43

42 U.S.C. § 3602 ....................................................................................... 25

42 U.S.C. § 3602 ....................................................................................... 27

42 U.S.C. § 3604 ....................................................................................... 25

42 U.S.C. § 3605 ....................................................................................... 26

42 U.S.C. § 3613 ....................................................................................... 27

42 U.S.C. § 3615 ....................................................................................... 25

42 U.S.C. § 3615 ....................................................................................... 26

50 U.S.C. § 4565 ....................................................................... 38, 39, 40, 43

8 U.S.C. § 1101 ......................................................................................... 34

8 U.S.C. § 1158 ......................................................................................... 34

Fla. Stat. § 222.17 ..................................................................................... 33

Fla. Stat. § 311.09 ..................................................................................... 31

Fla. Stat. § 333.01 ..................................................................................... 31

Fla. Stat. § 403.031(20) ............................................................................ 30

Fla. Stat. § 692.202 ................................................................................... 14, 15

Fla. Stat. § 692.203 .................................................................................. passim

Fla. Stat. § 692.204 .................................................................................. passim

Fla. Stat. § 775.082 ................................................................................... 14, 15

Fla. Stat. § 775.083 ......................................................................................... 15

House Bill No. 1355 ......................................................................................... 13

Laws of Fla. ch. 2023-33 ................................................................................. 10

### *Other Authorities*

84 Fed. Reg. at 50215 ...................................................................................... 38

E.O. 11858, 40 Fed. Reg. 20263 ..................................................................... 38

Foreign Investment and National Security Act of 2007, Pub. L. 110-
    49, 121 Stat. 246, July 26, 2007 .......................................................... 38

Foreign Investment Risk Review Modernization Act of 2018
    ("FIRRMA"), Pub. L. 115-232 ........................................................ 38, 39, 44

Pub. L. 100-418, Title V, Section 5021, August 23, 1988 ..................................... 38

Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev.
    1267 (2007) ........................................................................................ 24

## INTRODUCTION

Plaintiffs seek to preliminarily enjoin a new Florida law, SB 264, which imposes discriminatory prohibitions on ownership and purchase of real property based on alienage, national origin, race, and ethnicity—and imposes especially draconian restrictions on people from China. *See* Laws of Fla. ch. 2023-33, §§ 3-8, at 5-15 (CS for CS for SB 264) (to be codified at Fla. Stat. §§ 692.201-.205). Plaintiffs—four individual Chinese citizens who reside in Florida, and a real estate brokerage firm that principally serves Chinese and Chinese American clients—are subject to SB 264's restrictions and its far-reaching harms. Without this Court's intervention, the law will go into effect on July 1, 2023, and Plaintiffs will be forced to cancel purchases of new homes, register their existing properties with the State under threat of severe penalties, and face the loss of significant business.

Under this discriminatory new law, people who are not U.S. citizens or permanent residents, and whose "domicile" is in China, will be prohibited from purchasing any real property in Florida. A similar but less restrictive rule will apply to people whose permanent home is in Cuba, Venezuela, or other "countries of concern." The sole exception to these prohibitions is incredibly narrow: people with non-tourist visas or who have been granted asylum may purchase one residential property under two acres that is not within five miles of any "military installation" in the state. Notably, there are more than 20 military bases in Florida, many of them

within five miles of city centers like Orlando, Tampa, Jacksonville, Pensacola, Panama City, and Key West, and there are many other military sites across the state that may qualify as military installations. SB 264 will also impose requirements on people from China and other "foreign countries of concern" to register properties they currently own, at the risk of civil penalties and civil forfeiture. People who own or acquire property in violation of the law are subject to criminal charges, imprisonment, and fines.

Florida's new law stigmatizes Plaintiffs and their communities, and casts a cloud of suspicion over anyone of Asian descent who seeks to buy property in Florida. SB 264 recalls the wrongful animus of similar state laws from more than a century ago—laws that were eventually struck down by courts or repealed by legislatures. In May 1913, California enacted an "Alien Land Law," barring Asian immigrants from owning land. More than a dozen states, including Florida, followed suit, adopting similar Alien Land Laws restricting Asians' rights to hold land in America. Their purpose was to discourage and prevent "non-desirable" Asian immigrants from settling permanently in the United States and its territories.

In subsequent years, the U.S. Supreme Court's equal protection doctrine evolved, and most of the country's Alien Land Laws were repealed or struck down by state courts as unconstitutional. One of the last of these laws was in the Florida Constitution, which authorized the regulation of property ownership by "aliens

ineligible for citizenship." But in 2018, Florida voters passed a ballot measure repealing that provision.

Plaintiffs seek the Court's intervention to ensure that this racist chapter of American history remains firmly in the past. Plaintiffs respectfully request that the Court preliminarily enjoin SB 264 because it violates the equal protection and due process guarantees in the U.S. Constitution; it violates the Fair Housing Act; and it intrudes on the federal government's power to superintend foreign affairs, foreign investment, and national security.

## STATEMENT OF FACTS

Plaintiffs, four individuals of Chinese descent and a real estate business, live, study, and work in Florida. *See* Declaration of Yifan Shen ("Shen Decl.") ¶¶ 2, 9; Declaration of Zhiming Xu ("Xu Decl.") ¶¶ 2-5; Declaration of Xinxi Wang ("Wang Decl.") ¶¶ 2, 9; Declaration of Yongxin Liu ("Liu Decl.") ¶¶ 2, 9; Declaration of Jian Song ("Song Decl.") ¶¶ 3-5, 9. The individual plaintiffs are not citizens or permanent residents of the United States but have actively contributed to the State and its economy for years. *See* Shen Decl. ¶ 6; Xu Decl. ¶ 6; Wang Decl. ¶ 6; Liu Decl. ¶ 6.

## I.    Background

In September 2022, Governor Ron DeSantis announced new proposed legislation prohibiting people from China and "other countries of concern" from

buying property, stating: "[W]e do not want to see malign foreign influence in the State of Florida. And the number one source of that influence is the Chinese Communist Party." Declaration of Keliang Zhu ("Zhu Decl.") ¶ 2(c), Ex. 3.

The process to pass SB 264 moved quickly. On March 2, 2023, the Florida legislature introduced SB 264 and its companion House Bill No. 1355. On May 4, the Florida legislature passed SB 264. On May 8, Governor DeSantis signed SB 264. SB 264 will take effect in Florida on July 1, 2023.[1]

## II.    Florida's New Alien Land Law

SB 264 creates two separate sets of restrictions on land ownership in Florida, alongside new registration requirements, and imposes severe civil and criminal penalties for violations. The first set of restrictions bars people from seven "foreign countries of concern," including China, from owning or acquiring real property within ten miles of a military installation or a critical infrastructure facility. The second set of restrictions specifically bars people from China from owning or acquiring *any* real property in Florida. Both sets of restrictions are subject to only narrow exceptions.

The first category of prohibitions bars "foreign principals"[2] from "foreign

---

[1] Plaintiffs challenge and seek to preliminarily enjoin the portions of SB 264 that are to be codified as Part III of Chapter 692 of the Florida Statutes at Sections 692.201 through 692.205 ("SB 264" or "Florida's New Alien Land Law").

[2] SB 264 defines "foreign principals" as including "[a]ny person who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States." Fla.

countries of concern"[3] from acquiring agricultural land and real property on or within ten miles of any "military installation" or "critical infrastructure" in Florida. Fla. Stat. §§ 692.202(1), .203(1). The sole exception is that "foreign principals" who are natural persons with a valid non-tourist visa or who have been granted asylum are permitted to purchase one residential real property—but only if the property is less than two acres and not within five miles of a military installation. *Id.* § 692.203(4).[4]

In addition, existing owners and new purchasers are required to register real property on or within ten miles of any military installation or critical infrastructure facility with the Department of Economic Opportunity. *Id.* §§ 692.202(3)(a), .203(3)(a). Failure to comply with the statute's restrictions and registration requirements may result in civil penalties, including forfeiture. *Id.* §§ 692.202(2), (3)(b), (6), .203(2), (3)(b), (7).

SB 264 also imposes criminal penalties. "Foreign principals" who violate the law can be charged with a misdemeanor in the second degree, *id.* §§ 692.202(7), .203(8), punishable by up to 60 days' imprisonment and a $500 fine. *Id.* §§ 775.082,

---

Stat. § 692.201(4)(d).

[3] The "foreign countries of concern" are "the People's Republic of China, the Russian Federation, the Islamic Republic of Iran, the Democratic People's Republic of Korea, the Republic of Cuba, the Venezuelan regime of Nicolas Maduro, or the Syrian Arab Republic[.]" *Id.* § 692.201(3).

[4] Those who own or acquire property before July 1, 2023, may continue to own, subject to the law's registration requirements.

.083. Property sellers who violate the law are subject to the same penalty. *Id.* §§ 692.202(7), .203(8).

The second set of prohibitions in SB 264 targets people who are Chinese for even more sweeping restrictions and severe penalties. The statute bars "[a]ny person who is domiciled in the People's Republic of China and who is not a citizen or lawful permanent resident of the United States" from purchasing or owning *any* real property in the state. *Id.* § 692.204(1)(a)(4). This prohibition has the same narrow exception described above, the same requirement to register property with the State, and the same civil penalty and forfeiture consequences.

However, the Chinese-specific prohibitions impose harsher criminal sanctions for violations of the law. Chinese purchasers of land in violation of the law are subject to a third-degree felony, *id.* § 692.204(8), punishable by up to five years in jail and a maximum of $5,000 fine, *id.* §§ 775.082(3)(e), .083(2)(c). Meanwhile, selling real property to Chinese persons in violation of the statute is a misdemeanor of the first degree, *id.* § 692.204(8), punishable by up to one-year imprisonment and a $1,000 fine, *id.* §§ 775.082(4)(a), .083(1)(d).

## III.   Harm to Plaintiffs

SB 264 will force Plaintiffs to cancel purchases of new homes and forfeit deposits; register their existing properties with the State under threat of severe penalties; face the loss of significant business; and suffer anti-Asian discrimination

and stigmatization. The individual Plaintiffs are barred from purchasing property across nearly all of Florida.

In April 2023, Plaintiff Yifan Shen signed a contract to buy a home in Orlando. The property appears to be located within five miles of multiple military sites that may qualify as "military installations" under SB 264's broad definition. Shen Decl. ¶ 18. Because Ms. Shen is neither a citizen nor a permanent resident of the United States, and the closing date for the property is in December 2023, she will be forced to cancel the contract for the purchase and construction of her new home. *Id*. ¶ 20. Ms. Shen will lose all or part of her $25,000 deposit—and the ability to acquire her new home—if the law goes into effect. *Id*.

In early 2023, Plaintiff Zhiming Xu also signed a contract to buy a second home near Orlando. Because Mr. Xu is already a homeowner, is neither a citizen nor a permanent resident of the United States, and the closing date for the property is in September 2023, he will be forced to cancel the contract for the purchase of his new home. Mr. Xu will lose all or part of his $31,250 deposit, and the ability to acquire his new home. Xu Decl. ¶¶ 18-20.

In addition, Plaintiff Yongxin Liu owns a home near Daytona Beach, which is his primary residence. Mr. Liu had plans to purchase a vacation home for himself and his parents, but because of the new law, he will be prohibited from purchasing an additional property. Liu Decl. ¶ 18.

16

Several of the Plaintiffs also face new registration requirements for their existing properties, under threat of severe penalties. Xu Decl. ¶ 14; Wang Decl. ¶¶ 15-16; Liu Decl. ¶ 15.

Plaintiff Multi-Choice Realty, LLC is a real estate brokerage firm that primarily serves Chinese and Chinese American clients, and stands to lose significant business because of the new law. Song Decl. ¶¶ 3-5, 9. Many of Multi-Choice Realty's customers, both existing and potential, will be required to register their properties with the State and prohibited from acquiring new ones. *Id.* ¶¶ 12-13. Further, Multi-Choice Realty will be unable to facilitate real estate transactions that would close after the law takes effect on July 1, 2023, and that are barred by the law's prohibitions. *Id.* ¶¶ 13-15. As a result, Multi-Choice Realty will lose an estimated one-quarter of its business. *Id.* ¶ 14.

SB 264 has far-reaching discriminatory and stigmatizing effects on Plaintiffs and other people of Chinese and Asian descent. Plaintiffs fear that the registration process will be used to target, monitor, and harass them (Xu Decl. ¶ 15; Liu Decl. ¶ 16; Wang Decl. ¶ 16); that potential buyers of their properties will view them with suspicion (Xu Decl. ¶ 17); and that sellers of real estate will discriminate against them (Xu Decl. ¶ 21; Liu Decl. ¶ 21; Wang Decl. ¶ 20; Shen Decl. ¶ 23). The impacts of SB 264 will be severe and wide-ranging.

**ARGUMENT**

I.    **Plaintiffs are likely to prevail on the merits of their claims that SB 264 violates the Constitution and the Fair Housing Act.**

The Court may grant injunctive relief if the moving party shows that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Here, Plaintiffs have satisfied all four conditions.

A.    **SB 264 violates the Equal Protection Clause.**

The Fourteenth Amendment "entitles both citizens and aliens to the equal protection of the laws of the State in which they reside." *Graham v. Richardson*, 403 U.S. 365, 371 (1971). SB 264 violates the Equal Protection Clause because it discriminates on the basis of protected characteristics—alienage, national origin, race, and ethnicity—and it fails strict scrutiny, which requires the state to show that the legislation is narrowly tailored to serve a compelling state interest. *See, e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 219-22 & n.5 (1984). The statute's limitations on the ability of the individual plaintiffs to purchase property in Florida do not advance a legitimate (let alone compelling) state interest, and its restrictions sweep far more broadly than necessary.

18

For at least two reasons, SB 264 triggers strict scrutiny under the Equal Protection Clause. First, the statute expressly discriminates on the basis of alienage, and strict scrutiny generally applies to state laws that discriminate on this ground. *See Bernal*, 467 U.S. at 219-22;[5] *Graham*, 403 U.S. at 372 ("[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."); *see also Shaw v. Reno*, 509 U.S. 630, 642 (1993) (express discrimination triggers strict scrutiny without an extrinsic showing of discriminatory intent). As one example of how SB 264 discriminates based on alienage: Plaintiff Xinxi Wang resides in Florida on a nonimmigrant F-1 visa, which means her "domicile" is in her country of origin, China. Section 692.201(4) therefore categorizes her as a "foreign principal," and she is subject to the prohibitions in Section 692.204. However, if Ms. Wang were a U.S. citizen whose "domicile" is in China, she would not qualify as a "foreign principal," and would not be subject to the prohibitions in Section 692.204. Because the law discriminates based on alienage, strict scrutiny applies.

Second, SB 264 expressly discriminates on the basis of national origin, which is a separate ground for triggering strict scrutiny. *See, e.g.*, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985). Sections 692.201 and 692.203

---

[5] *Bernal* identified a "narrow" exception for "laws that exclude aliens from positions intimately related to the process of democratic self government," such as laws requiring police and probation officers to be citizens. 467 U.S. at 219-22. That exception is irrelevant here.

discriminate by applying prohibitions only to people domiciled in China, Cuba, Venezuela, Iran, Syria, Russia, and North Korea; and Section 692.204 discriminates further by singling out people who are domiciled in China for even more severe restrictions and penalties.

Because SB 264 is expressly discriminatory, strict scrutiny applies, and the state bears the burden of establishing that its conduct is narrowly tailored to a compelling government interest. Here, Florida cannot meet its burden.

Although national security often qualifies as a "compelling interest" of the federal government, it is doubtful that a *state* can simply invoke national security when defending against a constitutional challenge—particularly where, as here, Florida's blunt action is at odds with the federal government's nuanced approach to issues implicating foreign affairs, foreign investment, and national security. Regardless, SB 264 fails to satisfy this prong of the test because it does not "actually further[]" national security or any other compelling interest. *See Holt v. Hobbs*, 574 U.S. 352, 364 (2015); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 438 (2006). There is no evidence that Chinese buyers of property in Florida are agents of the Chinese Communist Party or have caused harm to national security. Indeed, Florida has failed to identify *any* nexus between real estate ownership by Chinese citizens in general and purported harm to national security or

Florida's security.[6]

With respect to the narrow-tailoring prong, the State must establish that these discriminatory restrictions on property are the least restrictive way to protect its compelling interest. Again, Florida cannot make this showing. SB 264's restrictions reach far beyond the interest Florida has identified: it simply cannot show that barring people "domiciled" in China from purchasing property in Florida is *necessary* to protect military installations or critical infrastructure. Accordingly, SB 264 violates the Equal Protection Clause.

Alternatively, SB 264 violates equal protection because discriminatory intent was a "motivating factor" behind the law, and it will have a discriminatory impact on the individual plaintiffs and others from "foreign countries of concern." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). The intent of the law was to discriminate on the basis of alienage, national origin, race, and ethnicity—to limit the ability of people who hail from "foreign countries of concern," and from China especially, to purchase property in Florida. Unless this Court intervenes, the statute will achieve its unconstitutional objectives.

The *Arlington Heights* inquiry examines the historical background of the

---

[6] In 2022, Chinese buyers were involved in 0.1 percent of all residential real estate purchases in Florida. Florida Realtors, 2022 Profile of International Residential Transactions in Florida at 6–8, https://www.floridarealtors.org/sites/default/files/basic-page/attachments/2023-04/2022%20Profile%20of%20International%20Residential%20Transactions%20in%20Florida.pdf (last accessed May 29, 2023).

government action, contemporary statements of legislators, the impact of the challenged law, foreseeability of disparate impact, knowledge of impact, and availability of less discriminatory alternatives. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322-23 (11th Cir. 2021). These factors weigh heavily toward a finding of discriminatory intent.

The historical background of SB 264 includes increased geopolitical tension between the United States and China, and politicians seeking to foment and capitalize on anti-China sentiment. *See, e.g.*, Zhu Decl. ¶ 10(a), Ex. 18 (State Senator Jay Collins, who introduced the bill, tweeted: "We are protecting our families, businesses, and land from bad actors like China[.]"); ¶ 2(a), Ex. 1 (Gov. DeSantis's press release, stating that he "proposed" the legislation, titled: "Governor Ron DeSantis Counteracts Malign Influence by China and Other Hostile Nations in Florida through New Action"). In a press release issued by Gov. DeSantis the day SB 264 was introduced, he said that the bill was part of a broader effort to "follow[] through on our commitment to crack down on Communist China." Zhu Decl. ¶ 13(a), Ex. 21 at 1; *see also id.* Ex. 1-57.

With respect to discriminatory impact based on alienage and national origin, SB 264's harms are far-reaching. Florida residents who are present on nonimmigrant visas and are legally "domiciled" in China will be broadly prohibited from purchasing property in the state, will be forced to cancel purchases of new homes,

and will be required to register their existing properties with the state under threat of severe penalties—simply because of their alienage and national origin. *See, e.g.*, Xu Decl. ¶¶ 14, 18-20; Shen Decl. ¶ 20; Liu Decl. ¶ 16; Wang Decl. ¶ 16. The statute will likewise have a discriminatory impact along racial and ethnic lines. The overwhelming number of people in Florida who are subject to the restrictions in Section 692.203 are racial and ethnic minorities. The overwhelming number of people in Florida who are subject to the even harsher restrictions in Section 692.204 are Chinese. In addition to imposing these restrictions, SB 264 stigmatizes Plaintiffs and others of Chinese and Asian descent, and it casts suspicion over anyone of Asian descent who seeks to buy property in Florida—racial animus that will extend to many other aspects of life in the state.

These impacts were foreseeable and known to Florida legislators and Gov. DeSantis, given the nature of the restrictions, and as evidenced by the bill analyses and fiscal impact statements prepared by the Florida Senate professional staff of the Committees on Judiciary and Rules. *See, e.g.*, Zhu Decl. ¶ 17(a), Ex. 32 at 1 (explaining that the bill's prohibitions apply to "persons domiciled in China, but who are not U.S. citizens"), ¶ 18(c), Ex. 36 at 1 (same), ¶ 20(a), Ex. 38 at 1 (same), ¶ 21(c), Ex. 41 at 1 (same). Finally, far less discriminatory alternatives were available to the state. Accordingly, under *Arlington Heights*, SB 264 violates the Equal Protection Clause.

It is true that in a series of cases decided 100 years ago, the Supreme Court upheld state "alien land laws" that discriminated against "aliens ineligible for naturalization," applying a standard less demanding than strict scrutiny. *See, e.g.*, *Terrace v. Thompson*, 263 U.S. 197 (1923); *Frick v. Webb*, 263 U.S. 326, 333 (1923). But those cases do not govern here. They predated several critical developments in equal protection law, including: (1) the Court's modern articulation and application of the strict scrutiny test to laws that discriminate based on national origin, race, or ethnicity, *see* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1297 (2007) (modern strict scrutiny test did not emerge until the 1960s); and (2) the Court's explicit adoption of strict scrutiny for state laws discriminating on the basis of alienage, *see Bernal*, 467 U.S. at 219; *Graham*, 403 U.S. at 371-72.

Even by the 1950s, several state supreme courts had struck down their state alien land laws as violating the Fourteenth Amendment, recognizing that *Terrace* and similar cases had been superseded by developments in equal protection law. *See Fujii v. State*, 38 Cal. 2d 718, 725-38 (1952); *Namba v. McCourt*, 185 Or. 579, 611 (1949); *State v. Oakland*, 129 Mont. 347, 352 (1955).

For the reasons above, SB 264 violates the Fourteenth Amendment both because it discriminates on its face and fails strict scrutiny, *see Bernal*, 467 U.S. at 219-22 & n.5, and because its intent and effect is to discriminate under *Arlington*

*Heights*, 429 U.S. at 265-66.

    **B.**    **SB 264 violates the Fair Housing Act.**

    The Fair Housing Act ("FHA") prohibits housing practices that discriminate based on race, color, religion, sex, familial status, or national origin, 42 U.S.C. § 3604(a)-(f), and declares that "any law of a State . . . that purports to require or permit any action that would be a discriminatory housing practice under [the FHA] shall to that extent be invalid." *Id.* § 3615. SB 264 blatantly flouts this fair housing mandate by requiring discrimination on the basis of race and national origin, thereby undermining a policy that Congress considered to be "of the highest priority." *See Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 211 (1972). Because SB 264 "require[s] . . . a discriminatory housing practice," it is "invalid" and cannot be enforced. *See* 42 U.S.C. § 3615.

    **1.**    **SB 264 violates Section 3604(a) of the FHA.**

    Section 3604(a) of the FHA makes it unlawful to "refuse to sell . . . after the making of a bona fide offer, or to refuse to negotiate for the sale . . . or otherwise make unavailable or deny, a dwelling[7] to any person because of race, color, . . . or national origin."[8] SB 264 violates this foundational civil rights law by making certain

---

[7] The FHA defines "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereof of any such building, structure, or portion thereof." 42 U.S.C. § 3602(b).

[8] While this motion focuses on the Section 3604(a) violation, SB 264 violates several additional

dwellings unavailable based on protected characteristics.

National origin discrimination is plain on the face of the statute. Its restrictions apply only to people from China and other "countries of concern." States rarely dictate housing policy in such overtly discriminatory terms, likely because doing so obviously violates the FHA. The FHA does not allow a state to "facially single out [a protected class] and apply different rules to them," as Florida has done here. *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995); *see Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289-90 (6th Cir. 1996) ("Here, the challenged portions of [the statute] are facially discriminatory. . . . Accordingly, this is a case of intentional discrimination or disparate treatment" under the FHA).

Furthermore, the *intent* of SB 264 is to discriminate based on both national origin and race. *See* Section I.A *supra*. Housing practices that intentionally discriminate based on these protected characteristics are also not permissible under the FHA. *See, e.g.*, *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1542 (11th Cir. 1994); *Sec'y, U.S. Dep't of Hous. & Urb. Dev. v. Blackwell*, 908 F.2d 864, 871 (11th Cir. 1990).[9] Defendants have no possible justification for such discrimination.

---

FHA provisions, including Sections 3604(b), 3604(c), 3604(d), 3604(e), 3605(a), and 3615.

[9] Even without facial or intentional discrimination, Plaintiffs could establish an FHA violation solely by relying on the law's disparate impact. *See Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1274 (11th Cir. 2019). SB 264 creates an "artificial, arbitrary, and unnecessary barrier[]" to housing that virtually exclusively affects Chinese people and people from other "countries of concern." *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmties. Project, Inc.*, 576 U.S. 519, 540 (2015). Because of the close link between national origin, race, and country of

### 2. Plaintiffs are "aggrieved persons" under the FHA.

The FHA grants Plaintiffs a cause of action because they are "aggrieved persons" under the statute, *see* 42 U.S.C. § 3613(a)—a term defined to include any person who either "claims to have been injured by a discriminatory housing practice[,] or believes that such person will be injured by a discriminatory housing practice that is about to occur." *Id.* § 3602(i). "Person" is defined to include "one or more individuals, corporations, [or] partnerships." *Id.* § 3602(d).

Plaintiffs Shen, Xu, Wang, and Liu are aggrieved persons under the FHA because if SB 264 goes into effect, they will be forced to cancel purchases of new homes and/or register their existing properties under threat of severe penalties. *See* Shen Decl. ¶ 21, 25; Xu Decl. ¶ 14, 18; Wang Decl. ¶ 15; Liu Decl. ¶ 15.

Plaintiff Multi-Choice Realty is also an aggrieved person because if SB 264 goes into effect, it will be unable to facilitate real estate transactions that are barred by the law's discriminatory prohibitions and penalties. *See* Song Decl. ¶ 14. Real estate brokers like Multi-Choice Realty who will lose income because of a discriminatory housing policy are covered under this broad definition. *Crumble v. Blumthal*, 549 F.2d 462, 469 (7th Cir. 1977); *see also Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 197 (2017).

---

domicile, the degree of disparity is "substantial enough to raise an inference of causation." *See Schaw*, 938 F.3d at 1274; *see also Jackson*, 21 F.3d at 1543.

For these reasons, SB 264 violates the FHA.

**C.      SB 264 violates the Due Process Clause because it is unconstitutionally vague.**

Florida's new land law violates due process because it leaves individuals like Plaintiffs in grave doubt about whether they and their property may be subject to the law's prohibitions, including its severe criminal penalties. The law does not adequately define or identify "military installations" and "critical infrastructure facilities"—central terms in the statute—making it impossible for a person of ordinary intelligence to know where Florida's new exclusion zones begin and end. In addition, the law does not define where individuals are "domiciled" for purposes of its prohibitions, compounding uncertainty about the statute's reach for foreign citizens who reside in Florida. Together, these ambiguities fail to provide the notice that due process requires—especially for a law that imposes strict criminal liability—and invite arbitrary and discriminatory enforcement across the state.

Courts have long recognized that, under the right to due process, statutes are "void for vagueness" when their prohibitions "are not clearly defined." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319-20 (11th Cir. 2017) (en banc) (citation omitted). A law "can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S.

703, 732 (2000). A statute that either forbids or requires an action "in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application[ ] violates the first essential of due process of law." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1310-11 (11th Cir. 2009).

A vague statute is especially likely to violate due process when it imposes criminal penalties. "When a criminal statute is involved, no one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1228-29 (11th Cir. 1982) (cleaned up). Criminal statutes that are vague and lack a mens rea requirement are routinely deemed unconstitutional. *See, e.g.*, *Fla. Action Comm., Inc. v. Seminole Cnty.*, 212 F. Supp. 3d 1213, 1225 (M.D. Fla. 2016) (ordinance that proscribed sex offenders from traveling through certain exclusion zones around schools, parks, and playgrounds was unconstitutionally vague); *Colautti v. Franklin*, 439 U.S. 379, 395 (1979), *abrogated on other grounds*, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) ("This Court has long recognized that the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of mens rea.").

In this motion for a preliminary injunction, Plaintiffs raise an as-applied challenge. For the reasons below, SB 264 violates due process standards as applied

to people like Plaintiffs—that is, people (1) who reside in the United States but are not U.S. citizens or legal permanent residents; (2) whose country of origin is a "country of concern" under SB 264; and (3) who own or seek to purchase real property in Florida.

      **1.**     **SB 264 is unconstitutionally vague because it provides insufficient notice about which properties are subject to its restrictions.**

SB 264 fails to provide people of ordinary intelligence a reasonable opportunity to understand whether their property is subject to the law's prohibitions. The law creates five- and ten-mile exclusion zones around "military installations" and "critical infrastructure facilities," respectively, but it does not adequately identify those sites, nor does it clearly define the boundaries of the resulting exclusion zones.[10] Instead, the law defines "military installation" as "a base, camp, post, station, yard, or center encompassing at least 10 contiguous acres that is under the jurisdiction of the Department of Defense or its affiliates." Fla. Stat. § 692.201(5). And it defines "critical infrastructure facility" as "any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons": (a) a chemical manufacturing facility; (b) a refinery; (c) an electrical power plant as defined in section 403.031(20); (d) a

---

[10] "Foreign principals" domiciled in China are subject to the requirements in both Sections 692.203 and 692.204, and thus both provisions are addressed here.

water treatment facility or wastewater treatment plant; (e) a liquid natural gas terminal; (f) a telecommunications central switching office; (g) a gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas; (h) a seaport as listed in section 311.09; (i) a spaceport territory as defined in s. 331.303(18); and (j) an airport as defined in section 333.01. *Id.* § 692.201(2).

These broad, vague terms make it exceedingly difficult for Plaintiffs and others to determine which restrictions and requirements apply to a given property. There is no catalog of the specific military installations and critical infrastructure facilities that the State believes fall within these definitions. There is also no map identifying which parcels or properties the State believes fall within the resulting five- and ten-mile exclusion zones. As a result, a "foreign principal" who owns or seeks to buy property in Florida must attempt to identify any Department of Defense military installations in the vicinity and then assess whether they "encompass at least 10 contiguous acres." *Id.* § 692.201(5). The person must also attempt to identify any potential critical infrastructure facilities in the vicinity and then assess whether those sites "employ[] measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons." *Id.* § 692.201(5). If the covered military installations and critical infrastructure facilities can be identified at all, the person must determine how to measure the distance from the various sites to the property in question, including whether such measurements must be drawn from the closest

point on the perimeter of the site, which may not be readily ascertainable, or some other internal reference point. Google Maps may help with all this, but it does not provide clear or definite answers for those seeking to buy property in Florida.

At the same time, the cost of a mistake is severe—because SB 264 imposes severe criminal and civil penalties on purchasers and owners who violate its terms, regardless of their knowledge. *See id.* §§ 692.204(4)-(8), 692.203(3)-(8). Most significantly, the criminal provisions contain *no mens rea requirement* for those who purchase property in violation of the law or who fail to register the properties they already own. The consequence is that many individuals will refrain from purchasing property altogether for fear of unknowingly falling within an exclusion zone.

These notice problems affect several of the Plaintiffs. Plaintiff Shen has signed a contract to buy a single-family home in Orlando, and that home appears to be within five miles of multiple military sites. Shen Decl. ¶¶ 12, 18. But because she does not know the acreage of these sites, whether each qualifies as a base, camp, post, station, yard, or center, and whether they are operated under the jurisdiction of the Department of Defense or its affiliates, it is extremely difficult for her to know whether her home is within five miles of a covered military installation. *See id.*

Plaintiff Xu is in contract to purchase a second property, and Plaintiff Liu plans to purchase a second property as well. Xu Decl. ¶ 12; Liu Decl. ¶ 13. Those purchases are prohibited altogether under Section 692.204, but Mr. Xu and Liu are

also subject to the separate 10-mile exclusion zones around "military installations" and "critical infrastructure facilities" in Section 692.203. Thus, even if Section 692.204 is invalidated, Mr. Xu and Mr. Liu will be forced to contend with the vagueness problems described above and may be forced to cancel their planned purchases due to fear of violating SB 264. Xu Decl. ¶ 18; Liu Decl. ¶ 18.

> ## 2. SB 264 is unconstitutionally vague because it provides insufficient notice about which individuals are subject to its restrictions.

The law is vague in another central respect. SB 264 nowhere defines "domicile," nor is there a general definition of the term in Florida statutes. Because SB 264 does not clearly define where individuals are "domiciled" for purposes of property ownership and purchases, it does not provide individuals sufficient notice about whether they are subject to the law's prohibitions.

For many individuals who reside in the United States on visas or as asylum seekers, the common law developed by the Florida courts reinforces this uncertainty. Domicile is generally defined as "the place where a person has his true, fixed, permanent home and principal establishment, and to which, whenever he is absent, he has the intention of returning." *Minick v. Minick*, 149 So. 483, 487-88 (1933); *cf.* Fla. Stat. § 222.17(1). But there are strong indications that, under Florida law, a noncitizen who has a subjective intent to remain in the State permanently may still be deemed legally domiciled in their country of origin. For example, the Florida

Supreme Court has held that a noncitizen, "temporarily absent from his homeland because of political persecution" and granted permission "to stay indefinitely" by federal immigration authorities, but not granted permanent resident status, could not lawfully make Florida his "permanent home." *Juarrero v. McNayr*, 157 So. 2d 79, 80 (Fla. 1963). Under *Juarrero*, a person, even with an indefinite permission to remain, "has no assurance that he can continue to reside in good faith for any fixed period of time in this country," and so "does not have the legal ability to determine for himself his future status and does not have the ability legally to convert a temporary residence into a permanent home." *Id.* at 81; *see also Matter of Cooke*, 412 So. 2d 340, 343 n.1 (2019) (where person did not have "the legal right to reside permanently in Florida," he "could not legally formulate the requisite intent to make [a] Florida property his family's permanent place of residence").

Should the reasoning of cases like *Juarrero* apply to the undefined term "domicile" in the statute, Plaintiff Mr. Xu would be deemed domiciled in China and subject to the prohibitions in SB 264. He is an asylum seeker—meaning that he has applied for asylum but not yet received a final decision regarding his application. When it comes to his subjective intent, he plainly does not seek to return to China; indeed, the asylum he seeks requires him to be "unable or unwilling to return" to that country. 8 U.S.C. § 1158(b)(1)(A), 1101(a)(42). But like the noncitizen in *Juarrero*, he has no assurance of permanent permission to remain. And if he were

deemed covered by SB 264, it would impact him severely: because he neither has a currently valid visa nor has he yet been granted asylum, Mr. Xu would not qualify for even the limited statutory exception for purchase of a single residence. *See* Section 692.204(2).

Perhaps the State will decide that Mr. Xu's subjective intent to remain is sufficient to be "domiciled" in Florida. But the point is the statute does not say. Thus, Mr. Xu is left guessing whether his planned real estate purchase will land him in jail, with no way to determine the answer without subjecting himself to jeopardy.

Nor is the vagueness problem limited to asylees or asylum seekers like Mr. Xu. It applies also to many of those lawfully residing in the United States on visas like Plaintiffs Ms. Shen and Mr. Liu, both of whom reside in Florida on H-1B nonimmigrant visas but plan to seek permanent legal residency. Shen Decl. ¶¶ 7, 8; Liu Decl. ¶¶ 7, 8. They appear to be classified as "foreign principals" domiciled in China by SB 264, yet their hope is to remain permanently in Florida.

There are many others who face the same uncertainty. For example, recipients of Deferred Action for Childhood Arrivals have lived in this country since they were children but, like the noncitizen in *Juarrero*, have not been granted permanent residence. Indeed, like Mr. Xu, they are neither permanent residents, nor visa holders, nor asylees, so the statute leaves them with no way to know whether they will be deemed "domiciled" in their country of origin.

For Mr. Xu, Ms. Shen, Mr. Liu, and countless others, this situation is untenable. Moreover, the same uncertainty will undoubtedly chill sellers, agents, insurance companies, and countless others from doing business with noncitizens who may or may not be deemed to be "domiciled" in China or another covered country. This is a classic case of an unconstitutionally vague statute threatening to "sweep so broadly as to render criminal a host of what might otherwise be considered ordinary activities." *Sackett v. EPA*, No. 21-454, 2023 WL 3632751, at *15 (U.S. May 25, 2023).

### 3.    SB 264 permits and encourages arbitrary and discriminatory enforcement.

Finally, for reasons related to those above, Florida's law permits and encourages arbitrary and discriminatory enforcement. A vagueness claim lies where those who enforce the law "must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926); *see Hill*, 530 U.S. at 732. SB 264's failure to identify where its exclusion zones begin and end, its failure to define where individuals are domiciled, and its imposition of strict liability leaves prosecutors too much discretion to be constitutionally permissible. It lacks the "minimal guidelines" necessary for them to determine when, exactly, the statute's restrictions are triggered. Given the overt discriminatory purpose that motivated the law, *see* Section I.A *supra*, these vague provisions open the door wide to arbitrary and discriminatory enforcement.

These defects are fatal, and accordingly, SB 264 violates due process.

**D.    SB 264 is preempted by federal law.**

In a carefully crafted set of statutes, regulations, and executive actions, a federal regime already addresses potential national security concerns related to real estate purchases. Federal law strikes a balance among competing considerations: the importance of foreign investment; potential national security issues; and the foreign affairs implications of interference with real estate purchases. SB 264 upends that balance. Disregarding the federal government's judgments regarding the appropriate approach to China and other foreign nations, Florida has adopted its own draconian regulation of land purchases. That infringement on the federal government's foreign policy and national security judgments is preempted.

Federal law can preempt state statutes in several ways, including conflict preemption, in which "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1274 (11th Cir. 2013) (internal quotation marks omitted). In three respects, SB 264 conflicts with the federal system governing national security concerns in real estate. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000).

**1.    Federal law strikes a careful balance in the regulation of foreign real estate purchases.**

The federal government has a detailed and carefully calibrated system for

monitoring, mitigating, and blocking certain real estate purchases if they threaten national security. *See* 50 U.S.C. § 4565(a)(4)(B)(ii), (d)(1); 31 C.F.R. Part 802. That system is built on a long history of federal monitoring of foreign investment for potential national security issues. In 1975, President Ford established the Committee for Foreign Investment in the United States ("CFIUS"), which is charged with reviewing foreign investments that could impact national security interests. E.O. 11858, 40 Fed. Reg. 20263. Congress codified CFIUS in 1988 and granted the President the authority to suspend or prohibit certain foreign acquisitions posing a threat to national security. Pub. L. 100-418, Title V, Section 5021, August 23, 1988; *see also* Foreign Investment and National Security Act of 2007, Pub. L. 110-49, 121 Stat. 246, July 26, 2007 (modifying responsibilities of CFIUS); *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 302-04 (D.C. Cir. 2014) (describing CFIUS).

In 2018, Congress enacted and President Trump signed the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. 115-232, which expanded the President's (and CFIUS's) authority to suspend or prohibit "certain types of real estate transactions involving the purchase or lease by, or a concession to, a foreign person." 84 Fed. Reg. at 50215. Specifically, FIRRMA's rules encompass real estate that "is located within, or will function as part of, an air or maritime port" or is "in close proximity to a United States military installation or

another facility or property of the United States Government that is sensitive for reasons relating to national security" or could provide "the ability to collect intelligence" or conduct "foreign surveillance" of such installations. 50 U.S.C. § 4565(a)(4)(B)(ii)(II)(aa), (bb). FIRRMA empowers the President to review, and, if necessary, prohibit covered real estate purchases if "there is credible evidence that leads the President to believe" that the purchaser might "take action that threatens to impair the national security." *Id*. § 4565(d)(4).

But Congress carefully balanced the perceived need for national security review against other considerations, emphasizing that "foreign investment provides substantial economic benefits to the United States, including the promotion of economic growth, productivity, competitiveness, and job creation, thereby *enhancing* national security." FIRRMA § 1702(b)(1) (emphasis added). In keeping with this balance, Congress took several deliberate measures to calibrate the regulation of real estate purchases.

First, Congress constrained the President's power to prohibit transactions by exempting those involving only "a single 'housing unit'"—a house, an apartment, etc. 50 U.S.C. § 4565(a)(4)(C)(i); *see* 31 C.F.R. § 802.223 (defining term); 31 C.F.R. § 802.216. That express statutory exception reflects the marginal national security implications of such transactions and the outsized economic, personal, and foreign policy implications of policing the purchases of foreign nationals' homes.

Second, Congress created an individualized process for reviewing *particular* transactions and purchasers to assess whether they pose any national security threat. *See* 50 U.S.C. § 4565(d)(4). The process allows purchases and sellers to request a meeting with CFIUS to discuss a transaction under review. 31 C.F.R. § 802.601(b). CFIUS is also empowered to negotiate and enforce an "agreement or condition with any party to the covered transaction in order to mitigate any risk to the national security," 50 U.S.C. § 4565(l)(3)(A), which allows concerning purchases to proceed with adequate safeguards.

Third, Congress limited penalties for violations of these rules. Criminal liability attaches only where a person has made false statements to CFIUS; violations of the terms of any mitigation agreement are punishable only by civil penalties. 31 C.F.R. § 802.901(a)-(c), (g).

Finally, in keeping with the sensitive and context-specific issues of national security and foreign policy, Congress delegated the final decision about whether to block a transaction under FIRRMA to the President. 50 U.S.C. § 4565(d)(4); 31 C.F.R. § 802.701. Congress contemplated that foreign policy considerations would play an important role in that decision. 50 U.S.C. § 4565(f)(9)(A)-(B), (11) (inviting President to consider "the relationship of such country with the United States," "the adherence of the subject country to nonproliferation control regimes," and "such other factors as the President or the Committee may determine to be appropriate").

The executive branch also has the discretion to exempt nationals of particular countries from the real estate provisions of FIRRMA based on specified considerations related to foreign policy. 31 C.F.R. § 802.1001(a).

>    **2.    SB 264 conflicts with the federal regime and foreign affairs authority.**

SB 264 concerns matters covered by CFIUS: regulation of real estate based on purported national security and foreign policy concerns. *See, e.g.*, Zhu Decl. ¶ 13(a), Ex. 21 at 1 (press release from Gov. DeSantis, stating: "Florida is taking action to stand against the United States' greatest geopolitical threat—the Chinese Communist Party," and is "following through on our commitment to crack down on Communist China."); ¶ 3(a), Ex. 4 at 1 (press release from state legislators, arguing that Chinese ownership of land in the United States leaves "our national security interests vulnerable to the [CCP]"). But SB 264 rejects the balance struck by Congress and the Executive, and interferes with the federal systems designed to assess national security concerns while promoting economic activity and advancing the President's foreign policy.

Notably, SB 264 is strikingly similar to prior efforts by Florida and other States to wrest control of foreign policy from the federal government—efforts that have been struck down as preempted. In *Odebrecht*, for example, Florida enacted legislation barring the State and local subdivisions from granting contracts to any company doing business with Cuba. 715 F.3d at 1272. The Eleventh Circuit held

that the statute "conflict[ed] directly with the extensive and highly calibrated federal regime of sanctions against Cuba promulgated by the legislative and executive branches," emphasizing that Florida's legislation "differs dramatically from the federal regime as to the entities covered, the actions triggering sanctions, and the penalties imposed." *Id*. The Florida law was also preempted because it "overrides the nuances of the federal law and weakens the President's ability 'to speak for the Nation with one voice in dealing' with Cuba." *Id*. (quoting *Crosby*, 530 U.S. at 381).

Likewise, *Crosby* examined a Massachusetts law that barred state agencies from purchasing goods or services from companies doing business with Burma, in the face of a federal law imposing different sanctions. The Supreme Court invalidated the Massachusetts law, holding that it stood as an obstacle to achieving the objectives of the federal law by "undermin[ing] the intended purpose and 'natural effect'" behind the federal law. 530 U.S. at 373-74. The state law weakened the President's discretion to calibrate economic sanctions against Burma using the authority conferred by Congress, displaced the President's exercise of that discretion by punishing conduct permitted by federal law, and exceeded the "specific range" of pressure Congress intended to impose against the Burmese Government. *Id.* at 377.

SB 264 is preempted for the same reasons. First, it "sweeps more broadly than the federal regime" in several respects. *Odebrecht*, 715 F.3d at 1282. Among other

things, Congress took care to specifically exempt *all* transactions involving a single housing unit from the scope of the President's review authority. 50 U.S.C. § 4565(a)(4)(C)(i). That judgment reflects the reality that the purchase of a home or lease of an apartment is highly unlikely to pose national security concerns, but subjecting every such transaction to scrutiny would wreak major economic and foreign policy harms and invite discrimination. *Cf. Crosby*, 530 U.S. at 377-78 ("These detailed provisions show that Congress's calibrated Burma policy is a deliberate effort to steer a middle path." (cleaned up)); *Hines v. Davidowitz*, 312 U.S. 52, 73 (1941) (similar); *Odebrecht*, 715 F.3d at 1282-83 (similar). Yet Florida's law *entirely* bans real estate purchases, including of homes, for many Chinese nationals, and the sole exception for home purchases is severely limited. Because Florida's law "does not countenance . . . the federal regime's exceptions," it "squarely conflicts with the more nuanced federal regime." *Odebrecht*, 715 F.3d at 1282.

Likewise, SB 264 is significantly broader than CFIUS in that SB 264 prohibits all purchases of real properties within five or ten miles of the vaguely defined terms "critical infrastructure" or "military installation," while CFIUS reviews only transactions involving real properties located within "an air or maritime port," or close to specified facilities identified in regulations, 31 C.F.R. Part 802, App. A. Thus, SB 264 also "sweeps more broadly than the federal regime" in terms of "the

43

[locations] covered." *Odebrecht*, 715 F.3d at 1282.

Similarly, Florida's blanket approach conflicts with the case-specific system Congress created. While transactions under FIRRMA are assessed individually, with the parties having opportunities to mitigate national security concerns through agreements with CFIUS, SB 264 simply bars a broad range of transactions, "no ifs, ands, or buts." *Odebrecht*, 715 F.3d at 1282. SB 264 affords no opportunity to address any particularized national security concerns because the law's premise is that *everyone* from the covered countries is a national security threat. "[T]he state Act's generality stands at odds with the federal discreteness." *Crosby*, 530 U.S. at 379.

Second, not only does SB 264 "penalize[e] economic conduct that the federal law expressly permits," but even where both regimes apply, there is a dramatic mismatch in the penalties imposed. *Odebrecht*, 715 F.3d at 1281. While FIRRMA imposes criminal liability only for misleading CFIUS through false statements or omissions, 31 C.F.R. § 802.901, SB 264 imposes severe criminal sanctions on any purchaser who violates its terms.

This mismatch is far more extreme than in *Odebrecht*, where the Eleventh Circuit held a Florida statute preempted. *Odebrecht* emphasized that the Florida statute "imposes additional penalties above and beyond the federal regime." 715 F.3d at 1283. Here, the federal statute imposes *no penalty at all* for engaging in a

covered transaction; rather, it simply authorizes the President to prohibit or suspend that transaction. By contrast, under SB 264, the same purchase is punishable by a lengthy prison sentence. The careful "congressional calibration of force" is replaced with a broad regime of strict liability. *Crosby*, 530 U.S. at 380.

Third, SB 264 "undermines the substantial discretion Congress has afforded the President" in addressing the national security and foreign policy implications of real estate purchases, thereby "weaken[ing] the President's ability to speak for the Nation with one voice in dealing with" China and other nations. *Odebrecht*, 715 F.3d at 1272, 1281 (cleaned up). The federal regime provides the President with "flexible and effective authority" to address particular national security concerns raised by specific transactions, and the broader foreign policy context in which those concerns arise. *Crosby*, 530 U.S. at 374. But arrogating that power to itself, Florida has dramatically "weakened the President's discretion to calibrate" the extent of control over foreign investment "using the authority conferred by Congress." *Odebrecht*, 715 F.3d at 1281. In Florida, the federal government's judgments and discretion are now all but irrelevant in cases covered by SB 264. *See Crosby*, 530 U.S. at 377 ("if the Massachusetts law is enforceable the President has less to offer and less economic and diplomatic leverage as a consequence").

In "the 'vast external realm' of foreign affairs, 'with its important, complicated, delicate and manifold problems, the President alone has the power to

speak or listen as a representative of the nation.'" *Odebrecht*, 715 F.3d at 1285 (citation omitted). The national security concerns Congress addressed through FIRRMA and related legislation are intimately tied up with foreign affairs; concerns about espionage and sabotage are of a piece with broader foreign policy interests and initiatives. *See Ralls Corp.*, 758 F.3d at 314. "Choosing 'the right degree of pressure to employ'" on those countries "is a 'federal decision,' not a decision for the State of Florida." *Odebrecht*, 715 F.3d at 1284 (quoting *Crosby*, 530 U.S. at 380) (citation omitted).

Indeed, "[i]t is fundamental that foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." *Arizona v. United States*, 567 U.S. 387, 395 (2012). Restrictions on ownership of property for purported national security reasons thus plainly implicate "foreign relations and must be made with one voice." *Id*. at 409. If Florida's New Alien Land Law is allowed to stand, all 50 states can designate their own lists of "foreign country of concern" and impose different regulations and sanctions. Such a scenario would "compromise the very capacity of the President to speak for the Nation with one voice in dealing with other governments." *Crosby*, 530 U.S. at 381.

Florida apparently disagrees with the federal government's approach to national security and foreign property ownership, and especially with its approach

to China and Chinese nationals. *See, e.g.*, Zhu Decl. ¶ 13(e), Ex. 23 at 3 (Statement of Rep. David Borrero) ("States may be tempted to rely on the federal government to prevent the growing threat of the" Communist Party of China, but "the federal government has not stepped up, [so] Florida today rises to the occasion").  But that is not a choice for Florida to make. A State may not "unilaterally select by name a foreign country" and declare "some kind of economic war." *Odebrecht*, 715 F.3d at 1287 (cleaned up). Here, Florida has done just that. For all these reasons, SB 264 conflicts with federal law and is preempted.

Finally, the same set of federal statutes, regulations, and executive orders also establishes field preemption, which applies where regulation in the area is "so pervasive" or touches on "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corporation Illinois Commerce Comm'n*, 331 U.S. 218, 230 (1947). Here, the comprehensiveness of federal scheme to address national security and foreign policy concerns relating to foreign investments, including real estate transactions, demonstrates that Congress intended for federal law to occupy the entire field. *See also, e.g.*, *United States v. Osorto*, 995 F.3d 801, 810-11 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 470 (2021) ("the federal government enjoys the exclusive authority . . . to regulate the relationship between the United States and noncitizen visitors").

**II.      Plaintiffs will suffer irreparable harm as a result of SB 264.**

Plaintiffs will suffer irreparable harm if SB 264 takes effect on July 1, 2023. The law will impose sweeping, discriminatory prohibitions on property purchases, as well as affidavit and registration requirements, all backed by criminal liability and draconian civil penalties. Nothing short of a preliminary injunction can adequately protect Plaintiffs from the obvious, profound injuries that now loom.

Plaintiffs' injuries are "actual and imminent" starting July 1, 2023. *Siegel*, 234 F.3d at 1176. If the law goes into effect, Plaintiffs Shen and Xu will be forced to cancel their contracts for new homes. As a result, Plaintiff Shen stands to lose her $25,000 deposit and Plaintiff Xu his $31,250 deposit. Shen Decl. ¶¶ 15, 20; Xu Decl. ¶¶ 12, 18. Even more importantly, their chosen properties are unique and irreplaceable. "Because real property is considered unique, money damages to a contract purchaser of real property is an inadequate remedy at law." *Ebsco Gulf Coast Dev., Inc. v. Salas as Tr. of Salas Child. Tr. dated Sept. 28, 2009*, No. 3:15-CV-586 (MCR)(EMT), 2016 WL 11189984, at *4 (N.D. Fla. Sept. 29, 2016); *see Johnson v. U.S. Dep't of Agric.*, 734 F.2d 774, 788 (11th Cir. 1984). By forcing the plaintiffs to cancel their contracts and depriving them of these particular properties, SB 264 causes them irreparable harm.

Plaintiff Multi-Choice Realty stands to lose an estimated one-quarter of its business, and will be forced to turn away customers whose real estate transactions

may be prohibited under the law for fear of aiding and abetting a criminal violation. *See* Song Decl. ¶ 15. This "loss of customers and goodwill is an irreparable injury." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005).

SB 264 will also impose discriminatory registration and affidavit requirements, on pain of perjury, liens, fines, and forfeiture—inflicting immediate chill throughout the housing market. In particular, Plaintiffs Xu, Wang, and Liu will be forced to register their properties with the state under threat of severe penalties. *See* Xu Decl. ¶¶ 14-15; Wang Decl. ¶¶15-16; Liu Decl. ¶ 15. *See Doe v. Wasden*, 558 F. Supp. 3d 892, 916 (D. Idaho 2021). If Plaintiff Shen is ultimately able to purchase a different property in Florida, she (and all other purchasers subject to the law) will be forced to sign an affidavit attesting to compliance that is difficult, at best, to ascertain—and that may expose her to prosecution for perjury and other criminal liability if later second-guessed. *See* Section I.C *supra*.

More broadly, once SB 264 goes into effect, it will immediately fuel discrimination in Florida's housing market and discriminate against Plaintiffs based on their alienage, national origin, race, and ethnicity—and "irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes." *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984). *See* Sections I.A-B *supra*. Due to the uncertainties about the size, definition, and location

of military installations and critical infrastructure facilities scattered throughout Florida, Plaintiffs will be denied fair opportunities to participate in the housing market on equal footing with other potential buyers. Where discrimination bars people from their chosen homes, "monetary relief cannot correct the injury completely." *Gresham*, 730 F.2d at 1424. And the harms are not limited to Plaintiffs: in practice, the law sows widespread housing discrimination because it threatens would-be sellers with criminal penalties for transacting with Chinese persons like the individual plaintiffs, given sellers' liability for "knowingly sell[ing] real property" in violation of the law.

All of the law's discriminatory prohibitions and requirements stigmatize Plaintiffs simply because they are Chinese and damage their status in their communities. SB 264 is explicitly based upon and perpetuates a malignant stereotype: that Chinese nationals are fundamentally non-American and untrustworthy, and thus are appropriately excluded from being able to purchase and make their home of choice in America. As Plaintiff Wang explains, "I am very fearful that my daughter and I will be subject to worsening racial hatred in Florida because the new law singles out Chinese." Wang Decl. ¶ 18; *see also* Liu Decl. ¶ 17. Monetary relief cannot adequately redress these harms.

For all these reasons, Plaintiffs will be irreparably harmed by SB 264 starting July 1.

**III.     The balance of equities and the public interest both favor granting
preliminary injunctive relief.**

The balance of equities and the public interest weigh heavily in favor of
preliminary enjoining SB 264. Where, as here, the government is the party opposing
the preliminary injunction, these two factors merge into a single analysis. *See Swain
v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020).

Plaintiffs will experience a constitutional injury, unwarranted stigma, and
significant financial harms if SB 264 goes into effect. Defendants, on the other hand,
face no appreciable injury from issuance of a preliminary injunction that simply
delays enforcement of an unprecedented, unsubstantiated, suspect law, pending the
Court's resolution of important constitutional and statutory matters. As the Eleventh
Circuit has recognized, the government has no interest in enforcing an
unconstitutional law. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261,
1272 (11th Cir. 2006). Rather, "the public interest is served when constitutional
rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327
(11th Cir. 2019); *see Strawser v. Strange*, 44 F. Supp. 3d 1206, 1210 (S.D. Ala.
2015) ("[I]t is always in the public interest to protect constitutional rights.") (citation
omitted).

On the other side of the scale, neither Florida nor anyone else suffers harm
from mere preservation of the longstanding status quo, under which persons hailing
from China have operated on equal footing with all other participants in Florida's

51

housing market. "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990). The requested relief would well serve that "chief function" consistent with all the equities. Notably, Florida has not identified evidence of any harm sufficient to justify SB 264, let alone exigency requiring immediate implementation of the law. Indeed, the very fact that the United States is not drawing any such lines around its own military bases belies any derivative interest Florida could possibly claim.

As explained, the law now under challenge is slated to impose a damaging, unconstitutional, irreparable stain on these Plaintiffs based solely on their country of origin, while casting a cloud over their homes, transactions, and counterparties. None of that should be permitted to happen before this Court can render its decision on the merits. In sum, the equities well support the issuance of an injunction preliminarily halting this discriminatory, unconstitutional law.

## CONCLUSION

For the foregoing reasons, this Court should preliminarily enjoin SB 264.

## **LOCAL RULE 7.1(F) CERTIFICATION**

This memorandum contains 10,485 words, fewer than 10,500 words as permitted by the Court Order (ECF No. 18).

## **LOCAL RULE 7.1(C) CERTIFICATE OF CONFERRAL**

Counsel for Plaintiffs conferred with counsel for Defendants, who oppose the relief requested by this motion.

Respectfully submitted this 6th day of June, 2023,

 /s/ Nicholas L.V. Warren

Daniel B. Tilley (FBN 102882)
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2707
dtilley@aclufl.org

Nicholas L.V. Warren (FBN 1019018)
**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

Ashley Gorski*
Patrick Toomey*
Sarah Taitz*
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**

Keliang (Clay) Zhu**
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
(925) 399-5856
czhu@dehengsv.com

Derek L. Shaffer**
William A. Burck[†]
Haiyan Tang[†]
**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com
williamburck@quinnemanuel.com
haiyantang@quinnemanuel.com

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org
ptoomey@aclu.org
staitz@aclu.org

Cody Wofsy**
**AMERICAN CIVIL LIBERTIES
UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
Email: cwofsy@aclu.org

Bethany Y. Li**
Elizabeth Koo**
**ASIAN AMERICAN LEGAL
DEFENSE AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932
bli@aaldef.org
ekoo@aaldef.org

*Attorneys for Plaintiffs*

*\* Admitted pro hac vice*

*\*\* Motion for leave to appear pro hac vice pending*

*† Motion for leave to appear pro hac vice forthcoming*