IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| YIFAN SHEN, an individual, ZHIMING XU, an individual, XINXI WANG, an individual, YONGXIN LIU, an individual, and MULTI-CHOICE REALTY LLC, a limited liability corporation,<br><br>      *Plaintiffs*,<br><br>v.<br><br>ASHLEY MOODY, in her official capacity as Attorney General of the State of Florida, WILTON SIMPSON, in his official capacity as Commissioner of Agriculture for the Florida Department of Agriculture and Consumer Affairs, MEREDITH IVEY, in her official capacity as Acting Secretary of the Florida Department of Economic Opportunity, PATRICIA FITZGERALD, in her official capacity as Chair of the Florida Real Estate Commission, R.J. LARIZZA, in his official capacity as State Attorney for the 7th Judicial Circuit, MONIQUE WORRELL, in her official capacity as State Attorney for the 9th Judicial Circuit, KATHERINE RUNDLE, in her official capacity as State Attorney for the 11th Judicial Circuit,<br><br>      *Defendants*. | Case No. 4:23-cv-208-AW-MAF |

## DECLARATION OF YIFAN SHEN

I, Yifan Shen, hereby declare as follows:

1. I am a plaintiff in the above-captioned action, and I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction, filed concurrently herewith. I have personal knowledge of the facts stated in this declaration, and if called to testify in this matter, I could and would competently testify to the facts contained herein.

### A. Personal Background

2. I am a 28-year-old woman of Asian descent and Chinese ethnicity.

3. I am a native-born citizen of the People's Republic of China.

4. I am neither a member of the Chinese government nor a member of the Chinese Communist Party.

5. I have lived in the United States since 2016.

6. I am neither a United States citizen nor a permanent resident of the United States.

7. I currently have permission to stay and live in the United States as a holder of a valid H-1B visa, which is a nonimmigrant worker visa.

8. I have not yet applied for permanent residency status in the United States, but my employer has begun the process of permanent labor certification and I plan to apply for permanent residency in the United States.

9. I have lived in Florida since 2019. Except for some recreational travel, I have continuously lived in Florida for the past four years.

10. I have a master's degree in science, and I am a dietitian, duly registered by the Florida Commission on Dietetic Registration. One of the joys of being a registered dietitian is that my work allows me to do my part to help keep the next generation of Floridians healthy. In particular, my work focuses on providing nutritional support and care to the pediatric population in Florida.

## B.  Property Interests in Florida

11. I am a renter who has lived at my current residence in Orlando, Florida for about two and a half years. My current lease ends in January 2024.

12. In April 2023, I signed a contract to buy a single-family home in Orlando, Florida, which I intend to be my primary residence. A true copy of the contract with private information redacted is attached as Exhibit 1.

13. The property is a new home construction and is currently in the process of being built. The nearest intersection is Heather Road and N. Forsyth Road, Orlando.

14. The estimated closing date for my new property is December 2023.

15. I have placed a deposit on the purchase and construction of my new property in the amount of $25,000.

16. I intend to move into my new property as soon as possible after the estimated closing date of December 2023, especially considering that my current lease ends in January 2024.

## C.  Irreparable Harm Caused by Florida's New Alien Land Law

17. I am aware that Senate Bill 264 (hereinafter, "Florida's New Alien Land Law") was recently passed in Florida and signed into law on May 8, 2023, which is the subject of this lawsuit. I learned about the new law from people I know, as well as from news and media reports. I have read the new law, read articles about it, and discussed it with others to try to understand what it means.

18. The home I am in contract to purchase is located in an area called Azalea Park in eastern Orlando. Based on searches on Google Maps, the home appears to be within five miles of multiple military sites, including one identified as "Orange County U.S. Army Recruiting Center Orlando" / "DEERS (Army Facility)" and one identified as "Florida Army National Guard (Army Facility)." Because I do not know the acreage of these sites, whether each qualifies as a base, camp, post, station, yard, or center, and whether they are operated under the

jurisdiction of the Department of Defense or its affiliates, it is extremely difficult to know whether they qualify as "military installations" under Florida's New Alien Land Law.

19. The home I am in contract to purchase also appears to be within ten miles of a critical infrastructure facility.

20. Given the severe criminal and civil penalties for violating Florida's New Alien Land Law, given that my closing date is after July 1, 2023, and given the uncertainty about whether my new property is within five miles of multiple "military installations" under the law's vague definitions, I will be forced to cancel the contract for the purchase and construction of my new home. I stand to lose all or part of my $25,000 deposit upon cancelling my contract.

21. I am extremely distressed at the prospect of not being able to acquire my new home and having no place to go when my lease ends. I am also extremely distressed at the prospect of losing my deposit, which would be a severe financial burden.

22. I am also very worried about my future ability to purchase a home in Florida. Although I am aware of an exception to Florida's New Alien Land Law allowing me to purchase one residential property up to two acres in size and not within five miles of a military installation, the new law is very unclear about the areas where I can safely purchase a home in Florida without risking criminal prosecution. I am very fearful that I could inadvertently purchase a home that violates the law and could be arrested and charged with a felony. If I were convicted, I could face up to five years in prison and a fine of $5,000, plus immigration consequences. On top of that, the property could be forfeited.

23. Relatedly, I am also very worried that I will be discriminated against by sellers and real estate agents in my future search for real estate because of their fear of the risk of violating the law and because I am Chinese. I believe that my search for real estate will be more costly, time-consuming, and burdensome under

the new law because I am Chinese. The new law will cast a cloud of suspicion over me as a Chinese person.

24. With respect to the possible criminal sanctions for violating the law, even inadvertently, I am very worried about the impact that being incarcerated could have on my life. Not only would being incarcerated deprive me of my freedom and basic liberties, but it would interrupt my income, destroy my career, and possibly result in me losing my ability to remain a registered dietitian.

25. Even if, under the new law, I am eventually able to purchase a property in Florida, I will have to register that property with the State. These registration requirements are burdensome, discriminatory, and stigmatizing to me. I am very worried that this registration will be used to target me, discriminate against me, monitor me, and generally harass me as a Chinese homeowner.

26. I feel that as a Chinese person, I have been singled out and targeted by the law simply because of where I came from, my ancestry, and my alienage status. The law stigmatizes me and wrongly treats me as suspicious because I am Chinese.

I declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct.

Executed this _5th___ day of June, 2023.

_____
Yifan Shen

# EXHIBIT 1

# BLUE DIAMOND
# PURCHASE CONTRACT

This Purchase Contract (the "Contract") is made by and between NEW EARTH PROPERTIES LLLP, a Florida Corporation ("SELLER"), whose address is ▮▮▮▮▮▮▮▮▮▮ Orlando, Florida 32801, and

| BUYER 1: YIFAN SHEN | |
|---|---|
| Home Phone: ▮▮▮▮ | Work Phone: |
| Email Address: ▮▮▮▮@GMAIL.COM | |
| Mailing Address: ▮▮▮▮▮▮▮ ORLANDO, FL  32814 | |

| BUYER 2: | |
|---|---|
| Home Phone: | Work Phone: |
| Email Address: | |
| Mailing Address: | |

**ORAL REPRESENTATIONS CANNOT BE RELIED ON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT.**

1. **DESCRIPTION OF PROPERTY.** Subject to the terms and conditions of this Contract and for the consideration set forth herein, BUYER hereby agrees to purchase and SELLER hereby agrees to sell and convey to BUYER all of that certain parcel of real property being situated in Orange County, State of Florida, known and designated as **LOT No**. ▮▮, (the "LOT") of BLUE DIAMOND, whose **STREET ADDRESS** is ---▮▮ ▮▮▮▮▮▮▮▮▮ DR, ORLANDO, FL  32807--------------------------------------------------------------------, together with all appurtenances thereto, as the same are contained and defined in the plat for BLUE DIAMOND, recorded in the Public Records of Orange County, Florida, Plat book 108, Pages 106-111.

    As part of the consideration for this transaction, SELLER hereby agrees to equip and furnish the Unit with the Standard Features set forth on the attached Exhibit "A." BUYER hereby is notified that the models that will be shown by SELLER may contain equipment and furnishings that may be different from the equipment and furnishings to be placed in the Unit by SELLER under this Contract, and BUYER hereby agrees that the only equipment and furnishings to be placed in the Unit by SELLER are as stated above. The cost of any additional equipment and furnishings shall be borne solely by BUYER.

2. **PURCHASE PRICE AND METHOD OF PAYMENT.**  BUYER agrees to pay the Total Purchase Price of $ 484,900 to SELLER as follows:

    Purchase Price:

    | | | |
    |---|---|---|
    | a. | Base Purchase Price of Unit | $479,900 |
    | b. | PLUS:  Extra/Options (if any, as listed in Addendum "A") | $ 5,000 |
    | c. | LESS:  Credits (if any) | $ |
    | d. | TOTAL PURCHASE PRICE | $ 484,900 |

Case 4:23-cv-00208-AW-MAF   Document 21-2   Filed 06/06/23   Page 8 of 18

Method of Payment:

|   | Item | Amount |
|---|---|---|
| a. | Initial Cash Deposit made as of the date of this Contract | $ 5,000 |
| b. | LESS: Additional deposit(s) due on or before as set forth below:<br>DUE BY     MAY 15TH, 2023 | $ 19,245 |
| c. | Balance due at Closing (Subject to adjustments and prorations provided for herein such as closing costs and prepaids. | $ 460,655 |

3. **FINANCING.**  If BUYER elects to obtain mortgage financing, BUYER shall assume responsibility and expense for obtaining such financing. BUYER acknowledges and agrees that this Contract shall not be conditioned on BUYER qualifying for mortgage financing from any lender or on any lender funding at closing. Notwithstanding the foregoing, if BUYER elects to obtain mortgage financing, BUYER hereby agrees to make a loan application within five (5) days from the effective date of this Contract.  The failure of BUYER to make a loan application within the above time frame shall constitute a default hereunder and may be actionable by SELLER in accordance with the terms of this Contract, and such default may be cured only on the express written statement by SELLER indicating that the default is deemed to be cured.  Loan approval by the lending institution must be issued within thirty (30) days following BUYER's loan application, unless otherwise agreed to in writing by SELLER and BUYER.  The failure of BUYER to secure loan approval within the thirty (30) day time frame shall not be grounds for BUYER to avoid BUYER's obligations under this Contract.  Loan approval shall mean a loan commitment from an institutional lender.

If BUYER complies with all of the above requirements and is unable to procure a loan commitment within thirty (30) days of the date of application, SELLER shall have the option of   refunding BUYER's deposits to BUYER and terminating this Contract, at any point after expiration of said 30 day period.

However, if BUYER fails to comply with any of the above requirements, BUYER will not be entitled to terminate this Contract and this Contract will be deemed a cash sale, or at SELLER's option, SELLER may declare BUYER in default.  If BUYER is unable to obtain mortgage approval due to an adverse change in BUYER's personal or financial condition occurring after BUYER first applies for a mortgage, or if the lender withdraws BUYER's approval after approving BUYER, BUYER will not be entitled to terminate this Contract and this will be deemed a cash sale or SELLER may, at its option, terminate this Contract and refund BUYER's deposits to BUYER.   If BUYER's approval is subject to any contingencies or conditions of any nature, to include but not limited to, credit updates, proof of funds available, proof of employment and income, insurance or any other requirements to be furnished or performed by the BUYER, or the approval is called preliminary or conditional, in such case, that approval shall constitute the approval required under this Contract, and BUYER shall be fully responsible and required to satisfy all conditions or contingencies to the satisfaction of the lender prior to the closing.   In the event BUYER does not satisfy the lender and the lender withdraws such preliminary, conditional or contingent approval, it shall be deemed a default on the part of the BUYER and this transaction shall be deemed a cash sale or, at SELLER's sole option, this Contract may be terminated and the BUYER's deposit refunded.

In addition, any other contingencies, conditions or requirements of BUYER that become effective upon mortgage approval shall be satisfied at the time designated regardless of the conditions or type of approval obtained. If BUYER's loan approval is withdrawn by the lender for any reason, this becomes a cash sale, and BUYER's deposits will be forfeited in the event that BUYER does not close on the transaction.

    The initial deposit of $5000 in paragraph 2a above is payable to the Escrow Agent Title Team, however, after 30 days, this deposit is forwarded to the Seller by Title Team and becomes non- refundable.  Buyer acknowledges and consents to this transfer of the initial deposit by signing this contract.  The additional deposit is paid directly to the Seller and is Non Refundable upon payment.

4. **SELECTION PERIOD**.  BUYER agrees to meet with SELLER's designated representative to complete the selection and all decisions required to be made regarding colors and whether to accept the standard features which are included in the base sales price for the Unit or select and agree to pay any increase in the Purchase Price for any option or upgrades in the Unit.  BUYER hereby acknowledges receipt and understanding of the standard features list for this development.  The selection process shall be completed within SEVEN (7) days of SELLER's oral or written request that BUYER make such selections ("Selection Period"), unless an extension is agreed to in writing by both parties. BUYER understands that after the Selection Period elapses further selections and changes to prior selections will not be allowed.

5. **CONSTRUCTION**.    The temporary or permanent certificate of occupancy from the applicable governmental authority shall be final with respect to completion and compliance.  The estimated date of completion of construction of the Unit is  12-28-23.  SELLER agrees that it will use its best efforts to complete construction by said date.  BUYER acknowledges and agrees that said completion date is not guaranteed and is not the essence of this Contract.  Under no circumstances shall SELLER be liable for any damages or inconvenience caused to BUYER because of the failure to complete construction by said date, regardless of the cause for the delay.  Notwithstanding anything contained herein to the contrary, SELLER unconditionally agrees to complete the Unit within a period of two (2) years from the date of this Contract.  Such two (2) year period, however, may be extended due to acts of God, inability to obtain materials, or any other event constituting an impossibility of performance under Florida law.  With respect to SELLER's two-year completion obligation, nothing contained herein shall restrict BUYER's right to seek specific performance or any other remedy if BUYER is entitled to such remedies by operation of law.

    Certain items displayed in the models (if one is to be built), and/or outside the models such as decorator items, and any other items displayed for merchandising purposes are not standard construction items and are therefore not included in the Agreement.  In the event of any conflict between SELLER's models or marketing materials and the plans and specifications for the Unit, the plans and specifications shall control.  Identification of such items should be obtained from SELLER's sales representatives.

    The Unit may be constructed as a reverse ("mirror image") of that illustrated in the floor plan of the applicable model as shown on sales and promotional material of the SELLER or as shown on an existing model of the Unit.  BUYER agrees to accept the Unit as sited by SELLER and as constructed according to a standard or reverse floor plan.

    SELLER reserves the right to make minor architectural, structural, or design modifications or changes in the Unit as it deems necessary or desirable, and BUYER agrees to close on the purchase of the Unit notwithstanding such modifications and changes, as long as the modifications and changes do not alter the overall  integrity of the Unit and any changes are such that the materials are at least of equal quality.  The square footage numbers advertised in sales materials are approximate and may vary.  SELLER may have to install chases for mechanical equipment or other reasons that may not appear in marketing or building plans.  Location of chases may vary and it will be at the option of the SELLER.

    In the event the Unit purchased herein has been constructed as of the date of this Contract, then BUYER acknowledges that BUYER has inspected the Unit and approves and accepts the Unit, as it now exists.

    The Purchaser of a one or two story residential unit has the right to have all deposit funds (up to ten (10) percent of the purchase price) deposited in an interest-bearing escrow account.  The Purchaser may waive this right in writing.  The interest if any, accrued on said escrow account shall be paid to SELLER at closing, unless previously disbursed in accordance with the provision of Florida Statutes at section 501.1375.  Deposit(s) made by BUYER hereunder shall be held in a non-interest bearing account.  If BUYER terminates this Contract

without defaulting, SELLER shall refund all deposits. If BUYER defaults, SELLER shall be entitled to retain all deposits. BUYER will be required to authorize disbursement of any escrowed funds by the Escrow Agent to SELLER at closing. Title Team shall act as an escrow agent. The escrow agent is located at 300 S Orange Ave, suite 1000, Orlando, FL 32801. PH: 407-591-3726. BUYER, by signing this contract, waves his/her right to have the deposit placed in an interest bearing account and allows the SELLER to use the whole deposit for construction. Once total of 5% deposit is paid by BUYER, the deposit shall become non-refundable.

In the event wood cabinets are installed, BUYER acknowledges that wood grain patterns on various segments of the cabinets may not match. SELLER will not replace cabinets due to color or such variations.

Ceramic Tiles may contain slightly different shades on some individual tiles. BUYER acknowledges and agrees that SELLER will not be obligated to replace individual tiles due to such differences.

6. **TITLE OF BUYER**. At closing, SELLER will transfer title to the Unit to BUYER by Warranty Deed, subject only to the following exceptions:

    a. The provisions of the Declaration of Covenants and all exhibits thereto.

    b. Taxes and assessments for the year of closing and subsequent years.

    c. Restrictions, reservations, conditions, agreements, limitations, and easements of record before closing or imposed by governmental authorities having jurisdiction or control over the subject property; provided, however, none of the foregoing shall prevent the use of the property for residential purposes.

    d. Zoning or building code ordinances, regulations, rights, or interests vested in the United States or the State of Florida.

    e. Matters of survey.

    f. BUYER's mortgage, if any.

    g. Any other items that BUYER has approved through the title insurance commitment approval process as discussed below.

    The foregoing shall be considered to be the "Permitted Exceptions."

    At closing, SELLER will deliver to BUYER a title insurance commitment issued by a title insurance company authorized to do business in the State of Florida, agreeing to issue to BUYER a policy of title insurance for the Unit. BUYER may then examine the same and notify SELLER of any objections to matters of title other than the Permitted Exceptions and matters to be satisfied at closing. If BUYER does not object to any other matters shown on the title insurance commitment, the other matters shall also automatically be considered to be included within the Permitted Exceptions. SELLER shall have 120 days after receiving BUYER's written notice of any objections to title to correct any defects in title that would render title unmarketable, but SELLER is not obligated to do so. If SELLER cannot or elects not to correct the title defects, BUYER shall have two options: (1) BUYER can accept title on the condition offered (with defects) and pay the full purchase price for the Unit and BUYER will not make any claims against SELLER because of the defects; or (2) BUYER can cancel this Contract and receive a full refund of BUYER's deposit(s), in which event SELLER shall be relieved of all obligations under this Contract when SELLER refunds BUYER's deposit(s).

7. **CLOSING**. Based on projected schedules for completion of construction of the Unit, SELLER shall notify BUYER seven (7) days in advance of the scheduled closing date for the purchase of the Unit by BUYER. Funds to be paid at closing shall be in current local funds paid by bank wire transfer. BUYER shall be expected to close on the date indicated in the notice, once the date is established. The notice also shall state the place and time of closing as designated by SELLER. If, after SELLER notifies BUYER of the time and place for closing, BUYER fails to close for any reason at that time and pay the balance of the full purchase price and all other amounts that are owed under this Contract, at SELLER's sole discretion, SELLER may either

    a. Treat BUYER's failure to close as a default, in which case SELLER shall have the rights set forth

      in paragraph 10 of this Contract; or

    b. Agree to set another date for closing. In such a case, BUYER will be required to pay SELLER at closing $200.00 per day due at closing based on the number of days between the date originally set for closing and the date the closing actually occurs.

8. **WARRANTIES**. Express and implied warranties by SELLER and other warranties are hereby specifically disclaimed. The unit shall be transferred subject only to the implied warranties of fitness and merchantability set forth in Florida Statutes and to a one (1) year builder's warranty. Said warranty shall be available for review at the SELLER's sales office. No other warranties, express or implied, are made.

9. **INSPECTION** . BUYER shall not enter into possession of the Unit or come on the construction site until the transaction has been fully closed except for the purpose of inspection as set forth herein. BUYER's failure to adhere to this provision will constitute default. BUYER will have no right of possession or use of the residence until closing. BUYER will be given an opportunity prior to closing, at a date and time scheduled by SELLER to inspect the residence with an authorized representative of SELLER ("Preclosing Final Walkthrough"). At that time, BUYER agrees to sign an inspection form listing any defect(s) or alleged defect(s) in workmanship or materials BUYER discovers. Any defect(s) or alleged defect(s) not so specified in the inspection form at the Preclosing Final Walkthrough shall be deemed to have occurred after said date, and SELLER shall have no responsibility for such defect(s) or alleged defect(s). SELLER is not required to make repairs of a cosmetic nature unless caused by a defect SELLER is responsible to repair or replace. Once the preclosing Final Walk Through items are corrected at SELLER's discretion and SELLER's best ability, BUYER shall proceed to close at a time and date set by SELLER. REFUSAL TO DO SO WILL CONSTITUTE A DEFAULT, IN WHICH CASE SELLER SHALL HAVE THE RIGHTS SET FORTH IN PARAGRAPH 10 OF THIS CONTRACT.

    BUYER acknowledges that, BUYER may only conduct "one walk through" prior to closing. SELLER is only required to correct the items in the original walk through. SELLER has no obligation to correct items that BUYER may generate as a result of a second inspection. In the event individuals other than BUYERS accompany the BUYER during the walk through, such individuals are required to present proper insurance to SELLER. Otherwise at the request of the SELLER, such individuals may not be allowed to accompany BUYER during the walk through.

10. **DEFAULT**. In the event BUYER is in default of any provisions of this agreement, at SELLER's option, SELLER has the right to cancel this agreement unilaterally in which case BUYER forfeits his/her deposit in full. At SELLER's discretion SELLER has the option to allow BUYER to cure a default resulting from failure to close on the date set under Section 7 or 9 herein, in this case BUYER shall pay to SELLER a charge of $ 200.00 per day for each day of delay following said date of closing. SELLER may also sue BUYER for specific performance of this Contract. If, for any reason other than failure of SELLER to make SELLER's title marketable after diligent effort, SELLER fails, neglects, or refuses to perform this Agreement, the BUYER may seek specific performance or elect to receive the return of BUYER's deposit. In the event BUYER issues a check that does not clear the bank due to funds not being available, it shall constitute a default under the terms of this contract. The SELLER may then cancel the contract.

11. **CLOSING COSTS**. BUYER shall pay the following costs at closing: a. Fees for recording the deed;

    b. Any attorney's fees incurred by BUYER;

    c. All costs and fees payable in connection with any mortgage that BUYER may obtain on the Unit;

    d. Costs for documentary stamps on the deed conveying title and the owner's title insurance policy;

    e. A one-time $300 fee payable to the Association.

  f. Any other document preparation and closing costs.

SELLER will contribute a total of $5,000 toward closing costs if BUYER uses SELLER's preferred lender, Contemporary Mortgage Services, Inc. Corky Howland: 407-834-3377 or Caliber Home Loans, Francheska Rodriguez: 407-719-0216. Movement Mortgage, Diana Arango: 407-852-6717.

12. **PRORATIONS**. The following items shall be prorated between SELLER and BUYER as of the date of closing;

  a. Monthly Common Expense Assessment for the Unit owed to the Association for the remainder of the applicable payment period (be it monthly, quarterly, or annually) presently set at $600 per year.

  b. General real estate taxes for the year of closing.

13. **DOCUMENTS EXECUTED BY SELLER**. SELLER will execute and deliver to BUYER a Warranty Deed and an Affidavit of No Liens with respect to the Unit conveyed.

14. **OCCUPANCY AND DISBURSEMENT**. Occupancy shall be delivered to BUYER at closing. The granting by SELLER of any limited right of possession or access to the Unit to BUYER before closing shall not constitute a waiver by SELLER of any of BUYER's obligations under this Contract. Any such limited right of possession or access in favor of BUYER shall be strictly subject to the consent of SELLER and shall not be a right of BUYER.

15. **RECORDING; ENTIRE CONTRACT; MODIFICATION; SURVIVAL; NOTICES; EFFECTIVE DATE; INSURANCE; AND TIME IS OF THE ESSENCE**. Neither this Contract nor any notice or memorandum hereof may be recorded in the Public Records of Orange County, Florida. This Contract contains the entire understanding between BUYER and SELLER, and BUYER hereby warrants that BUYER has not relied on any verbal representations, advertising, portrayals, or promises other than as contained herein. This Contract may not be modified, amended, or rescinded except by a written agreement signed by both BUYER and SELLER. The provisions and disclaimers in this Contract that is intended to have effect after closing will survive closing and delivery of the Warranty Deed. Unless otherwise notified in writing, notices shall be deemed duly sent if mailed or emailed, to either SELLER's or BUYER's respective address as listed on the first page of this Contract. This Contract shall become effective on the date when the last one of BUYER and SELLER has signed this Contract. BUYER shall have an affirmative duty to obtain and keep in good standing a hazard insurance policy on the Owner's Dwelling Unit in an amount not less than the replacement value thereof and naming the Association as a coinsured thereunder. Each Owner shall deliver a copy of said policy to the Association on the closing date on which an Owner obtains title to a Dwelling Unit and shall deliver evidence of the continued good standing of said policy annually thereafter.

16. **GOVERNING LAW; PARTIES BOUND AND PRIOR OCCUPANCY.** This contract shall be construed in accordance with the laws of the State of Florida, and shall, except as otherwise expressly provided herein, bind and inure to the benefit of the heirs, personal representatives, successors, and assigns of BUYER and SELLER. As used in this Contract, the word "BUYER" shall mean all BUYERS, jointly and severally, if there be more than one. The Unit that is the subject of this Contract has not been occupied previously.

17. **ASSIGNABILITY**. This Contract is not assignable by BUYER. SELLER shall have the right to assign its right under this Contract to a mortgage lender as additional security, and there shall be no restrictions on SELLER's ability to assign its obligations and rights under this Contract to any third party.

18. **RISK OF LOSS**. SELLER shall bear the risk of loss before closing unless possession of the Unit is

delivered to BUYER before closing, and in the latter event, the risk of loss shall be borne by BUYER as of the date of delivery of possession.

19. **INSULATION RIDER**. The BUYER shall be entitled to have the energy efficiency rating of the property determined.

Information regarding the type, thickness, R-value and location of insulation which is specified to be installed in each part of the Unit or surrounding the same is shown in the following table. Since this building is not constructed, the following information provided is based on the construction specifications only and not on the insulation actually installed. All R-values described are based upon information received from the manufacturer of the insulation materials and do not constitute representations or warranties of the SELLER. SELLER reserves the right to substitute a different type of thickness of insulation from that hereafter disclosed. However, in no event would the R-value for each respective use be less than that disclosed below. Should SELLER substitute a different type or thickness of insulation, the new disclosures concerning the substituted material will be supplied to BUYER as soon as the same is available.

TABLE OF INSULATION DATA

R-38 Blown over ceilings of living area.
R-4.1 Fi-foil installed in exterior furred walls.
R-13 Unface installed in wall between garage and living area.
R-13 Unface installed in interior sound walls per plans.
Polycel around doors, windows, and penetrations.

20. **RADON GAS**. F.S. Section 404.056(6) requires that the following notification be provided to BUYERS of real property located in the State of Florida: "Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit."

21. **BROKERS**. BUYER represents that BUYER has not dealt with any real estate broker or agent other than SELLER's representatives and: N/A

    NAME: MIA CHENG- NIZZ REALTY INC
    ADDRESS: 2414 NW 138TH DR, SUNRISE FL  33323
    EMAIL: ███████@GMAIL.COM
    PHONE: ███████

BUYER agrees to indemnify and hold SELLER harmless from: (a) the claim of any real estate broker or sales agent other than the above named broker(s) and (b) the claims of any real estate broker, including the above named broker(s), and in the event of BUYER's default hereunder, BUYER's indemnification obligations shall survive the closing of this transaction. Broker to receive a 3 % commission based on the purchase price upon closing of this transaction. Obligations of SELLER to pay real estate commission to broker will apply only if said broker is an "Active Licensee" under the provisions of the Department of Business and Professional Regulation at the time of contract execution. There will be no commission paid to any cooperating broker if not indicated herewith.

22. **SALES PROMOTION**. For the Purpose of completing the sales promotion of this Home until the sale of all Units in the community, SELLER is hereby given full right and authority to maintain or establish at the Property all models, sales office, and advertising signs and banners if any, and lighting in the connection

therewith, together with the right of ingress and egress and transient parking through the Property. This clause shall survive the closing contemplated herein and delivery of the deed to the BUYER.

**IN WITNESS WHEREOF**, the parties have hereunto set their hands and seals on the date(s) indicated below.

**BUYER(S):**

Signature: *YIFAN SHEN* (DocuSigned by: ADAC2B1ABCB5423...)   Signature: _____

Name: YIFAN SHEN   Name: _____

Social Security No: _____   Social Security No: _____

Date of Execution: 4/14/2023   Date of Execution: _____

**NEW EARTH PROPERTIES LLLP, a Florida Corporation:**

Signature: *Max Sabeti* (DocuSigned by: 96DA5C2367214B7...)

Title: General Partner

Date of Execution: 4/12/2023

**DISCLOSURE SUMMARY FOR BLUE DIAMOND**

**IF THE DISCLOSURE SUMMARY REQUIRED BY CHAPTER 720, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BE DELIVERING TO SELLER OR SELLER'S AGENT OR REPRESENTATIVE WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO**

**CLOSING, WHICHEVER OCCURS FIRST.  ANY PURPORTED WAIVER OF THIS VOIDABILITY RIGHT HAS NO EFFECT.  BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING.**

**BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THIS DISCLOSURE.**

1. As a Purchaser of property in this Community, you will be obligated to be a member of a Homeowners' Association.

2. There have been recorded Restrictive Covenants governing the use and occupancy of properties in this Community, namely the Declaration of Covenants, Conditions & Restrictions for Blue Diamond, Bylaws of Blue Diamond Owners Association, and Articles of Incorporation of Blue Diamond Owners Association, copies of which have been provided to BUYER, as acknowledged by the signature below.

3. You will be obligated to pay assessments to the Association.  Assessments may be subject to periodic change. If applicable, the current amount is $600 per YEAR. You will also be obligated to pay any special assessments imposed by the Association.

3. You will be obligated to pay Assessments to the Association.  You will be obligated to pay Special Assessments to the respective Municipality, County or Special District.  All Assessments are subject to periodic change.

4. Your failure to pay Special Assessments or Assessments levied by a mandatory Homeowners' Association could result in a lien on your property.

5. There is not an obligation to pay rent or Land Use fees for recreational or other commonly used facilities as an obligation of membership in the Homeowners' Association.

6. The Restrictive Covenants cannot be amended without the approval of the Association Membership.

7. The statements contained in this Disclosure form are only summary in nature, and, as a prospective Purchaser, you should refer to the Covenants and the Association Governing Documents before purchasing property.

8. These documents are or will be matters of public record and can be obtained from the record office in the county where the property is located.

9. The lake at Blue Diamond is for aesthetic benefits only. No recreational uses are available or allowed.

| 4/14/2023 | | DocuSigned by: YIFAN SHEN |
|---|---|---|
| Date: | Purchaser: | ADAC2B1ABCB5423 |
| Date: | Purchaser: | |

Addendum "A"

PURCHASER(s):    YIFAN SHEN

SUBDIVISION:    BLUE DIAMOND        MODEL:    SOLITAIRE    A

| ELEVATION: | A | LOT: ■ |

Options, or changes order charges, are not to be refunded under any circumstances after start of construction.

**COLOR SELECTIONS**. SELLER allows BUYER to maker color selections based upon materials available. BUYER agrees to make selections within 7 days of being notified to do so. Buyer acknowledges that construction delays will occur if selections are not made in a timely manner. If any material should prove not available, BUYER will be notified to make another selection. There will be no charge in this event.

| Item | Cost |
|---|---|
| SELLER WILL PAY A TOTAL OF $5000 TOWARD THE TOTAL CLOSING COSTS | |
| LOT PREMIUM | $5,000 |
| | |
| BASE PRICE: | $479,900 |
| TOTAL OPTIONS: | $5,000 |
| TOTAL PURCHASE PRICE: | $484,900 |

AGREED TO:                               4/14/2023

Purchaser: *YIFAN SHEN* (DocuSigned by: ADAC2B1ABCB5423...)   Date:
Purchaser:                                                    Date:

# STANDARD LUXURY FEATURES

## GOURMET KITCHEN

- Pantry Per Plan
- Icemaker Line
- Double Bowl Sink with Sprayer
- Stainless Steel Self-Cleaning Range w/ Glass Cook Top
- Stainless Steel Multi-Cycle Dishwasher
- Stainless Steel Microwave Oven
- Food Waste Disposal System
- Ceramic Tile (your choice of colors)
- Granite Countertops
- 42" Solid Wood Designer Cabinets

## LUXURY BATHROOMS

- Full Vanity Mirrors
- Elongated Toilets
- Ceramic Tile Flooring in All Bathrooms
- Water-Saving Showerheads
- Quality Plumbing Fixtures
- Double Bowl in Master Bath
- Ceramic Tile Walls/Shower
- Granite Countertops

## SAFETY & ENERGY EFFICIENCY

- R-38 Ceiling Insulation
- 40-Gallon Quick Recovery Hot Water Heater
- Energy Efficient A/C w/ Heat Pump
- Maintenance Free Vented Aluminum Soffits
- Energy Efficient Roof Vents
- Energy Saving Fiberglass Paneled Entry Doors
- Protective Smoke Detectors

## OUTSTANDING INTERIOR

- Ceramic Tile Floor in Foyer
- 10' High Ceilings on 1st Floor
- 3 1/4 inch Colonial Base Molding
- Raised Paneled Interior Doors
- Designer Light Fixture Package
- Pre-Wired for four Phone Jacks
- Pre-Wired for four Cable TV Outlets
- Pre-Wired for Fans in Family Room and Master Bedroom
- Your Choice of Stain Resistant Carpet
- Electric Smoke Detector/Door Chimes
- Garage Door Opener w/ Two Controls

## QUALITY CONSTRUCTION

- Concrete Block Structure
- Architectural Shingle Roofs
- White Aluminum Window Frames
- Professionally Engineered Roof Trusses w/ Hurricane Clips for Wind Protection
- 10-Year Structural Warranty
- 1-Year Builder Warranty

## SPECIAL FEATURES

- Professionally Landscaped Community
- Fully Sodded Yard w/ Irrigation System
- Air Filtration Prevention Sealing
- Underground Utilities







# VS2 SERIES
## -45' WIDE LOTS-

## The Solitaire

A solitaire diamond is the only gem a ring or necklace needs. Likewise, this home is sufficient to meet all your needs, with its two master suites, great room, and bedroom on the first floor.

**A**

**B**

**C**

**PORCH** 15'-0" x 6'-0"
**DINING** 10' Clg.
**GREAT ROOM** 24'-6" x 22'-4" 10' Clg.
**KITCHEN** 10' Clg.
**LDRY**
**2 CAR GARAGE** 20'-0" x 18'-8"
**BEDROOM 3** 10'-0" x 10'-0" 10' Clg.
**ENTRY**

**TERRACE** 19'-8" x 4'-0"
**MASTER SUITE 2** 17'-4" x 15'-0" 8' Clg.
**MASTER SUITE 1** 19'-0" x 13'-0" 8' Clg.
**M. BATH 2**
**WIC**
**M. BATH 1**

3 | 3 | 2 | 1,982