

EXHIBIT 36

**The Florida Senate**
# BILL ANALYSIS AND FISCAL IMPACT STATEMENT
(This document is based on the provisions contained in the legislation as of the latest date listed below.)

Prepared By: The Professional Staff of the Committee on Judiciary

BILL:          CS/SB 264

INTRODUCER:   Judiciary Committee and Senators Collins and Avila

SUBJECT:       Interests of Foreign Countries

DATE:          March 14, 2023      REVISED: _____  _____  _____  _____

| | ANALYST | STAFF DIRECTOR | REFERENCE | ACTION |
|---|---|---|---|---|
| 1. | Collazo | Cibula | JU | **Fav/CS** |
| 2. | | | RC | |

---

### Please see Section IX. for Additional Information:

COMMITTEE SUBSTITUTE - Substantial Changes

---

## I.     Summary:

CS/SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., not overseas.

Specifically, with respect to governmental entity contracting, the bill creates statutes that prohibit governmental entities from:
- Contracting with entities of foreign countries of concern.
- Entering into contracts for an economic incentive with a foreign entity.

And with respect to conveyances of agricultural lands, the bill creates statutes that:
- Prohibit a foreign principal from owning or acquiring agricultural land in the state.
- Prohibit a foreign principal from owning or acquiring any interest in real property within 20 miles of any military installation or critical infrastructure in the state.
- Prohibit China, Chinese Communist Party or other Chinese political party officials or members, Chinese business organizations, and persons domiciled in China, but who are not U.S. citizens, from purchasing or acquiring any interest in real property in the state.

The bill also amends:
- The Florida Electronic Health Records Act, to require that the offsite storage of certain personal medical information be physically maintained in the continental U.S.

- The Health Care Licensing Procedures Act, to require licensees to sign affidavits attesting that all patient information stored by them is being physically maintained in the continental U.S.
- The statute criminalizing threats and extortion, to provide that a person who commits a violation of the statute, and at the time is acting as a foreign agent with the intent of benefitting a foreign country of concern, commits a first degree felony.

The bill takes effect July 1, 2023.

## II.   Present Situation:

### Foreign Ownership of U.S. Agricultural Land

Foreign ownership and investment in U.S. agricultural land has generated significant interest in recent years.[1] Several high-profile incidents have prompted lawmakers to focus their attention on evaluating and responding to the potential impacts of foreign ownership and investment on national security, trade, and food security.[2]

A significant example occurred last year. Fufeng Group Limited, a Chinese food manufacturer, acquired 300 acres of land near the Grand Forks Air Force Base in North Dakota in order to build a wet corn milling and biofermentation plant.[3] The Air Force base, which is only about 12 miles away from the site, is believed to be the home of some of the country's most sophisticated, "top secret" military drone technology.[4] The location of the land close to the base made it particularly convenient for monitoring air traffic flows in and out of the base, among other security-related concerns.[5]

In January, Andrew P. Hunter, Assistant Secretary of the Air Force for Acquisition, Technology and Logistics,[6] sent U.S. Senator John Hoeven a letter providing the Air Force's official position on the project. It confirmed that "Grand Forks Air Force Base is the center of military activities related to both air and space operations" and that the department's position is "unambiguous: the proposed project presents a significant threat to national security with both near- and long-term

---

[1] Aleks Phillips, *What the U.S. Is Doing to Curtail Chinese Land Ownership,* NEWSWEEK, Feb. 13, 2023, https://www.newsweek.com/chinese-land-ownership-investment-us-military-bases-1780886.

[2] *See* Letter from Congressmen Glenn "GT" Thompson & James Comer to Gene L. Dodaro, Comptroller General of the U.S. Government Accountability Office (Oct. 1, 2022), *available at* https://oversight.house.gov/wp-content/uploads/2022/10/20221001_GAO_foreignlandownership.pdf (requesting that the office conduct a review of foreign investment in U.S. farmland and its impact on national security, trade, and food security).

[3] Congressional Research Service (CRS), *Foreign Ownership and Holdings of U.S. Agricultural Land* (version 4, updated Jan. 24, 2023), *available at* https://crsreports.congress.gov/product/pdf/IF/IF11977.

[4] Ariel Zilber, *Chinese firm bought North Dakota farm near U.S. Air Force drone base: report,* NEW YORK POST, Jul. 1, 2022, https://nypost.com/2022/07/01/chinese-firm-bought-farm-near-us-air-force-drone-base-report/; *see also* Letter from Thompson & Comer, *supra* note 2 (describing the technology as "top secret"); *see also* Lauren Greenwood, U.S.-China Economic and Security Review Commission, *China's Interests in U.S. Agriculture: Augmenting Food Security through Investment Abroad* (May 26, 2022), 11, *available at* https://www.uscc.gov/sites/default/files/2022-05/Chinas_Interests_in_U.S._Agriculture.pdf (noting that the Grand Forks Air Force Base "houses some of the United States' top intelligence, surveillance, and reconnaissance capabilities").

[5] Greenwood, *supra* note 4.

[6] U.S. Air Force, *Andrew P. Hunter* (Sept. 2022), https://www.af.mil/About-Us/Biographies/Display/Article/3154079/andrew-p-hunter/.

risks of significant impacts to our operations in the area."[7] About a week after the department issued its letter, the Grand Forks City Council abandoned the project.[8]

In addition to national security concerns, federal officials are also concerned about potential food security impacts. A recent letter from 130 lawmakers to the U.S. Government Accountability Office expressed concern that "foreign investment in U.S. farmland could result in foreign control of available U.S. farmland, especially prime agricultural lands, and possibly lead to foreign control over food production and food prices."[9] In a separate interview, one of the lawmakers noted that "food security is national security," explaining that Russia was able to exercise undue influence over Europe because it supplied Europe with a significant amount of natural gas, and that China might similarly try to control food supplies in South America, Southeast Asia, and even North America, in order to exert greater coercive power around the globe.[10]

Other recent incidents, while not involving the acquisition of U.S. farmland, suggest that China is working aggressively to undermine U.S. interests in other ways, both at home and abroad:

- Confucius Institutes, which offer Chinese language and cultural programs, first began appearing on U.S. university campuses in 2005. Some Members of Congress and others have alleged that they may play a role in China's efforts to influence public opinion abroad, recruit "influence agents" on U.S. campuses, and engage in cyber espionage and intellectual property theft.[11]
- In November of last year, FBI Director Christopher Wray testified at a U.S. Senate Homeland Security and Governmental Affairs Committee hearing about the existence of certain unauthorized 'police stations' established by China in major U.S. cities, noting that the U.S. has made a number of indictments involving the Chinese government harassing, stalking, surveilling, and blackmailing people in the U.S. who disagreed with Chinese leader Xi Jinping.[12]
- Last month, the U.S. shot down a Chinese spy balloon after it had traversed over a large swath of North America. The Biden Administration alleged it was part of a larger Chinese surveillance-balloon program that had violated the sovereignty of nations all over the word.[13]

---

[7] Letter from Andrew P. Hunter, Office of the Assistant Secretary, to U.S. Senator John Hoeven (Jan. 27, 2023), *available at* https://www.hoeven.senate.gov/imo/media/doc/USAIRFORCE-FUFENG-LETTER-HOEVEN.pdf.
[8] Meghan Arbegast, *Year-long Fufeng debate comes to an end after Grand Forks council members vote to stop project,* GRAND FORKS HERALD, Feb. 6, 2023, https://www.grandforksherald.com/news/local/year-long-fufeng-debate-comes-to-an-end-after-grand-forks-council-members-vote-to-stop-project.
[9] Letter from Thompson & Comer, *supra* note 2.
[10] NPR, *China is buying up more U.S. farmland. Some lawmakers consider that a security threat* (Mar. 1, 2023), https://www.npr.org/2023/03/01/1160297853/china-farmland-purchases-house-hearing-competition.
[11] CRS, *Confucius Institutes in the United States: Selected Issues* (version 12, updated May 20, 2022), https://crsreports.congress.gov/product/pdf/IF/IF11180.
[12] Michael Martina & Ted Hesson, *FBI director 'very concerned' by Chinese 'police stations' in U.S.,* REUTERS, Nov. 17, 2022, https://www.reuters.com/world/us/fbi-director-very-concerned-by-chinese-police-stations-us-2022-11-17/.
[13] Isaac Chotiner, *What's Behind the Chinese Spy Balloon,* THE NEW YORKER, Feb. 18, 2023, https://www.newyorker.com/news/q-and-a/whats-behind-the-chinese-spy-balloon.

- This month, the U.S. (and Canada) issued orders banning the use of TikTok, a Chinese-owned video sharing app, on government-issued mobile devices amid growing privacy and cybersecurity concerns.[14]
- Also this month, U.S. defense and national security officials have raised the possibility that certain Chinese-made giant cargo cranes are being used for espionage.[15]

### Ownership Statistics

Foreign persons and entities held an interest in 40.8 million acres of U.S. agricultural land in 2021, accounting for 3.1% of total privately owned land.[16] These data cover agricultural land and nonagricultural land (e.g. associated homesteads, roads, etc.). In 2021, forestland accounted for 47% of all foreign-owned land, cropland accounted for 29%, and pasture and other agricultural land for 22%. Nonagricultural land (such as homesteads and roads) accounted for 2%. Foreign land holdings have increased by an average of 2.2 million acres per year since 2015.[17]

With respect to China specifically, not including the Fufeng Group Limited's purchase in 2022, the U.S. Department of Agriculture reports that China accounted for 383,935 acres, or 0.9% of total foreign-owned U.S. agricultural land as of year-end 2021.[18] The department also reports that 85 Chinese investors own 275 parcels of agricultural land totaling 194,772 acres worth $1,868,577.[19]

| Country | Total | Foreign Entities | U.S. Entities w/ Foreign Shares | % of U.S. Private Land |
|---|---|---|---|---|
| | | (million acres) | | (percent) |
| Canada | 12.8 | 9.7 | 3.2 | 1.0% |
| Netherlands | 4.9 | 4.4 | 0.5 | 0.4% |
| Italy | 2.7 | 2.6 | 0.1 | 0.2% |
| United Kingdom | 2.5 | 1.5 | 1.0 | 0.2% |
| Germany | 2.3 | 1.4 | 0.9 | 0.2% |
| **Subtotal** | 25.2 | 19.6 | 5.7 | 2.0% |
| Other Countries | 12.4 | 7.1 | 5.3 | 1.0% |
| Not Listed | 3.2 | 2.4 | 0.8 | 0.3% |
| **Total** | 40.8 | 29.1 | 11.7 | 3.1% |



*Foreign Holdings of Agricultural Land, 2021[20]*

As of year-end 2021, the states with the most foreign-owned agricultural acreage were Texas (5.3 million acres), Maine (3.6 million acres), Colorado (1.9 million acres), Alabama (1.8 million

---

[14] CBS News, *TikTok banned on U.S. government devices, and the U.S. is not alone. Here's where the app is restricted* (Mar. 1, 2023), https://www.cbsnews.com/news/tiktok-banned-us-government-where-else-around-the-world/.
[15] Kent Masing, *U.S. Concerned China-Made Cranes In American Ports Used To Spy On Military: Report,* INTERNATIONAL BUSINESS TIMES, Mar. 6, 2023, https://www.ibtimes.com/us-concerned-china-made-cranes-american-ports-used-spy-military-report-3673964.
[16] CRS, *supra* note 3, at 2.
[17] *Id.*
[18] *Id.;* Farm Service Agency, U.S. Department of Agriculture, *Foreign Holdings of U.S. Agricultural Land* (through Dec. 31, 2021), 4, *available at* https://www.fsa.usda.gov/programs-and-services/economic-and-policy-analysis/afida/annual-reports/index.
[19] Farm Service Agency, *supra* note 18, at 229.
[20] *Id.* at Table 1 and Figure 2 (internal citations omitted).

acres), and Oklahoma (1.7 million acres). Other states with more than 1 million foreign-owned acres were Arkansas, California, Florida, Georgia, Kansas, Louisiana, Michigan, New Mexico, Oregon, and Washington.[21]

According to the U.S. Department of Agriculture, of the 21,849,568 acres of privately held agricultural land in Florida, 1,382,284 acres (6.3%) are held by foreigners, which is among the highest proportions in the U.S.[22] It is unclear how much of that land is owned by China, although the department does report that it owns 96,975 acres in the "South Region," which includes Florida.[23]

### Existing Federal and State Laws

Federal law currently imposes no restrictions on the amount of private U.S. agricultural land that can be foreign-owned.[24] However, the Agricultural Foreign Investment Disclosure Act of 1978 established a nationwide system for collecting information pertaining to the foreign ownership of U.S. agricultural land,[25] including land used for agricultural, forestry, or timber production purposes.[26] For purposes of the act, foreign persons include any individual, corporation, company, association, partnership, society, joint stock company, trust, estate, or any other legal entity (including any foreign government) under the laws of a foreign government or having a principal place of business outside of the U.S.[27]

The act's regulations require foreign persons who buy, sell, or gain interest in U.S. agricultural land to disclose their holdings and transactions to the U.S. Department of Agriculture directly or to the Farm Service Agency county office where the land is located.[28] Failure to disclose this information may result in penalties and fines.[29] After the original disclosure, each subsequent change of ownership or use must be reported.[30] It should be noted that some have expressed concern that U.S. Department of Agriculture figures developed under the act may actually underestimate foreign ownership due to unreliable data collection and the definitions used by the department.[31]

The Committee on Foreign Investment in the U.S. is an interagency committee authorized to review certain transactions involving foreign investment in the U.S. and real estate transactions by foreign persons, in order to determine the effect of such transactions on national security.[32] Notwithstanding recent expansions to the committee's jurisdictional authority and review

---

[21] *Id.*

[22] *See* Farm Service Agency, *supra* note 18, at 4, 17.

[23] *Id.* at 238.

[24] CRS, *supra* note 3, at 1.

[25] Pub. L. No. 95-460, 92 Stat. 1263 (1978); 7 U.S.C. ss. 3501-3508.

[26] 7 U.S.C. s. 3508(1); 7 C.F.R. s. 781.2(b).

[27] 7 U.S.C. s. 3508(3); 7 C.F.R. s. 781.2(g).

[28] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(a).

[29] 7 U.S.C. s. 3502; 7 C.F.R. ss. 781.4., 781.5.

[30] 7 U.S.C. s. 3501(a); 7 C.F.R. s. 781.3(b).

[31] Texas Farm Bureau, *Lawmakers ask for review of foreign ownership of U.S. farmland,* https://texasfarmbureau.org/lawmakers-ask-for-review-of-foreign-ownership-of-u-s-farmland/ (last visited Mar. 7, 2023).

[32] U.S. Department of the Treasury, *The Committee on Foreign Investment in the United States,* https://home.treasury.gov/policy-issues/international/the-committee-on-foreign-investment-in-the-united-states-cfius (last visited Mar. 6, 2023).

considerations,[33] there appear to be significant gaps. For example, the committee recently determined that Fufeng Group Limited's purchase near Grand Forks Air Force Base was outside of its jurisdiction and that it would therefore take no further action.[34]

Some U.S. states and localities have instituted restrictions on the foreign ownership of farmland.[35] Although no state has instituted an absolute prohibition on all foreign ownership, some states have limited or proposed to prohibit certain foreign persons and entities from acquiring or owning an interest in agricultural land within their states, and several states have separate disclosure requirements within their states.[36]



*Overview of Selected State Laws Related to Foreign Ownership of U.S. Agricultural Land[37]*

There is no single uniform approach under state laws to addressing foreign ownership.[38] Some general categories include:
- Restrictions on the amount of land that can be owned or the duration of ownership.
- Distinctions involving private versus public land or how agricultural land is defined.
- Distinctions involving resident and nonresident aliens.
- Inheritance considerations involving land ownership.
- Restrictions on ownership by foreign corporations (e.g. corporate farming laws or requirements corporations are subject to in order to obtain license or register).
- Differences related to enforcement and penalties.[39]

Currently, in Florida, foreign persons and entities have the same rights in real property as do citizens of the U.S. Foreign corporations, upon qualifying to do business in the state, have the same rights in real property as do domestic corporations. Foreign ownership of a domestic corporation has no effect on that corporation's rights in real property. No disclosure is required by any person or corporation when acquiring, holding or transferring rights in real property.[40]

---

[33] *See id.* (discussing Executive Order 14083, the Foreign Investment Risk Review Modernization Act of 2018, and associated regulations).
[34] T.J. Nelson, KVVR Local News, *Fufeng USA Looking to Move Ahead with Grand Forks Project After Federal Agency Review Suddenly Ends* (Dec. 13, 2022), https://www.kvrr.com/2022/12/13/fufeng-usa-looking-to-move-ahead-with-grand-forks-project-after-federal-agency-review-suddenly-ends/.
[35] CRS *supra* note 3, at 1.
[36] *Id.*
[37] *Id.* at Figure 1 (internal citation omitted).
[38] *Id.* at 1.
[39] *Id.*
[40] *See* 2 INTERNATIONAL BUSINESS TRANSACTIONS s. 29:26 (3d ed., updated Nov. 2022).

**Florida Electronic Health Records Act**

The Florida Electronic Health Records Act[41] authorizes health care providers to release or access an identifiable health record of a patient without the patient's consent for use in the treatment of that patient for an emergency medical condition, when consent cannot be obtained from the patient or the patient representative due to the patient's condition or the nature of the situation requiring immediate medical attention.[42] It provides immunity from civil liability whenever a health care provider accesses or releases the identifiable health record in good faith under the statute. It also directs the Agency for Health Care Administration to develop a form to document patient authorization for the use or release of an identifiable health record.[43] The act includes definitions for the following terms: "electronic health record," "qualified electronic health record," "certified electronic health record technology," "health record," "identifiable health record," "patient," and "patient representative."[44]

**Health Care Licensing Procedures Act**

The Health Care Licensing Procedures Act[45] provides a streamlined and consistent set of basic licensing requirements for health care providers.[46] The act is intended to minimize confusion, standardize terminology, and include issues that are not otherwise addressed in state law pertaining to specific providers.[47] Among other things, it provides certain minimum licensure requirements, with which applicants and licensees must comply in order to obtain and maintain a license.[48]

**Statute Criminalizing Threats and Extortion**

State law criminalizes threats and extortion. One commits the crime if he or she, either verbally or by a written or printed communication:

> maliciously threatens to accuse another of any crime or offense, or by such communication maliciously threatens an injury to the person, property or reputation of another, or maliciously threatens to expose another to disgrace, or to expose any secret affecting another, or to impute any deformity or lack of chastity to another, with intent thereby to extort money or any pecuniary advantage whatsoever, or with intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his or her will[.][49]

---

[41] Section 408.051, F.S.
[42] Section 408.051(3), F.S.
[43] Section 408.051(4), F.S.
[44] Section 408.051(2), F.S.
[45] Chapter 408, Part II, F.S.; *see also* s. 408.801(1), F.S. (providing a short title).
[46] Section 408.801(2), F.S.
[47] *Id.*
[48] *See generally* s. 408.810, F.S.
[49] Section 836.05, F.S.

The crime is a second degree felony, punishable by a term of imprisonment not exceeding 15 years[50] and a $10,000 fine,[51] or possibly more under the habitual offender statute.[52]

## III.    Effect of Proposed Changes:

CS/SB 264 generally restricts both governmental entity contracting with certain foreign countries and entities of concern, as well as conveyances of agricultural lands and other interests in real property to foreign principals, the People's Republic of China, and other entities and persons that are affiliated with them. It also amends certain electronic health record statutes to ensure that such records are physically stored in the continental U.S., not overseas.

**Prohibition on Governmental Entity Contracting with Entities of Foreign Countries of Concern**

**Section 1** of the bill creates s. 287.138, F.S., within chapter 287, part I, F.S., which governs commodities, insurance, and contractual services, to prohibit contracting between governmental entities and entities of foreign countries of concern.

The bill defines the following terms for purposes of the new statute:
- "Controlling interest" means possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract, or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company or is entitled to 25 percent or more of its profits is presumed to possess a controlling interest in that company.
- "Department" means the Department of Management Services.
- "Foreign country of concern" means:
  - The People's Republic of China.
  - The Russian Federation.
  - The Islamic Republic of Iran.
  - The Democratic People's Republic of Korea.
  - The Republic of Cuba.
  - The Venezuelan regime of Nicolás Maduro.
  - The Syrian Arab Republic.
  - Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- "Governmental entity" means any state, county, district, authority, or municipal officer, department, division, board, bureau, commission, or other separate unit of government created or established by law including, but not limited to, the Commission on Ethics, the Public Service Commission, the Office of Public Counsel, and any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that governmental entities may not knowingly enter into a contract with an entity which would give access to an individual's personal identifying information if:

---

[50] Section 775.082(3)(d), F.S.
[51] Section 775.083(1)(b), F.S.
[52] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).

- The entity is owned by the government of a foreign country of concern;
- The government of a foreign country of concern has a controlling interest in the entity; or
- The entity is organized under the laws of or has its principal place of business in a foreign country of concern.

Additionally, the bill provides that:
- Beginning January 1, 2024, a governmental entity may not accept a bid on, a proposal for, or a reply to, or enter into, a contract with an entity which would grant the entity access to an individual's personal identifying information unless the entity provides the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.
- Beginning July 1, 2025:
  - A governmental entity may not extend or renew a contract with one of the entities listed above if the contract would give such entity access to an individual's personal identifying information.
  - When an entity extends or renews a contract with a governmental entity which would grant the entity access to an individual's personal identifying information, the entity must provide the governmental entity with an affidavit signed by an officer or representative of the entity under penalty of perjury attesting that the entity does not meet any of the criteria in the new statute.

The bill authorizes the Attorney General to bring a civil action in any court of competent jurisdiction against an entity that violates the statute. Violations of the statute may result in:
- A civil penalty equal to twice the amount of the contract for which the entity submitted a bid or proposal for, replied to, or entered into.
- Ineligibility to enter into, renew, or extend any contract, including any grant agreements, with any governmental entity for up to 5 years.
- Ineligibility to receive or renew any license, certification, or credential issued by a governmental entity for up to 5 years.
- Placement on the suspended vendor list.[53]

Any penalties collected from entities that violate the statute must be deposited into the General Revenue Fund.

The bill also authorizes the department to adopt rules to implement the statute, including rules establishing the form for the affidavit required under the statute.

**Prohibition on Contracting for an Economic Incentive with a Foreign Entity**

**Section 2** of the bill creates s. 288.007, F.S., to prohibit governmental entities from entering into contracts for an economic incentive with a foreign entity.

The bill defines the following terms for purposes of the new statute:
- "Controlled by" means having possession of the power to direct or cause the direction of the management or policies of a company, whether through ownership of securities, by contract,

---

[53] *See* s. 287.1351, F.S. (providing for the suspension of certain vendors).

or otherwise. A person or entity that directly or indirectly has the right to vote 25 percent or more of the voting interests of the company, or that is entitled to 25 percent or more of its profits, is presumed to control the foreign entity.

- "Economic incentive" means all programs administered by, or for which an applicant for the program must seek certification, approval, or other action by, the department under chapter 288, F.S. (governing commercial development and capital improvements), chapter 212, F.S. (governing tax on sales, use, and other transactions), or chapter 220, F.S. (the income tax code), and all local economic development programs, grants, or financial benefits administered by a political subdivision or an agent thereof.
- "Foreign country of concern" has the same meaning as defined later in the bill.[54]
- "Foreign entity" means an entity that is:
  - Owned or controlled by the government of a foreign country of concern; or
  - A partnership, association, corporation, organization, or other combination of persons organized under the laws of or having its principal place of business in a foreign country of concern, or a subsidiary of such entity.
- "Government entity" means a state agency, a political subdivision, or any other public or private agency, person, partnership, corporation, or business entity acting on behalf of any public agency.

The bill provides that a government entity may not knowingly enter into an agreement or contract for an economic incentive with a foreign entity. Before providing any economic incentive, a government entity must require the recipient or applicant to provide the government entity with an affidavit signed under penalty of perjury attesting that the recipient or applicant is not a foreign entity.

The bill also requires the department to adopt rules to administer the new statute, including rules establishing the form for the required affidavit.

**Prohibition of Conveyances to Foreign Entities**

**Section 3** of the bill directs the Division of Law Revision to create part III of chapter 692, F.S., consisting of ss. 692.201, 692.202, 692.203, and 692.204, F.S., to be entitled "Conveyances to Foreign Entities."

*Definitions*

**Section 4** of the bill creates s. 692.201, F.S., which defines the following terms for purposes of part III of chapter 692, F.S.:
- "Agricultural land" means land classified as agricultural under state law.[55]
- "Critical infrastructure facility" means any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons:
  - A chemical manufacturing facility.
  - A refinery.

---

[54] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[55] *See* s. 193.461, F.S. (providing the agricultural land classification process).

- o An electrical power plant, including a substation, switching station, electrical control center, or electric transmission or distribution facility.[56]
- o A water intake structure, water treatment facility, wastewater treatment plant, or pump station.
- o A natural gas transmission compressor station.
- o A liquid natural gas terminal or storage facility.
- o A telecommunications central switching office.
- o An inland port or other facility or group of facilities serving as a point of intermodal transfer of freight in a specific area physically separated from a seaport.
- o A gas processing plant, including a plant used in the processing, treatment, or fractionation of natural gas.
- o A seaport.[57]
- o A spaceport territory.[58]
- • "Foreign country of concern" means:
  - o The People's Republic of China.
  - o The Russian Federation.
  - o The Islamic Republic of Iran.
  - o The Democratic People's Republic of Korea.
  - o The Republic of Cuba.
  - o The Venezuelan regime of Nicolás Maduro.
  - o The Syrian Arab Republic.
  - o Any agency of, or any other entity under the significant control of, one of the above-listed foreign countries of concern.
- • "Foreign principal" means:
  - o The government or any official of the government of a foreign country of concern;
  - o A political party or member of a political party or any subdivision of a political party in a foreign country of concern;
  - o A partnership, association, corporation, organization, or other combination of persons organized under the laws of, or having its principal place of business in, a foreign country of concern, or a subsidiary of such entity; or
  - o Any person who is domiciled in a foreign country of concern and is not a citizen of the U.S.
- • "Military installation" means a base, camp, post, station, yard, center, or other activity under the jurisdiction of the secretary of a military department or, in the case of an activity in a foreign country, under the operational control of the secretary of a military department or the

---

[56] *See* s. 403.031(20), F.S. (defining "electrical power plant" as meaning any electrical generating facility that uses any process or fuel and that is owned or operated by an electric utility, as defined in s. 403.503(14), and includes any associated facility that directly supports the operation of the electrical power plant).

[57] *See* s. 311.09(1), F.S. (listing the ports of Jacksonville, Port Canaveral, Port Citrus, Fort Pierce, Palm Beach, Port Everglades, Miami, Port Manatee, St. Petersburg, Putnam County, Tampa, Port St. Joe, Panama City, Pensacola, Key West, and Fernandina).

[58] *See* s. 331.303(18), F.S. (defining "spaceport territory" as the geographical area designated in s. 331.304, F.S., and as amended or changed in accordance with s. 331.329, F.S.; it includes, but is not limited to, the real property located in Brevard County that is included within the 1998 boundaries of Patrick Space Force Base, formerly Patrick Air Force Base; Cape Canaveral Space Force Station, formerly Cape Canaveral Air Force Station; and the John F. Kennedy Space Center).

Secretary of Defense, without regard to the duration of operational control.[59] For purposes of the bill, military installations include armories.[60]
- "Real property" means land, buildings, fixtures, and all other improvements to land.

### Purchase of Agricultural Land by Foreign Principals

**Section 5** of the bill creates s. 692.202, F.S., to prohibit the purchase of agricultural land by foreign principals.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent agricultural land or any interest in such land in the state. This prohibition does not apply to a foreign principal that acquires agricultural land for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires agricultural land or any interest in such land in the state before July 1, 2023:
- May continue to own or hold such land or interest, but may not purchase or otherwise acquire by grant, devise, or descent any additional agricultural land or interest in such land in the state.
- Must register with the Department of Agriculture and Consumer Services by January 1, 2024. The department must establish a form for such registration, which, at minimum, must include all of the following:
  - The name of the owner of the agricultural land or the owner of the interest in such land.
  - The address of the agricultural land, the property appraiser's parcel identification number, and the property's legal description.
  - The number of acres of the agricultural land.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered agricultural land for the unpaid balance of any penalties assessed under the new statute.

The bill clarifies that notwithstanding the general prohibition in the bill, a foreign principal can still acquire agricultural land on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of the agricultural land within 2 years after acquiring the agricultural land.

At the time of purchase, a buyer of agricultural land, or an interest in such land, must provide an affidavit signed under penalty of perjury attesting to compliance with this section. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the agricultural land. The Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

---

[59] 10 U.S.C. s. 2801(c)(4).
[60] *See* s. 250.01(5), F.S. (defining an "armory" as a building or group of buildings used primarily for housing and training troops or for storing military property, supplies, or records).

The bill provides that an agricultural land, or any interest in such land, that is owned or acquired in violation of the new statute may be forfeited to the state. In connection with such forfeitures, the bill provides:

- The Department of Agriculture and Consumer Services may initiate a civil action in the circuit court of the county in which the property lies.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[61] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the agricultural land, or any portion thereof, is owned or held in violation of the new statute.
- If the court finds that the agricultural land, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the agricultural land in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the agricultural land subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the agricultural land upon a showing that the defendant's control of the agricultural land constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:

- A foreign principal that purchases or acquires agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[62] and a $500 fine.[63]
- A person who knowingly sells agricultural land or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[64] and a $500 fine.[65]

The bill also requires the Department of Agriculture and Consumer Services to adopt rules to implement the new statute.

### Purchase of Real Property around Military Installation and Critical Infrastructure Facilities by Foreign Principals

**Section 6** of the bill creates s. 692.203, F.S., to prohibit the purchase of real property around military installations and critical infrastructure facilities by foreign principals.

The bill provides that a foreign principal may not directly or indirectly own or acquire by purchase, grant, devise, or descent any interest in real property within 20 miles of any military

---

[61] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).
[62] Section 775.082(4)(b), F.S.
[63] Section 775.083(1)(e), F.S.
[64] Section 775.082(4)(b), F.S.
[65] Section 775.083(1)(e), F.S.

installation or critical infrastructure facility in the state. This prohibition does not apply to a foreign principal that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

A foreign principal that directly or indirectly owns or acquires any interest in real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional real property within 20 miles of any military installation or critical infrastructure facility in the state.

The bill provides that a foreign principal that owns or acquires real property within 20 miles of any military installation or critical infrastructure facility in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:
- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A foreign principal that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this provision.

The bill clarifies that notwithstanding the general prohibition in the bill, a foreign principal can still acquire real property, or any interest therein, which is within 20 miles of any military installation or critical infrastructure facility in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property.

At the time of purchase, a buyer of real property that is located within 20 miles of any military installation or critical infrastructure facility in the state must provide an affidavit signed under penalty of perjury attesting to compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property. The Florida Real Estate Commission must adopt rules to implement this provision, including rules establishing the form for the affidavit required under this provision.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:
- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[66] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to

---

[66] See s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).

believe that the real property, or any portion thereof, is owned or held in violation of the new statute.
- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:
- A foreign principal that purchases or acquires real property or any interest therein in violation of the new statute commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[67] and a $500 fine.[68]
- A person who knowingly sells real property or any interest therein in violation of this section commits a misdemeanor of the second degree, punishable by a term of imprisonment not exceeding 60 days[69] and a $500 fine.[70]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

### *Purchase or Acquisition of Real Property by the People's Republic of China*

**Section 7** of the bill creates s. 692.204, F.S., to prohibit the purchase or acquisition of real property by the People's Republic of China.

The bill prohibits the following persons or entities from directly or indirectly owning or acquiring by purchase, grant, devise, or descent any interest in real property in the state:
- The People's Republic of China, the Chinese Communist Party, or any official or member of the People's Republic of China or the Chinese Communist Party.
- Any other political party or member of a political party or a subdivision of a political party in the People's Republic of China.
- A partnership, an association, a corporation, an organization, or any other combination of persons organized under the laws of or having its principal place of business in the People's Republic of China, or a subsidiary of such entity.
- Any person who is domiciled in the People's Republic of China and who is not a citizen of the U.S.

---

[67] Section 775.082(4)(b), F.S.
[68] Section 775.083(1)(e), F.S.
[69] Section 775.082(4)(b), F.S.
[70] Section 775.083(1)(e), F.S.

This prohibition does not apply to a person or entity of the People's Republic of China that acquires real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

Any person or entity described above that directly or indirectly owns or acquires any interest in real property in the state before July 1, 2023, may continue to own or hold such real property, but may not purchase or otherwise acquire by grant, devise, or descent any additional real property in the state.

The bill provides that any person or entity described above that owns or acquires real property in the state before July 1, 2023, must register with the Department of Economic Opportunity by January 1, 2024. The department must establish a form for such registration which, at a minimum, must include all of the following:
- The name of the owner of the real property.
- The address of the real property, the property appraiser's parcel identification number, and the property's legal description.

A person or entity that fails to timely file a registration with the department is subject to a civil penalty of $1,000 for each day that the registration is late. The department may place a lien against the unregistered real property for the unpaid balance of any penalties assessed under this paragraph.

The bill clarifies that notwithstanding the general prohibition in the bill, a Chinese person or entity can still acquire real property in the state on or after July 1, 2023, by devise or descent, through the enforcement of security interests, or through the collection of debts, but must sell, transfer, or otherwise divest itself of such real property within 2 years after acquiring the real property unless the person or entity acquired the real property for a diplomatic purpose that is recognized, acknowledged, or allowed by the Federal Government.

At the time of purchase, a buyer of real property in the state must provide an affidavit signed under penalty of perjury attesting to compliance with the new statute. The failure to obtain or maintain the affidavit does not affect the title or insurability of the title for the real property. The Florida Real Estate Commission must adopt rules to implement this subsection, including rules establishing the form for the affidavit required under this subsection.

The bill provides that if any real property is owned or acquired in violation of the new statute, it may be forfeited to the state. In connection with such forfeitures, the bill provides:
- The Department of Economic Opportunity may initiate a civil action in the circuit court of the county in which the property lies for the forfeiture of the real property or any interest therein.
- Upon filing such action, the clerk must record a lis pendens in accordance with state law.[71] The court must advance the cause on the calendar. The defendant may at any time petition to modify or discharge the lis pendens based upon a finding that there is no probable cause to believe that the real property, or any portion thereof, is owned or held in violation of the new statute.

---

[71] *See* s. 48.23, F.S. (addressing the recordation of notices of lis pendens in particular circumstances).

- If the court finds that the real property, or any portion thereof, is owned or held in violation of the new statute, the court must enter a final judgment of forfeiture vesting title to the real property in the state, subject only to the rights and interests of bona fide lienholders, and such final judgment relates back to the date of the lis pendens.
- The department may sell the real property subject to a final judgment of forfeiture. Any proceeds from the sale must first be paid to any lienholders of the land, followed by payment of any outstanding fines assessed pursuant to the new statute, after which the department must be reimbursed for all costs related to the forfeiture civil action and any costs related to the sale of the land. Any remaining proceeds must be paid to the property owner.
- At any time during the forfeiture proceeding the department may seek an ex parte order of seizure of the real property upon a showing that the defendant's control of the real property constitutes a clear and present danger to the state.

The bill provides the following criminal penalties:
- A violation of this section constitutes a felony of the third degree, punishable by a term of imprisonment not exceeding 5 years[72] and a $5,000 fine,[73] or possibly more under the habitual offender statute.[74]
- A person who sells real property or any interest therein in violation of the new statute commits a misdemeanor of the first degree, punishable by a term of imprisonment not exceeding 1 year[75] and a $1,000 fine.[76]

The bill also requires the Department of Economic Opportunity to adopt rules to implement the new statute.

**Amendments to the Florida Electronic Health Records Act**

**Section 8** of the bill amends s. 408.051, F.S., the Florida Electronic Health Records Exchange Act (Act), by adding two definitions and by requiring that the offsite storage of certain personal medical information be physically maintained in the continental U.S.

First, for purposes of the Act, the bill incorporates the definition for "cloud computing" found in chapter 282, part I, F.S., which governs information technology management. That definition[77] provides that cloud computing has the same meaning as provided in Special Publication 800-145 issued by the National Institute of Standards and Technology, which reads as follows:

> Cloud computing is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources (e.g., networks, servers, storage, applications, and services) that can be rapidly provisioned and released with minimal management effort or

[72] Section 775.082(3)(e), F.S.
[73] Section 775.083(1)(c), F.S.
[74] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).
[75] Section 775.082(4)(a), F.S.
[76] Section 775.083(1)(d), F.S.
[77] Section 282.0041(5), F.S.

service provider interaction. This cloud model is composed of five essential characteristics, three service models, and four deployment models.[78]

Second, for purposes of the Act, the bill defines the term "health care provider" as including all of the following:
- Any provider as defined in the Health Care Licensing Procedures Act;[79]
- Any health care practitioner as defined in chapter 456, F.S., which governs health professions and occupations;[80]
- Any health care professional certified under the Radiological Personnel Certification Act;[81]
- Any home health aide as defined in the Home Health Services Act;[82]
- Any service provider as defined in the Florida Mental Health Act,[83] and the service provider's clinical and nonclinical staff who provide inpatient or outpatient services;
- Any licensed continuing care facility;[84] and
- Any pharmacy permitted under the Florida Pharmacy Act.[85]

Third, the bill amends the Act to provide that in addition to complying with certain federal standards regulating the privacy of individually identifiable health information,[86] a health care provider that utilizes certified electronic health record technology must ensure that all patient information stored in an offsite physical or virtual environment, including through a third-party or subcontracted computing facility or an entity providing cloud computing services, is physically maintained in the continental U.S. The bill applies this provision to all qualified electronic health records that are stored using any technology that can allow information to be electronically retrieved, accessed, or transmitted.

---

[78] U.S. Department of Commerce, National Institute of Standards and Technology, *Special Publication 800-145 (The NIST Definition of Cloud Computing)* (Sept. 2011), *available at* https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication 800-145.pdf (also identifying the referenced five essential characteristics, three service models, and four deployment models) (footnotes omitted).
[79] *See* s. 408.803(12), F.S. (defining "provider" as any activity, service, agency, or facility regulated by Agency for Health Care Administration and listed in s. 408.802, F.S.).
[80] *See* s. 456.001(4), F.S. (defining "health care practitioner" as any person licensed under one of the listed statutes).
[81] Chapter 468, part IV, F.S.
[82] *See* s. 400.462, F.S. (defining "home health aide" as a person who is trained or qualified, as provided by rule, and who provides hands-on personal care, performs simple procedures as an extension of therapy or nursing services, assists in ambulation or exercises, assists in administering medications as permitted in rule and for which the person has received training established by the agency under part III (regulating home health services), or performs tasks delegated to him or her under ch. 464, F.S. (regulating nursing)).
[83] *See* s. 394.455(45), F.S. (defining "service provider" as a receiving facility, a facility licensed under ch. 397, F.S. (governing substance abuse services), a treatment facility, an entity under contract with the department to provide mental health or substance abuse services, a community mental health center or clinic, a psychologist, a clinical social worker, a marriage and family therapist, a mental health counselor, a physician, a psychiatrist, an advanced practice registered nurse, a psychiatric nurse, or a qualified professional as defined in s. 39.01, F.S. (referencing licensed physicians, physician assistants, psychiatrists, psychologists, and psychiatric nurses)).
[84] *See* ch. 651, F.S. (governing continuing care contracts).
[85] Chapter 465, F.S.
[86] 45 C.F.R. pts. 160 and 164 (subparts A and C).

**Amendments to the Health Care Licensing Procedures Act**

**Section 9** of the bill amends s. 408.810, F.S., which provides certain minimum licensure requirements for health care providers.[87]

The bill provides that a licensee must sign an affidavit at the time of his or her initial application for a license, and on any renewal applications thereafter, that attests under penalty of perjury that he or she is in compliance with the bill, specifically the requirement in the bill that health care providers using certified electronic health record technology ensure that all patient information stored in an offsite physical or virtual environment is physically maintained in the continental U.S. The licensee must remain in compliance with this requirement or be subject to disciplinary action by the agency.

The licensee must also ensure that a person or entity who possesses a controlling interest in the licensee does not also hold, either directly or indirectly, regardless of ownership structure, an interest in an entity that has a business relationship with a foreign country of concern or that is subject to the statute prohibiting contracting with scrutinized companies.[88]

For purposes of this provision, the bill defines the following terms:
- "Business relationship" means engaging in commerce in any form, including, but not limited to, acquiring, developing, maintaining, owning, selling, possessing, leasing, or operating equipment, facilities, personnel, products, services, personal property, real property, military equipment, or any other apparatus of business or commence.
- "Foreign country of concern" has the same meaning as provided earlier in the bill.[89]
- Having an "interest" in an entity means having any direct or indirect investment in or loan to the entity valued at 5 percent or more of the entity's net worth, or any form of direct or indirect control exerting similar or greater influence on the governance of the entity.[90]

**Amendments to the Statute Criminalizing Threats and Extortion**

**Section 10** of the bill amends s. 836.05, F.S., which criminalizes threats and extortion, to provide that a person who commits a violation of the statute and at the time of the violation is acting as a foreign agent as defined in state law,[91] with the intent of benefitting a foreign country of concern as defined earlier in the bill,[92] commits a felony of the first degree, punishable by a term of imprisonment of not exceeding 30 years[93] and a $10,000 fine,[94] or possibly more under the habitual offender statute.[95]

---

[87] *See supra* note 79 (defining providers); *see also* s. 408.802, F.S. (listing regulated providers).
[88] Section 287.135, F.S.
[89] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[90] *See* s. 286.101(1), F.S. (defining "interest").
[91] *See* s. 812.081(1)(b), F.S. (defining "foreign agent" as any officer, employee, proxy, servant, delegate, or representative of a foreign government).
[92] *See* s. 4 of the bill (creating s. 692.201(3), F.S., which defines "foreign country of concern").
[93] Section 775.082(3)(b)1., F.S.
[94] Section 775.083(1)(b), F.S.
[95] *See generally* s. 775.084, F.S. (providing heightened punishments for habitual offenders).

**Effective Date**

The bill takes effect on July 1, 2023.

## IV.    Constitutional Issues:

A.    Municipality/County Mandates Restrictions:

None.

B.    Public Records/Open Meetings Issues:

None.

C.    Trust Funds Restrictions:

None.

D.    State Tax or Fee Increases:

None.

E.    Other Constitutional Issues:

A state's power to apply its law exclusively to its alien inhabitants as a class is confined to narrow limits. However, each state, in the absence of any treaty provision to the contrary, may deny to aliens the right to own land within its border.[96]

## V.    Fiscal Impact Statement:

A.    Tax/Fee Issues:

None.

B.    Private Sector Impact:

Under the bill, governmental entities are prohibited from knowingly entering into contracts for an economic incentive with a foreign entity. Accordingly, foreign entities (as defined in the bill) will no longer be able to avail themselves of such economic incentives in connection with their projects.

The bill provides that foreign principals who acquired agricultural land or land within 20 miles of a military installation or critical infrastructure facility before July 1, 2023 may

---

[96] *See Graham v. Ramani,* 383 So. 2d 634, 635 (Fla. 1980) (recognizing that the U.S. Supreme Court has upheld statutes denying aliens the right to acquire land and citing in support *Terrace v. Thompson,* 263 U.S. 197 (1923); *Terrace* upheld a state of Washington statute prohibiting the ownership of land within the state by nondeclarant aliens, finding that the "privilege of owning or controlling agricultural land within the state" and the "allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the state itself" (*id.* at 221)).

continue to own those lands, but may not expand upon their ownership after that date. Similarly, Chinese businesses, and persons who are domiciled in China and not U.S. citizens, who acquired real property before July 1, 2023 may continue to own those lands, but may not expand upon their ownership after that date. To the extent any of these foreign principals, businesses, or persons' business plans assumed future expansions of land ownership, those plans will be negatively impacted by the bill.

The bill requires health care providers that use certified electronic health care technology to ensure that all patient information stored in an offsite physical or virtual environment, including through a third-party or subcontracted facility or an entity providing cloud computing services, is maintained in the continental U.S. To the extent such patient information is not already maintained in the continental U.S., health care providers will incur costs moving that information into the continental U.S.

C.      Government Sector Impact:

Under the bill, governmental entities may not contract with entities of foreign countries of concern. To the extent contracting with entities of foreign countries of concern might have resulted in more favorable contractual terms than contracting with other entities, governmental entities will be negatively impacted by the bill.

The bill authorizes the Attorney General, Department of Agriculture and Consumer Services, and the Department of Economic Opportunity to enforce certain affidavit preparation and property forfeiture provisions in the bill. Additionally, the bill requires the Department of Management Services, the Florida Real Estate Commission, and the Department of Economic Opportunity to adopt rules to implement various provisions of the bill. Although these state agencies will incur costs associated with these efforts, it is anticipated that they will be minimal and absorbed by their existing budget allocations.

## VI.     Technical Deficiencies:

None.

## VII.    Related Issues:

None.

## VIII.   Statutes Affected:

This bill creates the following sections of the Florida Statutes: 287.138, 288.007, 692.201, 692.202, 692.203, and 692.204.

This bill substantially amends the following sections of the Florida Statutes: 408.051, 408.810, and 836.05.

**IX.    Additional Information:**

A.    Committee Substitute – Statement of Substantial Changes:
(Summarizing differences between the Committee Substitute and the prior version of the bill.)

**CS by Judiciary on March 14, 2023:**
- Revises the definitions of "foreign entity" and "foreign principal," and the category of Chinese persons and entities that are prohibited from owning or acquiring protected lands in the state, to include the subsidiaries of those entities.
- Clarifies that notwithstanding the general prohibitions in the bill, foreign principals and Chinese persons and entities may still acquire protected lands on or after the effective date, but must divest themselves of those lands within 2 years unless a diplomatic exemption applies.

B.    Amendments:

None.

This Senate Bill Analysis does not reflect the intent or official position of the bill's introducer or the Florida Senate.