# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

| | |
|---|---|
| YIFAN SHEN, ZHIMING XU, XINXI WANG, YONGXIN LIU, and MULTI-CHOICE REALTY, LLC<br><br>   *Plaintiffs,*<br><br>v.<br><br>WILTON SIMPSON, in his official capacity as Florida Commissioner of Agriculture, MEREDITH IVEY, in her official capacity as Acting Florida Secretary of Economic Opportunity, PATRICIA FITZGERALD, in her official capacity as Chair of the Florida Real Estate Commission, R.J. LARIZZA, in his official capacity as State Attorney for the 7th Judicial Circuit, MONIQUE WORRELL, in her official capacity as State Attorney for the 9th Judicial Circuit, and KATHERINE FERNANDEZ RUNDLE, in her official capacity as State Attorney for the 11TH Judicial Circuit<br>   *Defendants.* | Case No. 4:23-cv-208-AW-MAF |

## BRIEF OF RACIAL JUSTICE CENTERS, AFFINITY BAR AND PROFESSIONAL ASSOCIATIONS, AND CIVIL RIGHTS ADVOCACY ORGANIZATIONS IN SUPPORT OF <u>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

Madeleine K. Rodriguez
Fla. Bar No. 115796
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2600
(617) 832-1720
mrodriguez@foleyhoag.com
***Counsel for Amici Curiae***

*Additional Counsel*

**Robert S. Chang***
Ronald A. Peterson Law Clinic
Seattle University School of Law
901 12th Avenue
Seattle, WA 98122-1090
(206) 398-4025
changro@seattleu.edu

Counsel for Amicus Curiae
FRED T. KOREMATSU CENTER FOR LAW
AND EQUALITY

**Rose Cuison-Villazor***
Rutgers Law School
123 Washington Street
Newark, NJ 07102
(973) 535-3159
rose.villazor@law.rutgers.edu

Counsel for Amicus Curiae
CENTER FOR IMMIGRATION LAW,
POLICY AND JUSTICE

**Gabriel J. Chin***
UC Davis School of Law
400 Mrak Hall Dr.
Davis, CA 95616
(530) 752-3112
gjchin@ucdavis.edu

Counsel for Amicus Curiae
AOKI CENTER
FOR CRITICAL RACE AND NATION
STUDIES

*\*Pro hac vice motions filed
contemporaneously*

# **TABLE OF CONTENTS**

INTEREST OF AMICI CURIAE...................................................................1

INTRODUCTION ......................................................................................3

ARGUMENT .............................................................................................4

   I.  Alien Land Laws Discriminated Against Asian Persons but Have Long Been Discredited. ....................................................................................4

      A.  Alien Land Laws Targeted Certain Persons of Asian Ancestry. ..............6

      B.  Race-Based Alien Land Laws Have Been Rejected as Improper State Laws..................................................................................................8

  II. Florida's Alien Land Law Is a Racially Regressive Law That Relies on Harmful Rhetoric to Restrict the Rights of Asian Persons...........................11

      A.  The National Security Argument Supporting the Alien Land Law Is Meritless and Pretextual. .......................................................................11

      B.  The Alien Land Law Endorses Generalized Discrimination Against All Asian Persons. .....................................................................................14

CONCLUSION ........................................................................................16

i

# TABLE OF AUTHORITIES

**Cases**

*Chy Lung v. Freeman,*
   92 U.S. 275 (1875)......................................................................................6

*Detzner v. Anstead,*
   256 So.3d 820 (Fla. 2018) ........................................................................11

*Fujii v. California,*
   242 P.2d 617 (1952)..................................................................................10

*Hirabayashi v. United States,*
   320 U.S. 81 (1943)....................................................................................13

*Hirabayashi v. United States,*
   828 F.2d 591 (9th Cir. 1987) ....................................................................14

*In re Guardianship of Yano,*
   188 Cal. 645 (1922) ....................................................................................7

*Korematsu v. United States,*
   323 U.S. 214 (1944)..................................................................................13

*Korematsu v. United States,*
   584 F. Supp. 1406 (N.D. Cal. 1984) ........................................................ 14

*Namba v. McCourt,*
   204 P. 2d 569 (Or. 1949) ......................................................................... 10

*Oyama v. California,*
   332 U.S. 633 (1948)....................................................................................9

*Ozawa v. United States,*
   260 U.S. 178 (1922)....................................................................................5

*Ping v. United States,*
   130 U.S. 581 (1889)..................................................................................13

*Shelley v. Kraemer,*
   334 U.S. 1 (1948)........................................................................................9

*State v. Oakland,*
   287 P.2d 39 (Mont. 1955).........................................................................10

*Takahashi v. Fish & Game Comm'n,*
   334 U.S. 410 (1948)..................................................................................10

*Terrace v. Thompson*,
   263 U.S. 197 (1923)................................................................... 5, 8, 13

*Terrace v. Thompson*,
   274 F. 841 (W.D. Wash. 1921)...............................................................13

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018)...........................................................................14

*United States v. Diggins*,
   36 F.4th 302 (1st Cir. 2022), *cert. denied,* 143 S. Ct. 383 (2022).......................15

*United States v. Thind*,
   261 U.S. 204 (1923).................................................................................5

*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886)...............................................................................10

**Statutes**

Civil Liberties Act of 1988,
   Pub. L. 100-383, 102 Stat. 903 (1988) (codified as amended at 50 U.S.C. §§
   1989b-1989b-8)....................................................................................14

COVID-19 Hate Crimes Act,
   Pub. L. 117-13, 135 Stat. 265 (2021) ..................................................15

Immigration and Nationality Act of 1952,
   Pub. L. 82-414, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. §§ 1101 *et
   seq*.)...................................................................................................8

Naturalization Act of 1870,
   Pub. L. 41-254, 16 Stat. 254 (amended 1906) ....................................8

Fla. Const. of 1885, Decl. of Rights, § 18 .................................................5

Fla. Const. of 1968, Art I., § 2 ...............................................................5

Fla. Stat. § 692.203(8)..........................................................................16

Fla. Stat. § 692.204(8)..........................................................................16

Fla. Stat. § 692.207(7)..........................................................................16

Fla. Stat. § 775.082(4)(a) ......................................................................16

Fla. Stat. § 775.083(1)(d) ......................................................................16

H. Res. 112-683, 112th Cong., 158 Cong. Rec. H3715-19 (2012) ........................11

S. Res. 112-201, 112th Cong., 157 Cong. Rec. S6352-54 (2011)..........................11

## Other Authorities

*1927 Legislative Program for Florida takes Shape with Amendment Adoption*, Tampa Morn. Trib. (Nov. 8, 1926) ........................................................5

Keith Aoki, *No Right to Own? The Early Twentieth-Century "Alien Land Laws" as a Prelude to Internment*, 40 B.C. L. Rev. 37 (1998) .........................................6, 7

*Bill Analysis and Fiscal Impact Statement*, Florida Senate, https://www.flsenate.gov/Session/Bill/2023/264/Analyses/2023s00264.pre.ju.PDF .............................................................................................................12

Luis Noe-Bustamante et al., *About a Third of Asian Americans Say They Have Changed Their Daily Routine Due to Concerns over Threats, Attacks*, Pew Rsch Ctr (May 9, 2022), https://www.pewresearch.org/short-reads/2022/05/09/about-a-third-of-asian-americans-say-they-have-changed-their-daily-routine-due-to-concerns-over-threats-attacks/ ...........................................................15

Roger Daniels, *Asian America: Chinese and Japanese in the United States Since 1850* (Univ. of Wash. Press) (1988) ...................................................16

Dudley O. McGovney, *The Anti-Japanese Land Laws of California and Ten Other States*, 35 Calif. L. Rev. 7 (1947) .........................................................7

Chandran Nair, *U.S. Anxiety Over China's Huawei a Sequel of the Yellow Peril*, S. China Morning Post (May 11, 2019), https://www.scmp.com/week-asia/opinion/article/3009842/us-anxiety-over-huawei-sequel-yellow-peril.........15

Polly Price, *Alien Land Restrictions in the Common Law: Exploring the Relative Autonomy Paradigm*, 43 Am. J. Legal Hist. 152 (1999) .......................................4

Press Release, *Governor Ron DeSantis Cracks Down on Communist China*, News Releases (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china ........................................................12

*Report to the Governor, Senate, and House of Representatives of the State of Florida Recommending Repeal of the Racially Discriminatory Alien Land Provision of the Florida Constitution,* Immigr. & Nat'y Law Rev. Ass'n, Univ. of Cin. Coll. of Law, Alien Land Law Project (Dec. 2000).............................................................5

United States Department of Agriculture (Farm Service Agency), *Foreign Holdings of U.S. Agricultural Land: Through December 31, 2021*, =(updated Jan. 24, 2023), https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/EPAS/PDF/2021_afida_annual_report_through_12_31_2021.pdf .................................................................................................................12

United States Department of Justice, *Information about the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since 2018* (last updated Nov. 19, 2021), https://www.justice.gov/archives/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related. .................15

## INTEREST OF AMICI CURIAE[1]

Amici include a coalition of racial justice centers, affinity bar and professional associations, and civil rights advocacy organizations, listed below.

*Racial Justice Centers:*

Fred T. Korematsu Center for Law and Equality at Seattle University School of Law;

Center for Immigration Law, Policy and Justice at Rutgers Law School;

Aoki Center for Critical Race and Nation Studies at UC Davis School of Law;

LLS Anti-Racism Center of LMU Loyola Law School;

Center on Race, Inequality, and the Law at New York University School of Law;

Boston University Center for Antiracist Research; and

Center for Civil Rights and Racial Justice at the University of Pittsburgh School of Law.

These racial justice centers include scholars who study historical and contemporary race discrimination, including the treatment of persons of Asian ancestry.

*Affinity Bar/Professional Associations:*

---

[1] Complete statements of interest are included in the motion for leave to file this amicus brief. Amici certify that neither party's counsel authored this brief in whole or in part, nor did any party or party's counsel, other than amici and their counsel, contribute money to fund preparation or submission of this brief.

> Asian Pacific American Bar Association of Tampa Bay;
>
> Conference of Asian Pacific American Law Faculty;
>
> Hispanic National Bar Association;
>
> National Asian Pacific American Bar Association; and
>
> South Asian Bar Association of North America.

These affinity bar/professional organizations are familiar with the history of discrimination that has thwarted inclusion and participation in this country's political, economic, and cultural spheres.

> *Civil Rights and Other Advocacy Organizations:*
>
> Asian Americans Advancing Justice – Asian Law Caucus;
>
> Asian Americans Advancing Justice – Atlanta;
>
> Asian American Women's Political Initiative;
>
> Asian Law Alliance;
>
> Chinese for Affirmative Action;
>
> Japanese American Citizens League; and
>
> LatinoJustice PRLDEF.

These civil rights and other advocacy organizations seek to safeguard civil and political rights.

Amici are keenly aware of the history of race and alienage discrimination in restricting property rights and the devastating impact such discrimination has on

individuals, communities, and this nation. Amici are also keenly aware that immigration restrictions, alien land laws, and the incarceration of Japanese Americans during World War II have been previously upheld by courts under the pretext of national security. Amici have an interest in this litigation to ensure that this pained part of American history, particularly as it relates to alien land laws, does not recur.

## INTRODUCTION

Seventeen days from today, following the passage of Florida's Conveyance to Foreign Entities Law ("Alien Land Law" or "Law"), persons of Chinese descent—among others defined by the law, will face various bars to land ownership in Florida, including a registration requirement for those that have acquired land.[2] Individuals who misstep in attempting to comply risk committing a third-degree felony.[3] This racially motivated Law is intended to trample on the property rights of Asian persons under the pretext of national security. Accordingly, Amici request that this Court grant Plaintiffs' Motion for Preliminary Injunction.

---

[2] *See* ECF 17 ¶ 38.

[3] *See id.* ¶¶ 46-48, 53-54, 56-58.

## **ARGUMENT**

Amici offer historical support for Plaintiffs' allegations that Florida's Alien Land Law is unconstitutional.[4] Race-based alien land laws like Florida's are stains on American history. Since the mid-twentieth century, these laws—aimed at curtailing the rights of Asian persons—have historically been struck down as invidiously discriminatory. Amici will show that (1) alien land laws have a history of promoting discrimination against Asian persons and have been deemed unconstitutional for well over seventy-five years, and (2) Florida's Law repeats history by scapegoating and discriminating against Asian persons under the guise of national security.

## I. **Alien Land Laws Discriminated Against Asian Persons but Have Long Been Discredited.**

Alien land laws are part of a long line of discriminatory uses of the legal system that deployed race and citizenship laws to subordinate Asian persons. They hearken back to the earliest days of the Republic when nativist principles restricted non-citizens from owning land.[5] Notably, states relied on racially restrictive citizenship laws in place at the time to deny Asian immigrants the right to own

---

[4] *See id.* ¶¶ 3, 120.

[5] Polly Price, *Alien Land Restrictions in the Common Law: Exploring the Relative Autonomy Paradigm*, 43 Am. J. Legal Hist. 152, 155-66 (1999).

property. A century later, however, states tentatively began to embrace broader ownership rights: by 1885, Florida offered foreigners "the same right as to the ownership and disposition of property in this State as citizens of the State."[6] Such progress was short-lived. By 1926, Florida, like other states,[7] enacted a constitutional amendment restricting the rights of "aliens ineligible to citizenship" to own land.[8] This facially race-neutral category was a euphemism for immigrants from Asia.[9] The provision, which had "the sole intention of forestalling any further importation into Florida of Japanese, Chinese and others of the Mongolian race,"[10] was championed by a future Chief Justice of the Florida Supreme Court.

---

[6] Fla. Const. of 1885, Decl. of Rights, § 18.

[7] *See infra Ozawa v. United States*, 260 U.S. 178, 198 (1922); *United States v. Thind*, 261 U.S. 204, 213 (1923).

[8] Fla. Const. of 1968 Art. I § 2; *See Report to the Governor, Senate, and House of Representatives of the State of Florida Recommending Repeal of the Racially Discriminatory Alien Land Provision of the Florida Constitution,* Immigr. & Nat'y Law Rev. Ass'n, Univ. of Cin. Coll. Of Law, Alien Land Law Project (Dec. 2000).

[9] *See Terrace v. Thompson*, 263 U.S. 197, 220 (1923).

[10] *1927 Legislative Program for Florida takes Shape with Amendment Adoption*, Tampa Morn. Trib., (Nov. 8, 1926), at 9.

## A. <u>Alien Land Laws Targeted Certain Persons of Asian Ancestry.</u>

Anti-Asian sentiment began gaining widespread attention in the mid-1800s in California, due to a growing Chinese immigrant laborer population.[11] California's white political leaders responded to growing anti-Chinese sentiment by enacting state laws discouraging immigration based on Chinese race and enforcing otherwise neutral state laws in a discriminatory manner. Such efforts were rebuked by the Supreme Court in 1875, holding that the authority to enact laws concerning relations with foreign nations "belongs to Congress, and not to the states."[12]

White politicians then pivoted from the states to the federal government to secure white social dominance. The federal Chinese Exclusion Act of 1882 banned Chinese laborers from emigrating to the United States in an effort to counter what white political leaders viewed as "an 'invasion' by a contagion that, once within the body politic, begins to eat away the nation from within."[13] These fears extended to Japanese immigrants, who were deemed "ineradicably foreign" and represented a growing industrial and military power.[14] This combination of a perceived inability

---

[11] Keith Aoki, *No Right to Own? The Early Twentieth-Century "Alien Land Laws" as a Prelude to Internment*, 40 B.C. L. Rev. 37, 40-41 (1998).

[12] *Chy Lung v. Freeman,* 92 U.S. 275, 286 (1875) (internal citation omitted).

[13] Aoki, *supra,* n. 11 at 46.

[14] *Id.* at 47.

to assimilate, combined with a threat to white social dominance, spurred draconian alien land laws across the country.

In 1913, California became the first state to pass an alien land law, explicitly aimed at deterring Japanese people from coming to the state. As the California Supreme Court stated, "[t]he object sought to be attained by these statutory provisions, that is, to discourage the coming of Japanese into this state, may be a proper one, and may be even desirable for the promotion of the welfare and progress of the state."[15] The alien land laws of the 1920s served as a precursor to the federal Immigration Act of 1924, which barred virtually all "aliens ineligible to citizenship" from immigration into the United States. These alien land laws "provided a bridge that sustained the virulent anti-Asian animus that linked the Chinese Exclusion Act of 1882 with the incarceration of Japanese American citizens" during World War II.[16] In 1943, during the height of the Second World War, three states that hosted Japanese American incarceration camps—Wyoming, Utah, and Arkansas—all passed alien land laws, with Arkansas singling out all persons of Japanese ancestry, regardless of citizenship.[17]

---

[15] *In re Guardianship of Yano*, 188 Cal. 645, 658 (1922).

[16] Aoki *supra,* n. 11 at 68.

[17] Dudley O. McGovney, *The Anti-Japanese Land Laws of California and Ten Other States*, 35 Calif. L. Rev. 7, 8 (1947).

These alien land laws barred "aliens ineligible for citizenship" from owning land, which, although "facially neutral," had the clear (and intended) effect of primarily barring land ownership by Asian immigrants. Though the Naturalization Act of 1870 extended naturalization rights to "aliens of African nativity and to persons of African descent,"[18] and naturalization rights were extended piecemeal starting in 1943 to certain Asian nationalities, the general racial bar to Asian naturalization was not lifted until 1952.[19] "Aliens ineligible for citizenship" was the racial code whose meaning was clear and whose usage was given constitutional legitimacy: "[g]enerally speaking, the natives of European countries are eligible [to own land]. Japanese, Chinese and Malays are not."[20]

## B. **Race-Based Alien Land Laws Have Been Rejected as Improper State Laws.**

After World War II, courts and legislatures began dismantling race-based alienage discrimination. In 1948, the Supreme Court in *Oyama v. California* held that California's alien land law violated the Equal Protection Clause by engaging in national origin discrimination when it denied U.S.-born children of Japanese

---

[18] Naturalization Act of 1870, Pub. L. 41-254, 16 Stat. 254 (amended 1906).

[19] Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163 (1952) (codified as amended at 8 U.S.C. §§ 1101 *et. seq.*).

[20] *Terrace*, 263 U.S. at 220.

noncitizens who were not eligible for citizenship the right to own land.[21] Though the opinion of the Court did not directly address the rights of ineligible aliens under Alien Land Laws, Justice Black's concurrence did, stating that the law "violate[s] the equal protection clause . . . and conflict[s] with federal laws and treaties governing the immigration of aliens and their rights after arrival in this country . . . [and] in actual effect singles out aliens of Japanese ancestry."[22] Justice Murphy's concurrence directly addressed the rights of ineligible aliens, highlighting the race-based intent behind California's purportedly race-neutral citizenship. He asserted that its intention was "to irritate the Japanese, to make economic life in California as uncomfortable and unprofitable for them as legally possible . . . to discourage the Japanese from entering California and to drive out those who were already there."[23]

The views expressed by the various justices in *Oyama* ushered in changes in equal protection jurisprudence that led to greater protection against race-based restrictions in land ownership. Four months after deciding *Oyama*, the Supreme Court prohibited judicial enforcement of racially restrictive covenants.[24] A month later, the Court ruled California could not bar an alien ineligible to citizenship "from

---

[21] *Oyama v. California*, 332 U.S. 633, 640 (1948).

[22] *Id*. at 647 (Black, J., concurring).

[23] *Id.* at 657 (Murphy, J., concurring).

[24] *Shelley v. Kraemer,* 334 U.S. 1, 21 (1948).

earning his living as a commercial fisherman," holding that the Fourteenth Amendment "embod[ies] a general policy that all *persons* lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws."[25]

Collectively, these developments led to a series of cases that recognized that laws prohibiting "aliens ineligible for citizenship" from owning land were racially discriminatory and must be struck down. In 1949, the Oregon Supreme Court invalidated its alien land law, acknowledging that limiting the rights of aliens ineligible for citizenship violated the Equal Protection and Due Process Clauses of the United States Constitution.[26] The California Supreme Court followed in 1952, holding that the state's alien land law—by barring "aliens not eligible for citizenship" from land ownership—illegally classified persons "on the basis of race or nationality."[27] Voiding the state's race-based alien land law, the court commented that "that the Fourteenth Amendment protects aliens as well as citizens from arbitrary discrimination."[28] Montana's alien land law came down next.[29] Others,

---

[25] *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419-20 (1948).

[26] *See Namba v. McCourt,* 204 P.2d 569, 582 (Or. 1949).

[27] *Fujii v. California*, 242 P.2d 617, 624-25, 630 (1952).

[28] *Id.* at 625 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)).

[29] *State v. Oakland,* 287 P.2d 39 (Mont. 1955) (holding Montana's alien land law unconstitutional).

such as New Mexico and Washington, fell by ballot measure. Florida's too fell by ballot measure—but not until 2018.[30] By then, it seemed that the country had finally moved past its shameful history of discriminatory restrictions on property ownership. Indeed, Congress apologized for legislation racially discriminating against Chinese people.[31]

## II. Florida's Alien Land Law Is a Racially Regressive Law That Relies on Harmful Rhetoric to Restrict the Rights of Asian Persons.

Florida's Law functionally legalizes discrimination against Asian persons based on anti-Asian rhetoric employing stereotypes and fearmongering. Coming at a time where anti-Asian sentiments and rhetoric are rising across the nation, the invidious effect of the Law is to sanction discrimination against Asian persons. It is patently unconstitutional.

## A. The National Security Argument Supporting the Alien Land Law Is Meritless and Pretextual.

Throughout his tenure, Governor DeSantis has sought to "crack down on" what he considers to be "the United States' greatest geopolitical threat"—the

---

[30] *See Detzner v. Anstead*, 256 So.3d 820 (Fla. 2018) (holding that the proposed constitutional amendment that removed the state's alien land law was not defective).

[31] H. Res. 112-683, 112th Cong., 158 Cong. Rec. H3715-19 (2012); S. Res. 112-201, 112th Cong., 157 Cong. Rec. S6352-54 (2011).

Chinese Communist Party—via measures such as the Alien Land Law.[32] Commissioner Simpson has also alleged that "China and other hostile foreign nations control hundreds of thousands of acres of critical agricultural lands in the U.S. leaving our food supply and our national security interest at risk."[33] Simpson's representations are contradicted by an inconvenient truth. Of the approximately 41 million acres of foreign-owned U.S. agricultural land—which accounts for roughly three percent of *total* privately owned agricultural land in the U.S.—less than one percent involves Chinese interest.[34] Such a de minimis interest cannot significantly impact—let alone threaten—the national security or national food supply.[35]

The fundamental factual and legal flaw embraced by the Law and the Defendants is the assumption that all or many non-United States citizens or permanent residents domiciled in China are agents of the Chinese Communist Party and are controlling land on its behalf. This unsupportable generalization is identical

---

[32] Press Release, *Governor Ron DeSantis Cracks Down on Communist China*, News Releases (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china

[33] *Id.*

[34] United States Department of Agriculture (Farm Service Agency), *Foreign Holdings of U.S. Agricultural Land: Through December 31, 2021*, (updated Jan. 24, 2023), https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/EPAS/PDF/2021_afida_annual_report_through_12_31_2021.pdf

[35] *See Bill Analysis and Fiscal Impact Statement*, Florida Senate, https://www.flsenate.gov/Session/Bill/2023/264/Analyses/2023s00264.pre.ju.PDF,

to that levied against Japanese Americans during World War II.[36] The Law targets Chinese persons based on their national origin alone, with neither evidence of ties to the Chinese Communist Party nor other particularized national security threat. The Law allows anti-Asian rhetoric, once again on the rise in society, to reestablish its improper place in the law.

Using the guise of national security as a pretext to discriminate hearkens back to the shameful chapters of 19th century Chinese Exclusion,[37] 20th century anti-Asian alien land laws,[38] the incarceration of Japanese Americans during World War II and the Court's endorsement of the same as "protection against espionage and against sabotage."[39] Hindsight shows that the measures taken in the name of national security were unconscionable, with recent proof that "the government knowingly withheld information from the courts when they were considering the critical question of military necessity in this case." This recent proof led to the wartime

---

[36] *See Korematsu v. United States,* 323 U.S. 214, 219 (1944) (recognizing that many Japanese Americans "no doubt were loyal to this country," but that "it was impossible to bring about an immediate segregation of the disloyal from the loyal.")

[37] *See, e.g.*, *Ping v. United States*, 130 U.S. 581, 606 (1889) (justifying measures to exclude Chinese laborers under national security rationale).

[38] *See, e.g.*, *Terrace*, 263 U.S. at 221 (anti-Asian alien land laws justified by danger that "every foot of land within the state might pass to the ownership or possession of noncitizens" who may lack an interest in the welfare of the state) (quoting *Terrace v. Thompson*, 274 F. 841, 850 (W.D. Wash. 1921)).

[39] *See Korematsu*, 323 U.S. at 217; *Hirabayashi v. United States*, 320 U.S. 81 (1943).

convictions of Fred Korematsu and Gordon Hirabayashi to be vacated in extraordinary *coram nobis* proceedings that took place four decades after their original convictions.[40] History has since judged *Korematsu* and *Hirabayashi* as "morally repugnant" and unquestionably wrongly decided.[41] The historical condemnation of *Korematsu* is widespread, notwithstanding that these measures were taken by the federal government—purportedly utilizing its constitutionally granted authority—at a time of war with Japan. Florida's Law, having the justification of neither federal action nor a war, fares no better.

### B. The Alien Land Law Endorses Generalized Discrimination Against All Asian Persons.

Florida's Alien Land Law will exacerbate the recent resurgence of anti-Asian persecution in the United States—and worse, impermissibly offer *state* sanction to unjust fear of and bias against persons of Asian descent. In 2018, along with the Department of Justice's formation of the China Initiative, which proposed to root

---

[40] *Korematsu v. United States*, 584 F. Supp. 1406, 1420 (N.D. Cal. 1984); *Hirabayashi v. United States*, 828 F.2d 591, 608 (9th Cir. 1987) (granting petitioners' *coram nobis* petitions and vacating their convictions under the Japanese curfew and incarceration laws).

[41] *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018) ("*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'")(quoting *Korematsu*, 323 U.S. at 248 (Jackson, J., dissenting)); Civil Liberties Act of 1988, Pub. L. 100-383, 102 Stat. 903 (1988) (codified as amended at 50 U.S.C. §§ 1989b-1989b-8).

out "Chinese national security threats" and counter "economic espionage,"[42] so too came a "sequel of the Yellow Peril," a repulsive phrase assigned to previous historical periods of anti-Asian sentiment.[43]

In 2020, the global crisis of the coronavirus pandemic took hold. With theories of its origination from Wuhan, China circulating throughout the media, the general public turned to the comfort of historical anti-Asian sentiment to assign blame to Asian persons. Racist epithets referring to COVID-19 as the "China virus" and "Kung-flu" accompanied increased hate crimes against Asian persons—regardless of national origin—which has impacted the lives of countless Asian Americans.[44] In 2021, Congress found a "dramatic increase in hate crimes and violence against Asian-Americans and Pacific Islanders," and allocated additional resources to federal programs combatting hate crimes.[45]

---

[42] United States Department of Justice, *Information about the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since 2018* (last updated Nov. 19, 2021), https://www.justice.gov/archives/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related.

[43] Chandran Nair, *U.S. Anxiety Over China's Huawei a Sequel of the Yellow Peril*, S. China Morning Post (May 11, 2019), https://www.scmp.com/week-asia/opinion/article/3009842/us-anxiety-over-huawei-sequel-yellow-peril..

[44] Luis Noe-Bustamante et al., *About a Third of Asian Americans Say They Have Changed Their Daily Routine Due to Concerns over Threats, Attacks*, Pew Rsch Ctr (May 9, 2022), https://www.pewresearch.org/short-reads/2022/05/09/about-a-third-of-asian-americans-say-they-have-changed-their-daily-routine-due-to-concerns-over-threats-attacks/

[45] *See* COVID-19 Hate Crimes Act, Pub. L. 117-13, 135 Stat. 265 (2021); *United States v. Diggins*, 36 F.4th 302 (1st Cir. 2022), *cert. denied,* 143 S. Ct. 383 (2022)

Now, only five years after Florida became the final state in the Union to strike its alien land law from its constitution, Florida has enacted a new era of alien land laws; a measure that will not only worsen governmental discrimination against Asian persons, but also incentivize individuals associating with Asian persons to do the same. By imposing significant penalties—including imprisonment—for knowingly selling land to a Chinese national, the Law will have the further chilling and discriminatory effect of dissuading individuals from selling their own properties to Asian persons under fear of potential criminal prosecution.[46] Faced with these penalties, many homeowners may decline to sell their property to *any* Asian-appearing person, out of concern of running afoul of this new law.[47]

## CONCLUSION

Allowing Florida's Alien Land Law to go into effect on July 1, 2023, under the pretext of national security will invite another era of anti-Asian sentiment and result in discrimination against all Asian persons. For the foregoing reasons, Amici request that this Court grant Plaintiffs' preliminary injunction enjoining Defendants from implementing the Law.

---

[46] Fla. Stat. §§ 692.207(7), 692.203(8), 692.204(8); §§ 775.082(4)(a), 775.083(1)(d).

[47] *Cf.* Roger Daniels, *Asian America: Chinese and Japanese in the United States Since 1850*, at 343 (Univ. of Wash. Press) (1988) (quoting Professor Floyd Shinomura: "The Vincent Chin case reminds us that non-Asian Americans tend to see all Asians as foreigners.")

Respectfully submitted,


FOLEY HOAG LLP

*/s/ Madeleine K. Rodriguez*
Madeleine K. Rodriguez
Bar No. 115796
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
(617) 832-1720
mrodriguez@foleyhoag.com
COUNSEL FOR AMICI CURIAE


Gabriel J. Chin*
UC Davis School of Law
400 Mrak Hall Dr.
Davis, CA 95616
(530) 752-3112
gjchin@ucdavis.edu
COUNSEL FOR AMICUS CURIAE AOKI
CENTER FOR CRITICAL RACE AND
NATION STUDIES

Rose Cuison-Villazor*
Rutgers Law School
123 Washington Street
Newark, NJ 07102
(973) 535-3159
rose.villazor@law.rutgers.edu
COUNSEL FOR AMICUS CURIAE
CENTER FOR IMMIGRATION LAW,
POLICY AND JUSTICE

Robert Chang*
Ronald A. Peterson Law Clinic
Seattle University School of Law
901 12th Avenue
Seattle, WA 98122-1090
(206) 398-4025
changro@seattleu.edu
COUNSEL FOR AMICUS CURIAE FRED
T. KOREMATSU CENTER FOR LAW
AND EQUALITY

*Pro hac vice motions filed
contemporaneously*