# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

YIFAN SHEN; ZHIMING XU, XINXI WANG; YONGXIN
LIU; and MULTI-CHOICE REALTY, LLC,

     *Plaintiffs*,

       v.

WILTON SIMPSON, in his official capacity as Florida
Commissioner of Agriculture; J. ALEX KELLY, in
his official capacity as Florida Secretary of Com-
merce; PATRICIA FITZGERALD, in her official capac-
ity as Chair of the Florida Real Estate Commission;
R.J. LARIZZA, in his official capacity as State Attor-
ney for the 7th Judicial Circuit; MONIQUE WOR-
RELL; in her official capacity as State Attorney for
the 9th Judicial Circuit; and KATHERINE FERNAN-
DEZ RUNDLE, in her official capacity as State Attor-
ney for the 11th Judicial Circuit,

     *Defendants*.

Case No. 4:23-cv-208-
AW-MAF

# DEFENDANTS' CORRECTED MEMORANDUM IN OPPOSITION
# TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ...............................................................................1

STATEMENT OF THE CASE ...........................................................1

LEGAL STANDARD...........................................................................6

ARGUMENT .......................................................................................7

I.    Plaintiffs are not likely to succeed on the merits.............................7

    A.    Plaintiffs lack standing. ...........................................................7

        1.    The individual Plaintiffs are not subject to SB 264....................8

        2.    Multi-Choice Realty's alleged injury is speculative.................11

    B.    SB 264 is not unconstitutionally vague..............................13

    C.    SB 264 does not violate the Equal Protection Clause........................15

        1.    Controlling Supreme Court precedent establishes that SB 264's restrictions on land ownership do not violate the Equal Protection Clause.........................................................15

        2.    SB 264's land restrictions do not establish a classification subject to heightened scrutiny...................................................19

        3.    SB 264 was not motivated by racial or national-origin animus. .....................................................................................22

    D.    Plaintiffs are not likely to succeed on their claim that the Fair Housing Act preempts SB 264..........................................27

        1.    Plaintiffs cannot invoke the FHA's private cause of action......................................................................................27

        2.    Plaintiffs have failed to show discrimination under the FHA.........................................................................................30

    E.    Plaintiffs cannot use the CFIUS regime to invalidate SB 264...........31

      1.     Plaintiffs have no private right of action to claim that the CFIUS regime preempts SB 264. ...............................................31

      2.     The CFIUS regime does not preempt SB 264. .........................34

II.    The remaining equitable factors do not support a preliminary injunction. ......................................................................................41

III.   Any injunctive relief should be limited to Plaintiffs and any parts of SB 264 the Court concludes they are likely to challenge successfully. ........42

CONCLUSION .......................................................................................43

LOCAL RULE 7.1(f) CERTIFICATION ..............................................43

CERTIFICATE OF SERVICE ..............................................................44

# TABLE OF AUTHORITIES

## Cases

*ACLU of Fla. v. Byrd*, 608 F. Supp. 3d 1148 (N.D. Fla. 2022) ..............................42

*Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000) ..............................24

*Alexander v. Sandoval*, 532 U.S. 275 (2001) ...........................................................33

*Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320 (2015) ...................................34

*Bank of Am. Corp. v. City of Miami*, 581 U.S. 189 (2017).............................. 29, 30

*Bernal v. Fainter*, 467 U.S. 216 (1984) ....................................................................21

*Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) .................................................. 17, 18

*City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274 (11th Cir. 2019) ................................................................................................................31

*City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030 (9th Cir. 2021) (en banc)...................................................................................................................29

*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113 (2005) ..............................33

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013)................................................12

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000)...............................40

*Crumble v. Blumenthal*, 549 F.2d 462 (7th Cir. 1977)...........................................29

*Dandamudi v. Tisch*, 686 F.3d 66 (2d Cir. 2012) ........................................... 11, 21

*Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) .........................22

*Equality Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134, 2022 WL 19263602 (N.D. Fla. Sept. 29, 2022)...............................................................11

*Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86 (1973)..................................... 22, 30

*Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019)................................................21

*Fla. Highway Patrol v. Jackson*, 288 So. 3d 1179 (Fla. 2020) ................................8

*Foley v. Connelie*, 435 U.S. 291 (1978) ........................................... 17, 21

*Frick v. Webb*, 263 U.S. 326 (1923) ..........................................................16

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) ................................35

*Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103 (1989)...........................34

*Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002) ...........................................33

*Graham v. Richardson*, 403 U.S. 365 (1971) ............................................ 17, 20, 21

*Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299 (11th Cir. 2021)................................................................. 23, 24

*Health & Hospital Corp. of Marion Cty. v. Talevski*, 143 S. Ct. 1444 (2023)...........................................................................................33

*In re Cooke*, 412 So. 2d 340 (Fla. 1982)...................................................10

*In re Mendoza*, 597 B.R. 686 (Bankr. S.D. Fla. 2019)...............................9

*In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021) (en banc)..................................33

*Inclusive Cmties. v. Lincoln Prop. Co.*, 920 F.3d 890 (5th Cir. 2019)...................31

*Jackson v. Okaloosa Cty.*, 21 F.3d 1531 (11th Cir. 1994)......................................28

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020)...........................7

*Jean v. Nelson*, 711 F.2d 1455 (11th Cir. 1983)......................................................23

*Juarrero v. McNayr*, 157 So. 2d 79 (Fla. 1963) ........................................................10

*Keveloh v. Carter*, 699 So. 2d 285, 288 (Fla. 5th DCA 1997) ................................8

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005)................................................ 20, 21

*Lehndorff Geneva, Inc. v. Warren*, 246 N.W.2d 815 (Wis. 1976) .........................20

*Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344 (5th Cir. 2015)..............................24

*LULAC v. Bredesen*, 500 F.3d 523 (6th Cir. 2007) ......................................... 20, 21

*Mallory v. Norfolk S. Ry. Co.*, No. 21-1168, 2023 WL 4187749 (U.S. June 27, 2023)..........................................................................................17

*Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers) .................41

*Nagaraja v. Comm'r of Revenue*, 352 N.W.2d 373 (Minn. 1984) .........................11

*Nyquist v. Mauclet*, 432 U.S. 1 (1977)...................................................................21

*Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268 (11th Cir. 2013)........................................................................................40

*Oyama v. California*, 332 U.S. 633 (1948).............................................................17

*Perez v. Perez*, 164 So. 2d 561, 562 (Fla. 3d DCA 1964).....................................10

*Phillips v. Moore*, 100 U.S. 208 (1879).................................................................16

*Plyler v. Doe*, 457 U.S. 202 (1982)........................................................... 10, 20, 25

*Porterfield v. Webb*, 263 U.S. 225 (1923) .............................................................16

*Ralls Corp. v. CFIUS*, 758 F.3d 296 (D.C. Cir. 2014) ...........................................32

*Rose v. Locke*, 423 U.S. 48 (1975).........................................................................13

*Sackett v. EPA*, 143 S. Ct. 1322 (2023) .................................................................35

*Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008).....................31

*SisterSong Women of Color Reproductive Justice Collective v. Gov. of Ga.*, 40 F.4th 1320 (11th Cir. 2022) .................................................................13

*Smith v. Zaner*, 4 Ala. 99 (1842)...........................................................................19

*State ex rel. Fronton Exhibition Co. v. Stein*, 198 So. 82 (Fla. 1940)....................15

*State v. Boston, Concord & Montreal R.R.*, 25 Vt. 433 (1853)...............................19

*State v. Burch*, 545 So. 2d 279 (Fla. 4th DCA 1989) ...............................................15

*Sugarman v. Dougall*, 413 U.S. 634 (1973) .........................................................18

*Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198 (11th Cir. 2021) ........................................................................................8, 11

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)........................................8

*Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020) .................................................6, 41

*Takahasi v. Fish & Game Comm'n*, 334 U.S. 410 (1948)................................ 17, 21

*Terrace v. Thompson*, 263 U.S. 197 (1923)....................................................... 16, 18

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmties. Project*, 576 U.S. 519 (2015)...........................................................................................31

*Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011) .................................. 29, 30

*TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255 (11th Cir. 2023)..........................13

*Toop v. Ulysses Land Co.*, 237 U.S. 580 (1915) ....................................................16

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ..............................................7

*Tucker v. Liebknecht*, 86 So.3d 1240 (Fla. 5th DCA 2012) ....................................15

*United States v. Heaton*, 59 F.4th 1226 (11th Cir. 2023) .......................................13

*United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29 (1963).............................14

*United States v. Osorto*, 995 F.3d 801 (11th Cir. 2021).........................................22

*United States v. Williams*, 553 U.S. 285 (2008) ....................................................14

*Village of Arlington Heights v. Metro. Hous. Dev. Co.*, 429 U.S. 252 (1977)..........................................................................................................22

*Webb v. O'Brien*, 263 U.S. 313 (1923)........................................................... 16, 39

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008)...............................................6

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................................. 34, 41

*Zarate v. U.S. Att'y Gen.*, 26 F.4th 1196 (11th Cir. 2022) ...................................... 13

**Statutes**

28 U.S.C. § 1332(a)(2) ............................................................................................ 13

42 U.S.C. § 1983 ..................................................................................................... 33

42 U.S.C. § 3602(b) ................................................................................................. 27

42 U.S.C. § 3604(a) ...................................................................................... 27, 28, 30

42 U.S.C. § 3605 ...................................................................................................... 29

42 U.S.C. § 3606 ...................................................................................................... 29

42 U.S.C. § 3613 ...................................................................................................... 29

42 U.S.C. § 3613(a)(1)(A) .................................................................................. 27, 28

42 U.S.C. § 3614(a) ................................................................................................. 42

42 U.S.C. § 3614(b)(1)(A) ....................................................................................... 42

42 U.S.C. § 3615 ................................................................................................ 27, 28

42 U.S.C. § 3617 ...................................................................................................... 29

45 U.S.C. § 4565(a)(4) ............................................................................................. 35

45 U.S.C. § 4565(b)(1)(A) ....................................................................................... 35

45 U.S.C. § 4565(b)(1)(F) ........................................................................................ 35

45 U.S.C. § 4565(b)(2) ............................................................................................. 35

45 U.S.C. § 4565(d) ................................................................................................. 35

45 U.S.C. § 4565(f) .................................................................................................. 35

45 U.S.C. § 4565(*l*)(2) ...................................................................................35

48 U.S.C. §§ 1501–1507 ..............................................................................38

50 U.S.C § 4565(d)(3).............................................................................. 32, 34

50 U.S.C. § 4565 ............................................................................................32

50 U.S.C. § 4565 note ....................................................................................32

50 U.S.C. § 4565(a)(4) ...................................................................................33

50 U.S.C. § 4565(a)(4)(B)(ii) ........................................................................36

50 U.S.C. § 4565(a)(4)(C) ..............................................................................36

50 U.S.C. § 4565(b)(1)(C)(i)(I) ......................................................................37

50 U.S.C. § 4565(b)(1)(D) ..............................................................................37

50 U.S.C. § 4565(b)(1)(H) ..............................................................................37

50 U.S.C. § 4565(d) ........................................................................................32

50 U.S.C. § 4565(d)(1).............................................................................. 34, 37

50 U.S.C. § 4565(d)(4) ....................................................................................37

50 U.S.C. § 4565(e)(1) ....................................................................................32

50 U.S.C. § 4565(e)(2).....................................................................................32

68 Pa. Stat. & Cons. Stat. § 41 (West 2018)...................................................39

8 U.S.C. § 1101(15)(F)(i) ...............................................................................11

D.C. Code Ann. § 42-901 (West 2001) ..........................................................38

Fla. Stat. § 193.461(3)(b) ................................................................................7

Fla. Stat. § 692.201(1)......................................................................................7

Fla. Stat. § 692.201(2)..............................................................................14

Fla. Stat. § 692.201(3)................................................................................4

Fla. Stat. § 692.201(4).........................................................................4, 24

Fla. Stat. § 692.201(4)(d)..........................................................................8

Fla. Stat. § 692.201(4)(e)..........................................................................8

Fla. Stat. § 692.201(5)..............................................................................14

Fla. Stat. § 692.202(1)................................................................................4

Fla. Stat. § 692.203(1)................................................................................4

Fla. Stat. § 692.203(2)................................................................................4

Fla. Stat. § 692.203(3)................................................................................4

Fla. Stat. § 692.204(1)................................................................................5

Fla. Stat. § 692.204(2)................................................................................5

Fla. Stat. § 692.204(2)(a)..........................................................................15

Fla. Stat. § 692.204(3)................................................................................5

Fla. Stat. § 692.204(4)................................................................................5

Foreign Investment Study Act of 1974, Pub. L. No. 93-479, 88 Stat.
    1450.......................................................................................................38

Haw. Organic Act § 73(f) (1960)..............................................................38

Haw. Rev. Stat. § 171-68 (2018) ..............................................................38

Iowa Code Ann. §§ 9I.2 (West 2018)........................................................38

John S. McCain National Defense Authorization Act for Fiscal Year
    2019, Pub. L. No. 115-232, 132 Stat. 1636 (2018) .....................32, 36

Ky. Rev. Stat. § 381.300 (2018) ................................................................38

Ky. Rev. Stat. Ann. § 381.290 (West 2018) ..............................................38

Laws of Fla. 2023-32 (May 8, 2023) (SB 258) ......................................1, 3

Laws of Fla. 2023-34 (May 8, 2023) (SB 846) ......................................1, 3

Laws of Fla. ch. 2023-33 (May 8, 2023) (SB 264).............................. passim

Minn. Stat. Ann. § 500.221 (West 2018) ...................................................38

Miss. Code Ann. § 29-1-75 (West 2018) ...................................................38

Miss. Code Ann. § 89-1 23 (West 2018) ...................................................38

Mo. Rev. Stat. § 442.571 (2018)................................................................39

N.D. Cent. Code Ann. § 10-06.1-12 (West 2018) .....................................39

N.D. Cent. Code Ann. § 47-10.1-02 (West 2018) .....................................39

N.J. Stat. Ann. § 46:3-18 (West 2018).......................................................39

Neb. Rev. Stat. § 76-402 (2018) ................................................................39

Okla. Stat. tit. 60, § 121 (2018)..................................................................39

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-
    418, 102 Stat. 1107 ...............................................................................32

Or. Rev. Stat. Ann. § 273.255 (West 2018)...............................................39

S.C. Code Ann. § 27-13-30 (2018).............................................................39

S.D. Codified Laws § 43-2A-5 (2018) .......................................................39

Wis. Stat. § 710.02 (2018) .........................................................................39

**Constitutional Provisions**

Ala. Const. of 1875, art. I, § 36.................................................................18

Ark. Const. of 1868, art. I, § 20 ..................................................................18

Colo. Const. of 1876, art. II, § 27 ...............................................................18

Fla. Const. art. III, § 7 ................................................................................25

Fla. Const. art. VI, § 2 .................................................................................26

Fla. Const. art. VII, § 6 ...............................................................................10

Fla. Const. of 1868, art. I, § 18 ..................................................................18

Iowa Const. of 1857, art. I, § 22 .................................................................18

Mich. Const. of 1850, art. XVIII, § 13 .......................................................18

Mont. Const. of 1889, art. III, § 25 ...................................................... 18, 19

Neb. Const. of 1867, art. I, §14 ..................................................................18

Nev. Const. of 1864, art I, § 16 ..................................................................18

Or. Const. of 1857, art. I, § 32 ...................................................................18

S.C. Const. of 1895, art. III, § 35 ...............................................................19

U.S. Const. amend. XIV, § 1 ......................................................................25

U.S. Const. art. VI, ¶ 2 ...............................................................................34

W. Va. Const. of 1872, art. II, § 5 ..............................................................18

Wis. Const. of 1848, art. I, § 15 .................................................................18

**Regulations**

Exec. Order No. 11858 (May 7, 1975), 40 Fed. Reg. 20263 (May 9,
   1975) .......................................................................................................32

*Provisions Pertaining to Certain Transactions by Foreign Persons
   Involving Real Estate in the United States*, 84 Fed. Reg. 50,214
   (Sept. 24, 2019) ......................................................................................36

## Treatises and Compilations

A.F. Denny, *The General Statutes of the State of Missouri* (1866)........................18

A.V.D. Honeyman, *An Abridgment of the Revised Statutes of New Jersey, and of the Amended Constitution* (1878)................................18

Frederick C. Brightly et al., *Purdon's Digest: A Digest of the Laws of Pennsylvania* (8th rev. ed. 1857) ........................................19

James M. Matthews, *Digest of the Laws of Virginia, of a Civil Nature and of a Permanent Character and General Operation* (J.W. Randolph ed., 1856)................................................18

John Sayles & Henry Sayles, *Sayles' Annotated Civil Statutes of the State of Texas* (1898) ............................................19

Seymour D. Thompson & Thomas M. Steger, *A Compilation of the Statute Laws of the State of Tennessee* (3d ed. 1873)........................18

*The General Statutes of the Commonwealth of Kentucky* (Edward I. Bullock & William Johnson eds., 1873)................................18

*The General Statutes of the State of Connecticut, with the Declaration of Independence, the Constitution of the United States, and the Constitution of Connecticut* (1875) ........................................18

*The Public Statutes of the State of Minnesota (1849–1858)* (Moses Sherburne & William Hollinshead comps., 1859) ............................19

*The Revised Statutes of the State of Illinois, Embracing All Laws of a General Nature in Force July 1, 1887* (George W. Cothran ed., 6th rev. ed. 1887) ........................................18

*The Revised Statutes of the State of New York* (Montgomery H. Throop ed., 7th ed. 1882)................................................18

William Blackstone, *Commentaries on the Laws of England* ................................18

**Law Review Articles**

Allison Brownell Tirres, *Ownership Without Citizenship: The Creation of Noncitizen Property Rights*, 19 Mich. J. Race & L. 1 (2013) ................................................................................................18

Charles H. Sullivan, *Alien Land Laws: A Re-Evaluation*, 36 Temp. L.Q. 15 (1962) ......................................................................................19

David M. Golove, *Treaty-Making and the Nation: The Historical Foundations of the Nationalist Conception of the Treaty Power*, 98 Mich. L. Rev. 1075 (2000) ..................................................................39

James Frechter, *Alien Landownership in the United States: A Matter of State Control*, 14 Brook. J. Int'l L. 147 (1988) ..............................39

Polly J. Price, *Alien Land Restrictions in the American Common Law: Exploring the Relative Autonomy Paradigm*, 43 Am. J. Legal Hist. 152 (1999) ......................................................................... 18, 19, 38

**International Agreements**

Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Alb., Jan. 11, 1995 ....................................................39

Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Moz., Mar. 3, 2005 ..................................................39

Treaty of Amity and Commerce, Feb. 6, 1778, U.S.-Fr., art. XI ............39

Treaty of Friendship, Commerce and Navigation, U.S.-Ire., Jan. 21, 1950 ....................................................................................................39

**Other Authorities**

2921 E Colonial Dr #102, Orlando, FL 32803, Google Maps ................15

3701 Corrine Dr, Orlando, FL 32803, Google Maps .............................15

CFIUS, *Annual Report to Congress—Report Period: CY 2021* (Aug. 2, 2022) ......................................................................................37

Committee on Judiciary, *Senate Committee Meeting held at 4:00 PM on 3/14/2023* (Mar. 14, 2023) ...................................................... 24, 25

CS/CS/SB 264, *Interests of Foreign Countries* (Bill History tab) .........................25

CS/CS/SB 264, *Senate Bill Analysis and Fiscal Impact Statement* (2023) ................................................................................................ 2, 3, 26

Fla. House of Representatives, *House in Session—May 2, 2023* (May 1, 2023) ..........................................................................................25

Ji Li, *Investing Near the National Security Black Hole*, 14 Berk. Bus. L.J. 1 (2017) ................................................................................................36

Nick Spellman & Micah Brown, Nat'l Agric. L. Ctr., *Statutes Regulating Ownership of Agricultural Land* ...............................................26

Patrick Toomey & Clay Zhu, *Florida Really Just Banned Chinese Immigrants from Owning Property. We're Suing*, Time (June 21, 2023) ................................................................................................12

Staff News Release, *Governor Ron DeSantis Cracks Down on Communist China* (May 8, 2023) ...................................................................2

The Florida Channel, *4/11/23 Senate Session* (Apr. 11, 2023) ..............................25

U.S. Dep't of Commerce, *Foreign Direct Investment in the United States: Report of the Secretary of Commerce to the Congress* (1976) ................................................................................................38

U.S. Dep't of Homeland Sec., *DHS Strategic Action Plan to Counter the Threat Posed by the People's Republic of China* (2021) ...........................26

U.S. Dep't of State, *The Chinese Communist Party: Threatening Global Peace and Security* ...............................................................................25

**INTRODUCTION**

The challenged legislation—Florida's SB 264—restricts the purchase of land in Florida by China and other "foreign countries of concern," such as Iran and North Korea. Laws of Fla. ch. 2023-33 (May 8, 2023). To prevent hostile government actors from circumventing the law, SB 264 also restricts land purchases by individuals domiciled in those countries of concern unless the federal government has granted them U.S. citizenship or lawful-permanent-resident status.

Plaintiffs are Chinese citizens who reside in Florida and a Florida real-estate-brokerage firm. They challenge this exercise of Florida's fundamental sovereign prerogative to regulate the land within its own borders as unconstitutional and preempted by federal law. They also seek a preliminary injunction, but their claims are likely to fail. First, they lack standing. Second, Florida has broad constitutional authority to regulate the acquisition of its own land and has not acted here based on national origin or race. Third, nothing in federal law preempts Florida's regulation of its own land to help safeguard the security of its own people.

The motion should be denied.

**STATEMENT OF THE CASE**

**A.** On May 8, 2023, Governor Ron DeSantis signed into law three bills (SB 258, SB 846, and SB 264), each designed to protect "against the United States' greatest geopolitical threat—the Chinese Communist Party" and against the governments

of six other foreign countries: Iran, North Korea, Cuba, Venezuela, Syria, and Russia. Staff News Release, *Governor Ron DeSantis Cracks Down on Communist China* (May 8, 2023), https://www.flgov.com/2023/05/08/governor-ron-desantis-cracks-down-on-communist-china/ ("May 8 News Release"). SB 264, the law at issue here, protects Florida's very soil, particularly areas close to sensitive sites, from acquisition by "China and other hostile foreign nations" and their principals. *Id.*

In explaining the bill, legislative staff pointed to efforts by a Chinese food manufacturer to purchase 300 acres of agricultural land just 12 miles from Grand Forks Air Force Base in North Dakota. CS/CS/SB 264, *Senate Bill Analysis and Fiscal Impact Statement* at 2–3 (Mar. 22, 2023) ("SB 264 Staff Analysis"), https://www.flsenate.gov/Session/Bill/2023/264/Analyses/2023s00264.rc.PDF.  Grand Forks was home to "some of the country's most sophisticated, 'top secret' military drone technology," and "[t]he location of the land close to the base made it particularly convenient for monitoring air traffic flows in and out of the base, among other security-related concerns." *Id.* at 2. The Air Force thus believed that "the proposed project present[ed] a significant threat to national security with both near- and long-term risks of significant impacts to our operations in the area." *Id.* at 3. But the federal Committee on Foreign Investment in the United States (CFIUS)—the federal interagency committee tasked with assisting the President with regulating foreign investments in the United States that pose national-security threats—determined that

the proposed transaction "was outside of its jurisdiction and that it would therefore take no further action." *Id.* at 6. The transaction fell through only because "the Grand Forks City Council abandoned the project." *Id.* at 3.

That near-miss came to a head in February 2023, a month before Florida's 2023 Legislative Session began. That month was marked by other noteworthy examples of Chinese Communist Party activity on U.S. soil, including the infamous "surveillance-balloon program" pursuant to which a Chinese balloon surveilled "a large swath of North America" before being shot down. *Id.* Around the same time, "U.S. defense and national security officials . . . raised the possibility that certain Chinese-made giant cargo cranes [we]re being used for espionage." *Id.* at 4. Those concerns followed closely the FBI's revelation of "the existence of certain unauthorized 'police stations' established by China in major U.S. cities" as bases of operation for "harassing, stalking, surveilling, and blackmailing people in the U.S. who disagreed with Chinese leader Xi Jinping." *Id.* at 3.

**B.** Among other things, the legislative package signed into law by the Governor on May 8 addresses "cybersecurity and data privacy risk" associated with the use of "applications owned by a foreign principal or foreign countries of concern" (SB 258), the threat of "higher education subterfuge" by those countries in the Florida College System (SB 846), and the security of private health information previously stored abroad (SB 264). May 8 News Release, *supra*. The provisions of SB

3

264 challenged here prohibit certain land acquisitions by any "foreign principal" of

a "foreign country of concern," defined as China, Russia, Iran, North Korea, Cuba,

Venezuela, Syria, and their agencies or instrumentalities. Fla. Stat. § 692.201(3). A

"foreign principal" includes the government of any foreign country of concern, as

well as:

    (a)    "any official of the government of" one of the countries,

    (b)    a "member of a political party or any subdivision of a political party in" one of the countries,

    (c)    a business "organized under the laws of or having its principal place of business in" one of the countries,

    (d)    "[a]ny person who is domiciled in" one of the countries "and is not a citizen or lawful permanent resident of the United States," or

    (e)    any LLC or other legal entity in which a foreign principal has a controlling interest.

Fla. Stat. § 692.201(4).

Effective July 1, those "foreign principals" are prohibited from acquiring real

estate within 10 miles of a "military installation" or "critical infrastructure facility."

Fla. Stat. § 692.203(1). Real-estate transactions completed prior to July 1 are unaf-

fected. Fla. Stat. § 692.203(2). Owners must file by the end of the year a one-time

registration statement. Fla. Stat. § 692.203(3). Another provision prohibits those

same "foreign principals" from acquiring agricultural land in Florida. Fla. Stat.

§ 692.202(1).

SB 264 places additional restrictions on China and its principals. Principals of China may continue to own property in Florida acquired prior to July 1, subject to the submission of a one-time registration by the end of the year. Fla. Stat. § 692.204(3), (4). Effective July 1, principals of China are prohibited from acquiring new property in Florida, regardless of its location. Fla. Stat. § 692.204(1). There is an exception for individuals granted a non-tourist visa or asylum in the United States, who may acquire up to two contiguous acres of residential property not within 5 miles of a military installation. Fla. Stat. § 692.204(2).

**C.** On May 22, 2023, Plaintiffs sued to enjoin the enforcement of SB 264 (DE1). They amended the complaint on June 5 (DE17) and moved for a preliminary injunction (DE23).

Plaintiffs are three Chinese citizens who allege that they possess nonimmigrant U.S. visas, one Chinese-citizen asylee, and one Florida LLC. The individual plaintiffs allege that SB 264 will require them to register Florida land that they already own and prohibits some of them from purchasing Florida land in the future. The other plaintiff is a real-estate-brokerage firm (Multi-Choice Realty) that claims to have "Chinese-speaking" clients and estimates that up to 25 percent of its business could be affected by the law. DE21-6 ¶¶ 5, 14.

The individual Plaintiffs assert equal protection, void-for-vagueness, and preemption claims based on the FHA and other federal statutes. Multi-Choice joins in only the preemption claims.

Defendants are the Florida Commissioner of Agriculture, the Florida Commerce Secretary,[1] the Florida Real Estate Commission Chair, and three State Attorneys.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, Plaintiffs must establish (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable injury absent the injunction; (3) their threatened injury outweighs the harm the injunction may cause Defendants; and (4) if issued, the injunction would not be adverse to the public interest. *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).

---

[1] The statutory functions of the Department of Economic Opportunity, whose head Plaintiffs has sued, were transferred to the newly created Department of Commerce on July 1, 2023. Laws of Fla. ch. 2023-173, § 10 (May 31, 2023) (HB 5).

## ARGUMENT

## I.  Plaintiffs are not likely to succeed on the merits.

### A.  Plaintiffs lack standing.

To have standing, Plaintiffs must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citation omitted). Because "standing is not dispensed in gross," Plaintiffs must establish standing "for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). Plaintiffs flunk that standard.

As an initial matter, although they ask the Court to enjoin "SB 264" without differentiation, Plaintiffs' claims implicate just a fraction of SB 264's provisions. Plaintiffs complain only of the restrictions on the acquisition of property by individuals domiciled in China and the requirement that such individuals register properties they already own. DE23 at 16–17, 52.  But they do not assert that any other parts of SB 264 affect them, let alone any injury sufficient to support standing to challenge those provisions, such as the restrictions applicable to land "used primarily for bona fide agricultural purposes." Fla. Stat. §§ 193.461(3)(b), 692.201(1); *see* DE17 ¶¶ 63–74.

Even as to the parts of SB 264 they do attack, Plaintiffs have not established standing. To do so, they must show "an invasion of a legally protected interest that is both (1) 'concrete and particularized' and (2) 'actual or imminent, not conjectural or hypothetical.'" *Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) (citation omitted). In the pre-enforcement context, that means they must establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and "a credible threat of prosecution." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted). They have not.

### 1. The individual Plaintiffs are not subject to SB 264.

As relevant here, SB 264 applies only to those "domiciled" in China or companies controlled by such individuals. Fla. Stat. § 692.201(4)(d), (e). The term "domicile" is well-defined in Florida's common law, and SB 264 "brings th[at] old soil with it." *Fla. Highway Patrol v. Jackson*, 288 So. 3d 1179, 1183 (Fla. 2020) (citation omitted). One is domiciled where he is physically present and intends to remain permanently or indefinitely. *E.g.*, *Keveloh v. Carter*, 699 So. 2d 285, 288 (Fla. 5th DCA 1997).

**a.** The individual Plaintiffs are not domiciled in China so they are not even subject to the statute. Their declarations in fact establish that they are physically present in the United States and intend to remain here permanently or indefinitely.

8

Shen and Liu admit that they intend to remain in the United States permanently. According to their declarations, they are H1-B visa holders who "plan to apply for permanent residency in the United States," DE21-2 ¶ 8; *see also* DE21-5 ¶ 8, and Shen has even "begun the process of [obtaining a] permanent labor certification," DE21-2 ¶ 8. Both have lived in Florida for several years, DE21-2 ¶ 9; DE21-5 ¶ 9, and have stable jobs, DE21-2 ¶ 10; DE21-5 ¶ 10. Both are thus domiciled here, not in China. *See Carter*, 699 So. 2d at 288.

Xu also intends to remain in the United States. His declaration states that he fled to the United States from China in 2019 on a tourist visa and applied for asylum. DE21-3 ¶¶ 2–7. He has no "plans to ever return to China" because of "persecution by the Chinese government," and hopes to "obtain permanent status in the United States." DE21-3 ¶¶ 7–9. He owns a business here, has a wife here (also an asylum applicant), and has a house here. DE21-3 ¶ 10–12. That adds up to domicile in Florida. *Cf. In re Mendoza*, 597 B.R. 686, 688–89 (Bankr. S.D. Fla. 2019) (asylum applicant had "intent to establish a permanent Florida residence").

Wang's declaration says that she has "continuously lived" in Florida since 2017, owns a home in Florida, and currently pursues a Ph.D. at a Florida university to advance her "goal" of "help[ing] residents of coastal regions, especially people in Florida." DE21-4 ¶¶ 9, 11–12. She also lives with her one-year-old daughter, who is a U.S. citizen. DE21-4 ¶ 10. Those facts reflect an intent to remain here

9

"permanently or for an indefinite period." *Perez v. Perez*, 164 So. 2d 561, 562 (Fla. 3d DCA 1964).

None of the Plaintiffs are domiciled in China, so the statute does not even apply to them.

**b.** Apparently more eager to challenge the statute than they are to buy property in Florida, the individual Plaintiffs suggest that the statute may prohibit their land purchases because their federal immigration status precludes them from having a Florida domicile. DE23 at 33–35. The Florida cases on which Plaintiffs rely for that notion, however, involve Florida's homestead exemption, *see* Fla. Const. art. VII, § 6, which requires that the person intend to remain permanently, not just indefinitely, *Juarrero v. McNayr*, 157 So. 2d 79, 80 (Fla. 1963), and that the person establish permanent residence "'legally,' 'rightfully' or in 'good faith,'" *In re Cooke*, 412 So. 2d 340, 343 (Fla. 1982). Domicile under Florida law does not require the person to be present permanently or even legally, just indefinitely. *See Perez*, 164 So. 2d at 562.

Nor does federal law control Plaintiffs' domicile under Florida law. Under federal law even "illegal entry into the country would not, under traditional criteria, bar a person from obtaining domicile within a State." *Plyler v. Doe*, 457 U.S. 202, 227 n.22 (1982). That is particularly clear for Shen and Liu's H-1B visas, which permit them to intend to remain in the United States permanently, consistent with

their federal immigration status. *See Dandamudi v. Tisch*, 686 F.3d 66, 70 (2d Cir. 2012). Wang's F-1 student visa, by contrast, requires that she maintain her "residence in a foreign country." 8 U.S.C. § 1101(15)(F)(i). But the fact that she is required to have that intent to maintain her student-visa status does not speak to her intent, which is what matters for state-law purposes. *See Nagaraja v. Comm'r of Revenue*, 352 N.W.2d 373, 377–78 & n.10 (Minn. 1984) (holding that F-1 visa holder established domicile for state-law purposes and citing cases).[2]

Plaintiffs have not shown that the statute even applies to them. *See Equality Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134, 2022 WL 19263602, at *1, *5 (N.D. Fla. Sept. 29, 2022) (plaintiff must allege sufficient facts to establish that the challenged statute applies to his conduct).

### 2.    Multi-Choice Realty's alleged injury is speculative.

Multi-Choice does not contend that it is subject to the statute. Instead, Multi-Choice claims standing by virtue of alleged harms to a roster of nameless customers. *E.g.*, DE21-6 ¶¶ 13–14. But those injuries are "conjectural [and] hypothetical," *Support Working Animals*, 8 F.4th at 1201 (citation omitted), and Multi-Choice provides nothing to support that they are traceable to SB 264.

---

[2] Wang can challenge only SB 264's property-registration requirements—she claims no intent to purchase property. DE21-4 ¶ 12.

Multi-Choice "estimates" that it "stands to lose . . . 25 percent of its business" from the law. DE21-6 ¶ 14. The only details Multi-Choice provides about its customers is that they are "Chinese" or "Chinese-speaking." DE21-6 ¶¶ 5, 9. But SB 264 does not restrict land ownership based on race or language; it does so primarily based on domicile. Fla. Stat. § 692.204(1)(a)(4). Multi-Choice makes no effort to establish the domicile of its customers, or to what extent even any of its customers domiciled in China might be "Chinese-speaking" U.S. citizens or lawful permanent residents ("LPRs") and thus exempt from the statute. Multi-Choice also does not specify how it estimated that potential loss of business. Those estimates could be attributable to any number of factors having nothing to do with SB 264, such as interest-rate fluctuations, negative economic conditions and currency outflow controls in China,[3] misreading the statute, *see supra* Part I.A.1, and media propaganda misdescribing SB 264's effect.[4] Multi-Choice's claim to standing "rest[s] on mere conjecture." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 420 (2013). And

---

[3] *China Tightens Grip on Markets After Selloff in Currency, Stocks*, Bloomberg (June 27, 2023, 3:32 AM), https://www.bloomberg.com/news/articles/2023-06-27/china-extends-fight-against-weak-currency-as-yuan-slide-persists; *Exodus of Wealthy Chinese Accelerates With End of Covid Zero*, Bloomberg (Jan. 25, 2023, 4:00 PM), https://www.bloomberg.com/news/articles/2023-01-25/rich-chinese-plan-to-leave-with-money-with-covid-zero-s-end.

[4] *See, e.g.*, Patrick Toomey & Clay Zhu, *Florida Really Just Banned Chinese Immigrants from Owning Property. We're Suing*, Time (June 21, 2023, 6:00 AM), https://time.com/6288638/florida-ban-chinese-immigrants-owning-property-suing/ (misdescribing the statute as "singl[ing] out people from China").

"conclusory affidavits lack probative value." *TocMail, Inc. v. Microsoft Corp.*, 67 F.4th 1255, 1263 (11th Cir. 2023) (alteration rejected; citation omitted).

**B.     SB 264 is not unconstitutionally vague.**

Plaintiffs allege that four statutory terms are unconstitutionally vague: (1) "domicile"; (2) "critical infrastructure facility"; (3) "military installation"; and (4) the distance calculations from critical infrastructure facilities or military installations. DE23 at 30–36. "A statute is unconstitutionally vague only when it is "utterly devoid of a standard of conduct so that it simply has no core." *SisterSong Women of Color Reproductive Justice Collective v. Gov. of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) (citation omitted). A statute is not vague simply because its "factual application will necessarily entail a case-by-case analysis," if it is "reasonably understandable." *United States v. Heaton*, 59 F.4th 1226, 1247 (11th Cir. 2023). All four statutory terms have a clear "core" and are "reasonably understandable."

**1.** As already explained, "domicile" has a settled meaning in Florida common law. A term with an established common-law meaning is not unconstitutionally vague. *See Rose v. Locke*, 423 U.S. 48, 50 (1975); *Zarate v. U.S. Att'y Gen.*, 26 F.4th 1196, 1200 (11th Cir. 2022) ("crimes of moral turpitude" not vague). Plaintiffs' position would invalidate innumerable statutes that use this commonplace legal term, such as the diversity-jurisdiction statute. *See* 28 U.S.C. § 1332(a)(2).

13

**2.** The statute defines "critical infrastructure facility" and "military installation" in detail. A critical infrastructure facility means "any of the following, if it employs measures such as fences, barriers, or guard posts that are designed to exclude unauthorized persons," and then lists refineries, water treatment facilities, airports, among the facilities covered. Fla. Stat. § 692.201(2). And a military installation is defined as "a base, camp, post, station, yard, or center encompassing at least 10 contiguous acres that is under the jurisdiction of the Department of Defense or its affiliates." Fla. Stat. § 692.201(5). Those terms have a clear "core." *Sistersong*, 40 F.4th at 1327 (citation omitted). "[T]he mere fact that close cases can be envisioned" does not make them vague. *United States v. Williams*, 553 U.S. 285, 305 (2008).

Plaintiffs complain that "[t]here is no catalog" of the covered facilities or a "map identifying" the statute's geographic coverage. DE23 at 31. But the Supreme Court has held "many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963) (rejecting vagueness challenge to statute criminalizing sales at "unreasonably low" prices).

Plaintiffs also do not seem to have expended too much effort trying to figure things out. For instance, Shen claims that she is uncertain whether a national guard facility and an Army recruiting center in Orlando are military installations. DE21-2

14

¶ 18. But a Google search reveals that the guard facility is housed in a small business building and the recruiting center is on a one-block plot of land.[5] Neither is "at least 10 contiguous acres" in size—equivalent to eight American football fields.

**3.** Plaintiffs also see unconstitutional vagueness in the provision permitting Chinese domiciliaries to purchase up to two acres of residential property if that land is not "within [five] miles of any military installation." Fla. Stat. § 692.204(2)(a). In Florida, absent contrary indications in the statute, measurements are taken from the boundary of a property, extending outward in a straight line. *State ex rel. Fronton Exhibition Co. v. Stein*, 198 So. 82, 85–88 (Fla. 1940). This is called the "as the crow flies" metric. *State v. Burch*, 545 So. 2d 279, 281 (Fla. 4th DCA 1989); *see also Tucker v. Liebknecht*, 86 So. 3d 1240, 1242 (Fla. 5th DCA 2012). That easily administered distance calculation is not vague.

    **C.**    **SB 264 does not violate the Equal Protection Clause.**

        **1.**    **Controlling Supreme Court precedent establishes that SB 264's restrictions on land ownership do not violate the Equal Protection Clause.**

As Plaintiffs acknowledge, "in a series of cases decided 100 years ago, the Supreme Court upheld state 'alien land laws' that discriminated against 'aliens

---

    [5] *See* 2921 E Colonial Dr #102, Orlando, FL 32803, Google Maps, https:// goo.gl/maps/eLphHNC1mnr1b4rGA (national guard facility); 3701 Corrine Dr, Orlando, FL 32803, Google Maps, https://goo.gl/maps/BsekhYYoHmHM2wCi9 (recruiting center).

ineligible for naturalization.'" DE23 at 24; *see, e.g.*, *Terrace v. Thompson*, 263 U.S. 197, 219–22 (1923); *Porterfield v. Webb*, 263 U.S. 225, 233 (1923); *Webb v. O'Brien*, 263 U.S. 313, 321–22 (1923); *Frick v. Webb*, 263 U.S. 326, 333 (1923); *Toop v. Ulysses Land Co.*, 237 U.S. 580, 582–83 (1915) (dismissing as "frivolous" the contention that a "state statute forbidding the ownership of real property by aliens was repugnant to the 14th Amendment").

In *Terrace*, for example, the Supreme Court sustained the constitutionality of a provision of the Washington state constitution that generally "prohibit[ed] the ownership of land by aliens other than those who in good faith have declared intention to become citizens of the United States" and to "permanently reside therein." 263 U.S. at 212, 219. The Court noted that the common law had generally prohibited aliens from owning real property. *Id.* at 217 (citing *Phillips v. Moore*, 100 U.S. 208, 212 (1879)). The Court also rejected the contention that the law unconstitutionally discriminated against aliens in excepting U.S. citizens and eligible aliens who had declared an intention to naturalize. *Id.* at 219. SB 264 is constitutional for similar reasons. Like the law upheld in *Terrace*, its prohibitions on land ownership extend only to aliens who do not intend to reside indefinitely in this country.

Plaintiffs make no attempt to distinguish those decisions, and the United States, in its late-breaking amicus brief, ignores them. Plaintiffs instead contend that the decisions have been superseded by "developments in equal protection law."

16

DE23 at 24. Even if that were true—and as shown below it is not—this Court's obligation would be to follow Supreme Court precedent that "has direct application in a case," and leave to that Court "the prerogative of overruling its own decisions," regardless of whether "precedent is in tension with some other line of decisions." *Mallory v. Norfolk S. Ry. Co.*, No. 21-1168, 2023 WL 4187749, at \*7 (U.S. June 27, 2023). Subsequent equal-protection cases have distinguished, not overruled, the alien-land cases, reasoning that they rest on "a power long exercised and supported on reasons peculiar to real property." *Takahasi v. Fish & Game Comm'n*, 334 U.S. 410, 422 (1948); *see also Graham v. Richardson*, 403 U.S. 365, 373–74 & nn. 8–9 (1971) (reserving the question of the "contemporary vitality" of decisions such as *Terrace*); *Oyama v. California*, 332 U.S. 633, 646–47 (1948) (same).

The Supreme Court continues to recognize that not "all limitations on aliens are suspect." *Foley v. Connelie*, 435 U.S. 291, 294 (1978). Otherwise, the Equal Protection Clause would "obliterate all the distinctions between citizens and aliens" and "depreciate the historic value of citizenship." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982). Consistent with the alien-land cases, the Court has distinguished between an alienage classification that affects "the economic" functions of government, such as the provision of welfare benefits, and one that affects its "sovereign" or "political functions." *Id.* at 439–40. And land regulation is a quintessential

exercise of "the State's broad power to define its political community." *Id.* at 440 (quoting *Sugarman v. Dougall*, 413 U.S. 634, 643 (1973)).

History confirms what the Supreme Court's precedents establish. As the Supreme Court observed in *Terrace*, 263 U.S. at 217, the common law severely restricted alien land ownership.[6] By the ratification of the Fourteenth Amendment in 1868, state constitutional provisions and statutes touching on alien land ownership were widespread.[7] Even of states that had loosened ownership restrictions by statute,

---

[6] *See also, e.g.*, Allison Brownell Tirres, *Ownership Without Citizenship: The Creation of Noncitizen Property Rights*, 19 Mich. J. Race & L. 1, 11–14 (2013); Polly J. Price, *Alien Land Restrictions in the American Common Law: Exploring the Relative Autonomy Paradigm*, 43 Am. J. Legal Hist. 152, 157–66 (1999); William Blackstone, *Commentaries on the Laws of England* \*371–72.

[7] Many states distinguished between classes of aliens in property rights. *See, e.g.*, Wis. Const. of 1848, art. I, § 15; 1 James M. Matthews, *Digest of the Laws of Virginia, of a Civil Nature and of a Permanent Character and General Operation* 76 (J.W. Randolph ed., 1857); Mich. Const. of 1850, art. XVIII, § 13; Iowa Const. of 1857, art. I, § 22; Or. Const. of 1857, art. I, § 32; Kan. Const. of 1859, Bill of Rights § 17; Nev. Const. of 1864, art I, § 16; 1 A.F. Denny, *The General Statutes of the State of Missouri* 448 (1866); Neb. Const. of 1867, art. I, §14; 1 Seymour D. Thompson & Thomas M. Steger, *A Compilation of the Statute Laws of the State of Tennessee* 932 (3d ed. 1873); Fla. Const. of 1868, art. I, § 18; Ark. Const. of 1868, art. I, § 20; W. Va. Const. of 1872, art. II, § 5; 1 *The General Statutes of the Commonwealth of Kentucky* 190 (Edward I. Bullock & William Johnson eds., 1873); Ala. Const. of 1875, art. I, § 36; 1 *The General Statutes of the State of Connecticut, with the Declaration of Independence, the Constitution of the United States, and the Constitution of Connecticut* 4 (1875); Colo. Const. of 1876, art. II, § 27; 1 A.V.D. Honeyman, *An Abridgment of the Revised Statutes of New Jersey, and of the Amended Constitution* 21 (1878); 3 *The Revised Statutes of the State of New York* 2164 (Montgomery H. Throop ed., 7th ed. 1882); 1 *The Revised Statutes of the State of Illinois, Embracing All Laws of a General Nature in Force July 1, 1887* 95 (George W. Cothran ed., 6th rev. ed. 1887); Mont. Const. of 1889, art. III, § 25; Wyo. Const. of

many required aliens to declare intentions to become U.S. citizens. *See* Sullivan, *supra* note 7, at 29–31. And shortly after ratification of the Fourteenth Amendment, eleven states passed new restrictions out of concerns about absentee alien landlords. *Id.* This history shows that the Equal Protection Clause does not prohibit them.

### 2. SB 264's land restrictions do not establish a classification subject to heightened scrutiny.

Plaintiffs and the United States err in contending that SB 264's land restrictions are alienage or national-origin classifications subject to heightened scrutiny.

The courts have distinguished classifications disfavoring aliens only temporarily present in the United States from those disfavoring permanent resident aliens, recognizing that the latter category has more substantial connections to this country. Despite broad pronouncements that "classifications based on alienage, like those

---

1889, art. I, § 29; Wash. Const. of 1889, art. II, § 33; S.D. Const. of 1889, art. VI, § 14; Miss. Const. of 1890, § 84; Cal. Const. of 1879, art. I, § 17 (as amended in 1894); S.C. Const. of 1895, art. III, § 35; 1 John Sayles & Henry Sayles, *Sayles' Annotated Civil Statutes of the State of Texas* 5–6 (1898); Okla. Const. of 1907, art. XXII; *see also* Price, *supra* note 6, at 168–74; Charles H. Sullivan, *Alien Land Laws: A Re-Evaluation*, 36 Temp. L.Q. 15, 18–31, 31 n.68 (1962). Those statutes were in addition to the cases interpreting state law to incorporate the common-law rule. *See e.g.*, *State v. Boston, Concord & Montreal R.R.*, 25 Vt. 433, 436 (1853); *Smith v. Zaner*, 4 Ala. 99, 106 (1842). A few states chose to exercise their authority to remove distinctions between alien and citizen. *See* 1 Frederick C. Brightly et al., *Purdon's Digest: A Digest of the Laws of Pennsylvania* 851 (8th rev. ed. 1857); Mont. Const. of 1889, art. III, § 25; 1 *The Public Statutes of the State of Minnesota (1849–1858)* 411 (Moses Sherburne & William Hollinshead comps., 1859).

based on nationality or race, are inherently suspect," *Graham*, 403 U.S. at 372 (foot-notes omitted), "the Supreme Court has reviewed with strict scrutiny only state laws affecting permanent resident aliens," *LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005). For instance, the Court has held that illegal aliens are not a suspect classifi-cation. *Plyler*, 457 U.S. at 219 n.19.

The Wisconsin Supreme Court made the point well in upholding a statute pro-hibiting nonresident aliens from owning more than 640 acres of land. It observed the Supreme Court's alienage cases turned on "the inequity of singling out aliens" that had "the characteristics of resident aliens." *Lehndorff Geneva, Inc. v. Warren*, 246 N.W.2d 815, 821 (Wis. 1976). That reasoning, the court observed, is inapplicable to "foreign nationals who reside outside our borders" and "have voluntarily associated with each other simply to have an investment vehicle here." *Id.* at 822.

Both the Fifth and Sixth Circuits have likewise declined to apply strict scru-tiny to classifications disfavoring only nonimmigrants temporarily present in this country, exempting citizens and LPRs. In *LeClerc*, the Fifth Circuit upheld a Loui-siana rule that made all nonimmigrant aliens ineligible to sit for the bar examination. 419 F.3d at 415–20. In *LULAC v. Bredesen*, the Sixth Circuit upheld a Tennessee law that denied driver's licenses to all aliens other than LPRs, including "lawful temporary resident aliens." 500 F.3d 523, 533 (6th Cir. 2007). And in *Estrada v.*

*Becker*, 917 F.3d 1298, 1310 (11th Cir. 2019), the Eleventh Circuit approvingly cited *LeClerc*'s reasoning in holding that illegal aliens are not a suspect class.[8]

SB 264's alienage distinction tracks, and indeed is more modest than, the ones upheld in *LeClerc* and *LULAC*. SB 264 prohibits only aliens domiciled abroad from owning land. It not only categorically exempts LPRs, like the laws in *LeClerc* and *LULAC*, but also allows nonimmigrant aliens domiciled in America to own land.

The cases cited by Plaintiffs (DE23 at 18) and the United States (DE54 at 17) involved broader state restrictions applicable to LPRs.[9] But those decisions are different because they "struck at the noncitizens' ability to exist in the community, a position seemingly inconsistent with the congressional determination to admit the alien to permanent residence." *Foley*, 435 U.S. at 295. Florida's law does not suffer

---

[8] In *Dandamudi*, the Second Circuit declined to adopt the reasoning of *LeClerc* and *LULAC*. But there, the Second Circuit invalidated a New York law that precluded, without differentiation, all nonimmigrants from obtaining a pharmacist's license, without regard to whether the nonimmigrant intended to reside in the United States permanently. *See Dandamudi*, 686 F.3d at 77. Here, nonimmigrants domiciled in Florida are not subject to the challenged restrictions.

[9] *See Bernal v. Fainter*, 467 U.S. 216, 218–19 (1984) (law that precluded resident aliens from being notaries public); *Graham*, 403 U.S. at 371 (law that precluded "resident aliens" from receiving welfare benefits); *Nyquist v. Mauclet*, 432 U.S. 1, 7–8 (1977) (law that precluded resident aliens from obtaining financial assistance for higher education); *Takahasi v. Fish & Game Comm'n*, 334 U.S. 410, 422 (1948) (law stating that resident aliens ineligible for citizenship banned from commercial fishing).

from that problem. The aliens it restricts from land purchases are those whose connections to this country are most tenuous.

Plaintiffs and the United States join forces in baselessly contending that the land-ownership restrictions in SB 264 facially discriminate based on national origin, because they draw lines based on "nationality" or "domicile." DE23 at 19; *see* DE54 at 17. But "alienage—not being a citizen of the United States—differs from national origin, i.e., the particular country in which one was born." *United States v. Osoro*, 995 F.3d 801, 822 (11th Cir. 2021). And domicile—where someone lives—is equally distinct from national origin—"the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973). Domicile may overlap with national origin, but that does not render it a national-origin-based classification. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2245–46 (2022) (holding that a regulation of abortion is not a sex-based classification, even though only women have abortions).

### 3.    SB 264 was not motivated by racial or national-origin animus.

Plaintiffs (though not the United States) also rely on *Village of Arlington Heights v. Metropolitan Housing Development Co.*, 429 U.S. 252 (1977) to argue that SB 264 was motivated by unconstitutional animus. That precedent requires Plaintiffs to show that SB 264, though facially neutral, has a significantly greater

impact on a protected class than on other groups. *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). Plaintiffs then must show animus through several evidentiary factors: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. And, because these factors are not exhaustive, the list has been supplemented: (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Id.* at 1321–22 (citing *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983)). Plaintiffs have failed to make either showing, and SB 264 accordingly is subject only to rational basis review, which it easily survives.

**a.** Plaintiffs have failed to support their claim that the land restrictions will "have a discriminatory impact along racial and ethnic lines." DE23 at 23. The people potentially subject to those restrictions encompass a wide range of ethnicities and national origins—from white, British-born, Dutch citizens who are domiciled in Hong Kong, to individuals born in China who remain domiciled there. Plaintiffs offer nothing that sheds light on the ethnicity of individuals domiciled in China who wish to invest in Florida land—a tiny and possibly unrepresentative fraction of those domiciled in China. Conversely, the statute exempts a range of racial and ethnic

minorities, such as Plaintiff Wang's U.S. citizen daughter, and all LPRs, who are aliens from abroad.

Plaintiffs have provided no evidence about the relative proportions of ethnicities and races in those varied categories. Instead, they offer the bald assertion that "[t]he overwhelming number of people in Florida who are subject to the restrictions in Section 692.20[4] are racial and ethnic minorities." DE23 at 23. That is not enough. *See Greater Birmingham Ministries*, 992 F.3d at 1329 (equal protection "require[s] proof of both discriminatory intent and actual discriminatory effect"); *Lewis v. Ascension Par. Sch. Bd.*, 806 F.3d 344, 359–60 (5th Cir. 2015); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000).

**b.** Plaintiffs make no serious attempt to demonstrate that the Florida legislature was motivated by racial animus in enacting SB 264. As reflected by the statements Plaintiffs cite, *see* DE23 at 22, the Florida legislature adopted this law to address threats posed by hostile foreign nations. SB 264 itself reflects this focus: its definition of "foreign principal" primarily targets agents of hostile government actors. Fla. Stat. § 692.201(4).[10] The vast bulk of individuals subject to the law, moreover, are aliens present abroad, who have no equal-protection rights. *See* U.S. Const.

---

[10] *See also* Committee on Judiciary, *Senate Committee Meeting held at 4:00 PM on 3/14/2023* at 13:00–13:45 (Mar. 14, 2023), https://tinyurl.com/bdep8nt5 ("[W]e are not targeting individuals. We are talking about countries specifically and their practices." (statement of Sen. Collins)).

amend. XIV, § 1 (requiring equal protection "within [the] jurisdiction" of states); *Plyler*, 457 U.S. at 214–15. And no procedural irregularities attended the law's enactment: SB 264 was submitted, referred to the Committee on the Judiciary, voted out of committee, and sent to the Senate floor, where the Senate did the traditional three readings and debated. *See* Fla. Const. art. III, § 7. SB 264 then was approved in similar fashion in the House and finally signed by the Governor.[11]

Plaintiffs complain that SB 264 "capitalize[d] on anti-China sentiment." DE23 at 22. The law, however, targets agents of the Chinese government and members of the Chinese Communist Party, Fla. Stat. § 692.204(1)(a)(1)–(2), the latter of whom the U.S. State Department describe as "pos[ing] the central threat of our times."[12] Plaintiffs' arguments would just as well prove that the many actions the federal government has taken  to combat malign Chinese influence and the Chinese

---

[11] CS/CS/SB 264, *Interests of Foreign Countries* (Bill History tab), https://www.flsenate.gov/Session/Bill/2023/264; *see also* Committee on Judiciary, *Senate Committee Meeting held at 4:00 PM on 3/14/2023* at 6:10–20:15 (Mar. 14, 2023), https://tinyurl.com/bdep8nt5; The Florida Channel, *4/11/23 Senate Session* at 2:35:45–2:50:00 (Apr. 11, 2023), https://thefloridachannel.org/videos/4-11-23-senate-session/ (third reading); Fla. House of Representatives, *House in Session— May 2, 2023* at 9:20:15–9:48:30 (May 1, 2023), https://tinyurl.com/33b8m5sd (second reading).

[12] U.S. Dep't of State, *The Chinese Communist Party: Threatening Global Peace and Security*, https://2017-2021.state.gov/the-chinese-communist-party-threatening-global-peace-and-security/ (last visited July 3, 2023).

Communist Party are unconstitutional, which is probably why the United States does not support them.[13]

**c.** Finally, the land-ownership provisions of SB 264 are rational. They are consistent with the long tradition in this country of restricting alien land ownership, rooted in concerns for public safety and state security. Many states have such laws even today, driven by avoiding landlord absenteeism and foreign influence in America.[14] They combat malign foreign influence in areas close to military installations and critical infrastructure, which raise cybersecurity, espionage, and other national security concerns. *See* SB 264 Staff Analysis at 2–3. And they tend to preserve scarce resources for those to whom the government is most politically accountable: citizens, the only class of individuals who may vote in Florida, *see* Fla. Const. art. VI, § 2, and those who intend to remain here indefinitely.

---

[13] *See, e.g.*, U.S. Dep't of Homeland Sec., *DHS Strategic Action Plan to Counter the Threat Posed by the People's Republic of China* (2021), https://www.dhs. gov/sites/default/files/publications/21_0112_plcy_dhs-china-sap.pdf (identifying and denying entry to certain PRC officials, curbing PRC law enforcement in the United States, and protecting intellectual property rights).

[14] *See* Nick Spellman & Micah Brown, Nat'l Agric. L. Ctr., *Statutes Regulating Ownership of Agricultural Land*, https://nationalaglawcenter.org/state-compilations/aglandownership/ (last visited July 3, 2023).

**D.    Plaintiffs are not likely to succeed on their claim that the Fair Housing Act preempts SB 264.**

**1.    Plaintiffs cannot invoke the FHA's private cause of action.**

Plaintiffs sue under the FHA's private cause of action in 42 U.S.C. § 3613(a)(1)(A), which gives an "aggrieved person" the right to sue for "an alleged discriminatory housing practice." The alleged "practice," they argue (DE23 at 25–26 & n.9), is that SB 264 itself "make[s] unavailable . . . a dwelling" to them "because of race, color, or national origin." 42 U.S.C. § 3604(a).

**a.** At the outset, the vast majority of SB 264's applications do not implicate the FHA. The term "dwelling," under the FHA, includes only residential property, *see* 42 U.S.C. § 3602(b), as the United States notes in limiting its "FHA analysis" to residential property, DE54 at 7 n.6. And the FHA preempts state law only to the "extent" state law "requires or permits any action that would be a discriminatory housing practice" under the FHA. 42 U.S.C. § 3615. Only Plaintiffs Shen, Xu, and Liu claim to intend to purchase residential property in Florida. DE21-2 ¶ 12; DE21-3 ¶¶ 12, 18; DE21-5 ¶ 13. Multi-Choice provides no details about how much of its business comprises residential property sales. SB 264 could be invalid under the FHA only to the extent it applies to residential property.

**b.** Even to the extent it implicates the FHA, SB 264, itself, is not a "discriminatory housing practice," 42 U.S.C. § 3613(a)(1)(A)—an odd label for a generally applicable state law. The FHA carefully distinguishes between a preempted state

27

"law" and a "discriminatory housing practice" that is "require[d] or permit[ted]" by that law. 42 U.S.C. § 3615. Only the latter may be attacked in a private lawsuit under the FHA, because the FHA's private cause of action only authorizes "appropriate relief with respect to" a "discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). That may include, for example, discrimination in the buying and selling of real estate. *See* 42 U.S.C. § 3604(a). Plaintiffs Shen and Xu at most may use the FHA's preemption clause to compel specific performance of their real-estate contracts notwithstanding SB 264, but they cannot invoke it against the State to invalidate the statute itself.

In arguing the contrary, Plaintiffs (DE23 at 26) and the United States (DE54 at 11) cite *Jackson v. Okaloosa County*, 21 F.3d 1531 (11th Cir. 1994). But *Jackson* did not involve an attempt to preempt state law; it involved a challenge to a "policy" a county had adopted ad hoc to evaluate whether to approve a particular public-housing project. *Id.* at 1535. The "policy" took the form of a non-binding administrative procedure outlining the circumstances in which the county might approve housing construction. *Id.* The discriminatory practice at issue thus was not a law or even a local regulation—it was a non-binding set of guidelines seemingly masking a case-specific decision. *Jackson* therefore does not hold that a state law itself is a "discriminatory housing practice," and the text of the FHA shows that it is not.

28

**c.** Multi-Choice is also not an "aggrieved person" under the statute. 42 U.S.C. § 3613. Multi-Choice does not have "an interest arguably sought to be protected by the statute." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 178 (2011) (Title VII).[15]

Multi-Choice does not claim that it is threatened by a "discriminatory housing practice"; it speculates that it may lose business from discrimination against others. DE23 at 27. But Congress crafted provisions of the FHA tailored to real-state-brokers, making them liable for discrimination in the provision of brokerage services, 42 U.S.C. § 3605, and protecting them from discriminatory exclusion in brokerage services, 42 U.S.C. § 3606, which are not applicable here. The lone case that Plaintiffs cite involving real-estate brokers (DE23 at 27), involved 42 U.S.C. § 3617, which prohibits "interfer[ing] with" a person as a result of the person's having "aided or encouraged" the exercise of FHA rights. *See Crumble v. Blumenthal*, 549 F.2d 462, 468 (7th Cir. 1977). Multi-Choice does not invoke that provision here.

---

[15] To assert FHA claims, Multi-Choice also must show "proximate cause"— a "direct relation between the injury asserted and the injurious conduct alleged." *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 202–03 (2017) (cleaned up). That inquiry generally stops at "the first step" in the chain of causation, *id.* at 203—the housing discrimination itself, *City of Oakland v. Wells Fargo & Co.*, 14 F.4th 1030, 1036 (9th Cir. 2021) (en banc). That should be the last step here given how speculative Multi-Choice's injuries are. *See supra* Part I.A.2.

The economic harms of which Multi-Choice complains are distinct from the harms that are the basis for other vicarious lawsuits that may proceed under the FHA. *See Bank of Am.*, 581 U.S. at 198. In those cases, individuals or cities (though not directly discriminated against) were held to be "aggrieved persons" under the FHA based on the public interests in "lost tax revenue," achieving "racial balance," and the like. *Id.* But if the economic harms suffered by real-estate brokers qualified too, there would be no stopping all manner of "farfetched results": "restaurants, plumbers, utility companies, or any other participant in the local economy" could equally sue for FHA violations. *Id.* at 199; *see Thompson*, 562 U.S. at 176–77. That cannot be right.

### 2. Plaintiffs have failed to show discrimination under the FHA.

The FHA does not prohibit discrimination based on alienage. *See, e.g.*, 42 U.S.C. § 3604(a). Plaintiffs nonetheless argue that SB 264 violates the FHA because it discriminates based on race and national origin. DE23 at 25. But again, SB 264 distinguishes based on domicile, U.S. citizenship, and LPR status, not race or national origin. *See Espinoza*, 414 U.S. at 88–89 & n.2. And SB 264 was not otherwise motivated by racial or ethnic animus. *See supra* Part I.C.3.

In a footnote, Plaintiffs theorize that they "could establish an FHA violation solely by relying on the law's disparate impact." DE23 at 26 n.10. To do that, however, Plaintiffs would have to show, among many other things, "robust causality"

between a facially neutral policy and a "significant statistical disparity" in the policy's effects on a protected class. *City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1296–97 (11th Cir. 2019) (W. Pryor, J., concurring) (cleaned up). They would need to provide comparative data beyond "[b]ald assumptions." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008). They would also have to show that any "statistical discrepancy is" not "caused by factors other than the defendant's policy," *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmties. Project*, 576 U.S. 519, 527 (2015), such as the choices of individuals of Asian ethnicity or Chinese national origin to domicile in China. *See Inclusive Cmties. v. Lincoln Prop. Co.*, 920 F.3d 890, 907 (5th Cir. 2019). Plaintiffs have not begun to do any of that.

### E.    Plaintiffs cannot use the CFIUS regime to invalidate SB 264.

Plaintiffs next claim that SB 264 is preempted by the regulatory regime administered by CFIUS. It is telling that United States does not join in this argument. The United States, after all, believes the statute unconstitutional on other grounds, DE54 at 16–20, and presumably would say so if it believed the law to interfere with its own foreign-affairs authority.

### 1.    Plaintiffs have no private right of action to claim that the CFIUS regime preempts SB 264.

**a.** The CFIUS regime does not expressly create a preemption cause of action. President Ford first established CFIUS on May 7, 1975, through Executive Order

11858, 40 Fed. Reg. 20263, and directed CFIUS to review potential foreign invest-ments in the United States, *id.* § 1(b)(3). That order, including as amended, *see* 50 U.S.C. § 4565 note, did not purport to create any cause of action, much less one challenging a state law as preempted by the order. The 1988 statute that gave the President authority to suspend or prohibit foreign transactions also did not contain any cause-of-action language. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, sec. 5021, § 721, 102 Stat. 1107, 1425–26 (codified as amended at 50 U.S.C. § 4565).

Today, the CFIUS statute precludes judicial review of the actions and findings of the President. 50 U.S.C. § 4565(e)(1). In *Ralls Corp. v. CFIUS*, 758 F.3d 296, 308–12 (D.C. Cir. 2014), the D.C. Circuit held that this provision still permitted an Administrative Procedure Act challenge to the procedures CFIUS used to block a transaction under 50 U.S.C. § 4565(d). In 2018, Congress created venue in the D.C. Circuit over "a civil action challenging an action or finding" of the President under 50 U.S.C. § 4565. John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, sec. 1715(2), § 721(e)(2), 132 Stat. 1636, 2191 (codified at 50 U.S.C. § 4565(e)(2)). The statute also gives the U.S. Attorney General a cause of action to enforce a presidential order under CFIUS. 50 U.S.C § 4565(d)(3). But Congress has never created a private civil action to challenge any state law as preempted by the regime. *See In re Wild*, 994 F.3d 1244, 1255 (11th Cir.

2021) (en banc) ("[T]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)).

**b.** The CFIUS statute also lacks "rights-creating" language necessary to support an implied cause of action or a cause of action under 42 U.S.C. § 1983. *See Wild*, 994 F.3d at 1255 n.11; *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002). To support the latter, the statute in question must "unambiguously confer[]" an individual right, not just a general "benefit[]" or "interest[]." *Gonzaga*, 536 U.S. at 283; *see also City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119–20 (2005). That means Congress must have created a federal right "*for* the identified class, not merely that the plaintiffs fall 'within the general zone of interest that the statute is intended to protect.'" *Health & Hosp. Corp. of Marion Cty. v. Talevski*, 143 S. Ct. 1444, 1457 (2023) (quoting *Gonzaga*, 536 U.S. at 283, adding emphasis). The text must be "individual-centric," with an "'unmistakable focus on the benefited class.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 287).

The CFIUS regime "has an aggregate, not individual, focus," *Gonzaga*, 536 U.S. at 290, on national security. It applies to "covered transactions," defined to include mergers and acquisitions that will result in foreign control of a U.S. business, as well as transactions in U.S. real estate within air or maritime ports or near military installations. 50 U.S.C. § 4565(a)(4). The central provision of the regime authorizes

the President to "take such action for such time as the President considers appropriate to suspend or prohibit any covered transaction that threatens to impair the national security of the United States." 50 U.S.C. § 4565(d)(1). Nothing in the statute establishes or even suggests an individual right to challenge state action.

**c.** Nor can Plaintiffs invoke the Supremacy Clause, U.S. Const. art. VI, ¶ 2, or this Court's equitable powers to assert their preemption claim. "[T]he Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 324–25 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)). And the Court's equitable power is "subject to express and implied statutory limitations." *Id.* at 327. If the CFIUS regime "implicitly precludes private enforcement," as it does by explicitly providing only for the Attorney General's cause of action in 50 U.S.C. § 4565(d)(3), Plaintiffs "cannot, by invoking [a court's] equitable powers, circumvent Congress's exclusion of private enforcement." *Id.* at 328.

## 2.    The CFIUS regime does not preempt SB 264.

Plaintiffs are wrong that the CFIUS regime preempts SB 264. SB 264 comes with the strongest of presumptions against preemption because it constitutes the exercise of a historic and traditional state power—regulation of local real-property transactions. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (requiring "the clear and manifest purpose of Congress" to overcome this presumption); *see also Sackett v.*

*EPA*, 143 S. Ct. 1322, 1342 (2023) ("Regulation of land and water use lies at the core of traditional state authority."). As a general matter, "[p]reemption may be either express or implied." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Plaintiffs do not argue that the CFIUS regime expressly preempts SB 264, with good reason, as the CFIUS regime lacks "explicit pre-emptive language." *Id.* Instead, Plaintiffs argue that SB 264 is impliedly preempted.

On the contrary, the CFIUS regime and SB 264 comfortably coexist. CFIUS regulates foreign investment in the United States, permitting the President, based on particularized national security concerns identified by CFIUS, to "suspend or prohibit" covered transactions. 45 U.S.C. § 4565(a)(4), (d). The review process is laborious, resource-intensive, and case specific. The statute directs CFIUS to review certain covered transactions through weighing ten factors and a catch-all eleventh, generally within 45 days of its initiation. 45 U.S.C. § 4565(b)(1)(A), (b)(1)(F), (f). If CFIUS identifies a threat to national security that has not been mitigated, the statute instructs CFIUS to conduct a further investigation and take necessary action to address it. 45 U.S.C. § 4565(b)(2). If CFIUS wishes to block a transaction, it must refer the matter to the President, who then decides whether to implement CFIUS's recommendation, typically via executive order. 45 U.S.C. § 4565(d), (*l*)(2). Unsurprisingly, CFIUS review covers only a small fraction of potential "covered transactions"

35

occurring throughout the United States. Ji Li, *Investing Near the National Security Black Hole*, 14 Berk. Bus. L.J. 1, 4–5 (2017).

Real-estate transactions are a tiny part of this process. CFIUS's jurisdiction did not even include stand-alone real estate transactions until 2018. *See* Pub. L. No. 115-232, sec. 1703, § 721(a)(4)(B)(ii), 132 Stat. 2177 (codified at 50 U.S.C. § 4565(a)(4)(B)(ii)); *Provisions Pertaining to Certain Transactions by Foreign Persons Involving Real Estate in the United States*, 84 Fed. Reg. 50,214, 50,214–15 (Sept. 24, 2019). Today, CFIUS has jurisdiction over real estate transactions involving real property (1) "located within," or that "will function as part of," an "air or maritime port"; or (2) "in close proximity to" a military or other installation belonging to the U.S. government. 50 U.S.C. § 4565(a)(4)(B)(ii). This definition does not cover transactions in real property that is privately owned but nevertheless contains infrastructure facilities critical to national security. As a result of these gaps, CFIUS dropped a review of a Chinese food manufacturer that tried to buy 300 acres of farmland near a military base in North Dakota. *See supra* pp. 1–3. The definition also excludes the purchase or lease of "a single 'housing unit," as defined by the Census Bureau, or of real estate in "urbanized areas." 50 U.S.C. § 4565(a)(4)(C). Plaintiffs' proposed transactions are thus entirely outside CFIUS's jurisdiction. *See* DE17 ¶¶ 64, 69.

The President and CFIUS also have limited means by which to identify a "covered transaction" that might warrant an order prohibiting or suspending the transaction under 50 U.S.C. § 4565(d)(1). The primary means is an investor's written notice, which for the most part is voluntary, 50 U.S.C. § 4565(b)(1)(C)(i)(I), and is never mandatory for real estate transactions such as Plaintiffs'.[16] A small fraction of noticed transactions involve real estate; in 2021, a mere 6 of 272 notices were real estate transactions. CFIUS, *Annual Report to Congress—Report Period: CY 2021* at 15, 23 (Aug. 2, 2022), https://home.treasury.gov/system/files/206/CFIUS-Public-AnnualReporttoCongressCY2021.pdf.

Plaintiffs surmise that CFIUS's limited jurisdiction over real-estate transactions reflects Congress's judgment that such transactions are "highly unlikely to pose national security concerns." DE23 at 43. More likely, Congress's judgment was to allow the states to exercise their traditional authority to address concerns arising from foreign land ownership. In preemption cases, the courts must so presume. In

---

[16] CFIUS does have authority to initiate review of "covered transactions" independently of any formal notice, *see* 50 U.S.C. § 4565(b)(1)(D), but the effectiveness of that unilateral authority is naturally constrained by the need for "credible evidence," 50 U.S.C. § 4565(d)(4), regarding which transactions throughout the United States might be "covered" and which might "threaten[] to impair the national security of the United States," 50 U.S.C. § 4565(d)(1). The CFIUS regime does not provide a means of investigating all land purchases by foreign investors taking place throughout the United States. *See* 50 U.S.C. § 4565(b)(1)(H) (directing CFIUS to establish process to identify "covered transactions" for which no notice has been filed and "information is *reasonably* available") (emphasis added)).

establishing CFIUS, the President and Congress were undoubtedly aware that restrictions on purchase of land by aliens have been around since even before the Republic. *See supra* notes 6–7 & accompanying text. Congress itself has prohibited aliens from purchasing land in territories, on federal lands, and in the District of Columbia. *See* D.C. Code Ann. § 42-901 (West 2001); 48 U.S.C. §§ 1501–1507. In 1976, a year after President Ford first established CFIUS by executive order, the Secretary of Commerce issued a report pursuant to the Foreign Investment Study Act of 1974, Pub. L. No. 93-479, 88 Stat. 1450, noting the existence of several alien land restrictions and observing that "[l]and or property law is primarily state law." 1 U.S. Dep't of Commerce, *Foreign Direct Investment in the United States: Report of the Secretary of Commerce to the Congress* 190 (1976); *see also* 8 *id.* app. M (canvassing federal and state restrictions on alien land ownership then in place). As late as 1999, at least half of all states had some restrictions on alien land ownership. Price, *supra* note 6, at 152. And when the CFIUS statute was amended in 2018 to apply to land transactions, at least 15 states still had restrictions on alien land ownership.[17] Nothing in this history discloses any intent to displace these longstanding local restrictions.

---

[17] Haw. Organic Act § 73(f) (1960); Haw. Rev. Stat. § 171-68 (2018); Iowa Code Ann. § 9I.2 (West 2018); Ky. Rev. Stat. Ann. § 381.290 (2018); Ky. Rev. Stat. Ann. § 381.300 (West 2018); Minn. Stat. Ann. § 500.221 (West 2018); Miss. Code Ann. § 29-1-75 (West 2018); Miss. Code Ann. § 89-1 23 (West 2018); Mo. Rev.

The President and the Senate furthermore have a long history of using treaties to determine whether to retain or override state alien land laws as applied to particular countries' nationals. Some of these treaties of "friendship, commerce and navigation" displace state alien land laws[18]; others make a point to exempt them.[19] This practice indicates a default assumption that state alien land laws are not preempted by the CFIUS regime or any other general foreign affairs authority. *See Webb v. O'Brien*, 263 U.S. at 321–22 ("In the absence of a treaty to the contrary, the state has power to deny to aliens the right to own land within its borders."). Deviating

---

Stat. § 442.571 (2018); Neb. Rev. Stat. § 76-402 (2018); N.J. Stat. Ann. § 46:3-18 (West 2018); N.D. Cent. Code Ann. § 10-06.1-12 (West 2018); N.D. Cent. Code Ann. § 47-10.1-02 (West 2018); Okla. Stat. tit. 60, § 121 (2018); Or. Rev. Stat. Ann. § 273.255 (West 2018); 68 Pa. Stat. & Cons. Stat. § 41 (West 2018); S.C. Code Ann. § 27-13-30 (2018); S.D. Codified Laws § 43-2A-5 (2018); Wis. Stat. § 710.02 (2018).

[18] *See, e.g.*, David M. Golove, *Treaty-Making and the Nation: The Historical Foundations of the Nationalist Conception of the Treaty Power*, 98 Mich. L. Rev. 1075, 1104–10 (2000); Treaty of Amity and Commerce, Feb. 6, 1778, U.S.-Fr., art. XI, 8 Stat. 12, 18 (providing that subjects of France would be able to own real property in the United States); Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Alb., Jan. 11, 1995, arts. I(1)(d)(iv), II(1), T.I.A.S. No. 98-104, at 2–4; *see also id.* art. XV(1)(a), at 12 (applying treaty requirements to all political subdivisions, including state and local governments); Treaty Concerning the Encouragement and Reciprocal Protection of Investment, U.S.-Moz., Mar. 3, 2005, arts. I(d)(iv), II(1), T.I.A.S. No. 13006, at 2–4.

[19] *See, e.g.*, James Frechter, *Alien Landownership in the United States: A Matter of State Control*, 14 Brook. J. Int'l L. 147, 168–71 (1988); Treaty of Friendship, Commerce and Navigation, U.S.-Ire., Jan. 21, 1950, art. VII(3), 1 U.S.T. 788, 792.

from this centuries-long acquiescence in alien land laws deserves at least a word from Congress. Plaintiffs point to none.

Plaintiffs rely heavily on *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), and *Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation*, 715 F.3d 1268 (11th Cir. 2013). But in those cases, states had enacted country-specific sanctions in direct conflict with federal statutes and executive orders imposing carefully calibrated sanctions on the very same countries. *Crosby* held that Massachusetts could not "impos[e] a different, state system of economic pressure against the Burmese political regime" than Congress had directed, and authorized the President to fine-tune, through its own Burma sanctions statute. 530 U.S. at 376. *Odebrecht* held that Florida could not enact its own Cuba-sanctions statute "exceeding the 'specific range' of pressure" imposed on Cuba through a "complex and interlocking network of [federal] statutes, regulations, and executive orders." 715 F.3d at 1275, 1281 (quoting *Crosby*, 530 U.S. at 377). The CFIUS regime, by contrast, is a generally applicable statute designed to enable the President to block individual merger and land transactions, based on a wide-ranging set of national-security concerns that happen to come to the attention of CFIUS. It does not impose or authorize country-wide measures, nor does it lend itself to the exertion of country-specific diplomatic pressure.

If anything, SB 264 advances the purposes of the CFIUS regime by prohibiting transactions that may create national-security threats. It thus supplements CFIUS's limited capacity to review and investigate real-estate transactions that pose national-security risks. Just as state tort law may provide for stronger drug regulation consistent with the Food and Drug Administration's preclearance regime, *see Wyeth*, 555 U.S. at 574–75, so too may SB 264 supplement Congress's broad national security goals in enacting the CFIUS statute.

## II.   The remaining equitable factors do not support a preliminary injunction.

The equities also disfavor injunctive relief. Plaintiffs' alleged harms are either speculative (i.e., Multi-Choice's loss of business and housing market "chill"), reparable (registration and affidavit violations), or premised on the mistaken views that SB 264 discriminates based on race (discrimination and stigmatic harms) or proscribes their conduct (Shen and Xu's housing contracts). Nor is an injunction in the public interest. *See Swain*, 961 F.3d at 1293 (balance-of-the-harms and public-interest factors "merge" when, as here, "the Government is the opposing party"). None of Plaintiffs' alleged harms outweigh the harm that the State and its citizens will suffer if SB 264 is enjoined. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

**III.    Any injunctive relief should be limited to Plaintiffs and any parts of SB 264 the Court concludes they are likely to challenge successfully.**

Finally, if equitable relief is granted, it should be narrowly drawn to these Plaintiffs and those parts of SB 264 where Plaintiffs have a likelihood of success. *See ACLU of Fla. v. Byrd*, 608 F. Supp. 3d 1148, 1159 (N.D. Fla. 2022) (enjoining enforcement of select parts of campaign-contribution law "against Plaintiffs" only).

The FHA statute, in particular, does not permit Multi-Choice to obtain an injunction on behalf of an unspecified universe of unknown prospective real-estate clients. That would allow Multi-Choice to wield far greater power under the statute than possessed by the U.S. Attorney General, who is empowered to sue on behalf of discriminated-against individuals only in narrowly delineated circumstances. *See* 42 U.S.C. § 3614(a) (authorizing the Attorney General to sue based on a "pattern or practice" of discrimination); 42 U.S.C. § 3614(b)(1)(A) (permitting the Attorney General to sue only after a referral from the HUD Secretary).

## CONCLUSION

The motion should be denied.

## LOCAL RULE 7.1(f) CERTIFICATION

This memorandum contains 10,439 words, fewer than the 10,500 words requested in Defendants' motion.

                                        Respectfully submitted,

July 5, 2023                            ASHLEY MOODY
                                          *Attorney General*

                                        */s/ Henry C. Whitaker*
                                        Henry C. Whitaker (FBN 1031175) *
                                          *Solicitor General*

                                        Daniel William Bell (FBN 1008587)
                                          *Chief Deputy Solicitor General*

                                        Nathan A. Forrester (FBN 1045107)
                                          *Senior Deputy Solicitor General*

                                        David M. Costello (FBN 1004952)
                                          *Deputy Solicitor General*

                                        Robert S. Schenk (FBN 1044532)
                                          *Solicitor General Fellow*

Daniel E. Nordby (FSB 14588)            Office of the Attorney General
Shutts & Bowen LLP                      The Capitol, PL-01
215 South Monroe Street, Ste. 804       Tallahassee, Florida 32399-1050
Tallahassee, FL 32301                   (850) 414-3300
(850) 241-1725                          (850) 410-2672 (fax)
DNordby@shutts.com                      Henry.Whitaker@myfloridalegal.com

*Counsel for Defendants*                 * *Lead Counsel*

43

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of July, 2023, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ Henry C. Whitaker
Solicitor General