## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

YIFAN SHEN, an individual,
ZHIMING XU, an individual, XINXI
WANG, an individual, YONGXIN
LIU, an individual, and MULTI-
CHOICE REALTY LLC, a limited
liability corporation,

*Plaintiffs*,

v.

WILTON SIMPSON, in his official
capacity as Commissioner of
Agriculture for the Florida Department
of Agriculture and Consumer Affairs,
MEREDITH IVEY, in her official
capacity as Acting Secretary of the
Florida Department of Economic
Opportunity, PATRICIA
FITZGERALD, in her official capacity
as Chair of the Florida Real Estate
Commission, R.J. LARIZZA, in his
official capacity as State Attorney for
the 7th Judicial Circuit, MONIQUE
WORRELL, in her official capacity as
State Attorney for the 9th Judicial
Circuit, and KATHERINE
FERNANDEZ RUNDLE, in her
official capacity as State Attorney for
the 11th Judicial Circuit,

*Defendants*.

Case No. 4:23-cv-208-AW-MAF

**PLAINTIFFS' REPLY IN
SUPPORT OF THEIR MOTION
FOR A PRELIMINARY
INJUNCTION**

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................1

ARGUMENT........................................................................................2

I.     Plaintiffs have standing. ...........................................................2

II.    SB 264 violates the Constitution and federal statutory law............6

      A.    SB 264 violates the Equal Protection Clause...................... 6

      B.    SB 264 violates the Fair Housing Act. ............................10

            1.    Plaintiffs can challenge SB 264 under the FHA. ...............10

            2.    SB 264 discriminates based on national origin and race in violation of the FHA.................................13

      C.    SB 264 is unconstitutionally vague. ................................14

      D.    SB 264 is preempted by federal law.................................16

            1.    Equity provides a cause of action for Plaintiffs' preemption claim. .............................................16

            2.    SB 264 is preempted. ........................................17

III.    The equities strongly favor Plaintiffs. ........................................22

CONCLUSION ..................................................................................23

LOCAL RULE 7.1(F) CERTIFICATION..............................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)..................................................................16, 17

*Bank of Am. Corp. v. City of Miami Fla.*,
  581 U.S. 189 (2019)........................................................................12

*Bernal v. Fainter*,
  467 U.S. 216 (1984)..........................................................................7

*BluestarExpo, Inc. v. Enis*,
  No. 21-cv-20875, 2022 WL 2341168 (S.D. Fla. May 16, 2022)........................9

*Bolden-Hardge v. Off. of Cal. State Controller*,
  63 F.4th 1215 (9th Cir. 2023)............................................................13

*Brown v. State*,
  629 So. 2d 841 (Fla. 1994)................................................................15

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000)..................................................... 19, 20, 21, 22

*Doe v. Snyder*,
  101 F. Supp. 3d 672 (E.D. Mich. 2015) ...............................................15

*Dream Defs. v. DeSantis*,
  559 F. Supp. 3d 1238 (N.D. Fla. 2021) .........................................2, 14

*Elkins v. Moreno*,
  435 U.S. 647 (1978)..........................................................................4

*Estrada v. Becker*,
  917 F.3d 1298 (11th Cir. 2019) ..........................................................7

*Fisher v. Univ. of Tex. at Austin*,
  570 U.S. 297 (2013)..........................................................................6

*Foley v. Connelie*,
  435 U.S. 291 (1978)..........................................................................7

ii

*Frick v. Webb*,
    263 U.S. 326 (1923)........................................................................8

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
    691 F.3d 1250 (11th Cir. 2012)....................................................16

*Garcia-Bengochea v. Carnival Corp.*,
    57 F.4th 916 (11th Cir. 2023)........................................................5

*Graham v. Richardson*,
    403 U.S. 365 (1971)........................................................................7

*Gresham v. Windrush Partners, Ltd.*,
    730 F.2d 1417 (11th Cir. 1984)....................................................22

*Health & Hosp. Corp. of Marion Cty. v. Talevski*,
    143 S. Ct. 1444 (2023)..................................................................16

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)........................................................................21

*In re Wild*,
    994 F.3d 1244 (11th Cir. 2021)....................................................16

*Jeffrey O. v. City of Boca Raton*,
    511 F. Supp. 2d 1339 (S.D. Fla. 2007)........................................11

*Louisiana v. NAACP*,
    366 U.S. 293 (1961)......................................................................15

*Maryland v. King*,
    567 U.S. 1301 (2012)....................................................................23

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012)......................................................................11

*McWright v. Alexander*,
    982 F.2d 222 (7th Cir. 1992)..........................................................7

*Meisman v. Hernandez*,
    353 So. 3d 669 (Fla. 2d DCA 2022)..............................................3

*Minick v. Minick*,
   149 So. 483 (Fla. 1933)...................................................................................3

*Namba v. McCourt*,
   204 P.2d 569 (Or. 1949)..................................................................................9

*Nat'l Foreign Trade Council v. Natsios*,
   181 F.3d 38 (1st Cir. 1999) ...........................................................................22

*Newton v. Duke Energy Fla., LLC*,
   895 F.3d 1270 (11th Cir. 2018).....................................................................16

*Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*,
   715 F.3d 1268 (11th Cir. 2013)......................................................... 18, 19, 23

*Old W. End Ass'n v. Buckeye Fed. Sav. & Loan*,
   675 F. Supp. 1100 (N.D. Ohio 1987) .............................................................11

*Pac. Shores Props., LLC v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013)..........................................................................6

*Perez v. Perez*,
   164 So. 2d 561 (Fla. 3d DCA 1964)................................................................3

*Plyler v. Doe*,
   457 U.S. 202 (1982).........................................................................................7

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) .......................................................................19

*Rice v. Cayetano*,
   528 U.S. 495 (2000)..........................................................................................6

*Sec'y U.S. Dep't Housing and Urban Dev. v. Hope*,
   No. HUDALJ 04-99-3640-8, 2002 WL 983040 (May 8, 2002).......................11

*Shaw v. Delta Air Lines, Inc.*,
   463 U.S. 85 (1983)..........................................................................................16

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)..........................................................................................2

*Terrace v. Thompson*,
263 U.S. 197 (1923)..............................................................................8

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015)........................................................................10, 11

*Town of Huntington v. Huntington Branch, NAACP*,
488 U.S. 15 (1988)..............................................................................11

*UAW v. Johnson Controls, Inc.*,
499 U.S. 187 (1991)............................................................................13

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012)............................................................21

*Vill. of Arlington Heights v. Metro. Hous. Dev. Co.*,
429 U.S. 252 (1977)..............................................................................9

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982)............................................................................14

*Williams v. Miller*,
460 F. Supp. 761 (N.D. Ill. 1978).....................................................11, 12

## Rules / Statutes

8 C.F.R. 214.2.......................................................................................4

42 U.S.C. § 1983.................................................................................16

42 U.S.C. § 3605.................................................................................12

42 U.S.C. § 3613.................................................................................10

42 U.S.C. § 3615.................................................................................10

50 U.S.C. § 4565..........................................................................17, 20

Fla. Stat. § 692.202..............................................................................2

Fla. Stat. § 692.204.........................................................................4, 22

## <u>Other Authorities</u>

CIA World Factbook, https://www.cia.gov/the-world-
  factbook/countries/china/#people-and-society; ...................................................9

HB 379, Reg. Sess. (Ala. 2023) ...............................................................................9

The Florida Channel, *05/02/23 House in Session* at 9:23:10-9:23-20
  (May 2, 2023), https://thefloridachannel.org/videos/5-2-23-house-
  session/ ................................................................................................................3

The Florida Channel, *05/04/23 Senate Session* at 03:56:31-03:58:19
  (May 4, 2023), https://thefloridachannel.org/videos/5-4-23-senate-
  session-part-2/.....................................................................................................4

## INTRODUCTION

Plaintiffs have established their entitlement to a preliminary injunction. SB 264 illegally discriminates against Plaintiffs, is unconstitutionally vague, and is preempted by the federal government's carefully drawn system for regulating real estate purchases that implicate foreign affairs and national security. The irreparable harms of SB 264 are already being felt by Plaintiffs and other Asians in Florida, who today face discrimination when seeking to buy homes. These harms are also roiling the real estate market in Florida, where some lenders are now refusing to do business with *any* Chinese national. And the equities weigh decisively in Plaintiffs' favor.

The State fails to overcome Plaintiffs' showing. While the State's litigation position that Plaintiffs are not "domiciled" in China is welcome news as far as it goes, it does not bind Defendants or provide reliable assurance for Plaintiffs and other essential participants in property transactions. If anything, the State's debatable "domicile" theory underscores how unconstitutionally vague SB 264 is. The State's other arguments fail to grapple with current precedent, misread the FHA, and largely concede the merits of Plaintiffs' preemption claim.

## ARGUMENT

## I.   Plaintiffs have standing.

Because Plaintiffs have shown more than a "substantial risk" of harm from SB 264, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014), they have standing.[1]

To begin, the State ignores that SB 264 subjects Plaintiffs and other would-be purchasers to its affidavit requirement, irrespective of where they are domiciled. That alone places the standing of Plaintiffs Shen, Xu, and Liu beyond doubt, because they are subjected to both the burden of this new requirement and the stigma and suspicion it casts on any purchaser from China.

As for the State's proffered interpretation of "domicile," its argument goes to the merits of Plaintiffs' claim challenging the term's vagueness—not justiciability. *See, e.g.*, *Dream Defs. v. DeSantis*, 559 F. Supp. 3d 1238, 1269-70 (N.D. Fla. 2021). Regardless, its opposition brief does not protect Plaintiffs from the statute's harms. Its argument does not bind the State, local prosecutors, or judges who may interpret "domicile" differently based on the prior rulings of Florida's courts. Lenders are *now* cutting off transactions with Chinese nationals altogether, and non-binding

---

[1] Plaintiffs no longer seek to preliminarily enjoin SB 264's agricultural land provisions. *See* Fla. Stat. § 692.202.

2

arguments will not change that. *See* Supp. Song Decl., Exs. 1-2. These harms confer standing.

In addition, the State's reading of "domicile" is hardly well-established in Florida's common law. Florida's Supreme Court has held that nonimmigrant visa-holders cannot legally form the intent to remain permanently. Mot. 33-34. In response, the State rests on a distinction between intending to remain in Florida "indefinitely" versus "permanently," Opp. 10—an elusive line that Florida law does not firmly support. *See Minick v. Minick*, 149 So. 483, 487-88 (Fla. 1933) (domicile is a "permanent" home); *Meisman v. Hernandez*, 353 So. 3d 669, 672 (Fla. 2d DCA 2022) (outside of homestead-exemption context, requiring "permanent" intent). And unlike the refugee in *Perez v. Perez*, 164 So. 2d 561, 562 (Fla. 3d DCA 1964), Plaintiffs' authorization to remain is not for an "indefinite" or "unlimited" period.

Tellingly, the State's definition of "domicile" and its declaration that federal law does not "control Plaintiffs' domicile under Florida law" are at odds with the legislative history of SB 264 and companion bill HB 1355. Opp. 10. When asked how "domiciled" was defined, HB 1355's lead sponsor, David Borrero responded, "You can look up federal law definition of that."[2] However, under federal law, "Congress intended that . . . nonimmigrants in restricted classes who sought to

---

[2] The Florida Channel, *05/02/23 House in Session* at 9:23:10-9:23-20 (May 2, 2023), https://thefloridachannel.org/videos/5-2-23-house-session.

establish domicile would be deported." *Elkins v. Moreno*, 435 U.S. 647, 665-66 (1978). Similarly, when SB 264's lead sponsor, Jay Collins, was asked whether the law would limit "a foreign national from China" with "a visa to be here" from purchasing property, he responded: "You are limited to one property within five miles" of a military installation—with none of the limitations the State now argues are implicit in the law.[3]

Nor is it clear how the State draws its legal conclusions from Plaintiffs' facts. For example, although Plaintiff Wang does not assert an intent to stay indefinitely in the United States, DE21-4, the State argues that her circumstances "reflect" such an intent, Opp. 9-10. It is doubtful that prosecutors would readily reach the same conclusion. F-1 visa holders like Ms. Wang typically intend—as required under immigration law—to remain only for a discrete time. *See* 8 C.F.R. § 214.2(f)(5)(iv).

SB 264's structure is also in tension with the State's interpretation. The law contains a safe harbor allowing people who hold non-tourist visas to purchase a single residential property not within five miles of a military installation. Fla. Stat. § 692.204(2)(b). But under the State's "domicile" theory, such visa-holders do not need a safe harbor at all—and can buy as much property as they like—so long as they subjectively intend to remain in the United States "indefinitely." Opp. 9. Yet

---

[3] The Florida Channel, *05/04/23 Senate Session* at 03:56:31-03:58:19 (May 4, 2023), https://thefloridachannel.org/videos/5-4-23-senate-session-part-2.

SB 264 nowhere suggests that visa-holders' subjective intent exempts them from its strict prohibitions and criminal penalties; it contains no provisions specifying how visa-holders can establish that intent to protect themselves against future prosecution or forfeiture; and it says nothing about what occurs if a visa-holder's intent changes after purchasing property in Florida. In short, the law does not plainly exclude Plaintiffs in the way the State now claims. They are exposed to criminal charges, with no assurance that the State's say-so will protect them.

Finally, despite the State's efforts to nit-pick Multi-Choice's evidence, its standing is clear. The majority of its customers are "Chinese or Chinese American," and they include clients who live in China, as well as clients who live in the United States, and who are neither citizens nor permanent residents of the United States. DE26-1 ¶¶ 5, 9, 11, 13-15; Supp. Song Decl. ¶ 2. Many of these customers are indisputably foreclosed from purchasing property under the law, and lenders are already refusing to do business with them—or with *any* Chinese citizen seeking to purchase property in Florida. *See* Supp. Song. Decl. & Exs. 1-2; *see also* DE26-1 ¶ 15 (substantial decrease in inquiries from prospective buyers). These harms to Multi-Choice's business are not based on "misreading" or "propaganda," Opp. 12, but are directly traceable to SB 264. *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 926-27 (11th Cir. 2023) (defendant need not be "the sole or even proximate cause" of injury).

## II.   SB 264 violates the Constitution and federal statutory law.

### A.   SB 264 violates the Equal Protection Clause.

As the State effectively concedes, SB 264 expressly discriminates based on alienage. It also expressly discriminates based on national origin. *See* U.S. Statement of Interest, DE54 at 8-15, 19. Under either analysis, strict scrutiny applies. Because the State cannot prevail under that standard, it does not even attempt to argue that SB 264 is narrowly tailored and necessary to advance a compelling government interest—waiving any such argument. And notably, the State provides no evidence that home ownership by Chinese nationals living in Florida harms the state's security. Instead, the State advances three arguments, each meritless.

First, the State contends that SB 264 does not facially discriminate based on national origin. Opp. 22. But the statute, on its face, singles out people whose home is in China or one of the other "countries of concern." Discrimination based on "domicile" in a foreign country—particularly considered alongside SB 264's alienage provisions—is effectively discrimination based on national origin. *See Rice v. Cayetano*, 528 U.S. 495, 514 (2000) (under Fifteenth Amendment, use of ancestry as a proxy for race resulted in a race-based voting qualification); *see also Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 309 (2013). "Proxy discrimination is a form of facial discrimination." *Pac. Shores Props., LLC v. City of Newport Beach*, 730

F.3d 1142, 1160 n.23 (9th Cir. 2013); *see also McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992).

Second, the State argues that the Supreme Court did not mean what it said when holding that state-law alienage classifications are generally subject to strict scrutiny. *Compare* Opp. 20-22, *with Bernal v. Fainter*, 467 U.S. 216, 219 (1984). The State argues that "illegal aliens are not a suspect classification." Opp. 20-21 (citing *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982); *Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019)). But that is irrelevant: SB 264 draws no such line. The State asserts that *Bernal* is inapplicable to foreign nationals outside of the United States. Opp. 20. But again, that is irrelevant: Plaintiffs reside here. The State also invokes the political-function exception. Opp. 17-18. But this "narrowly construed" exception is inapposite: it applies only to alienage discrimination in certain government jobs. *Bernal*, 467 U.S. at 220-22. In a last-ditch effort, the State relies on out-of-circuit cases to draw a spurious distinction between classifications involving "permanent resident aliens" and "aliens only temporarily present in the United States." Opp. 19-20. But that distinction has no basis in *Bernal* or *Graham v. Richardson*, 403 U.S. 365 (1971), which applied strict scrutiny to laws discriminating against all noncitizens residing in the United States, on the ground that the laws discriminated against "[a]liens as a class." *Bernal*, 467 U.S. at 219 n.5 (quoting *Graham*, 403 U.S. at 372). In the same vein, the State cites *Foley v.*

*Connelie*, 435 U.S. 291, 295 (1978), to suggest that strict scrutiny applies only to laws harming LPRs. Opp. 21. But *Bernal* was decided after *Foley*, and nothing in its analysis is so limited.

Third, the State contends that a 100-year-old case, *Terrace v. Thompson*, 263 U.S. 197 (1923), should dictate the outcome of the equal protection analysis here. But *Terrace* and its companion cases have been superseded by decades of precedent applying strict scrutiny to laws discriminating based on alienage and national origin. *Terrace* is not merely "in tension with" subsequent decisions, Opp. 17 (citation omitted); instead, it is irreconcilable with precedent, Mot. 24.

*Terrace* is also factually distinguishable. Unlike the law in *Terrace*, SB 264 *expressly* singles out foreign nationals from specific countries and applies uniquely harsh penalties to people domiciled in China. The Supreme Court characterized the law in *Terrace* as not based on "race and color," 263 U.S. at 220, and the California law in the companion cases as one "for general application . . . to limit the privileges of all ineligible aliens," *Frick v. Webb*, 263 U.S. 326, 333 (1923). Even by 1949, the Oregon Supreme Court recognized that the Equal Protection Clause would no longer permit an alien land law primarily affecting Japanese people, distinguishing *Terrace*

as permitting only even-handed discrimination against all noncitizens. *Namba v. McCourt*, 204 P.2d 569, 582 (Or. 1949).[4]

In addition to facially discriminating based on alienage and national origin, SB 264 violates equal protection because of its discriminatory intent and effects based on alienage, national origin, race, and ethnicity. Mot. 21-25 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Co.*, 429 U.S. 252 (1977)). The State barely responds to Plaintiffs' *Arlington Heights* arguments concerning national origin, Opp. 22-26—presumably because SB 264 was plainly motivated by the intent to discriminate on that ground. As to race, Opp. 23, China is populated almost entirely by people who are Asian.[5] It follows that people in Florida who are "domiciled" in China and harmed by SB 264 are disproportionately Asian.

The State argues that SB 264 was not motivated by discrimination because it "primarily targets agents of hostile government actors." *Id.* Yet the Legislature easily could have limited the law to foreign powers and their agents. *See, e.g.*, HB 379, Reg. Sess. (Ala. 2023) (cited in States' amicus, DE64 at 2). It did not. Discrimination against Chinese people was, at a minimum, a "motivating factor" driving the law's breadth. *Arlington Heights*, 429 U.S. at 265-66.

---

[4] Historical state restrictions on land ownership by noncitizens are beside the point. Opp. 18-19. The equal protection analysis does not ask whether discrimination was historically acceptable.

[5] *See* CIA World Factbook, https://www.cia.gov/the-world-factbook/countries/china/#people-and-society; *see also BluestarExpo, Inc. v. Enis*, No. 21-cv-20875, 2022 WL 2341168 at *11 n.11 (S.D. Fla. May 16, 2022) (taking judicial notice).

Finally, the State asserts that most people subject to the law are noncitizens abroad. Opp. 24. That too is irrelevant. What matters is that the law was designed to—and has the effect of—discriminating against people in Florida based on their alienage, national origin, race, and ethnicity. Thus, under *Arlington Heights*, SB 264 violates the Equal Protection Clause.

### B.     SB 264 violates the Fair Housing Act.

### 1.     Plaintiffs can challenge SB 264 under the FHA.

Defendants claim, without citation, that because SB 264 is a law, it cannot constitute a "discriminatory housing practice" and cannot be challenged by Plaintiffs under the FHA. Opp. 27. The Supreme Court says otherwise, explicitly treating "laws" as "practices" that individual plaintiffs can challenge under the FHA. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 539-40 (2015) (collecting cases).

Defendants further assert, without citation, that Plaintiffs can seek only "specific performance of their real estate contracts," and cannot "invalidate the statute itself." Opp. 28. But the FHA expressly preempts "any law of a State . . . that purports to require or permit any action that would be a discriminatory housing practice." 42 U.S.C. § 3615. Moreover, the FHA authorizes courts to issue "appropriate relief with respect to [a] discriminatory housing practice," including a "permanent or temporary injunction"—with no limitation to specific performance.

10

*Id.* §§ 3613(a)(1)(A), (c)(1). Where a provision of a law violates the FHA—as SB 264 does—an order striking that provision or enjoining enforcement constitutes appropriate relief. *See Town of Huntington v. Huntington Branch, NAACP*, 488 U.S. 15 (1988); *Jeffrey O. v. City of Boca Raton*, 511 F. Supp. 2d 1339, 1359 (S.D. Fla. 2007).

Defendants wrongly argue that Multi-Choice is not an "aggrieved person" with a right to sue under the FHA because it lacks "an interest arguably sought to be protected by the statute." Opp. 29. But the lenient zone-of-interests test "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012). "[T]he benefit of any doubt goes to the plaintiff." *Id.*

Consistent with the FHA's broad mandate to "eradicate discriminatory practices within a sector of our Nation's economy," *Inclusive Cmtys.*, 576 U.S. at 539, various economic injuries experienced by housing market actors—including real estate brokers—ground an FHA claim. *See Sec'y U.S. Dep't Housing and Urban Dev. v. Hope*, No. HUDALJ 04-99-3640-8, 2002 WL 983040, at *9 (May 8, 2002); *Old W. End Ass'n v. Buckeye Fed. Sav. & Loan*, 675 F. Supp. 1100, 1102 (N.D. Ohio

1987); *Williams v. Miller*, 460 F. Supp. 761, 761 (N.D. Ill. 1978), *aff'd*, 614 F.2d 775 (7th Cir. 1979). The State does not cite a single case to the contrary.

Here, Multi-Choice plainly "has a financial stake in the litigation." *Williams*, 460 F. Supp. at 761. SB 264 does not just block a single transaction—it prevents Multi-Choice from facilitating all residential real estate transactions for a large group of potential customers. DE21-6 ¶ 14. The harm to its business is already accruing, as lenders refuse to do business with its customers and inquiries from prospective buyers decrease. *Id.*; Supp. Song Decl. & Exs. 1-2.

Multi-Choice does not bring suit merely as a tangential "participant in the local economy," like a restaurant. Opp. 30. Rather, Multi-Choice is a direct participant in the housing market that is losing income precisely because it cannot broker housing transactions for Chinese nationals. For this same reason, SB 264 is the proximate cause of Multi-Choice's injuries, as there is "some direct relation between the injury asserted and the injurious conduct alleged." *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 202-03 (2019).[6]

---

[6] The incompatibility of SB 264 and 42 U.S.C. § 3605, which applies to Multi-Choice, Opp. 29, is an additional ground for enjoining SB 264. Mot. 25-26 n.8; U.S. Statement of Interest, DE54 at 12.

### 2. SB 264 discriminates based on national origin and race in violation of the FHA.

As discussed above, despite the State's attempts to hide behind the word "domicile," SB 264 discriminates based on national origin and race, on its face and through its intent, and thus violates the FHA. *See* Mot. 25-27; U.S. Statement of Interest, DE54.

Contrary to the State's argument, the FHA requires that a plaintiff demonstrate *discrimination*, not "racial or ethnic animus." Opp. 30. *See UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 200 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates[.]").

Plaintiffs are also likely to succeed on a disparate impact FHA claim. Defendants fault Plaintiffs for not producing comparative data, Opp. 31, but at this stage in litigation, Plaintiffs need only demonstrate a likelihood of success. The Court can use common sense combined with sworn declarations to find it very likely that a law that discriminates against people domiciled in China has a disparate impact on Chinese people. *See Bolden-Hardge v. Off. of Cal. State Controller*, 63 F.4th 1215, 1227 (9th Cir. 2023) ("[S]tatistics are not strictly necessary . . . where a disparate impact is obvious.").

13

**C.     SB 264 is unconstitutionally vague.**

Multiple aspects of SB 264 are too vague to permit Plaintiffs and other members of the public to understand key provisions. Mot. 28-37. The State attempts to rewrite the statute to cure these problems, and insists that Plaintiffs decipher its ambiguities. But the fact that criminal penalties loom reduces "[t]he degree of vagueness that the Constitution tolerates." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982). Due process does not allow Florida to expose thousands of people in the State engaging in ordinary life to potential criminal liability when no one can even say what the statute actually forbids. This case thus differs profoundly from those cited by the State, where only "marginal offenses" posed difficulty. Opp. 14 (citation omitted).

For starters, the question of where Plaintiffs are "domiciled" may stump even lawyers versed in nuances of common law. *See supra*. A fortiori, "a person of ordinary intelligence" lacks fair opportunity to ascertain where his or her "domicile" falls for purposes of SB 264. *Dream Defs.*, 559 F. Supp. 3d at 1271-72. After all, Florida courts have decided closely related questions in a way that could expose the individual Plaintiffs to criminal liability here. Mot. 33-34. As explained above, the State's litigating position to the contrary is not binding—so it cannot cure that vagueness. Moreover, the statute permits and encourages arbitrary and discriminatory enforcement. Mot. 36. Indeed, its vague terms have led market

participants to refuse to deal with *any* Chinese nationals, regardless of the fine distinctions the State attempts to draw in its brief. *See* Supp. Song Decl.

In addition, SB 264's definitions of "critical infrastructure" and "military installation" are rife with ambiguity. *See* Mot. 30-31; *see also Brown v. State*, 629 So. 2d 841, 842-43 (Fla. 1994) ("public housing facility" term was unconstitutionally vague). If identifying such facilities were truly straightforward, there is no satisfying reason why the State would decline simply to list covered sites.

Even if individuals knew *which* facilities qualified under SB 264, the legal boundaries for those sites are still opaque, making it extraordinarily difficult to draw accurate 5- and 10-mile exclusion zones. *Cf. Louisiana v. NAACP*, 366 U.S. 293, 295 (1961). Courts have held the absence of clear, ascertainable boundaries to be constitutionally defective. *See, e.g.*, *Doe v. Snyder*, 101 F. Supp. 3d 672, 682-85 (E.D. Mich. 2015) (statute prohibiting sex offenders from loitering within 1,000 feet of school property was void for failing to specify where boundary line began). Nor can Plaintiffs "figure things out" by enlisting Google or flying crows to determine, for instance, where a perimeter runs, whether a site is fenced off, or its precise acreage. Opp. 14-15. Tellingly, the State itself cannot get the statutory analysis

straight: its Opposition flags the wrong military site potentially blocking Plaintiff Shen's purchase. Opp. 14-15.[7]

### D.   SB 264 is preempted by federal law.

#### 1.   Equity provides a cause of action for Plaintiffs' preemption claim.

Plaintiffs have an equitable cause of action to challenge SB 264 as preempted. The Supreme Court has confirmed the "power of federal courts of equity" to "issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, federal courts "regularly consider[]" such challenges. *Id.* at 326; *see Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (collecting cases); *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1260-62 (11th Cir. 2012). Plaintiffs thus have a "right of action to assert a preemption claim seeking injunctive relief." *Newton v. Duke Energy Fla., LLC*, 895 F.3d 1270, 1276 (11th Cir. 2018) (cleaned up).

Because the State acknowledges the general availability of an equitable cause of action in preemption suits, Opp. 34, most of its arguments are irrelevant. Unlike attempts to derive an implied cause of action from the terms of a federal statute, *see In re Wild*, 994 F.3d 1244, 1256 (11th Cir. 2021) (en banc), or enforce a federal statute under 42 U.S.C. § 1983, *see Health & Hosp. Corp. of Marion Cty. v. Talevski*,

---

[7] The correct National Guard site is 2809 S. Ferncreek Ave., Orlando, FL 32806, not 2921 E. Colonial Dr. #102, Orlando, FL 32803.

143 S. Ct. 1444, 1451 (2023) (both cited by State), Congress must act to *displace* the generally available equitable cause of action, *see Armstrong*, 575 U.S. at 327-28, 331-32 (analyzing these issues separately). The State effectively concedes as much, arguing only that "the Court's equitable power is 'subject to express and implied statutory limitations.'" Opp. 34 (quoting *Armstrong*, 575 U.S. at 327).

The State fails to show any such limitation here. It contends that FIRRMA impliedly forecloses this challenge. Opp. 34. But the cited provision merely permits the President to direct the government to file an action to enforce his orders. 50 U.S.C. § 4565(d)(3). It says nothing about who can sue to enjoin a *state* statute setting up an alternative scheme preempted by FIRRMA. Likewise, the fact that FIRRMA permits challenges to a particular "action or finding," *id.* § 4565(e)(2); Opp. 32, says nothing about the availability of an equitable challenge to a state law preempted by FIRRMA. By contrast, *Armstrong* held that the Medicaid Act foreclosed an equitable suit alleging a "breach" of the State's agreement with the federal government, because the Act channeled such quasi-contractual disputes into an administrative process. 575 U.S. at 327, 328-29. The State identifies nothing similar here.

### 2. SB 264 is preempted.

As Plaintiffs explained, SB 264 impinges on and interferes with the carefully calibrated federal scheme governing national security review of real estate

purchases. Mot. 37-47. It replaces Congress's deliberate, case-by-case process with a categorical ban; imposes dramatically more severe penalties; and wrests from the President critical discretion in the spheres of foreign policy and national security.

In response, the State concedes much of Plaintiffs' preemption case. It admits that SB 264 aims at the same national security considerations addressed by the federal regime. Opp. 24 ("[T]he Florida legislature adopted this law to address threats posed by hostile foreign nations."). It *emphasizes* the ways in which SB 264 "sweeps more broadly than the federal regime." *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1282 (11th Cir. 2013); Opp. 36 (noting federal law exempts "Plaintiffs' proposed transactions"). And it urges that the federal regime is (in the State's view) *inadequate* to protect national security. Opp. 1, 35, 37 & n.16 (criticizing Congress's "laborious, resource-intensive, and case specific" system, the Executive's "limited means" to identify transactions, and the "constrained" "effectiveness" of Congress requiring individualized credible evidence).

That renders Florida's statute preempted. Just as in *Odebrecht*, 715 F.3d at 1272, and *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000), Florida may not simply replace the federal scalpel with a state-law sledgehammer.[8]

---

[8] The State suggests that the CFIUS process was inadequate in one case involving a planned agricultural-land purchase in North Dakota. Opp. 2-3, 36. If Florida believes the balance Congress struck needs adjustment, it can ask Congress to amend the statute.

The State's responses all fail. The State posits that the laws at issue in *Odebrecht* and *Crosby* are inapposite because they addressed only one country. Opp. 40. That is a distinction without a difference. As the State concedes, the state and federal regimes here both address national security concerns potentially raised by the purchase of property by foreign nationals. It is no defense that the federal scheme only permits "the President to block *individual* merger and land transactions," while Florida's imposes "*country-wide* measures." Opp. 40 (emphasis added). Rather, that highlights the problem: Florida's statute "reaches far beyond the federal law in numerous ways and undermines the President's exercise of the discretion afforded him by Congress." *Odebrecht*, 715 F.3d at 1290. Moreover, the State does not dispute that SB 264 has "select[ed] by name a foreign country on which it ha[s] declared, in effect, some kind of economic war." *Id.* at 1287; *see* Mot. 47.

The State expresses doubt that Congress struck a balance in calibrating the scope of transactions covered and the force it brought to bear. Opp. 37. But that balance is evident in the carefully crafted terms of the statute and the legislative findings accompanying it. Mot. 38-41. The State cryptically suggests that FIRRMA does not "lend itself to the exertion of country-specific diplomatic pressure." Opp. 40. That bare assertion is contradicted by the statute's terms, 50 U.S.C. § 4565(f)(9)(A)-(B), (11), the D.C. Circuit's opinion in *Ralls Corp. v. Committee on*

*Foreign Investment in the U.S.*, 758 F.3d 296, 314 (D.C. Cir. 2014), and common sense.

Likewise, the supposition that Congress meant to leave this issue to the states, Opp. 37, finds no support in the statutory text. Why, for example, would Congress craft careful exceptions for a single "housing unit" ("as defined by the Census Bureau") and for real estate in "urbanized areas" (except as prescribed by federal regulations "in consultation with the Secretary of Defense"), 50 U.S.C. § 4565(a)(C)(i), if it invited States to run roughshod over that system? *Cf. Crosby*, 530 U.S. at 377. The State offers no response. And while the State suggests that banning far more transactions than Congress did "advances the purposes of the CFIUS regime," Opp. 41, "[t]he fact of a common end hardly neutralizes conflicting means," particularly where, as here, the state scheme ignores countervailing federal interests and "undermines the congressional calibration of force." *Crosby*, 530 U.S. at 379-80.

The State argues that the Court should apply a presumption against preemption because regulation of land is a traditional state concern. Opp. 34-35. But "the thrust of [the statute] is to impinge on an area of core *federal* concern"— national security and foreign policy. *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (emphasis added) (rejecting presumption against preemption). As explained, such matters must be addressed with one voice, setting this case apart

from ordinary land regulation and rendering Florida's foreign policy preempted. Mot. 45-47; *Hines v. Davidowitz*, 312 U.S. 52, 68 (1941). And even if a presumption applied, "the state Act presents a sufficient obstacle" to trigger preemption. *Crosby*, 530 U.S. at 374 n.8.

Finally, the State points to the history of state laws limiting land ownership and suggests that Congress needed to enact an *express* preemption provision to displace SB 264. Opp. 37-40. But the laws the State cites that were still on the books when FIRRMA was enacted were overwhelmingly confined to agricultural, public-owned, or large-tract land; under all of them, noncitizens enjoyed broad rights to purchase homes; and none singled out nationals of particular countries for restrictions, displacing the federal government's foreign policy and national security judgments. What (if any) effect FIRRMA and the federal government's foreign affairs authority has on even-handed regulation of foreign ownership over agricultural land, for example, is simply not presented here. *See supra* note 1.

Moreover, *Crosby* rejected this argument. There, Massachusetts pointed to a "large number" of earlier state sanctions laws and "instances of express preemption of state sanctions in the past." 530 U.S. at 387. The Court, however, refused to infer that the "failure to enact express preemption implies approval." *Id.* at 388.[9]

---

[9] The State deems it "telling," Opp. 31, that the United States has taken no position on Plaintiffs' preemption claim. DE54 at 6 n.5. That reads a great deal into very little. In *Crosby*, the federal

### III. The equities strongly favor Plaintiffs.

Plaintiffs are suffering irreparable harm from SB 264. Indeed, the State does not meaningfully deny that (1) canceled property contracts; (2) onerous registration and affidavit requirements; and (3) discriminatory effects in the housing market are forms of irreparable harm. Mot. 48-50.

Although the State offers the bare assertion that the affidavit requirement would be "reparable," Opp. 41, it is not. SB 264 mandates that Plaintiffs or any other would-be buyer attest under penalty of perjury to their compliance, on pain of third-degree felony charges, up to five years' imprisonment, heavy fines, and property forfeitures. Fla. Stat. § 692.204(8). Given the statute's vagueness, *see supra*, would-be purchasers will be deterred from potentially lawful purchases and deprived of unique, irreplaceable properties.

More broadly, Plaintiffs are harmed by SB 264's stigmatizing effects and resulting discrimination in the housing market. Mot. 49-50. Under Eleventh Circuit precedent, this constitutes irreparable injury. *See Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir. 1984). Plaintiffs have explained how SB 264 "sows widespread housing discrimination because it threatens would-be sellers with criminal penalties for transacting with Chinese persons like the individual

---

government took no position in the lower courts, *see Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 54 n.9 (1st Cir. 1999), but later briefed the foreign policy considerations on which the Supreme Court relied, 530 U.S. at 384 n.22.

plaintiffs." Mot. 50. Since then, lenders have stated that they are cutting off business with *all* Chinese citizens in Florida, Supp. Song Decl., Exs. 1-2, undercutting Multi-Choice's core business. Only an injunction can prevent these multiple dimensions of irreparable harm.

Finally, nothing appreciable weighs on the other side of the scale. Not only is there no public interest "in the enforcement of what is very likely an unconstitutional statute," *Odebrecht*, 715 F.3d at 1290, but the State's position is that the individual Plaintiffs and people like them are not covered by the statute, so an injunction as to them could not possibly harm the State. Unlike *Maryland v. King*, 567 U.S. 1301 (2012), Opp. 41, the State has no evidence that real estate purchases by Florida residents like Plaintiffs pose any threat to state security, and the United States supports Plaintiffs' motion while noting that SB 264 "will not advance the State's purported goal of increasing public safety." DE54 at 2. The equities weigh decisively in favor of a preliminary injunction.

## CONCLUSION

This Court should preliminarily enjoin the challenged provisions of SB 264.

## LOCAL RULE 7.1(F) CERTIFICATION

The undersigned hereby certify that Plaintiffs' Reply in Support of Their Motion for a Preliminary Injunction contains 5,244 words.

Dated: July 11, 2023

*/s/ Ashley Gorski*

Ashley Gorski*
Patrick Toomey*
Sarah Taitz*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
agorski@aclu.org
ptoomey@aclu.org
staitz@aclu.org

Cody Wofsy*
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0770
Email: cwofsy@aclu.org

Daniel B. Tilley (FBN 102882)
**ACLU FOUNDATION OF FLORIDA**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2707
dtilley@aclufl.org

Nicholas L.V. Warren (FBN 1019018)

Keliang (Clay) Zhu*
**DEHENG LAW OFFICES PC**
7901 Stoneridge Drive, Suite 208
Pleasanton, CA 94588
(925) 399-5856
czhu@dehengsv.com

Derek L. Shaffer*
Haiyan Tang*
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com
haiyantang@quinnemanuel.com

Bethany Y. Li*
Elizabeth Koo*
Razeen Zaman*
**ASIAN AMERICAN LEGAL DEFENSE AND EDUCATION FUND**
99 Hudson Street, 12th Floor
New York, NY 10013
(212) 966-5932
bli@aaldef.org
ekoo@aaldef.org
rzaman@aaldef.org

**ACLU FOUNDATION OF FLORIDA**
336 East College Avenue, Suite 203
Tallahassee, FL 32301
(786) 363-1769
nwarren@aclufl.org

*Attorneys for Plaintiffs*

*\* Admitted pro hac vice*