**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
YIFAN SHEN, ET AL.,            )
                              )
           Plaintiffs,        ) Case No: 4:23cv208
                              )
        v.                    ) Tallahassee, Florida
                              ) July 18, 2023
WILTON SIMPSON, IN HIS        )
OFFICIAL CAPACITY AS          )
COMMISSIONER OF AGRICULTURE    )
FOR THE FLORIDA DEPARTMENT     )
OF AGRICULTURE AND CONSUMER    )
AFFAIRS, ET AL.,              )
                              ) 1:30 PM
           Defendants.        )
_____ )
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION**
**BEFORE THE HONORABLE ALLEN C. WINSOR**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 98)**

*LISA C. SNYDER, RPR, CRR*
**Official United States Court Reporter**
**111 North Adams Street, Tallahassee, FL 32301**
**(850)567-1374 * lisasnydercr@gmail.com**

*Proceedings reported by stenotype reporter.*
Transcript produced by Computer-Aided Transcription.

```
 1   APPEARANCES:

 2   For the Plaintiffs:      ACLU
                              By:  ASHLEY GORSKI
 3                                 Attorney at Law
                                   agorski@aclu.org
 4                            125 Broad Street
                              18th Floor
 5                            New York, New York 10004

 6                            ACLU
                              By:  NICHOLAS WARREN
 7                                 Attorney at Law
                                   nwarren@aclufl.org
 8                            336 E. College Avenue
                              Suite 203
 9                            Tallahassee, Florida  32301

10                            Deheng Law Offices, PC
                              By:  Keliang Zhu
11                                 Attorney at Law
                                   chu@dehengsv.com
12                            7901 Stoneridge Drive, Suite 208
                              Pleasanton, California 94588
13
                              AALDEF
14                            By:  BETHANY Y. LI
                                   Attorney at Law
15                                 bli@aaldef.org
                              99 Hudson Street, 12th Floor
16                            New York, New York  10013

17   For the Defendant:       Florida Attorney General's Office
     State                    By:  HENRY CHARLES WHITAKER
18                                 Attorney at Law
                                   henry.whitaker@myfloridalegal.com
19                            PL-01 The Capitol
                              Tallahassee, Florida 32399
20
                              Florida Attorney General's Office
21                            By:  ROBERT SCOTT SCHENCK
                                   Attorney at Law
22                                 robert.schenck@myfloridalegal.com
                              Collins Building
23                            107 Gaines Street, Suite 424
                              Tallahassee, Florida 32399
24                            PL-01 The Capitol
                              Tallahassee, Florida 32399
25
```

```
1    Appearances continued:

2                               Shutts & Bowen, LLP
                                By:  DANIEL ELDEN NORDBY
3                                    Attorney at Law
                                     dnordby@shutts.com
4                               215 S. Monroe Street, Suite 804
                                Tallahassee, Florida 32301
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1

2          (Call to Order of the Court at 1:33 PM on Tuesday, July 18,

3     2023.)

4               THE COURT:  Good afternoon.  Have a seat.

5               We are here in 4:21cv208, Shen versus Simpson.  We are

6     here for argument on the plaintiffs' motion for preliminary

7     injunction.

8               We will start with appearances for the plaintiffs.

9               MS. GORSKI:  Thank you, Your Honor.

10              Ashley Gorski for plaintiffs.

11              And I am joined today by co-counsel Clay Zhu, Bethany

12     Li and Nicholas Warren.

13              THE COURT:  Okay.

14              Ms. Gorski, you are presenting the argument?

15              MS. GORSKI:  Yes, Your Honor.

16              THE COURT:  Okay.

17              For the defendants?

18              MR. WHITAKER:  Thank you, Your Honor.

19              Henry Whitaker for the State.

20              With me is Robert Schenck and Daniel Nordby.

21              I will be presenting the argument today.

22              Mr. Schenck will also be taking some of the issues.

23              THE COURT:  Okay.  Very good.

24              I know the United States filed a statement of

25     interest, but there is no one here to present any argument or

1    position from it; is that correct?

2              Okay.  Well, we have got a lot to cover, but my hope

3    is an hour per side will be sufficient.  Maybe less than that.

4              Ms. Gorski, you can take it away.

5              MS. GORSKI:  Thank you, Your Honor.

6              Your Honor, plaintiffs are -- well, good afternoon.

7              May it please the Court.

8              Ashley Gorski for plaintiffs.

9              Plaintiffs are four people who live in Florida, and a

10   real estate brokerage firm, all of whom are directly and

11   irreparable harmed by SB264.

12             This law discriminates against Chinese people in

13   violation of the Fair Housing Act and the Constitution, as both

14   we and the United States have explained.  It is also

15   unconstitutionally vague and it is preempted by federal law.

16             The State is taking the litigation position that the

17   individual plaintiffs are not domiciled in China, but that

18   representation is based on a novel and highly uncertain clause

19   on Florida law, especially given the fact that three of the

20   plaintiffs are in the US on time-limited non-immigrant visas.

21             And that argument simply does not go far enough

22   because it fails to provide plaintiffs with a legally binding

23   assurance they need.  An order from this Court that

24   preliminarily enjoins the law will provide plaintiffs with the

25   greatest measure of protection against this enforcement and

1    plaintiffs have made requisite showing.

2            I do want to be clear from the outset, if it is

3    possible to obtain legally binding assurance from all of the

4    defendants that the law does not apply to the individual

5    plaintiffs, and that clearly specifies the State's view of the

6    law in this scope, the individual plaintiffs are, of course,

7    open to that.

8            On July 5th we reached out to the State about the

9    possibility of a stipulation along these lines, but we have not

10   yet heard back.

11           In the meantime, the individual plaintiffs are still

12   at substantial risk that the law will be enforced against them.

13           The answer to --

14           THE COURT:  What's your -- I don't know that this was

15   brought up, but two of the plaintiffs -- or three -- have

16   contracts for property.  One does not.  That's the one -- I

17   think it's Plaintiff Wang does not have a contract for property.

18   And that plaintiff you probably have the strongest footing in

19   the domicile aspect of things.

20           But does the fact that there is no contract, or no

21   concrete plans to buy property, does that hurt your standing

22   claims with respect to Wang?

23           MS. GORSKI:  Your Honor, no, because Plaintiff Wang

24   is -- you know, she is a property owner and she is going to be

25   subject to this registration requirement, and so she will have

1    standing to challenge the registration requirement.

2              And to clarify, two of the plaintiffs do have pending

3    purchases.  Plaintiff Liu has a plan to purchase.  He is

4    interested in acquiring property, and he is also a property

5    owner who is subject to the registration requirement which

6    provides standing.

7              In addition, Multi-Choice Reality, of course, is

8    already being harmed by the law and will continue to lose

9    customers, so its standing --

10             THE COURT:  That one I think you have got some trouble

11   with.  Of course, you only have to have standing as to one to

12   the extent they are all seeking the same relief.

13             But the reality -- it seems like you are relying on

14   other people's misunderstandings about what the law does.  So in

15   your reply you have got an email of someone saying, We are not

16   going to do business with Chinese people at all.  That wouldn't

17   be required by this.  So it seems like there is a couple levels

18   of speculation with respect to the harm to the reality.

19             Is that not right?

20             MS. GORSKI:  No, Your Honor.

21             The standing is not predicated on those lender emails.

22   We submitted those to the Court because they are additional

23   evidence of ongoing irreparable harm.

24             It is true that the mortgage broker there seems to

25   have misunderstood the law.  The lender's legal department

1    separately looked at the question and the company made a

2    business decision, presumably because of the potential breadth

3    of domicile and the narrowness of the safe harbor.

4              But Multi-Choice is already --

5              THE COURT:  But if someone makes a decision to say, I

6    am going to change my practices because this law exists, but

7    they are not required to, that doesn't give you standing; does

8    it?  If someone says, Based on this law we are going to stop

9    doing something unrelated to real estate, I am going to stop

10   doing business with Chinese people because of this law, you have

11   a traceability problem there still, don't you?

12             MS. GORSKI:  In plaintiffs' view that is a direct and

13   foreseeable harm of a law that is so broad and that is

14   deliberately targeting people who are domiciled in China.  But

15   even setting all of that aside, Multi-Choice is already being

16   harmed because of the declined inquiry from prospective

17   customers.

18             The exhibits show that one of -- the client whose

19   property is at issue in the email correspondence is a client who

20   is indisputably domiciled in China and will be unable to secure

21   a loan from these lenders.

22             And Multi-Choice's customer base includes people who

23   are indisputably domiciled in China.  And Multi-Choice will no

24   longer be able to facilitate those transactions.

25             So even setting aside potential misunderstandings

1    about the scope of the law Multi-Choice clearly has standing to

2    bring those two claims.

3           To clarify here, as well, Multi-Choice's claims are

4    under the FHA, the Fair Housing Act, and the preemption claim.

5    It's just those two.

6           And so I don't know -- if it would be helpful for the

7    Court -- I'm happy to talk more about the domicile issue, or to

8    move on.

9           THE COURT:  You mean as it relates to standing?

10          MS. GORSKI:  Yes.

11          THE COURT:  No.  I think I have got that.

12          MS. GORSKI:  For the individual plaintiffs?

13          Great.

14          And, again, regardless of the definition of

15   "domicile," Plaintiffs Shen, Xu and Liu have standing because

16   they will be subject to the law's affidavit requirement as

17   purchasers.

18          So turning first to the Fair Housing Act.  Congress'

19   purpose in enacting this law was to eradicate discrimination in

20   housing, to ensure that housing options are not more restrictive

21   for people on the basis of national origin, race and other

22   protected characteristics.

23          SB264 violates the FHA in several respects.  First,

24   the statute facially discriminates on the basis of national

25   origin.  This is per se discriminatory and plainly forbidden by

1   the FHA.

2           The Eleventh Circuit, along with the Third Circuit,

3   have not yet decided whether there are circumstances in which

4   facial discrimination could, in theory, be justified.  However,

5   the circuits that have addressed this question have defined the

6   test in a way that facial discrimination can only be justified

7   in extraordinarily narrow circumstances that are not present

8   here.

9           Both the Sixth and Ninth Circuits have said that it

10  may be justified where the discriminatory prohibitions are

11  actually tailored to the particular needs of the disabled

12  people -- these cases all concern disability discrimination --

13  the particular needs of disabled people who are being

14  discriminated against.

15          And, of course, here SB264 in no way responds to the

16  particular needs of plaintiffs.

17          The Tenth Circuit has adopted a similar test, saying

18  restrictions on disabled people must be tailored to

19  particularized concerns about individual residents and cannot be

20  based on blanket stereotypes about the handicapped.

21          Of course, SB264 is based on blanket stereotypes that

22  conflate people who are domiciled in China with the Chinese

23  government.

24          The Eighth Circuit imports an Equal Protection

25  standard.  We don't think that is appropriate, because the reach

1  of the FHA extends beyond the equal protection clause.

2           But under any of these tests, if the Eleventh Circuit

3  were to even conclude that facial discrimination could be

4  permissible, under any of these tests, SB264 fails.

5           If this Court is going to adopt one of these tests, we

6  would encourage it to adopt the Sixth and Ninth Circuit test.

7           And on this issue, you know, the State argues that

8  SB264 does not actually facially discriminate based on national

9  origin.  But the law discriminates against a class of people who

10 are born in China and I think discrimination based on domiciled

11 abroad.

12          THE COURT:  Who are domiciled abroad.

13          I mean, you may be right that most people who are

14 subject to this are -- have a national origin of China.  But

15 they don't have to.  On its face the statute deals with

16 something else, and alienage is not part of what the FHA says.

17          So I guess you have got this disparate impact

18 footnote, but on the face of the statute it just doesn't seem

19 like there is discrimination that's prohibited by the Fair

20 Housing Act.

21          MS. GORSKI:  Your Honor, I don't think the Court has

22 to reach the disparate impact issue, although I am happy to talk

23 about that, because there is facial discrimination.  As the

24 Ninth Circuit explained in *Pacific Shores,* proxy discrimination

25 is facial discrimination.

1          Another way to think about this is proxy

2    discrimination.  The Seventh Circuit, in the case of *McWright v.*

3    *Alexander* said:  If you are discriminating on the basis of gray

4    hair, you are discriminating on the basis of age.

5          The Third Circuit has looked at this proxy

6    discrimination question closely, and I think it recognizes a

7    little bit of the awkwardness of a facial analysis that is also

8    looking at this secondary effect, but it still says that's

9    appropriate.

10          THE COURT:  When there is a proxy, though.

11          This is a little bit of a different flavor, it seems.

12          If someone says, I am not going to -- I want to

13    discriminate on a prohibited characteristic like race, and so I

14    know I am not allowed to, so I'm going to go some other avenue

15    and do a proxy like your gray hair example.

16          But here -- you've got your equal protection in a

17    minute -- but you have got the protected discrimination

18    *Arlington Heights* argument.  But there is a lot of aspects

19    where, you know -- take the federal government treats different

20    countries differently.  You wouldn't be able to say that's a

21    proxy for discrimination based on race, or would you?

22          MS. GORSKI:  Well, Your Honor, I think the question of

23    the application -- I mean, I think the Fair Housing Act --

24          THE COURT:  It seems like a proxy argument is another

25    way of saying what the real intention was, was to discriminate

1    against Chinese people, not against principals of the

2    government, right?  I mean, that's what the proxy argument would

3    have to do.

4          MS. GORSKI:  I think it would be saying that what the

5    statute is actually doing is discriminating against a class of

6    individuals whose origin, whose ancestry is in China.  And I

7    think that is clear from the face of the statute.

8          And it is true that there are some people whose

9    national origin is China who are not domiciled there, of course.

10   But the Supreme Court addressed this issue in *Rice v. Cayetano*.

11   It said:  Simply because a class defined by ancestry does not

12   include all members of a race does not suffice to make the

13   classification race neutral.

14         And similarly, *Nyquist* --

15         THE COURT:  That's certainly true.

16         MS. GORSKI:  Yes.

17         Discrimination against a subset of non-citizen in

18   *Nyquist* was still deemed discrimination on the basis of

19   alienage.  So I don't think there has to be a perfect fit.

20         Here I think the fit is close enough to call this

21   proxy discrimination.

22         Again, I would encourage the Court to look at the

23   Third Circuit's analysis on this.  This is not a case that we

24   cited in our briefs, but it's *Community Services v. Wind Gap*,

25   421 F.3d 170.  And the pincite is page 178.

1          THE COURT:  I apologize.  Will you give me that

2    citation one more time?

3          MS. GORSKI:  Of course.  421 F.3d 170, and the pincite

4    is 178.

5          THE COURT:  Are there cases where they apply this

6    proxy concept to cases that touch on immigration status, or --

7    it would seem like, if you're right, then any time the federal

8    government says, We are going to treat people from X country

9    differently for immigration purposes, someone can jump up and

10   say, Well, that's a proxy or racism, couldn't they?

11         MS. GORSKI:  Well, Your Honor, as the United States

12   represents in its statement of interests, when you are

13   talking -- getting out of the Fair Housing Act for a moment and

14   just thinking about proxy discrimination and equal protection,

15   the federal government indicates that it has far more latitude

16   to discriminate on the basis of protected characteristics,

17   including alienage, than the states do.

18         So I don't think the Court has to be concerned about

19   the potential implications of a ruling, such as facial

20   discrimination, because this is an extraordinary law.

21         I am not aware of a federal law that in any respect is

22   similar.  And this is a highly unusual law.  And given that, I

23   think that the Court need not be concerned about the potential

24   reach of the entry of a preliminary injunction.

25         THE COURT:  I am not -- I mean, the reach of any

1   injunction would just be to the parties here.  I am not worried

2   about that, or how it could affect some other case.  I am just

3   trying to understand -- used that example as just trying to

4   better understand the argument and what it would mean in this

5   case.

6          I am not concerned that this injunction would change

7   the world or anything like that.

8          MS. GORSKI:  Fair enough.

9          THE COURT:  People don't have to follow what district

10  courts do.

11         MS. GORSKI:  Outside the realm of facial

12  discrimination, SB264 also violates the FHA because national

13  origin and race played a role in its enactment.

14         There is direct proof of the intent discriminate

15  against the Chinese people.  The text of the statute is proof.

16  Our brief also highlights with remarks from legislators and

17  Governor DeSantis concerning China.

18         I think the express desire is to, quote, Crack down on

19  communist China, end quote, that resulted in legislation

20  impacting ordinary Chinese people who are not agents of their

21  government.  And the State has relied on pernicious stereotypes

22  about Chinese people to wrongly conflate people who are

23  domiciled in China with the Chinese communist party.

24         There were also -- there are remarks in the record

25  that reflect an intent to go beyond the CCP with this

1   legislation.

2          During a press conference, Governor DeSantis remarked,

3   quote, We saw what happened with COVID when almost all this

4   stuff was made in China.  Why would you want them to be involved

5   in our food supply and our chain -- supply chain here in the

6   United States, end quote.  That's ECF 21-10f3.

7          During another press conference he argued that

8   restrictions on purchase of residential property should apply

9   beyond the Chinese government, stating, It's not the CCP making

10  purchases, quote, These are holding companies and all that.  So

11  you have got to structure it in a way that will effectively

12  police, end quote.  See ECF at 21-15.

13         Governor DeSantis also described this legislation as,

14  quote, protecting Americans from Chinese influence in the

15  economy, end quote.  That's at ECF 21-30.

16         Under Eleventh Circuit precedent, this is direct

17  evidence of intentional discrimination and the inquiry for FHA

18  purposes ends there.

19         THE COURT:  I am not sure I understood you to be

20  making that argument under the Fair Housing Act.  Is that any

21  different than your equal protection argument on the *Arlington*

22  *Heights* factor?

23         MS. GORSKI:  It is different, Your Honor, because

24  under the Fair Housing Act we have said in our brief that the

25  statute reflects discriminatory intent in addition to being

 1   facially discriminatory.

 2           And for the purposes of the FHA there is an analysis

 3   of disparate treatment or intentional discrimination.  And

 4   courts look to see if there is direct evidence of intentional

 5   discrimination.

 6           If there is, the inquiry ends there.

 7           If there is not that direct evidence, they look to

 8   circumstantial evidence.  And that would be the *Arlington*

 9   *Heights* analysis, you would import that into the FHA analysis.

10           But, again, regardless of intent, SB264 also violates

11   the Fair Housing Act because of the resulting disparate effects

12   on the basis or national origin and race.

13           Then two final notes about the State's argument with

14   respect to this claim.

15           First, the State argued that Multi-Choice should not

16   be able to obtain a broad injunction because the Attorney

17   General's authority is limited to suing to correct a pattern or

18   practice discrimination.  But there are numerous --

19           THE COURT:  I don't think that's a good argument.

20           MS. GORSKI:  All right.

21           THE COURT:  The FHA says, State laws are preempted to

22   the extent they allow this type of discrimination.  So if you

23   are right about sort of step one of FHA, I don't think it would

24   need to be a separate private cause of action.

25           But I will hear from Mr. Whitaker on that.  But you

1   can skip it for now.

2          MS. GORSKI:  All right.  Sounds good.

3          I would also just flag -- we say in our brief that

4   Multi-Choice established proximate cause.  It's not a demanding

5   test.  It clearly has.  This requirement comes from the Supreme

6   Court's decision in Bank of America, and that decision is

7   focused on claims seeking damages, which we don't have here.  We

8   have a claim for injunctive relief.

9          The court's reasoning in adopting this proximate cause

10   standard is about the common law history of suits for damages

11   and the risk of massive and complex damages litigation.  It's

12   not even clear that it's actually required here, but in any

13   event, we have met our burden.

14          If the Court has no further questions on FHA, I will

15   turn to the Equal Protection Clause.

16          THE COURT:  Okay.

17          MS. GORSKI:  SB264 discriminates on the basis of both

18   national origin and alienage.  Both independently trigger strict

19   scrutiny.

20          The State has not even attempted to argue that the law

21   is narrowly tailored to advance a compelling interest.  And

22   there is no evidence that homeownership by Chinese nationals,

23   living in Florida, harms the state security.  And the United

24   States has made this point as well.

25          Even if the Court were to disagree with plaintiffs

1    about the express national origin discrimination in the statute,

2    the statute's explicit targeting of people who are domiciled in

3    China is at a minimum a factor that distinguishes this case from

4    *Terrace* and the hundred-year-old companion cases.

5           We believe *Terrace* has been superseded by *Ranal* and

6    *Graham*, but even if the Court disagrees, *Terrace* is not directly

7    controlling because of the unique features of this extraordinary

8    and extraordinarily harmful --

9           THE COURT:  The unique feature that it's got a sub

10   class?  I mean, I understand you have two separate answers to

11   the *Terrace* cases; one was that they were sort of overruled.  I

12   think that's -- that's a difficult one, because in subsequent --

13   it's clear that some justices have had enough of it, and in

14   later cases they kept distinguishing it or assuming it's still

15   going.  And we have this long line of cases saying district

16   courts don't get to sort of anticipate what might happen if it

17   were at the Supreme Court now.  I think you have some good

18   points on that, but I think it's ultimately hard to say, you

19   know, in some more general cases some other general language

20   undoes all of those.

21          But the other argument was that, I guess, it would

22   have been better for the State to say, No foreign national can

23   have property, right?  Is that the distinction that would say,

24   you know, the *Terrace* cases were broader in that respect?

25          Because there is a certain -- I don't know if irony is

1    the right word or not -- but say that the State, if they want to

2    restrict all aliens, that's fine, but if they want to restrict

3    just a few, that would not be fine, which seems to be the part

4    two argument to the *Terrace*.

5              MS. GORSKI:  Your Honor, I certainly appreciate the

6    irony.  It is plaintiffs' position that it would be acceptable

7    for the State to restrict --

8              THE COURT:  I understand.

9              MS. GORSKI:  -- but, I think when you are looking at

10   whether *Terrace* is directly controlling, *Terrace*, again, has

11   been superceded.  But if the Court were to disagree, it would be

12   more on point, more squarely on point, if there were a statute

13   that discriminated in a more even-handed way.  That's the

14   plaintiffs' argument.

15             In these circumstances it's not directly on point.

16   And the Eleventh Circuit has said that there is no obligation to

17   extend a discredited Supreme Court case by even a micron.  And

18   we would ask the Court to take the same approach here.

19             THE COURT:  That's a fair argument, I guess.

20             I do want to -- whether it's been superceded or not, I

21   don't want to cut off any argument you might make there.  I

22   mean, I understand the points you are making, and certainly the

23   courts have come along and said alienage requires heightened

24   scrutiny and things like that.  But then you have much more

25   recent cases saying that's not always the case, including the

1    Eleventh Circuit.

2           You have a separate body of law saying things are

3    different when you are dealing with illegal aliens, which I know

4    you said are not at issue here, but to the extent that Graham or

5    these other cases say heightened scrutiny always applies, we

6    know that's not the case.

7           The defense points out that the Supreme Court's not

8    ever applied to temporary alien, and things like that.  So I

9    think it's probably more complicated than either side would

10   argue.  So I want to give you a chance to respond to that.

11          If *Graham* does what you say it does, then how can we

12   have these very recent cases saying there is no heightened

13   scrutiny when we are dealing with illegal aliens?

14          MS. GORSKI:  Your Honor, *Bernal* articulates the

15   standard as generally.  It says, strict scrutiny generally

16   applies to state laws discriminating on the basis of alienage.

17   And it says there is a narrow exception -- the political

18   function exception -- which is not at issue here.

19          I think the Supreme Court's reasoning in the *Plyler*

20   case involved just a unique set of facts where the court was

21   very focused on the decisions of individuals to violate the law.

22   And under those circumstances the court was unwilling to say

23   that those individuals constituted suspect classification.  But

24   I think that that is a unique and separate set of facts.

25          I do think *Graham* explained --

1          THE COURT:  But the Eleventh Circuit came along after

2     that and said essentially the same thing.

3          MS. GORSKI:  Yes.  Yes, in *Estrada*.

4          But *Graham* did explain that the court's precedence,

5     including *Takahasi,* had cast doubt on the continuing validity of

6     the special public interest doctrine, which is what had animated

7     *Terrace*.  And that was predicated on the distinction between

8     rights and privileges that no longer has any footing in

9     constitutional jurisprudence.

10         And reading *Graham*'s analysis of the question,

11    although Graham did not squarely overrule *Terrace*, I think it is

12    evidence that *Terrace* has been superceded.

13         If there are no further questions on Equal

14    Protection --

15         THE COURT:  I do have a couple.

16         One, so you say strict scrutiny applies.  And they

17    have not tried to justify it, if that standard does apply.  They

18    say rational basis applies.  But you have said it's irrational.

19         Is there any third possibility?  I mean, there is no

20    argument on either side that some sort of intermediate scrutiny

21    or something else would apply.  Either strict scrutiny and you

22    win, or it's not and you lose.  Is that -- on the constitutional

23    issue.

24         MS. GORSKI:  No.  If rational basis review applies,

25    it's plaintiffs' position that this law is not a rational one.

1    We considered a footnote to that effect, but cut it for space.

2            THE COURT:  Rational basis is very difficult to

3    overcome.  You agree with that?

4            MS. GORSKI:  Yes.

5            THE COURT:  But your argument would be that it's

6    completely irrational, and that would apply to, I guess, any

7    state that's done anything like this.

8            MS. GORSKI:  And there are -- Your Honor raises a

9    point that the State's amicus brief raised that our argument

10   would call 23 other state laws into question.  That is

11   definitely not the case.  Because, again, Florida's law is truly

12   extraordinary.

13           Of those 23 state laws, only one is arguably similar

14   to SB264.  That is Nebraska.  And it contains a much broader

15   carve out for the purchase of a home.

16           Most of these laws restrict only purchases of

17   agriculture land, public land, or large tracts of land.  Very

18   different.

19           So even if strict scrutiny applies, those states may

20   have different arguments under strict scrutiny for why those

21   restrictions are appropriate.  But the Court doesn't have to

22   reach that.

23           Then of the remaining laws, virtually none impose

24   restrictions on people who live inside the United States.  So

25   our argument would not require calling into question 23 other

1   state laws.

2          THE COURT:  I wanted to talk on your motivating factor

3   argument.

4          It seems to me that that can't help, because it would

5   seem like if strict scrutiny applies you wouldn't need that

6   anyway.  And if it turns out that the State can, as a 14th

7   Amendment matter, do what they have done here in the abstract,

8   it doesn't seem like the *Arlington Heights* would help you

9   either.

10          It seems to say if the holding were rational basis

11  applies and the states meet rational basis, then it would seem

12  odd to turn out to say, But in this they had to have a bad

13  purpose.

14          You want to speak to that?

15          MS. GORSKI:  Yes, Your Honor.

16          For the purposes of equal protection analysis, these

17  are two separate paths.  So where a statute is facially

18  discriminatory, the court considers whether it is discriminating

19  against a protected class.  If so, strict scrutiny applies.  If

20  not, rational basis, potentially intermediate scrutiny,

21  depending on the circumstances.

22          But, separately, if plaintiffs can show through a

23  combination of direct and circumstantial evidence under

24  *Arlington Heights* that there was a bad motive in this situation,

25  that, in itself, violates the Equal Protection Clause.  So the

1    Court would need to go onto the *Arlington Heights* analysis to

2    assess whether --

3                THE COURT:  You usually see that whether it's a

4    facially neutral thing and someone comes behind and says, They

5    did that facially neutral thing for unconstitutional reasons, or

6    unconstitutional motivation.  And here there is no question that

7    the statute discriminates against the category of people that it

8    affects, right?

9                So I am not sure what the separate showing would be

10   unless it was -- what would the separate showing be?  They were

11   motivated by what the face of the statute shows they were trying

12   to do, or something different?

13               MS. GORSKI:  Yes, sir.

14               I think the face of the statute would be relevant

15   evidence for the purpose of the *Arlington Heights* analysis.  And

16   then the Court would go on to consider the historical background

17   and the comments that -- the many, many comments from state

18   legislators and Governor DeSantis about their intention here

19   with the law, and whether the law's impact was foreseeable.  And

20   here I think the fact that mortgage lenders are discriminating

21   against all Chinese citizens is foreseeable.

22               But the narrowness of the safe harbor was understood.

23   We have discussed that in the briefing, and the Court should

24   consider the availability of a less discriminatory alternative.

25   And here it is plain, in the same way that Alabama has a law

1   that targets foreign powers and agents of a foreign power, it is

2   plain that Florida could have chosen a narrower path that would

3   be more likely to pass constitutional muster.

4        Instead, what it did was conflate people who are

5   domiciled in China with the Chinese communist party, and that is

6   constitutionally impermissible.

7        THE COURT:  When you talk about the other -- the

8   statute does a whole lot of additional things that aren't

9   challenged here -- and I know you have drawn the agricultural

10   component of things.  But you don't disagree with what the

11   defense says:  If you were successful, it would be only as to

12   the provisions that you are talking about dealing with

13   individuals buying property or registering and nothing else,

14   right?

15        MS. GORSKI:  I would like to put a finer point on

16   that.

17        So we are seeking to preliminarily enjoin subsections

18   203 and 204 with the caveat.  And that's because the motion does

19   not encompass all the categories of foreign principals.  Our

20   motion concerns the domicile provision -- that's 692.201,

21   paragraph 4d -- and in the China specific subsection where there

22   is a definition of the foreign principal but the corresponding

23   restrictions.  That is 204, paragraph 184.

24        So the PI, if entered, would not reach restrictions on

25   foreign governments or members of political parties of foreign

1    governments.

2         However, the scope of the injunction would be broader

3    than -- my understanding is the State --

4         THE COURT:  Okay.  Is that just because you have not

5    brought a claim that was covered by those others, or is it

6    because the State is authorized to put into place those types of

7    restrictions?

8         MS. GORSKI:  We aren't taking a position on the State

9    being authorized to put into place those types of restrictions.

10   But our plaintiffs have standing to challenge --

11        THE COURT:  Okay.  Fair enough.

12        I sort of interrupted you.  You were about to say

13   whether you disagreed with the defense about what an appropriate

14   remedy would be.

15        MS. GORSKI:  Yeah.  So the scope of the injunction

16   would depend on the Court's reasoning.

17        With respect to preemption, it would be enjoining the

18   challenged portions of the law in their entirety, as the

19   district court did in *Odebrecht*.

20        With respect to the FHA, the Court would be

21   preliminarily enjoining the challenged provisions of the law but

22   only with respect to dwellings -- what is covered by the FHA.

23        And then under due process and equal protection, the

24   Court would be enjoining the challenged portions of the law with

25   respect to the individual plaintiffs.

1          THE COURT:  Okay.  So what you are saying with

2    preemption, it would be broader than the individual plaintiffs?

3          MS. GORSKI:  Yes, Your Honor.

4          But it would not reach the provisions of the law that

5    restrict the ability to foreign governments or members of

6    political parties of foreign governments to purchase property in

7    Florida.

8          THE COURT:  Okay.

9          MS. GORSKI:  So turning to preemption; SB264 is

10   preempted by federal law.  Plaintiffs have an equitable cause of

11   action to bring this claim.

12         For several reasons the statute violates and

13   interferes with the carefully calibrated federal scheme

14   governing national security review of real estate transactions.

15         First, big picture, I want to flag that SB264 does

16   exactly what *Odebrecht* warned against.

17         Florida has, quote, selected by name a foreign country

18   on which it has declared, in effect, some kind of economic war,

19   end quote.

20         Governor DeSantis has said that Florida is protecting

21   Americans from Chinese influence in the economy.

22         And since we filed our reply brief, Governor DeSantis

23   has been campaigning on this issue.  And in response, a

24   spokesperson from the Chinese Embassy in Washington, DC, said to

25   a Politico reporter, quote, Politicizing economic issues is

1  against market principles and will affect investors' confidence

2  in Americas's market, end quote.

3          This is what *Odebrecht* warned against.

4          I am happy to go through these factors in more detail.

5  I think they are pretty thoroughly covered in our --

6          THE COURT:  Well, here's the situation on the

7  preemption; it does seem like most of the immigration-related

8  general obstruction preemption cases go against the states.  But

9  it seems like most of them, and *Odebrecht* is like this, deal

10  with what's explicitly a foreign relations matter.  So it is

11  sanctioning another country just to try to affect the behavior

12  of another country.

13          Here, I don't think the cases indicate something quite

14  like this where I think the interest is not to affect the

15  behavior of another country so much as to protect the state.

16  You would say, Well, that's the federal government's role, to

17  protect military bases and things like that.

18          But does that distinction of the purpose make much of

19  a difference?

20          MS. GORSKI:  I don't think it does, Your Honor.

21          And in *Crosby*, I'm not recalling offhand whether there

22  was an explicit discussion about the state's purpose in enacting

23  its sanctions regime.

24          THE COURT:  The sanctions regime almost, per se, would

25  be for that purpose, right, to change the behavior of something

1  else?  Not to like -- I don't think the State would say this is

2  more of a public safety measure.

3          I am not saying that's a meaningful distinction.  And

4  it does seem like the fact that you could coexist, you could

5  have this -- you know, they said you can go above and beyond

6  like you would in tort law.  I think probably the same argument

7  could have been made about what is protected in *Odebrecht* and

8  *Crosby* and cases like that, is not a hard conflict the way there

9  are in some cases.

10         It does seem like there is a dividing line between the

11 obstruction cases that deal with immigration than some other

12 type of federal policy.

13         MS. GORSKI:  We have cited, I think, at least one of

14 the immigration cases here.  There is an argument that says,

15 Immigration power is at issue as well.  It's not something we

16 elaborated on.

17         I think what is absolutely clear, however, is this law

18 speaks to the intersection of national security, foreign

19 affairs, and foreign investments, and those are all rightly

20 issues that the federal government has authority over.  And,

21 again, has already legislated in the state.

22         You have the conjunction of Congress acting to create

23 this process for the president to exercise his order discretion,

24 and then the president acting to do that.

25         For those reasons, I think it's straightforward that

1   the law is preempted.

2          One note here, too, I don't think we can infer

3   anything about the US government's view on this question from

4   the fact that DOJ's housing section weighed in on an egregious

5   violation of the housing law.  And we also note in our papers

6   that in *Crosby* --

7          THE COURT:  I noticed -- I appreciate that.  That was

8   the housing department that filed that?

9          MS. GORSKI:  Yes, Your Honor.

10         THE COURT:  It does -- see, I don't know that it

11  legally makes a difference.  You can make a claim about what the

12  government's interest is.  But it did seem quite peculiar that

13  the United States would show up and say, We want to be heard on

14  this, and then take a complete pass on the argument that its own

15  interests are undermined.  That does seem peculiar.

16         MS. GORSKI:  The preemption claim requires a more

17  complex consultation with multiple stakeholders, versus a

18  situation where you have a dedicated unit within DOJ that is

19  focused on those issues.

20         THE COURT:  It's also peculiar, while we are talking

21  about their brief, that they would have an entire protection

22  argument and not even address *Terrace*.  That's the key issue in

23  an equal protection action, I think, whether *Terrace* remains

24  pertinent or not.  Don't you think?

25         MS. GORSKI:  I think it is a question with respect to

1    alienage discrimination.  With respect to national alienage

2    discrimination, *Terrace* in no way controls that.

3              And I think also, separately, when considering the

4    impact of the law -- so getting out of the realm of facial

5    discrimination and thinking about the discriminatory impact and

6    effect, while also discriminating on the basis of race and

7    ethnicity in ways that *Terrace* does not answer the question.

8              THE COURT:  Right.  But you would agree that if you

9    take *Terrace* off the table and you go back and remove them, they

10   never happened, your equal protection claim gets a lot stronger.

11   You would agree with that?

12             MS. GORSKI:  The equal protection claim on the basis

13   of alienage would be more straightforward.

14             THE COURT:  Okay.

15             MS. GORSKI:  Finally, turning to due process.

16             SB264 is unconstitutionally vague in several respects.

17   I think the Court would probably like me to begin by talking

18   about *Bankshot*.

19             THE COURT:  Sure.

20             MS. GORSKI:  *Bankshot* says that the Court reviews

21   statutes for vagueness concerns where a litigant alleges

22   constitutional harm or is chilled from engaging in

23   constitutional activity.

24             First, plaintiff satisfied this test because the right

25   to acquire real property is a right protected by the 14th

1    Amendment under several Supreme Court cases:  *Holden v. Hardy*,

2    *Buchanan v. Warley*, and *Yick Wo v. Hopkins*.

3            The Eleventh Circuit has been skeptical that land use

4    decisions involving executive action implicate fundamental

5    rights.  But here we are talking about legislative actions

6    restricting the ability of an entire class of people to acquire

7    property.

8            And then second, even setting that aside, the

9    affidavit requirement makes this case very different.

10           In *Louisiana v. NAACP*, the Supreme Court said:  It is

11   not consonant with due process to require a person to swear to a

12   fact that he cannot be expected to know or alternatively to

13   refrain from a wholly lawful activity.  And that applies here

14   very clearly.

15           And then third, *Bankshot* predates --

16           THE COURT:  How does that apply here?  You are saying

17   that's what -- *Bankshot* would say that's chilling of some

18   protected right.  Maybe I missed the argument about how the

19   affidavit fits in.

20           MS. GORSKI:  I think the Supreme Court is pointing

21   specifically to this issue with the affidavit.

22           In *Bankshot* you had no facts that even come close to a

23   situation where an individual is required affirmatively to

24   provide an affidavit under penalty of perjury to the government

25   if the individual wants to proceed with a lawful activity.  It's

1    just very distinct from the facts of *Bankshot*.

2           Then the Supreme Court speaking specifically to this

3    scenario involving an affidavit and saying, It is not consonant

4    with due process to require a person to swear to a fact that he

5    cannot be expected to know, or alternatively refrain from the

6    lawful activity.  And here the lawful activity is the purchase

7    of property.

8           Third, *Bankshot* predates *Susan B. Anthony List*.  And,

9    therefore, is not aggressive pre-enforcement challenges where

10   the plaintiff is able to show a substantial risk or credible

11   threat of enforcement.

12          *Bankshot* allows for pre-enforcement review where the

13   plaintiff is chilled from engaging in constitutionally protected

14   activity.  But *Susan B. Anthony List* allows for pre-enforcement

15   review where the plaintiff can show a substantial risk of

16   enforcement regardless of actual chill.

17          And more broadly, on due process, the statute, as the

18   Court knows, imposes criminal liability, more severe criminal

19   penalties, for people who are domiciled in China and people who

20   sell to individuals who are domiciled in China.

21          It does so with no mens rea requirement for the

22   purchasers, and that makes the due process problem even more

23   egregious.

24          As the Supreme Court has explained, the

25   constitutionality of a vague statutory standard is closely

 1  related to whether that standard features a mens rea

 2  requirement.  And that makes sense.

 3           As discussed, domicile is not clear.  And given the

 4  uncertainly in Florida common law, there is no way for a person

 5  of ordinary intelligence, which is the standard, to ascertain

 6  its meaning.

 7           THE COURT:  Wouldn't that apply to any statute that

 8  has the word "domicile" in it?

 9           Let me just start with just an observation.  I think,

10  of your arguments, the void-for-vagueness is by far the most

11  difficult for you.  It's a high standard.

12           A lot of your argument deals with things that are

13  knowable, but maybe the plaintiffs don't know.  And how far is

14  this one?  How big is this military base?  Things like that.

15  You don't see cases saying that a void-for-vagueness issue.

16           Just looking at the statute, it's not something that

17  is impossible to comprehend.  So I think on the merits there you

18  have a very difficult argument.

19           But when you focus on a word like "domicile," that is

20  used throughout the statutes all over the country, it seems like

21  if it were the law that -- a term that, you know, maybe is going

22  to have a different application in different scenarios is

23  void-for-vagueness, we'd have a hard time crafting any statutes

24  ever.  Wouldn't we?

25           MS. GORSKI:  Well, Your Honor, we found only one

1    Florida statute creating criminal liability and using the word

2    "domicile," and that is a statute prohibiting people who are

3    operating massage parlors from using the parlor as a principle

4    domicile, unless it's zoned accordingly.

5              I don't think that presents the same ambiguities in

6    this case.  And the national components, the complexity of the

7    visa situation -- other criminal laws --

8              THE COURT:  The complexity doesn't make something

9    vague.  I mean, you know, if you get a text there is all kinds

10   of complexities and uncertainties in it.  You don't see cases

11   that say, Well, we can't be sure exactly how this is going to

12   apply in every single circumstance, ergo this is a violation and

13   preempt and enforcement right off the bat.

14             MS. GORSKI:  Understood.

15             THE COURT:  On top of that, you have got a situation

16   where you are not -- don't really have the facts about how this

17   would apply to your clients.  You claim the facial challenge

18   here on the vagueness, and so you have someone come in and say,

19   Well, you know, I am unsure about this or that, and I think the

20   best you have done is we are not sure how big this military base

21   is or how many miles it is from here or there, things like that.

22             MS. GORSKI:  Your Honor, understood.

23             We just say many other criminal laws refer to

24   temporary residence, permanent residence, but define those

25   terms, provide some clarify.  And the fact that this is a

1  criminal law is different from the diversity jurisdiction

2  statute.  It's a criminal law with no mens rea requirement.  And

3  I think those factors, in conjunction with the use of the word

4  "domicile," present significant unconstitutional problems.

5       THE COURT:  As a matter of Florida law, would it be

6  implied mens rea?  Maybe not.

7       MS. GORSKI:  I am unaware.  And I don't believe that

8  the State has made that argument in response.  But that's

9  something we will certainly look into, Your Honor.

10      The last note here, I would encourage the Court to

11  look at the Michigan District Court's decision in *Doe v. Snyder*,

12  which we cite in our reply, because the court there is very

13  clear that Google Maps cannot tell you precisely where a

14  perimeter runs.  And for that reason, statutes that limited the

15  ability of sex offenders to loiter or reside in certain areas

16  was deemed void-for-vagueness.

17      So if there are no further questions, Your Honor, I

18  will reserve my time for rebuttal.

19      THE COURT:  You certainly may.

20      Thank you very much.

21      Mr. Whitaker.

22      MR. WHITAKER:  Thank you, Your Honor.

23      As I indicated, we would like to divide things up.  So

24  if it's all right with you, we would start out with Mr. Schenck

25  addressing standing and vagueness.  And I would be happy to

1   address the rest of the issues and whatever questions you might

2   have for us.

3           THE COURT:  Okay.  That will be fine.

4           Mr. Schenck.

5           MR. SCHENCK:  Your Honor, Robert Schenck for the State

6   defendants.

7           Plaintiffs' claims fail for lack standing.  SB264 is

8   not vague.

9           Their burden here is to establish specific facts, the

10  same burden on summary judgment, to show that they have

11  standing, not rest on mere allegations.

12          We would first argue the individual plaintiffs are not

13  domiciled in China and have failed to meet their burden for

14  their conduct as arguably described.

15          Everyone agrees here that the test for domicile in

16  Florida involves two elements; presence and intent.

17          It seems that we have a dispute about what the proper

18  standard of intent is, and what the impact is of federal law.  I

19  want to take each in turn.

20          On the relevant intent, Your Honor, even where Florida

21  courts say "permanently," what they mean is, in a colloquial

22  sense, indefinitely.  That's what the Third DCA in *Perez* made

23  clear.  It directly addressed this point, noting it was

24  addressing general domicility or principals in Florida, and

25  said:  The term should not be taken too literally.  It simply

```
 1    means indefinitely.

 2            And federal law is not dispositive of domiciliary

 3    intent in Florida.  Rather, the Florida courts look -- or

 4    rather, the Florida courts on the issue definitively say as

 5    much.

 6            I apologize for not citing this in our response, but

 7    in the Nicholas v. Nicholas case, from the Third DCA, that's 444

 8    So2d 1118, they stated:  An alien's foreign citizenship or

 9    non-permanent immigration status in this country does not

10    constitute in itself an absolute bar to residency, although, of

11    course, it is of evidentiary weight.

12            They go on and say:  This conclusion is in accord with

13    the overwhelming weight of authority of the subject throughout

14    the country.

15            Rather, plaintiffs point to two cases to dispute this

16    from the homestead context.  But the Supreme Court has

17    interpreted the language in the homestead provision in the

18    Florida Constitution.  The words are "in good faith makes the

19    same his or her permanent residence," to create a unique set of

20    requirements.  Essentially, in good faith make one's permanent

21    residence implies a lawfulness requirement.

22            And the Florida Supreme Court expressly distinguished

23    general domiciled principles in 2012.  This is a case called

24    Garcia v. Andonie, 101 So3d 339, at footnote 11.

25            The Court stated in a unanimous opinion that domiciled
```

1    law is quite distinct and it does not apply to the homestead

2    context necessarily.

3              That's why we see cases like *Nicholas* being able to

4    say that non-permanent immigration status is not an absolute bar

5    to establishing domicile in Florida.

6              THE COURT:  How does that apply to Plaintiff Wang?

7              MR. SCHENCK:  Your Honor, we believe that these

8    principles are mostly established as to the other plaintiffs.

9    The real dispute here is about Plaintiff Wang.

10             Even as to Plaintiff Wang, it is still her burden to

11   show that her conduct is arguably prescribed by the statute.

12             Given the statements of others plaintiffs that made

13   quite clear that they intend to reside permanently in Florida,

14   the failure of Ms. Wang to shoulder that similar minimum burden

15   is telling.

16             It's even more telling because of the other facts that

17   she has alleged --

18             THE COURT:  Shoulder the burden of her saying she is

19   not going to stay.  Is that what you mean?

20             MR. SCHENCK:  Yes.  Yes, Your Honor.

21             We would also assert that that would be helpful in

22   this context to remove any speculation because of the other

23   allegations that she has made in her declaration.  Despite her

24   temporary visa status, which is dispositive under Florida law,

25   she has significant ties to Florida.

1        THE COURT:  But that's not irrelevant.  I mean, it's

2   not dispositive.  You take it away.  But it's a factor.  You

3   know, you look at the affidavit, and I guess the ultimate

4   question is, is there any some credible threat that this would

5   be used against her?  And it seems like -- difficult to say

6   clearly it wouldn't be, isn't it?

7        MR. SCHENCK:  We think that in light of those

8   allegations to establish standing, what we want to know is

9   whether her conduct is prescribed by the statute.  We think that

10  that burden here, in the context where she has made some

11  allegations that are very consistent with domicile, we think

12  that --

13       THE COURT:  What are those?  Just that she -- what are

14  you saying are the things consistent with domicile?  You mean

15  consistent with domicile here?

16       MR. SCHENCK:  Yes, Your Honor.  For example, she has

17  lived here for five years.  She has a house.  A one-year old

18  daughter who is a US citizen here.  She states that she intends

19  to help individuals of Florida with her career.

20       Moving on to the affidavit requirement, we don't

21  believe that the affidavit requirement provides the plaintiffs

22  standing.

23       To start, that section is not self-executing.

24  Instead, requires the Real Estate Commission to promulgate the

25  forms to be filed under that provision.  So at the very least

1  this challenge is premature.

2          But even if it wasn't premature, any injury from those

3  affidavit provisions, Your Honor, would largely track the

4  injuries from the purchase provisions.

5          In other words, because a person must feel the stigma

6  of discrimination personally in order to state a claim, and

7  SB264 only differentiates foreign principals, in order for them

8  to feel the stigma of the affidavit provision, they must

9  themselves be foreign principals, therefore, they must be

10  domiciled in the state of Florida.

11          This challenge fails for the same reasons as the

12  argument about domicile.

13          In any event, Your Honor, this provision does not

14  apply to Plaintiff Wang because she has no concrete plans to

15  purchase property in the State of Florida.

16          Turning to Multi-Choice Reality.  As we mentioned in

17  our response, Multi-Choice hasn't shown its math as to how it's

18  going to lose revenue.

19          Of course, it has claimed that it will lose 25 percent

20  of its business in its original declaration, but really provide

21  no information from which we can glean that injury is traceable

22  to SB264, or any myriad of other sources, including

23  misinformation about the statute, or just general public

24  misunderstanding about the statute, economic conditions of the

25  housing market itself.

1          But even after identifying a single client in their

2    new declaration, Multi-Choice still hasn't explained how the

3    failure of one customer to obtain financing on a four-year-old

4    contract relates injury to them.

5          It's unclear whether Xu had sought alternative

6    financing, what the financing was specifically to do, and

7    whether the injury was traceable to misunderstanding, for

8    example, of its lending company that thinks that the law -- or

9    as all Chinese nationals are buying property in Florida.

10         And we would also argue that it is, in our view, at

11   best speculative whether Mr. Xu will be subject to SB264.  He

12   gives a contract -- or at least alleges he has a contract from

13   2019.  And even if it hadn't closed, the law has a grandfather

14   provision in 692.204, subsection 3, which clarifies a person may

15   continue to own or hold real property as long as they obtain the

16   interest in the property before July 1st, 2023.

17         So when you sign a real estate contract in Florida, a

18   buyer obtains all the interest in the property and the seller

19   gets to retain -- bear legal title to security interest.

20         That interest, however, is not sufficient to subject

21   that contract to criminal liability under the statutes.  To do

22   so we think would probably violate canons of substantive

23   retroactivity under Florida law.  Perhaps even the rule of

24   lenity would come into play.

25         Before I turn to vagueness, Your Honor, I want to

1    address *Bankshot*.

2          You know, we think that plaintiffs' distinctions may

3    be tenable about *Bankshot*.

4          THE COURT:  Might be what?

5          MR. SCHENCK:  The distinction might be tenable.

6          But we would just steer the Court to our merits

7    argument on the vagueness claim.

8          With respect to those, we would argue that the statute

9    is not vague.  None of the four terms that the plaintiffs have

10   identified render the statute vague.

11         A statute is only vague if, after applying the

12   ordinary tools of statutory instruction, the statute has no core

13   left.  It gives no standards to guide the factfinder in the

14   inquiry of applying these statutes.

15         And so we would argue that none of these terms that

16   the plaintiffs have identified are vague.

17         "Domicile," obviously, as we have explained, has a

18   long common law tradition and case law provides a loss on that

19   term.

20         "Critical infrastructure facility and military

21   installation," also has a statutory definition.  It gives

22   several tools to help individuals to understand where those

23   facilities are.

24         And we would argue that the distance calculation is

25   because Florida case law adopting the as the crow flies metric

1    presumption would not render that term vague either.

2            Unless the Court has any questions, I will give the

3    balance of my time to General Whitaker.

4            THE COURT:  Okay.

5            MR. SCHENCK:  Thank you.

6            MR. WHITAKER:  Thank you.

7            I am happy to address whatever issues in whatever

8    order Your Honor would like.  I was going to start out with

9    equal protection and move on to the Fair Housing Act and finish

10   it off with the CFIUS issues.

11           As Your Honor was discussing with Ms. Gorski, we do

12   think that the Supreme Court's serious decision that it reached

13   in the '20s on this issue are directly on point and controlling

14   here.  And I don't think it's tenable to distinguish *Terrace*,

15   for example, on the basis that you heard today.

16           In *Terrace* the law in question was a provision of

17   Washington law restricting aliens from owning property in

18   Washington unless they had made the declaration then required by

19   the naturalization laws that they intend to become a United

20   States citizen, which encompassed a number of requirements.

21           There were eligibility requirements that, in part,

22   turned on things like countries.

23           There were requirements that you renounce your

24   allegiance to whatever foreign country you were from.

25           And there were requirements that you state an intent

1   to reside permanently in the United States.

2          And I think that makes *Terrace* pretty on point here.

3   If anything, I think the fact that our law is, in certain

4   respects, more limited than the law in *Terrace.*  If anything, it

5   makes *Terrace* a --

6          THE COURT:  It's interesting, though, one of the

7   *Terrace* case -- and it may have been *Terrace* itself.  I think

8   the law had originally limited the Japanese citizens, and then

9   they broadened it to avoid equal protection problems.  And it's

10  not a holding in the case that that was an equal protection

11  problem.  But it does seem like when you are dealing with

12  subclasses you are dealing with something different than

13  alienage.

14         So you have got -- none of these cases really talk

15  about -- you can correct me if I am wrong -- a state's

16  historical interest in excluding people from a certain country

17  versus non-citizens generally.

18         MR. WHITAKER:  I am not aware that they talked about

19  that specific thing.  But certainly there are cases that have

20  described the *Terrace* cases in terms of the state's fundamental

21  sovereign prerogative to control its own soil.  I believe that

22  is the *Takahasi* case from 1948 which distinguishes *Terrace* on

23  that basis.

24         So I don't think there is meaningful distinction

25  between *Terrace* and those cases.

1          And, certainly, as Your Honor pointed out, even in the

2    body of law that has been developed over the years by the US

3    Supreme Court, starting in the early '70s, with regard to

4    alienage classification, they have always specifically

5    distinguished cases like *Terrace* and not overruled them.

6          THE COURT:  But they have done it in sort of a dubious

7    way.  I mean, I realize it doesn't matter for what we are doing

8    here.  But it is difficult to think that that case would come

9    out the same way today.  I know that, again, that doesn't answer

10   the question about what the courts would do with this.

11         Do you disagree with that?

12         MR. WHITAKER:  Yes, I do disagree with that, Your

13   Honor.

14         I don't think it is in a dubious way.  Certainly the

15   US Supreme Court, even under the modern alienage jurisprudence,

16   has never held that all such classifications are necessarily

17   constitutionally suspect.  And, indeed, the Court has drawn a

18   distinction between laws that primarily affect, let's say,

19   primarily economic interests versus sovereign or regulatory

20   interests.

21         And I do think there is a way to think about the alien

22   land cases as falling within that kind of distinction, even

23   though perhaps it would not meet all meets and bounds of those

24   distinctions as -- in the specific context in which the Supreme

25   Court considered those issues, but the court has never

1    considered this particular context of land laws.  And I think

2    that's particularly significant because there is a long

3    tradition in this country, dating from the common law,

4    continuing through the ratification of the 14th Amendment, and

5    continuing even today, of the states having these laws.

6          And I think it's pretty hard to say -- I would be

7    happy to make the argument to the US Supreme Court that there is

8    substantial evidence that the Equal Protection Clause, certainly

9    as understood by the ratifiers in 1868, was not understood to

10   invalidate these laws.  And that history, I think, to the extent

11   the Court thinks there is any ambiguity in the precedent, and we

12   don't think there is any such ambiguity, I think the tie would

13   go to the Constitution and that history, which I think is

14   substantial evidence that, indeed, the protection of this kind

15   of law is not repugnant in the Equal Protection Clause of the US

16   Constitution.

17         And I think that is highlighted -- the particular

18   manner in which the State has implemented that tradition here,

19   quite apart from that history, is consistent even with the

20   modern equal protection jurisprudence which has subjected

21   alienage classifications to exacting judicial scrutiny only when

22   they disfavor resident aliens.  And we cited the Fifth Circuit's

23   decision in *LeClerc* and the Sixth Circuit's decision in *LULAC* of

24   that proposition.

25         *LULAC* was, indeed, cited and quoted favorably by the

1    Eleventh Circuit in the *Estrada* case just in 2019.

2             So I think here the State's law expressly exempts

3    lawful permanent residents, and indeed even non-immigrants, who

4    are domiciled in Florida, that is, those non-immigrants with the

5    most substantial connections.

6             THE COURT:  You make that point in the brief, but

7    under your theory they wouldn't -- the law would be just as

8    permissible if it -- covered law more permanent, right?

9             MR. WHITAKER:  I think we might be well making that

10   same argument, Your Honor.  I do think that it is -- certainly

11   the law -- it's an easier case for us by virtue of the fact that

12   it exempts lawful permanent residents.  I think I would be

13   making the argument that --

14            THE COURT:  Easier how?  Not easier if the *Terrace*

15   case was controlling, because they didn't draw that distinction.

16   Right?  It would be easier to respond to what they are saying,

17   which is that the court sort of walked away from *in Terrace*,

18   right?

19            MR. WHITAKER:  Sure.  Although I do think that if we

20   had made the law, for example, only depend on domicile, I think

21   it would be pretty difficult to conclude that somebody who is

22   not -- the federal government has admitted that lawful permanent

23   residency is not, in fact, domiciled in the United States.  So

24   even if we didn't have that precise distinction --

25            THE COURT:  No.  I am saying you could say under your

1    theory, forget where they are domiciled.  As long as they are a
2    non-citizen, they are not buying property in Florida.  That's
3    the ultimate takeaway from *Terrace*.
4           MR. WHITAKER:  I think that might well be tenable.
5    Obviously, *Terrace*, Your Honor, did, in fact, involve a
6    requirement that you make the declaration required, so if we
7    didn't have that distinction --
8           THE COURT:  Some of the other ones they did not.
9           MR. WHITAKER:  That's fair, Your Honor.  Like I said,
10   we might well be making the same constitutional argument before
11   you today if that were the case.
12          I do think the fact that we have proceeded in more
13   modest fashion is a constitutional virtue for us and makes this
14   an easier case for us to prevail on that issue.
15          I did want to talk about proxy discrimination a little
16   bit.  That's not what's going on here, Your Honor.
17          Domicile is a big overlap with those protected
18   characteristics that my friend mentioned.  It's not coextensive.
19          I'd point Your Honor to a number of cases where the
20   Supreme Court has recognized that there is a fundamental
21   distinction between a facial classification and incidental
22   effect of facial classification.
23          In 2022, in the *Dobbs* case, the Supreme Court just
24   recently reaffirmed that is just a classification that's, for
25   example, based on -- related to abortion is necessarily a sex

1    classification even though only women have abortions.  I think

2    that is pretty clear.

3          My friend cites *Rice versus Cayetano* for the contrary

4    proposition.  I think *Rice* is quite different than what we have

5    here, because in that case what was going on was the State of

6    Hawaii was drawing a classification that turned on whether

7    somebody was an ancestor of the race of individuals who

8    inhabited Hawaii prior to 1778.  And that seemed to be pretty

9    clearly a race-based/ancestry classification, and it's nothing

10   like we have here.

11         And both the Supreme Court and the Eleventh Circuit

12   have drawn a clear distinction between alienage classification

13   and a national origin classification.  And we cited to the Court

14   the *Osorto* case, Judge Rosenbaum's opinion from the Eleventh

15   Circuit, from 2021, and also the *Espinoza* case from the Supreme

16   Court from 1973, both of which I think support this distinction

17   quite strongly.

18         If it really were the case that this was a proxy

19   discrimination, it would be very -- that would kind of

20   obliterate the distinction between national origin

21   classifications and alienage classifications which have been

22   treated quite differently with Supreme Court precedent, because

23   I suppose you could say that a nationality classification is

24   automatically, I guess, closely correlated with individuals who

25   are from a specific country, although not necessarily

 1   correlated.  Clearly the Supreme Court has drawn that

 2   distinction, and I think this Court should as well.

 3          If there are no further questions about that --

 4          THE COURT:  "That" being equal protection?

 5          MR. WHITAKER:  Well, I was going to turn to making

 6   points about *Arlington Heights*.

 7          THE COURT:  Go ahead.

 8          MR. WHITAKER:  I would be happy to talk about

 9   whatever.

10          THE COURT:  You heard me ask your colleague if there

11   is some third option.  I mean, if heightened -- their position

12   is heightened scrutiny applies.  If they are right about that,

13   the State loses at this stage because there has been no showing

14   that you would satisfy that.

15          Do you agree with that?

16          MR. WHITAKER:  We have not advanced an argument under

17   heightened scrutiny, Your Honor.

18          THE COURT:  And you would have to to win at this

19   stage, right, if heightened scrutiny applies?

20          MR. WHITAKER:  That's right.  We haven't advanced that

21   argument.

22          THE COURT:  And they have -- as you heard me tell her,

23   if rational basis applies, you are probably in pretty good

24   footing on the equal protection side of things.

25          Those are the two options, right?  There is not some

1    third way, correct?

2            MR. WHITAKER:  I don't understand the third way,

3    Your Honor.

4            THE COURT:  I mean, intermediate scrutiny or something

5    else that would apply.

6            MR. WHITAKER:  I don't think so, Your Honor.  And I

7    don't think plaintiffs have advanced that argument either.  I

8    don't want to speak for them.

9            I was going to move on to some of the issues on

10   *Arlington Heights*.  And that's where this proxy discrimination

11   type issues come in.  The Supreme Court has a distinction for

12   facial classifications and discerning legislature are cases such

13   as *Arlington Heights*.

14           I think we need to start with -- from the -- I think

15   this is a problem with plaintiffs' submission -- from the

16   presumption of legislative good faith.

17           Both the Supreme Court and the Eleventh Circuit have

18   instructed us to presume the best and not the worst from our

19   legislators when they act.  And in light of that presumption, I

20   think all the evidence that the plaintiffs cite and point to is

21   perfectly consistent with benign motives for our law.

22           A motive to promote security of the state; if you are

23   targeting bad malign foreign actors, and the US State Department

24   has called the Chinese Communist party the "grave threat to the

25   United States," and I think all the statements that plaintiffs

1    cite can be viewed with that concern in mind.

2            Of course, it's true that the classification we have

3    here, while there are a number of different classifications --

4    and I guess I would emphasize that the classifications and the

5    restrictions that are in place here start with targeting the

6    governments of these countries:  The Chinese government, the

7    Chinese Communist Party, the instrumentalities of those

8    government.  And I think the domicile provision, the provision

9    that attach significance to Chinese domicile, need to be read in

10   light of that, because I think the purpose of those provisions

11   is sort of an anti-circumvention measure; namely to target those

12   individuals who may be subject to the influence and control of

13   malign foreign actors.

14           And that's a commonplace form of preservation, I

15   think, to anti-circumvention concern, and it's certainly

16   rational for the State to proceed in that way.

17           THE COURT:  I guess their argument -- and maybe I am

18   misunderstanding it.  You heard my question to the other side

19   about, is the *Arlington Heights* ever going to come into play.

20   Because it's strict scrutiny, you win.  If it's rational basis,

21   it would be odd to say -- if it's the rational basis standard,

22   the State has a rational basis for doing this, but the fact that

23   it targets the same group that we just finished saying you can

24   constitutionally target advances some intentional discrimination

25   claim.

1          So I guess the argument would have to be, even

2   assuming that it was constitutional for the State to, say,

3   target those domiciled in China in this case, as an abstract

4   matter permissible under the 14th Amendment.  In this particular

5   case they did it for some other motivation and that wasn't the

6   real motivation.  The real motivation was to harm a minority

7   group.

8          Is that how you understand that argument?

9          MR. WHITAKER:  Yes.

10          THE COURT:  I am still struggling to see how it would

11   ever come into play, this separate *Arlington Heights* inquiry, in

12   this case.

13          MR. WHITAKER:  Well, I agree with that.  I think

14   that's right, Your Honor.  And I think it's very hard to see how

15   if we permissibly targeted malign foreign actors, how you could

16   understand motive to legislative evidence and legislative

17   history reflecting exactly that, that the State is concerned

18   with the influence of the Chinese Communist Party and their

19   agents in Florida.

20          And, you know, malign foreign actors don't typically

21   shout from the rooftops that they are acting as agents of a

22   hostile foreign government.  And it's reasonable, certainly, for

23   the State to proceed in that fashion.

24          And I think it's an important point, because

25   disparities in application of a law that -- of the kind that

1  raise concerns under *Arlington Heights* need to be inexplicable

2  on grounds other than the elicit animus that is prohibited by

3  the Constitution.

4          And certainly any impacts or disparate impact that are

5  caused by that law are certainly understandable in light of the

6  legislature's purpose and Governor's purpose here.

7          I think I would be happy to move on the Fair Housing

8  Act issue.

9          THE COURT:  Before you do, I do have a couple of

10  additional questions on the equal protection.

11          You said there is this political function exception to

12  the general rule that heightened scrutiny applies.  They say it

13  doesn't apply.  I think in your brief you said that land

14  ownership is sort of akin to political involvement in the same

15  way that running for office might be or serving as a police

16  officer might be.

17          I wonder if you can address that.  That seems like a

18  difficult argument to make, but I wonder if there is any support

19  for that, to the extent you are relying on that exception.

20          MR. WHITAKER:  Well, I don't think we are relying,

21  necessarily, on that exception per se, as it has been developed

22  in modern jurisprudence.

23          I think it is a way to explain why *Terrace*'s continued

24  existence coheres, to some degree, with that jurisprudence.

25          The thing that I would point to, I guess, is that

political -- I would say sovereign regulatory interest, because
one of the interests, I think, that this law is fairly advancing
is the fact that -- this was a motive for many of some of the
land laws that came up, especially starting toward the end of
the 19th Century -- a regulatory interest concern about absentee
landlords and the like.  And that kind of regulatory interest is
being advanced by encouraging land ownership by those with the
greatest connection to this country, I guess is what I would say
to that.

THE COURT:  That's a little bit of a mismatch when
it's limited to the countries of concern.  If it's an absentee
land issue, it would be the same whether it was somebody from
Canada, right?  Again, if you are right on the rational basis,
you don't have to have a perfect connection.  But that seems
like a different justification than I understood in the briefs.

MR. WHITAKER:  Well, I think it is both, Your Honor.
And it's a -- fair enough.  I mean, there is absolutely some
under-inclusivity there.  But as Your Honor pointed out, under
rational basis there doesn't need to be a particularly close
fit.  And I do think that, at a minimum, that interest is one
that is floating in the mix.

But certainly, you know, the one we are primarily
asserting is an interest in security.  That's certainly true.

THE COURT:  What do you make of the line in *Terrace*
that says state legislation applying equally to all aliens, and

 1  it goes on to say, is okay?  I mean, we talked about that a

 2  little bit at the outset.  But what is your best authority that

 3  there is a separate right to treat different -- to have separate

 4  subclasses of aliens treated differently?

 5          MR. WHITAKER:  Well, I think that is actually *Terrace*

 6  itself, Your Honor.  Because there were different classes of

 7  aliens that were treated differently.  Aliens eligible for

 8  citizenship would not make the declaration required by the

 9  naturalization laws, could not own land, and aliens who had made

10  the required declaration were.  So to that -- that's *Terrace*

11  itself, Your Honor.

12          Well, I guess I would also point to the Wisconsin --

13  the decision of Wisconsin Supreme Court from 1987, which we cite

14  in our brief, which held Wisconsin's land law, notwithstanding

15  the modern equal protection jurisprudence.  And I believe the

16  Wisconsin law was like our law, attached significance to

17  residency; that is, it allowed resident aliens to own land and

18  those that were not resident landowners were restricted to some

19  degree.  So there are precedents for those kinds of

20  distinctions.

21          And as I was mentioning to Your Honor earlier, even

22  the modern equal protection cases are consistent with the idea

23  that distinctions can be drawn to the extent that lawful

24  permanent residents are not being disfavored by particular

25  classifications.  And we have cited those cases in our brief.

1           THE COURT:  Okay.  All right.  So you were going to

2    move on to the Fair Housing.

3           MR. WHITAKER:  I was going to go on to the Fair

4    Housing Act.  I think Your Honor previewed, I guess, the

5    skepticism about the cause of action arguments.  I am happy to

6    address those.

7           THE COURT:  I do on the merits, but on your procedural

8    argument that they have to have some separate private cause of

9    action, I am not sure I am fully understanding that, or maybe I

10   don't accept it, I am not sure which.

11          But you have a federal statute that says state law is

12   preempted if they do XYZ.  They say that's what's happening

13   here.  Why would they need a separate cause of action within the

14   Fair Housing Act to pursue that?

15          In other words, if Congress came along and said, All

16   laws dealing with whatever topic are preempted, period.  Nothing

17   else.  Don't you, under Eleventh Circuit and Supreme Court

18   precedent, have the right of action to get an equitable relief

19   from a state statute that is preempted?

20          MR. WHITAKER:  Certainly, Your Honor.  That's an

21   important question.

22          Let me just -- this also makes sense and rolls into

23   the CFIUS cause of action discussion as well, which is related,

24   I think, to Your Honor's question.

25          THE COURT:  Well, it's both.  I think it's the same

1    inquiry.  I think whether you are talking about that one -- the

2    Fair Housing Act claim is ultimately just a preemption claim.

3    It's not any different, as I understand it.

4            In any instance, the law is, as I understand it, that

5    you would have an equitable claim that a state statute is

6    preempted and federal law preempts it.

7            MR. WHITAKER:  I don't think that's correct, actually,

8    Your Honor.

9            The analysis is slightly different as it relates to

10   the Fair Housing Act and the CFIUS claim.  It may make sense

11   just to go ahead and tackle these both at the same time, because

12   I think the analysis is related.

13           So let's just think about CFIUS for a second.  I mean,

14   I take it that there isn't any dispute that the -- there is a

15   cause of action under CFIUS.  There is a cause of action under

16   the FHA, and I'm happy to talk about that.

17           THE COURT:  The cause of action under CFIUS would be

18   the same cause of action under *Odebrecht*, right, which is not a

19   statutory one.  Not based on the statute -- not provided by the

20   statute that caused the preemption.

21           MR. WHITAKER:  Right, Your Honor.

22           But I think that the Supreme Court has said that

23   before you can assert a general cause of action in equity you

24   have to examine the particular statutory scheme that is being

25   enforced to see if Congress intended to permit private

1   enforcement of that scheme.

2           I point to the Supreme Court's analysis of the

3   *Armstrong* case as the state of the art these days in Supreme

4   Court law.  The question in *Armstrong*, and the Supreme Court

5   held, was that Section 30(a) of the Medicaid Act channeled

6   private -- all remedies to the -- created exclusive remedy for

7   enforcement of that provision to the Secretary of Health and

8   Human Services' ability to withhold federal Medicaid funds,

9   together with some other statutory indicia that were thought

10  reflected that Congress did not intend a freestanding right of

11  enforcement of that statute.  So you have to examine the

12  particular statutory scheme to see if Congress intended to

13  permit private enforcement.

14          With regard to the FHA, we have submitted to you that

15  FHA's private cause of action in 36 -- in 42 USC 3613, is

16  applicable to prohibited housing practices, which is distinct

17  from laws that are preempted, I think, based on the text of the

18  preemption provision of the Fair Housing Act, which draws a

19  distinction between a state law and prohibited housing practices

20  that may be required.

21          THE COURT:  I think you are right about that.  I think

22  there is a distinction.  I think their claim is not under the

23  private cause of action provision.  I think it's a general

24  equitable claim based on the separate statute that says certain

25  types of state law claims are preempted.

1          MR. WHITAKER:  Well, but, if Your Honor agrees with me

2     that they are not entitled to permit -- to assert a preemption

3     action directly under 3613, consistent with that statute, I

4     think that's a very strong indication that Congress did not

5     intend to permit a separate non-statutory right of action.

6          And I point Your Honor, for example, to the *Seminole*

7     *Tribe* case, which is sort of the case where the Supreme Court

8     held this, where the Supreme Court held that the general

9     equitable right of action under *ex parte Young* was displaced by

10    the specific remedies provided by the Indian Gaming Regulatory

11    Act, as the state, which were more limited than the type of

12    blunderbuss equitable remedy *ex parte Young* would have provided

13    with regard to any provision or any remedy that was available

14    under state law.  And I think that, again --

15         THE COURT:  Walk me through how that would work then.

16         Suppose the ruling is a state law is a hundred percent

17    preempted by the Fair Housing Act.  Sort of finish the order for

18    me.  Finish that section that then says, but there is no relief

19    because...

20         MR. WHITAKER:  Well, in this case there is no relief

21    because there isn't a cause of action to enforce on the part of

22    these plaintiffs.  That's not to say that there wouldn't be

23    other kinds of remedies that could vindicate the fact that the

24    law might be preempted.  Again, we vigorously dispute on the

25    merits.  Just want to make that clear.  We are not conceding

1    that.

2           But, if it were, there would be any number of remedies

3    available to vindicate the Fair Housing Act preemption

4    provision.

5           Plaintiff Shen thinks that she has a contract with the

6    counterpart.  And I suppose if she thinks that our law, 264, is

7    preempted, she could, if the counterparty decided to cancel the

8    contract, she could certainly assert, in any enforcement action

9    she would like that, that Section 264 is unenforceable, whether

10   it's in state court or perhaps in federal court.  So there might

11   be a variety of ways to enforce that law.

12          We are not suggesting that the Fair Housing Act

13   doesn't apply to governments.  It may well apply to governments

14   in various respects.  But I do think that the text of the Fair

15   House Act reflects a distinction between a challenge to a

16   prohibited housing practice itself, while itself is -- which I

17   think as Your Honor seemed to recognize.  And I think that is

18   highlighted by --

19          THE COURT:  But is the argument that there is no

20   private action provided, or that there is a private action

21   provided that's limited and so that indicates Congress meant to

22   exclude?

23          In other words, if the statute just said -- the entire

24   Fair Housing Act said, all state laws are preempted that deal

25   with anything.  Is your argument the same?  I mean, there is no

1    private cause of action spelled out?

2          MR. WHITAKER:  I think it would be more difficult in

3    that instance, Your Honor, because there wouldn't necessarily be

4    that congressional intent.

5          THE COURT:  Okay.  So your argument is that by

6    providing a form of private action Congress was precluding

7    others, including what they are trying to do here?

8          MR. WHITAKER:  Not just a private cause of action.  A

9    pretty comprehensive one that is wrongly applicable to

10    prohibited housing practice --

11          THE COURT:  That's why you are saying the analysis is

12    different from the obstruction preemption --

13          MR. WHITAKER:  Absolutely.

14          I would also note, as Your Honor mentioned, I do think

15    it's significant that the Fair Housing Act provides for

16    enforcement by the US Attorney General.  There are various

17    articulated provisions that require even the US Attorney General

18    to jump through various hoops before asserting a vicarious cause

19    of action on behalf of somebody else.

20          That's another aspect of the remedial scheme I think

21    makes that quite comprehensive and I think forecloses the

22    availability of the non-statutory cause of action.

23          And I am happy to talk about that under CFIUS, but I

24    think CFIUS is the same kind of story because --

25          THE COURT:  It would be a different story, I guess,

1   because there is no comparable, you know, so and so can jump in

2   and enforce this kind of provision that you have --

3          MR. WHITAKER:  No.  I think there is actually,

4   Your Honor.

5          THE COURT:  Okay.

6          MR. WHITAKER:  I think there is.

7          THE COURT:  Was that briefed?

8          MR. WHITAKER:  Well, Your Honor, I think -- we did

9   make a mistake, and I apologize for this.  We had one key CFIUS

10  provision that seems to have made the cutting room floor.

11         THE COURT:  Okay.

12         MR. WHITAKER:  If you look at 50 USC 4564.  Excuse me.

13  That's not the correct provision.

14         If you look at 4556(a), that provision reserves to,

15  quote, the judgment of the president, a decision whether, quote,

16  any person has engaged or about to engage in any acts or

17  practices which constitute or will constitute a violation of

18  this chapter.  And gives the president directly a right of

19  action to sue for, quote, an order of enjoining such acts or

20  practices.

21         The term "person" is defined to include, quote, any

22  state or local government or agency thereof.  That's in 4552

23  paragraph 15.

24         That is a specific mechanism of enforcement as to the

25  states.  And I don't think we could dispute, if the United

1    States wished to enforce CFIUS and assert that our law was

2    preempted, they could assert that cause of action.

3           And I think that way of specifying a cause of action

4    is significant because it reflects, I think, Congress' judgment

5    that the CFIUS statute which does vindicate the federal interest

6    in foreign affairs, its enforcement of something that should be

7    entrusted directly to the president and not necessarily to any

8    random private person who asserts Article III injury from a

9    state law that it asserts may be preempted by CFIUS.

10          THE COURT:  So that's why you would say *Odebrecht* is

11   different.  I mean, I don't think they talked about it, and

12   maybe I am misremembering, but they cite the *Georgia Association*

13   *of Human Rights* case, Eleventh Circuit case, saying there is

14   implied -- there is always implied federal action for equitable

15   relief when something is preempted.  *Odebrecht* didn't really

16   talk about it at all, but certainly allowed the case to go

17   forward.

18          This provision you are talking about seems to -- its

19   50 4556 provision seems to say, whenever there is a violation.

20   And I guess that's not quite what an obstruction preemption case

21   is.  It's not quite a violation.  It's an obstacle or can't

22   quite live harmoniously.  It's a little different than saying

23   you violated the statute.

24          MR. WHITAKER:  Well, at least as conceptualized by the

25   Supreme Court in *Crosby,* I am not sure that there really is that

1  distinction.  I mean, *Crosby* did characterize a particular brand

2  of preemption.  It was engaged in that as a form of conflict.

3  Preemption, I do think, is implied conflict.  Preemption is a

4  high bar there, and ultimately, I do think we have to infer that

5  the purposes and the objective of Congress from the text of the

6  statute.

7          But I would just underscore, you know, Your Honor

8  mentioned *Odebrecht*.  I do think that --

9          THE COURT:  Mentioned what?  I'm sorry?  I mentioned

10  what?

11          MR. WHITAKER:  You mentioned *Odebrecht*.  I don't think

12  *Odebrecht* addressed this.  At most, I think that's a drive-by

13  cause of action.

14          THE COURT:  I think that's right.

15          MR. WHITAKER:  In any event, as Your Honor mentioned,

16  it didn't involve CFIUS.

17          Your Honor mentioned the *Georgia Latino Alliance* case.

18  If I recall that case correctly, I believe that case rested on

19  the premise -- if I am recalling it incorrectly, I apologize.  I

20  don't have it in front of me.  But that the supremacy clause

21  itself creates a cause of action for preemption.  That was

22  expressly abrogated by the *Armstrong* case, so I don't think that

23  case is at all controlling on this question.

24          What I do think is controlling is that CFIUS, much

25  like the Medicaid statute at issue in *Armstrong*, itself contains

1   a comprehensive remedial scheme containing not just the

2   provision that we were discussing earlier for enforcement by the

3   president directly, but also it contains a preclusion of

4   judicial review for lawsuits challenging the findings of the

5   president, and permits the Attorney General, in yet another

6   express cause of action, to enforce the presidential blocking

7   order under CFIUS.  And it creates a venue in the DC Circuit for

8   other sorts of action that might -- private actions that might

9   be taken to challenge the president's findings, such as the one

10  recognized by the DC Circuit in the *Ralls* case from 2014.

11          And I do think that that adds up, coupled with the

12  judgment to the president to enforce a national security

13  statute, a judgment that Congress did not wish private

14  enforcement of this kind of preemption action.

15          So that's the cause of action issues.

16          I'm happy to -- go ahead.

17          THE COURT:  Well -- no.  Go ahead.

18          There is another case that I was going to ask about

19  which is escaping my mind at the moment.  It was along the same

20  lines as the *Georgia Latino Alliance* one and others.

21          There is the *Arizona versus United States* case that I

22  think neither side cited.  It seems to fit in here.  Maybe not

23  on that issue, but I wonder if you can address that.

24          MR. WHITAKER:  I believe that was a cause of action

25  brought by the United States.

1          THE COURT:  Not on the procedural aspect of things,

2    but just on the overall merits issue of the obstruction

3    preemption concept.

4          MR. WHITAKER:  I am happy to address that.

5          Are we off the Fair Housing?  I would be happy to

6    address the Fair Housing Act.

7          THE COURT:  I thought we were moving on to the -- I

8    guess we did skip over the merits.

9          MR. WHITAKER:  I think it's quite similar to the

10   analysis that we were talking about with the equal protection.

11   I just wanted to stress that the Fair Housing Act does not put

12   discrimination on the basis of alienage.  For all the reasons we

13   were discussing in the equal protection section, I don't think

14   there is any argument that there is facial classification based

15   on national origin or race.

16         And I understood, as well, the other side to be

17   making -- just incorporating by reference to their *Arlington*

18   *Heights* argument and Fair Housing Act.  Disparate treatment,

19   elicit motive argument, and for all of the reasons we discussed

20   in the *Arlington Heights* context, I think those arguments fail

21   as well with respect to the Fair Housing Act.

22         But I am happy to move on to CFIUS.  And you were

23   asking about the *Alabama* case.

24         I do think that is different in two respects -- at

25   least two respects, Your Honor.  Number one, the INA I think is

1  a distinctive grant of exclusive authority to the federal

2  government that is distinct from what we have in CFIUS.

3          And number two, I think that there the court -- the

4  Eleventh Circuit found that Georgia was implicitly doing

5  backdoor immigration regulation by virtue of its own contract

6  law.

7          Here, we have the state operating with respect to

8  regulation of its own various soil.  Regulation that the states

9  have engaged in for a very, very long time.  And I think that's

10  a distinctively local interest that distinguishes this case from

11  what was at issue in the *Alabama* case.

12          More broadly, with regard to the CFIUS preemption

13  issue, there is no indication that Congress intended CFIUS to be

14  the exclusive means for anyone in the United States to engage in

15  regulation into this field.

16          CFIUS is a relatively limited statute that permits the

17  inner agency federal committee to review proposed transactions

18  with regard to foreign investments in the United States for

19  national security concerns.

20          CFIUS has limited resources and jurisdiction is

21  limited in certain important respects.

22          That limited scheme, I think, reflects Congress'

23  intent not to be exclusive in the entire field of foreign

24  investment.

25          The limited nature of that scheme is, I think, quite

1    distinct from what we had in, for example, the *Crosby* case,

2    where *Crosby* involved basically Massachusets setting up its own

3    foreign policy with respect to a particular country and with

4    respect to a particular foreign policy problem; namely human

5    rights cases in affirming that Congress had separately and

6    comprehensively addressed through its own sanctioning statute.

7            Here, unlike in the *Crosby* case, unlike *Odebrecht*,

8    there was no indication that Florida's land law undermined in

9    any way CFIUS' ability to engage in a case-by-case review of

10   particular land transactions.

11           THE COURT:  Well, it would in the sense to the extent

12   that the idea is Washington gets the final say on whether

13   someone can or can't buy land.  This would interfere with that,

14   right?

15           MR. WHITAKER:  Well, I guess --

16           THE COURT:  You could have a situation where the

17   federal government says to a particular Chinese national, You

18   can buy land, and then Florida says you can't.  Right?

19           MR. WHITAKER:  Your Honor, if what we had here was a

20   particular CFIUS decision, to decline to proceed against a

21   particular transaction, that would be a much more difficult

22   case.  I still probably would be making the same argument

23   because I do think that our law advances particular interests

24   that are distinct from the CFIUS system.

25           But in any event, certainly I don't think you can

1    infer ab initio before CFIUS has reviewed any particular

2    transaction that any transaction that simply involves foreign

3    investment in real estate is ipso facto preempted.  And I think

4    that's particularly evident because CFIUS' jurisdiction wouldn't

5    even reach these particular transactions.  I mean, these

6    particular transactions probably couldn't even be noticed to

7    CFIUS within its jurisdiction.

8         THE COURT:  They say that's a fact that helps them.

9         MR. WHITAKER:  Well, and I -- I did seriously disagree

10   with that.  I guess what I would say is much more likely

11   Congress did not want to bother CFIUS with every single Podunk

12   real estate transaction, because CFIUS, again, has very limited

13   resources to engage in this kind of review.

14        Each review is laborious.  There is a multifactor list

15   that Congress has directed CFIUS to consider in each and every

16   investigation.

17        THE COURT:  But the idea that Florida is sort of

18   building on or helping out or filling in the gaps, to use the

19   term that someone said in the briefs, I am not sure that helps

20   when you have these cases -- and granted, they are in a little

21   bit different context, often dealing with putting direct

22   leverage on other countries where the states say, We are trying

23   to kind of go above and beyond, and the Supreme Court says, You

24   can't do that.  Right?

25        MR. WHITAKER:  Not in every context, though,

1    Your Honor.  I guess I would point, for example, to the *Wyeth*

2    case which involved the question of whether --

3              THE COURT:  Right.  I think that's right and I was --

4    some of these -- seems to me there is a dividing line in these

5    type of cases between those that touch on immigration, or relate

6    to immigration, and sort of everything else.  I mean, you have

7    got *Crosby*, you've got *Arizona*, the Eleventh Circuit's cubitus

8    decision that's escaping me now.

9              MR. WHITAKER:  *Odebrecht*.

10             THE COURT:  *Odebrecht* -- we have been talking about

11   it -- and others.  And then you have plenty of other cases that

12   say, This is our sort of baseline regulation.  States, you can

13   add on if you want to.  And you say this ought to be the same.

14   And maybe you are right, but you have this whole -- I don't know

15   of any, other than I guess the one Eleventh Circuit decision

16   dealing with the Georgia scholarships, that touches on

17   immigration in any way and comes out in the State's favor.

18             MR. WHITAKER:  Well, I would point --

19             THE COURT:  *Crosby* did, in part, I guess.

20             MR. WHITAKER:  Well, I do think that the Eleventh

21   Circuit's decision in the *Winn* case is instructive on this.  And

22   *Winn* distinguished *Crosby* in much the same way that --

23             THE COURT:  Which case?

24             MR. WHITAKER:  The *Winn* case.  The *Faculty Senate of*

25   *Florida International*, which I do not believe we actually cited,

1   but it is discussed actually in some detail in the *Odebrecht*

2   case.

3           THE COURT:  Okay.

4           MR. WHITAKER:  Which was a case that involved a

5   Florida law that restricted state universities from spending

6   funds that were under its control on travel to various countries

7   that were designated by the State Department, by the federal

8   government, as state sponsors of terrorism.  The court said,

9   Well, *Crosby* was different because that involved a

10  country-specific statute where Massachusetts was setting up its

11  own foreign policy.  And here Florida was doing something much

12  more limited.

13          I guess the analogy that I would draw --

14          THE COURT:  And something that was sort of building on

15  exactly the decision that the federal government had made, which

16  is, I guess, a distinction they make here.

17          MR. WHITAKER:  I think so, Your Honor.

18          And the feature that I would stress here is the focus

19  on protecting the security of Florida residents.  Just because

20  the federal government has some national level scheme that to

21  some degree, and with using limited resources, protects against

22  those threats, I don't think prevents Florida from adding on to

23  that to some degree.

24          I guess the analogy I would draw is the FBI, I guess,

25  you know, has national-level police presence.  They investigate

1    national security threats.  No one would think that that would

2    somehow imply to preclude a state from having its own kind of

3    law enforcement interest, even with regard to, I don't know,

4    somebody who might commit a crime who is associated with a

5    foreign government, I guess.  That's the analogy I guess I would

6    draw here.

7              And I think you can't just say, Well, the states are

8    disabled from competent volition.  You have to examine the

9    character of the scheme to see if the federal government

10   actually did intend to occupy the field in that area.

11             And another point I would stress is the history of how

12   the federal government has dealt with state alien land laws.

13   These are laws that, like I said, had been around for a long

14   time.  They were around when CFIUS was amended in 2018, for the

15   first time, to cover real estate transactions.  Many states at

16   the time had alien land laws that, to some degree, regulated in

17   the this field.

18             I would also point to the fact that the federal

19   government itself has an alien land law that's applicable in the

20   territories.  And I think it would be pretty odd to infer an

21   intent on the part of the federal government in CFIUS to

22   preclude states from having that kind of law when the federal

23   government itself, in its own capacity as a local legislature,

24   has much the same kind of law.

25             THE COURT:  I think that's a fair argument.  You're

1  talking about the other states having things at the time this

2  came into being, but that was the same argument that was more or

3  less reflected in *Crosby*; wasn't it?  I mean, there was a debate

4  about it is clear that Congress meant to overturn the existing

5  statutes that deal with sanctions.

6          MR. WHITAKER:  Fair enough.  If all we had was that,

7  Your Honor, I am not sure I would be making the same argument.

8          I guess the other feature that I would point to is the

9  federal government's history of dealing with this problem

10  through Treaties of Friendship, Commerce and Navigation.  And in

11  many of these land cases the issue arises whether a particular

12  state land restriction is consistent with an FCN treaty that the

13  federal government has with a particular foreign nation.

14          And there have been instances, and we cite these in

15  our brief, where there have been those restrictions, and it is

16  often the case that Friendship, Commerce and Navigation treaties

17  are held to have sufficient force of law to preempt state law.

18  And that's the mechanism that the federal government has

19  historically used to address this problem and to vindicate a

20  uniquely federal diplomatic interest in preempting state laws.

21          And I would think Congress would want to have a

22  clearer statement from Congress before you'd lightly infer that

23  it silently decided to take a much more -- much different

24  approach and just basically sweep away all state laws that might

25  touch on this field.

1          THE COURT:  No.  I think that's fair.  If we are

2     starting from scratch it would be an even better argument.  But,

3     I mean, there was a lot of cites going on in *Odebrecht* and

4     *Crosby* and some of these other statutes, too.

5          Again, each one of these is different.  And you are

6     right, you have to look carefully at what was going on and what

7     Congress was doing.  But it would be nice if there was a clean

8     rule that said, There is not going to be any preemption unless

9     it's explicit, but that's not the law.

10         MR. WHITAKER:  Fair enough, Your Honor.

11         But I do think -- and, again, those cases did not

12    involve CFIUS.  Those cases involve sanction statutes.  And I

13    think Your Honor was mentioning this particular feature of a

14    sanctioning statute in your discussion with opposing counsel.

15    But one of the things that the Supreme Court was concerned

16    about, with Massachusetts law in *Crosby*, was that in creating

17    its own sanction statute Massachusetts was basically taking away

18    from the president an important tool that Congress' own law gave

19    him to rachet up and rachet down sanctions against Burma.  We

20    don't have anything like that.

21         THE COURT:  Actually, I think it is, but it's a

22    meaningful difference.  I am not sure it controls the outcome,

23    but those other cases, like *Odebrecht*, dealing with specifically

24    foreign relations, and this is a little tangential.  This was at

25    least an argument that there is some state interest discrete

1    from the federal interest, which I don't think would have been

2    much of an argument in *Odebrecht*, for example.  So it is

3    different.

4            MR. WHITAKER:  Your Honor, I am happy -- I think

5    that's a pretty comprehensive discussion of CFIUS.  I guess the

6    one additional point I would make on the scope of the remedy is

7    that there was some discussion --

8            THE COURT:  Before you get to the scope of the remedy,

9    let me ask one other thing.

10           Putting the merits of the last issue aside and just

11   dealing with their procedural right to bring such a claim, if

12   you take away the provision you cited to me a minute ago that

13   gave the president the right to take action, if you take that

14   away, what is left of our argument that they don't have a

15   procedural avenue to bring this challenge?

16           MR. WHITAKER:  Yeah.  I do think that we -- I probably

17   would be making that argument even if we didn't have it,

18   although I think our argument is obviously stronger with it.

19           THE COURT:  What would be the argument be in the face

20   of the *Georgia Latino Alliance* cases and things like that?

21           MR. WHITAKER:  Well, I think the argument would be

22   based on the US Supreme Court's decision in *Armstrong* abrogating

23   the Eleventh Circuit case, number one.

24           And, number two, I think it would be based as well on

25   *Armstrong*'s reasoning saying that when you have a statute that

1    contains a specific remedy that displaces a --

2            THE COURT:  I am saying you take -- the remedy

3    provision that you are talking about is 4556(a), right?

4            MR. WHITAKER:  That's not the only one.

5            THE COURT:  Oh, okay.

6            MR. WHITAKER:  That's not the only one, Your Honor.

7    There is also a remedy in 4565(d), there is a cause of action

8    that's created on the part of the Attorney Generals to enforce a

9    CFIUS blocking order.  There is at least two different remedies

10   there to enforce CFIUS.  That, of course, is a more limited

11   remedy than the remedy I just quoted to you in 4556(a).  So I do

12   think that would be significant.

13           Again, I don't think that the Supreme Court and the

14   Eleventh Circuit, in a number of different cases, have said that

15   the provision of a specific remedy often implied or forecloses

16   the availability of other remedies.  And that's what we would be

17   relying on.

18           If we didn't have either of those, which may be what

19   you were asking, yeah, we would have a tougher argument.

20           THE COURT:  All right.

21           You were starting to talk about the scope of remedy.

22           MR. WHITAKER:  Sure, Your Honor.

23           I guess whatever you think of the FHA preemption

24   arguments I do think we should account for, in the scope of the

25   remedy, in examining the scope of the remedy, the fact that

1    CFIUS, FHA, provides the Attorney General this remedy, and that

2    should make you hesitate.  Particularly when we refer to

3    Multi-Choice, can you imagine standing in the shoes of the

4    Attorney General involved in some kind of a state-wide

5    injunction?

6         If you did think that Multi-Choice had standing, I

7    would -- we would submit that you should limit the remedy to

8    whatever specific injuries -- Article III injuries Multi-Choice

9    has asserted.  And I think that's consistent with the --

10        THE COURT:  I think that's right.  There is clear law

11   in this circuit that any injunction ought to be only as broad as

12   is necessary to provide appropriate relief to the actual

13   parties.  People come in a lot of times saying, We want this

14   stricken from the books or we want to be enjoined state-wide and

15   things like that.

16        MR. WHITAKER:  I'm familiar.

17        THE COURT:  But in this case, you have particular

18   plaintiffs bringing particular claims seeking particular relief.

19   So that's what would be at issue if they were to succeed on the

20   merits.

21        It is a little more complicated, I guess, with the

22   realty company, because to the extent their asserted injury is

23   that unspecified people aren't coming to them, I am not sure how

24   that would -- I am not sure what the appropriate remedy would be

25   there, if they have standing, and you say they do not.  But what

1    is your thought there?

2            I mean, what would -- would the injunction just

3    preclude the enforcement of the statute against anyone who is

4    contemplating doing business with Multi-Choice, or what would

5    the bottom line for the injunction be?

6            MR. WHITAKER:  Well, I guess there is different ways

7    you can look at it.  Obviously, they have identified at least

8    one potential customer in the supplemental declaration.  One way

9    of looking at it was you could only -- you could do an

10   injunction that would be limited to the one identifiable person

11   that they have actually set forth.

12           You know, I think -- I suppose there would be

13   different ways of looking at it and I am reluctant to speculate

14   too much.  Obviously, we don't think --

15           THE COURT:  You don't want any remedy.

16           MR. WHITAKER:  I don't want any remedy.  But I do

17   think the difficulty that you just highlighted of trying to

18   fashion a remedy based on the morphous injury that Multi-Choice

19   asserted in its original declaration, at least, is a very strong

20   reason to say that that's not a sufficient Article III interest,

21   I guess is what I would say.

22           THE COURT:  Okay.  Anything else?

23           MR. WHITAKER:  We would ask for the preliminary

24   injunction to be denied.

25           THE COURT:  Yes, sir.

1          All right.  Ms. Gorski, I will give you rebuttal.

2          MS. GORSKI:  Thank you, Your Honor.

3          If you are interested, I am happy to start with

4     domicile.

5          THE COURT:  I would like you to start with domicile.

6     I would like to -- their point, in not so many words, is it

7     wouldn't have been that hard for your clients to say, I don't

8     have a plan to stay here or something like that.  But I wonder

9     if you can go through with respect to each of those, where we

10    are standing wise?

11         MS. GORSKI:  Yes, Your Honor.

12         So on the domicile issue, specifically, we have talked

13    about standing in the abstract with respect to the pending

14    purchases, the affidavits, the registration requirement.  But,

15    on domicile --

16         THE COURT:  Let me ask one thing:  The registration

17    requirement would be the same -- the domicile issue would cover

18    both of those, right?  Because you would not -- if you are

19    domiciled in the United States, you would not then be subject to

20    either requirement; correct?

21         MS. GORSKI:  You would not be subject to the

22    restrictions on purchases or the registration requirement.  You

23    would, however, still be subject to the affidavit requirement

24    and you would be required to attest to your domicile in a way

25    that is violative of the language in the *Louisiana versus NAACP*.

1              THE COURT:  The application requirement you are

2      talking about is the one that applies to every buyer that ever

3      buys or sells real estate.

4              MS. GORSKI:  That's correct, Your Honor.

5              THE COURT:  I don't know that this matters, but was

6      there something similar in existing law dealing with -- anything

7      dealing with nationality in real estate transactions in

8      Florida --

9              MS. GORSKI:  I am not aware --

10             THE COURT:  -- if you know?

11             MS. GORSKI:  I am not aware of any affidavit

12     requirement like this.

13             And the affidavit requirement itself is also

14     stigmatizing and discriminatory for people of Asian descent.

15             And because of the law of criminal liability imposed

16     on sellers, I think they are really far-reaching, stigmatic, and

17     concrete harms in the real estate market given the risk of

18     discrimination against Asian purchasers.

19             Speaking to Plaintiff Wang's situation, particularly,

20     because there was a lot of focus on that, she is subject to the

21     registration requirements because she is currently a property

22     owner.

23             Her declaration speaks to the goal of her academic

24     work, which is to help residents of coastal regions, especially

25     people in Florida, to survive coastal hazards.

1          She is currently a Ph.D student in Florida, so that is

2     the wholly unremarkable observation about the nature of her

3     current academic work.  She does not say her life goal is to

4     help people living in Florida.

5          And more broadly --

6          THE COURT:  Is the best inference from that that she

7     does not intend to stay in Florida?  Do you agree with the

8     premise that if she does intend to stay in Florida, and she has

9     a Florida domicile, and therefore does not have any --

10         MS. GORSKI:  No, Your Honor.  I think if she does

11    intend to stay in Florida there is a lot of -- I think there is

12    a substantial risk that she would be deemed domiciled in

13    Florida.  I hesitate to say one way or the other, in the same

14    way that this Court doesn't have to reach a definitive

15    conclusion about where each of the plaintiffs are domiciled to

16    find that there is a substantial risk that they would be deemed

17    domiciled in Florida.

18         I will say she represented, for the purposes of her

19    student visa, she intends to depart the United States.  And she

20    meant it.  And if you need additional information to that

21    effect, we can provide it.

22         Federal immigration law says she cannot be domiciled

23    here.  The State has gone far beyond the facts in her

24    declaration to reach its conclusion about her intent.  And she

25    even puts her visa status in significant jeopardy if she were to

1    assert domicile here.

2           There was a reference to a case that hasn't been cited

3    in the papers, *Nicholas*, and it sounds like that concerns

4    residency which, of course, is distinct from domicile.

5           I believe explained before the Florida Supreme Court

6    has said that domicile is defined as permanent home.  That

7    definition is echoed in *Keveloh*, which is one of the State's

8    cases.

9           And then the Supreme Court, separately, has said in

10   the homestead exemption context that non-immigrant visa holders

11   cannot establish the intent to live permanently in Florida.  And

12   the State's response, as the Court knows, is to say domicile may

13   be a place where you intend to reside indefinitely.

14          But it cites this lower Florida court state court

15   decision in *Perez*, and that case concerns a refugee who is

16   legally authorized to remain indefinitely, not on a time-limited

17   visa.  And the court relied on policy considerations specific to

18   family law.

19          More generally, if people on time-limited visas cannot

20   form an intent to remain permanently, the State has not

21   explained how they can form the intent to remain indefinitely.

22          And the State's argument is in tension with the

23   statute, and Mr. Xu's case illustrates this.

24          The statute creates a safe harbor for people who have

25   been granted asylum, who may purchase one residential property

1   less than two acres and not within five miles of a military

2   installation.

3           But here the State is saying that Mr. Xu, someone who

4   has applied for asylum but has not yet received it, is domiciled

5   here in Florida.

6           If that argument applied to all asylum applicants, or

7   even virtually all asylum applicants, there wouldn't be a need

8   for a statutory safe harbor for people who have been granted

9   asylum.  It would follow that if you have been granted asylum

10  your intent is to stay in Florida.  You are not actually

11  domiciled in China and the statute doesn't apply to you at all.

12          And, again, regardless of domicile, Plaintiffs Shen,

13  Xu and Liu have standing because of the affidavit requirements.

14  And Multi-Choice has standing to pursue its FHA and preemption

15  claims.

16          Then turning to the FHA, we have invoked both 3604 and

17  3615.  Insofar as the State's argument is predicated on the idea

18  that laws cannot be discriminatory housing practices, there are

19  numerous cases making clear that that is not a valid argument.

20          THE COURT:  I didn't understand that to be their

21  argument here today.

22          MS. GORSKI:  Okay.

23          THE COURT:  I guess in the papers there was something

24  about that.

25          Going a little out of order -- you are not disagreeing

1  with that last statement, Mr. Whitaker, that the State practice

2  can be a discriminatory housing practice or state law?

3          MR. WHITAKER:  Well, yes, Your Honor, we would say

4  that a state action certainly can be a discriminatory housing

5  practice.  We would not understand the State's laws itself to be

6  a discriminatory housing practice within the meaning of 3604.

7  And, again, that would be grounded in the distinction that 3615

8  draws between those two things and also the definition I would

9  say of that term in 3602.

10          THE COURT:  I think I have got it.  There are not two

11  discrete claims.  Your claim is that the law conflicts with --

12  your sort of top level argument is that the State law conflicts

13  with the Fair Housing thing because it allows practices that

14  would be unlawful under it?

15          MS. GORSKI:  It allows practices that would be

16  unlawful under it.  And the law itself, the way it is crafted,

17  is a discriminatory housing practice.

18          THE COURT:  What does that get you bringing it two

19  different ways?

20          MS. GORSKI:  Covering all bases.

21          THE COURT:  Okay.

22          But, I mean, I can't imagine a scenario where the

23  ruling would say, It is not preempted because it does not allow

24  a discriminatory practice but it is itself a discriminatory

25  housing practice.  Are you doing this just so you can sort of

1    tuck in to the private right of action that they disputed or is

2    there some merits difference there?

3            MS. GORSKI:  I think this is more a procedural matter

4    making sure that our bases are covered depending on how the

5    Court approaches this question.

6            THE COURT:  All right.  Sorry for the out-of-order

7    sequence there.  You can go ahead.

8            MS. GORSKI:  Not at all.

9            The State also raises the matter of private

10   enforcement by the Attorney General to argue that any injunction

11   would have to be narrow, or that even perhaps it's not

12   appropriate for plaintiffs to obtain an injunction at all.  But

13   the Supreme Court explained in a seminal decision, *Trafficante*

14   *v. Metro Life,* a 1972 complaint, by private parties are the

15   primary method of obtaining compliance with the Fair Housing

16   Act:  Complainants act on their own behalf and as private

17   attorneys general in vindicating a policy that Congress

18   considered to be the highest priority.

19           THE COURT:  What's your answer to their indication of

20   *Armstrong* and specifically -- this affects not just the Fair

21   Housing Act but the general preemption claim.  What's your

22   answer to that, and whether it invalidates *Georgia Latino*

23   *Alliance*?

24           I will go back and look more at *Armstrong*, but let me

25   hear your position on that.

1        MS. GORSKI:  I don't think *Armstrong* bears on the Fair

2   Housing Act claim at all.  There is a discrete and longstanding

3   body of Fair Housing Act jurisprudence that involves individual

4   plaintiffs obtaining broad injunctions and individual plaintiffs

5   challenging state laws as discriminatory housing practices,

6   including in the Tenth Circuit decision in *Bangerter v. Orem*

7   *City Corp*, which is one of the cases that we were talking about

8   earlier in conjunction with the various circuit tests around

9   facial discrimination.

10       So I don't think *Armstrong* is relevant to the FHA

11  analysis.

12       THE COURT:  How about on the other --

13       MS. GORSKI:  On the other side it stands for the

14  proposition that this preemption claim does not derive directly

15  from the supremacy clause.  It's not a constitutional claim.

16  It's an equitable one.  So then the Court should look to see

17  whether Congress has acted in a way that preclude a private

18  cause of action.  And here nothing in CFIUS precludes a private

19  cause of action.

20       The decisions cited by the State concern violations of

21  CFIUS decisions, and that's not what plaintiffs are challenging

22  here.  There is no CFIUS decision that the plaintiffs are

23  seeking to challenge.

24       So I don't -- I think *Armstrong* matters at the

25  technical level for understanding where the cause of action

1   comes from, but otherwise I don't think it in any way is an

2   obstacles to plaintiffs' claims.

3          Turning to -- I guess since we are on CFIUS we should

4   stay there.  I believe my friend said that there is no

5   indication that Florida's law undermines CFIUS and characterized

6   Florida's law as filling in gaps.

7          Florida is not merely filling in gaps.  The geographic

8   zones occupied by Florida's law and by CFIUS's jurisdiction

9   overlap.  There is the possibility for further conflict.  And

10   this is, broadly speaking, a federal regime that gives the

11   president discretion.

12          The state said there was no indication here that SB264

13   was taking away from the president an important tool, and that's

14   what distinguishes this from the cases involving sanctions and

15   laws.  But that's inaccurate because the president has the final

16   say on whether these real estate transactions should proceed or

17   not and relies on foreign affairs considerations.

18          The statute specifically directs the president to rely

19   on foreign affairs considerations.

20          And Florida is taking away one of the president's tool

21   and the president's ability to calibrate his or her decision

22   based on foreign affairs considerations more broadly.

23          Then turning to the Equal Protection Clause, on proxy

24   discrimination in *Dobbs*; *Dobbs* contains a lot of language

25   limiting the analysis in the abortion context.  I do not think

1   that's a relevant case on point here.

2        And more broadly speaking to the Court's concern about

3   how the *Arlington Heights* analysis would fit into either the FHA

4   claim or the equal protection claim, it cannot be the case that

5   if a plaintiff loses on facial discrimination because of the

6   particular way that the law happens to be drafted that the

7   plaintiff is then foreclosed from proceeding under *Arlington*

8   *Heights*.

9        The plaintiffs still have the ability to show that

10  that law has discriminatory intent and effect.  And, here, it

11  may well be the case that the statute, while -- if the Court

12  says the statute is not facially discriminatory, the statutory

13  text may still be evidence of discriminatory intent.  And even

14  if the Court disagrees that the statute --

15        THE COURT:  Is it the intent?  I mean, where you see

16  that come up, usually, is in a generally applicable facial law

17  that says, There is going to be XYZ tax.  And someone says,

18  Well, that's actually done for discriminatory purposes, and you

19  look into all of these factors.

20        Here, the purpose -- the effect of it is what's right

21  on the face of it, right?  That's what you are saying is the

22  problem.  If you are right about that, then that's the end of

23  that.  That's a constitutional problem.  If you are wrong about

24  that, then I don't see how we would look into all of those

25  factors and come up with some other effect other than what --

1    this is not something that on its face treats everyone the same,

2    right?  No one is disputing that.

3            So I guess I am wondering if it's a separate claim

4    that is sort of -- if you came along and said the states can

5    restrict real estate purchases to nationals of certain countries

6    of interest, and that's a general proposition -- say the Supreme

7    Court said that yesterday -- then, yes, I don't think that would

8    preclude a claim that you would say in this case they were

9    trying to do something else.  They are using this as sort of

10   like a pretext because they are really just trying to do

11   something invidious that has nothing to do with whatever their

12   asserted interests are.  And then maybe you can prevail in

13   something like that.

14           But it seems like everything you are saying on the

15   *Arlington Heights* is what you are saying on what the statute

16   means.  All the quotes you are talking about are just talking

17   about doing what everyone agrees the statute does, right?

18           MS. GORSKI:  I think that is why the statute is so

19   patently unconstitutional, Your Honor.

20           THE COURT:  If you are right about that we would never

21   get into *Arlington Heights*.

22           MS. GORSKI:  Well, it may be the case that the Court

23   views the statutes as not facially discriminatory because it

24   deems domicile not to have an adequate fit with national origin

25   and so as a technical matter it's not discriminatory on that

1    basis.  We are in FHA land, so we are only looking at national

2    origin.

3            If the Court makes that finding based on how the

4    statute is drafted, it would still need to go on to consider the

5    *Arlington Heights* factor.  And we are saying more under

6    *Arlington Heights* there is a more robust discussion of intent

7    and effect under *Arlington Heights*.

8            I appreciate -- I think the line between proxy

9    discrimination and other kinds of discrimination can be fuzzy.

10   It can be a spectrum.

11           THE COURT:  Have you never seen *Arlington Heights*

12   apply to a statute that on its face treated people differently

13   on the same basis that the *Arlington Heights* claim was based on?

14           MS. GORSKI:  I don't have a case offhand, Your Honor.

15   That's something we would be happy to submit supplemental

16   briefing on.

17           THE COURT:  Okay.  I am not sure that -- I think I

18   understand your position.

19           MS. GORSKI:  I think the statute is, at its core,

20   unlawful.  And so -- but it is drafted in a way where the Court,

21   and I understand the questioning, the Court may not perceive it

22   to be facially discriminatory.  And if that is the Court's view,

23   the Court still must engage in the separate analysis about

24   intent and effect.

25           THE COURT:  Okay.  Well, it definitely discriminates

1    based on alienage.  I mean, there is no question about that.

2         That's what I thought your *Arlington Heights* piece

3    went to.  I guess now you are sort of pushing it into the Fair

4    Housing Act aspect of things, too.  And maybe you already have

5    and I overlooked it.

6         MS. GORSKI:  We talked about discriminatory intent in

7    the Fair Housing Act section that did not delve into the

8    *Arlington Heights* factors because of the way the brief was

9    structured.  It dealt with equal protection first, and then

10   dealt with *Arlington Heights*, and then I think we did see supra,

11   but we did not delve into the *Arlington Heights* factors in the

12   Fair Housing Act briefing.  But for equal protection purposes,

13   yes, it's both national origin and alienage.  And the State does

14   not dispute that the statute discriminated on the basis of

15   alienage.

16        But Your Honor may find that strict scrutiny does not

17   apply for one reason or another, and Your Honor may conclude

18   that that rational basis review is -- that standard is

19   satisfied, although plaintiffs would disagree with that.

20        In that event, it is still appropriate for the Court,

21   because plaintiffs have the *Arlington Heights* claim, to go

22   through the *Arlington Heights* factors to assess whether there

23   was discriminatory effect.

24        And if plaintiffs prevail on *Arlington Heights*, there

25   is no scrutiny analysis.  Plaintiffs prevail, period, for the

1  purpose of the Equal Protection Clause.

2           THE COURT:  Okay.

3           MS. GORSKI:  On the question of scrutiny, plaintiffs

4  would, of course, prefer the Court apply in terms of

5  intermediate scrutiny over rational basis review.

6           THE COURT:  There is no authority for that, right?  I

7  mean, coming into this it seemed like maybe this would be the

8  type of case where someone would have said if intermediate

9  scrutiny applies, based on what you all have argued, and my

10  independent research, it doesn't seem like there is any basis

11  for that.  But I just want to make sure I am not --

12           MS. GORSKI:  I think *Plyler* could be a hook for

13  applying --

14           THE COURT:  It was really rational basis.

15           MS. GORSKI:  They did apply intermediate scrutiny,

16  though.  They said that they applied intermediate scrutiny.

17           THE COURT:  I thought they said there was no rational

18  reason to do what they are doing because they were --

19           MS. GORSKI:  My understanding of *Plyler* was the Court

20  said that intermediate scrutiny applied.

21           THE COURT:  Okay.  I think you could make a fair

22  argument that it wasn't the same type rational basis that the

23  Supreme Court looked at the FCC for speech communications or

24  something like that.

25           Okay.

1          One other question:  I had asked you this about other

2     provisions of the statute.  Specifically on the agricultural

3     thing, you said a lot of these other states deal with just

4     agricultural land, but your legal theory would be the same if

5     this were -- I know you don't have a plaintiff with agriculture

6     land, but your legal theory wouldn't account for any difference

7     whether it's residential or agricultural land, right?

8          MS. GORSKI:  We would argue that strict scrutiny

9     applies to both.  And it may be that the factual -- it's a fact

10     intensive analysis.  Maybe the factual showing for purposes of

11     strict scrutiny with respect to other kinds of regulations would

12     turn out differently.

13          THE COURT:  Got it.  Okay.  All right.

14          I think that's all the question I have.

15          Did you have anything else?

16          MS. GORSKI:  With respect to the injunction --

17          THE COURT:  Oh, yes.

18          MS. GORSKI:  -- for Multi-Choice, at a minimum the

19     injunction could encompass prospective customers.

20          Again, there is case law both in the preemption --

21          THE COURT:  How would that work?  I mean, there is due

22     process concerns, right?  If someone is enjoined they have to

23     know how they can apply it.  If you went to a state attorney and

24     said, You can't enforce this against a prospective customer, how

25     would the state attorney know whether he or she is complying

1    with that?

2           MS. GORSKI:  I don't think it's a terrific standard.

3    I think our first -- Multi-Choice's claims are only with respect

4    to the FHA and preemption.  And in both contexts courts issue

5    broad injunctions foreclosing enforcement of laws altogether.

6    And so here we would ask for the same.  And so the Court doesn't

7    have to --

8           THE COURT:  Doesn't that bump up against Eleventh

9    Circuit precedent saying, You only get the relief that's

10   necessary to give full relief to the parties?

11          MS. GORSKI:  I think in the context of discriminatory

12   housing practice a broad injunction is appropriate.  And the

13   same for preemption.  There is no -- I don't see how the line

14   could be drawn elsewhere.

15          THE COURT:  Elsewhere than what?

16          MS. GORSKI:  Elsewhere than enjoining the law, the

17   challenged portion of the law altogether.  But, again, at a

18   minimum you could say prospective customers who have made

19   contact with Multi-Choice.

20          THE COURT:  All right.

21          Well, I want to thank both sides.  I think the

22   argument was very helpful today.

23          I think the briefing was very good on both sides, with

24   the exception of maybe the void-for-vagueness argument.  These

25   are very complicated issues.

1        I am going to spend a little time considering

2    everything that was said today and look at some of these cases

3    that you all pointed out and get an order out as soon as I can.

4    It's not going to be super imminent because there is a lot here,

5    but I am going to make an effort to get something sooner rather

6    than later.

7            Again, I appreciate the argument on both sides.

8            Anything further at all for today, Mr. Whitaker?

9            MR. WHITAKER:  No, Your Honor.

10           THE COURT:  Ms. Gorski?

11           MS. GORSKI:  No, Your Honor.

12           THE COURT:  Court is adjourned then.

13       (Proceedings concluded at 2:40 PM on Tuesday, July 18,

14   2023.)

15                       *  *  *  *  *  *  *  *

16           I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
17   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy are noted within the
18   transcript.

19

20   /s/ Lisa C. Snyder                        7/20/2023

21   Lisa C. Snyder, RPR, CRR                  Date
     Official U.S Court Reporter
22

23

24

25