IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**YIFAN SHEN, ZHIMING XU, et al.,**

     **Plaintiffs,**

**v.**                              **Case No. 4:23-cv-208-AW-MAF**

**WILTON SIMPSON, in his official
capacity as Florida Commissioner of
Agriculture, MEREDITH IVEY, in her
official capacity as Acting Florida
Secretary of Economic Opportunity, et
al.,**

     **Defendants.**

_____/

## ORDER DENYING PRELIMINARY INJUNCTION MOTION

A new Florida law limits landownership rights of certain noncitizens domiciled in China or other specific countries. *See* Fla. Stat. §§ 692.201-.204. Four Chinese citizens living in Florida, along with a brokerage that does business with Chinese citizens, sued to challenge that new law. They contend it violates the Fourteenth Amendment's Equal Protection and Due Process Clauses, the Fair Housing Act, and the Supremacy Clause. ECF No. 17 (Am. Compl.). They seek declaratory relief and an injunction precluding the law's enforcement.

Defendants are Florida's Agriculture Commissioner, Economic Opportunity Secretary, and Real Estate Commission Chair (collectively the State Defendants),

along with the State Attorneys for Florida's Seventh, Ninth, and Eleventh Judicial Circuits. Am. Compl. at 1.[1]

Plaintiffs moved for a preliminary injunction. ECF No. 23 (MPI). The State Defendants responded in opposition, ECF No. 60 (Resp.), and Plaintiffs replied, ECF No. 65 (Reply). The United States of America filed a brief supporting Plaintiffs' motion, and other amici weighed in too. ECF Nos. 43, 54, 64.[2]

After a nonevidentiary hearing, and having carefully considered the evidence and the parties' arguments, I now deny the motion.

## I.    BACKGROUND

### A.    The Challenged Law

The challenged law, codified at Florida Statutes § 692.201-.204, became effective July 1. It restricts land purchases by any "[f]oreign principal," which it defines to include anyone "who is domiciled in a foreign country of concern and is not a citizen or lawful permanent resident of the United States." Fla. Stat.

---

[1] All citations are to CM/ECF-assigned page numbers.

[2] Several advocacy organizations filed an amicus brief supporting Plaintiffs, ECF No. 43, and twelve States filed an amicus brief supporting the State, ECF No. 64. The Defendant State Attorneys, for their part, have taken no position on the motion or the law's validity. They instead stipulated they would comply with any injunction entered against the State Defendants. ECF No. 55. They did not otherwise respond to the preliminary injunction motion, and they did not appear at the hearing.

§ 692.201(4)(d). It specifies the countries "of concern" are China, Russia, Iran, North Korea, and others. *Id.* § 692.201(3).

Section 692.203 provides that, subject to certain exceptions, "[a] foreign principal may not directly or indirectly own . . . any interest . . . in real property on or within 10 miles of any military installation or critical infrastructure facility." *Id.* § 692.203(1).[3] (The statute defines the terms "military installation" and "critical infrastructure facility," *id.* § 692.201(2), (5), and this order's references to those terms are to the statutory definitions.) Anyone purchasing real property within that protected zone must sign an affidavit attesting that he is not a foreign principal. *Id.* § 692.203(6).

Section 692.203 includes a grandfather provision for foreign principals who owned covered property before the law took effect. Those foreign principals can keep the grandfathered property but cannot acquire any new covered property. *Id.* § 692.203(2). They also must register their property with the Department of Economic Opportunity. *Id.* § 692.203(3)(a). Foreign principals who do not timely register face civil penalties, *id.* § 692.203(3)(b), and those who acquire land in violation of the provision commit a misdemeanor, *id.* § 692.203(8).

---

[3] One exception provides that "a foreign principal who is a natural person may purchase one residential real property that is up to 2 acres in size" if certain conditions are met. *Id.* § 692.203(4); *see also id.* § 692.204(2).

Section 692.204 imposes additional restrictions, but it applies only to foreign principals domiciled in China—not in other countries "of concern." *Id.* § 692.204(1)(a)(4). Subject to certain exceptions, foreign principals domiciled in China cannot "directly or indirectly own . . . any interest . . . in real property," regardless of its proximity to military installations or critical infrastructure. *Id.* Florida real estate purchasers must sign affidavits attesting that they are not principals of China. *Id.* § 692.204(6)(a); *see also id.* § 692.204(6)(c) (directing the Florida Real Estate Commission to adopt rules regarding the affidavit).

Section 692.204 includes a grandfather provision and registration requirement like those in § 692.203. *Id.* § 692.204(3), (4)(a). It likewise provides for civil penalties for failing to register, *id.* § 692.204(4)(b), and it provides that those who acquire land in violation of the provision commit a third-degree felony, *id.* § 692.204(8).[4]

## B.    Facts

The facts come from the parties' affidavits. No party requested an evidentiary hearing, and the relevant facts are not in dispute.

---

[4] Plaintiffs' complaint also attacks a similar provision that restricts purchase of agricultural land. *See* Am. Compl. at 1-2; *see also* Fla. Stat. § 692.202. But at least for purposes of preliminary injunctive relief, Plaintiffs have abandoned that challenge, Reply at 9 n.1, presumably because no Plaintiff has shown any intent to purchase agricultural land.

Multi-Choice Realty is a Florida real estate brokerage that often transacts business with Chinese clients. ECF No. 21-6 ¶¶ 3-5. Plaintiffs Yifan Shen, Zhiming Xu, Xinxi Wang, and Yongxin Liu are native-born citizens of China living in Florida. ECF No. 21-2 ¶¶ 3, 9; ECF No. 21-3 ¶¶ 3, 5; ECF No. 21-4 ¶¶ 3, 9; ECF No. 21-5 ¶¶ 3, 9. They own Florida real estate, plan to buy some, or both. ECF No. 21-2 ¶¶ 12-16, 18; *id.* at 6-18; ECF No. 21-3 ¶¶ 11-12, 18; *id.* at 6-24; ECF No. 21-4 ¶¶ 12-13; ECF No. 21-5 ¶¶ 12-13, 18. Each is lawfully present in the United States, but none has lawful-permanent-resident status. ECF No. 21-2 ¶¶ 6-7; ECF No. 21-3 ¶¶ 6-7; ECF No. 21-4 ¶¶ 6-7; ECF No. 21-5 ¶¶ 6-7. Shen, Liu, and Wang are present on nonimmigrant H-1B or F-1 visas, ECF No. 21-2 ¶ 7; ECF No. 21-4 ¶ 7; ECF No. 21-5 ¶ 7, and Xu has a pending political asylee application, ECF No. 21-3 ¶ 7.

Fearing that the challenged law will restrict their right to own Florida real estate (as to Shen, Xu, Liu, and Wang) or cause lost business (as to Multi-Choice), Plaintiffs initiated this preenforcement lawsuit.

## II.   PRELIMINARY INJUNCTION STANDARD

"[A] preliminary injunction is an extraordinary and drastic remedy." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (quoting *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998)); *see also Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) ("[W]e must remember that granting a

preliminary injunction is the exception rather than the rule."). It is available only when the party seeking it "clearly establishe[s]" entitlement. *Siegel*, 234 F.3d at 1176 (quoting *McDonald's Corp.*, 147 F.3d at 1306).

To succeed, Plaintiffs must clearly establish four factors: (1) that they have "a substantial likelihood of success on the merits"; (2) that they will suffer irreparable injury without an injunction; (3) that they face a threatened injury that "outweighs whatever damage the proposed injunction may cause" Defendants; and (4) that "the injunction would not be adverse to the public interest." *Id.* Plaintiffs must clearly establish all four factors; failing as to any one is "fatal." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). Movants most commonly fail on the first factor—substantial likelihood of success, *id.*—which is also generally the "most important," *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). As explained below, that is where Plaintiffs fall short.

### III.   PLAINTIFFS HAVE NOT SHOWN A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.   Plaintiffs Have Shown a Substantial Likelihood That They Have Standing.

Before turning to the merits, the court must address standing, an "indispensable" part of every plaintiff's case. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). If Plaintiffs cannot establish standing, they cannot invoke the court's jurisdiction, and they cannot succeed.

To have standing, a plaintiff must first have suffered an "injury in fact," which is the "invasion of a legally protected interest," in a manner that is "concrete and particularized" and not "conjectural" or "hypothetical." *Id.* at 560. Second, there must be a "causal connection" between the injury and the alleged misconduct such that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (cleaned up). Third, it must be "likely"—and not speculative—"that the injury will be redressed by a favorable decision." *Id.* at 561 (marks and citation omitted).

A plaintiff must show each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* At this stage, where Plaintiffs must show a likelihood of success on the merits, they must show a likelihood that they will ultimately prove standing. *See Church v. City of Huntsville*, 30 F.3d 1332, 1339 (11th Cir. 1994); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

Moreover, because "standing is not dispensed in gross, . . . plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (citations omitted). If at least one plaintiff has standing to raise each claim, though, the court

need not consider the other plaintiffs' standing. *Hispanic Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1244 n.6, 1250 (11th Cir. 2012).

The State Defendants argue that Plaintiffs cannot demonstrate standing. Resp. at 22-28. More specifically, they argue that none has shown any concrete harm. *Id.* at 23. But at least one Plaintiff has shown a likelihood that he will be able to prove sufficient injury.

The law has not been enforced against any Plaintiff, but that is not a requirement for standing. "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (marks omitted) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). Allegations of future harm are not enough, though, when they rest on a "speculative chain" of future contingencies. *Clapper*, 568 U.S. at 414. A two-part test distinguishes "substantial risks" from merely speculative ones. *Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 887 (11th Cir. 2023). First, the plaintiff must intend to engage in "conduct arguably affected with a constitutional interest, but proscribed by a statute." *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159). Second, he must show a "credible threat of prosecution." *Id.*

The individual Plaintiffs have shown they likely face a substantial risk of future harm. Each engages in or intends to engage in conduct "arguably affected

with a constitutional interest, but proscribed by" the new law. *Id.* For starters, at least Shen, Xu, and Liu have shown they are likely subject to the law's affidavit requirements. The challenged law requires any "buyer of real property in this state"—notwithstanding domicile—to sign an affidavit attesting that he is not a principal of China. Fla. Stat. § 692.204(6)(a); *see also id.* § 692.203(6)(a) (same requirement for buyers of land near military installations and critical infrastructure). These three Plaintiffs have shown concrete plans to be "buyer[s] of real property" in Florida, including near military installations and critical infrastructure. ECF No. 21-2 ¶¶ 12-16, 18; *id.* at 6-18; ECF No. 21-3 ¶¶ 12, 18; *id.* at 6-24; ECF No. 21-5 ¶¶ 13, 18. That is enough to show that the law will govern their conduct and that they will face harm sufficient to confer standing to challenge the affidavit requirements.

Whether Plaintiffs have standing to challenge the property-acquisition restrictions and registration requirements is a separate question. Again, there must be a plaintiff with standing as to each provision challenged. And while the affidavit requirements apply notwithstanding domicile, the property-acquisition restrictions and registration requirements apply only to certain noncitizens with certain domiciles. The State Defendants argue that Plaintiffs have not shown they are "domiciled" in China and therefore have not shown the law applies to them. Resp. at 22-26. But the record shows that at least Shen and Liu would arguably violate the law by carrying out their plans to buy new property. And it shows that the law likely

9

requires Wang and Liu to register the property they currently own. Indeed, the State Defendants almost concede that as to Wang. *Id.* at 26 & n.2.

As relevant here, three criteria determine whether a person is a "foreign principal" subject to § 692.203's restrictions: that person must be (1) a noncitizen (2) lacking federal lawful-permanent-resident status and (3) "domiciled" in a "country of concern." Fla. Stat. § 692.201(4)(d). Section 692.204 requires the same except that it only applies to those domiciled in China.

The State Defendants do not dispute the fact that the individual Plaintiffs are all native-born citizens of China who lack lawful-permanent-resident status here. ECF No. 21-2 ¶¶ 3, 6-7; ECF No. 21-3 ¶¶ 3, 6-7; ECF No. 21-4 ¶¶ 3, 6-7; ECF No. 21-5 ¶¶ 3, 6-7. Thus §§ 692.203 and 692.204 restrict Plaintiffs' property ownership if they are "domiciled" in China. The State Defendants argue that as a matter of Florida law, none is domiciled in China because each intends to reside in Florida indefinitely. Resp. at 22-26.

The relevant issue, though, is whether Plaintiffs' conduct is "arguably . . . proscribed by" the new law. *Susan B. Anthony List*, 573 U.S. at 162 (citation omitted). And Shen, Wang, and Liu have shown that they are arguably domiciled in China and risk violating §§ 692.203 and 692.204. The new law, which does not

independently define "domicile,"[5] "sweeps broadly," *Susan B. Anthony List*, 573 U.S. at 162, and arguably applies to Plaintiffs.

The State Defendants do not dispute the fact that these Plaintiffs were once domiciled in China. ECF No. 21-2 ¶ 3; ECF No. 21-4 ¶ 3; ECF No. 21-5 ¶ 3. Plaintiffs' domicile there is "presumed to continue" absent proof of abandonment. *Keveloh v. Carter*, 699 So. 2d 285, 288 (Fla. 5th DCA 1997) (citations omitted). Shen, Wang, and Liu have shown it at least arguable that they did not intend to abandon that domicile.

First, each is in the United States on a federally time-limited, nonimmigrant visa. ECF No. 21-2 ¶ 7 (H-1B worker visa); ECF No. 21-4 ¶ 7 (F-1 student visa); ECF No. 21-5 ¶ 7 (H-1B); *cf.* 8 U.S.C. § 1184(g)(4) (prescribing finite time limit for H-1B visas); *id.* § 1101(15)(F)(i) (same for F-1s); *see also* ECF No. 68 (Hearing Transcript) at 5:16-20. They can apply to change their temporary status (by, for example, applying for lawful-permanent-resident status), but they have not. ECF No. 21-2 ¶ 8; ECF No. 21-4 ¶ 8; ECF No. 21-5 ¶ 8. And to obtain their visas, they

---

[5] Under Florida law, a person's domicile is not always where he physically resides. *Minick v. Minick*, 149 So. 483, 487-88 (Fla. 1933). It is where he has a good-faith intent to establish his home permanently or indefinitely. *See id.*; *Perez v. Perez*, 164 So. 2d 561, 562-63 (Fla. 3d DCA 1964) (citations omitted). A person can only have one domicile at a time, *Weiler v. Weiler*, 861 So. 2d 472, 477 (Fla. 5th DCA 2003) (citing *Keveloh v. Carter*, 699 So. 2d 285 (Fla. 5th DCA 1997)), and does not acquire a new domicile—even if temporarily absent—without intending to abandon his prior one, *Meisman v. Hernandez*, 353 So. 3d 669, 672-73 (Fla. 2d DCA 2022).

had to declare that they did not intend to remain permanently or indefinitely in the United States. *See* 8 C.F.R. § 214.1(a)(3)(ii); 8 U.S.C. § 1101(15)(F)(i). Although that fact may not be dispositive as to their domicile, it is significant in determining whether the law arguably applies to them. Indeed, often "[t]he best proof of domicile is where the individual says it is." *Weiler v. Weiler*, 861 So. 2d 472, 477 (Fla. 5th DCA 2003) (citation omitted)).

To the extent Plaintiffs' affidavits suggested they do not want to return to China, that reflects their hope to stay in Florida if future contingencies go their way—namely applying for and obtaining lawful-permanent-resident status. *See* ECF No. 21-2 ¶¶ 6-8; ECF No. 21-4 ¶¶ 6-8; ECF No. 21-5 ¶¶ 6-8; *cf. Dandamudi v. Tisch*, 686 F.3d 66, 70 (2d Cir. 2012) (describing the "dual intention" often held by nonimmigrant visa holders). Those hopes perhaps reflect an intent to make Florida "a home in the future." *Keveloh*, 699 So. 2d at 288. But it is at least arguable that they are not intentions to make it "home at the moment," which is necessary for a Florida domicile. *Id.* (citing *Campbell v. Campbell*, 57 So. 2d 34 (Fla. 1952)).

The State Defendants' contrary arguments are unpersuasive. They cite *Perez v. Perez*, in which a Florida court found a Cuban political *refugee* was domiciled in Florida. 164 So. 2d 561 (Fla. 3d DCA 1964); *see also* Resp. at 25; Hearing Trans. at 38-39. Based on that status, the court assumed he intended to remain in Florida indefinitely. *Perez*, 164 So. 2d at 562 (citing "the uncertainty as to when, if ever, the

contingencies necessary to end that period will occur in Cuba"). That case has little value here, because although Xu is an asylum applicant conceivably present in Florida indefinitely, ECF No. 21-3 ¶¶ 7-9, Shen, Wang, and Liu are not.

The State Defendants also cite *Nicolas v. Nicolas*, which affirmed a trial court's finding that a noncitizen was domiciled in Florida notwithstanding his lack of lawful-permanent-resident status. Hearing Trans. at 39 (citing 444 So. 2d 1118 (Fla. 3d DCA 1984)). But the facts surrounding Plaintiffs here are different. Moreover, *Nicolas* makes no mention of whether the alien there was present in the United States on a time-limited visa or, say, illegally.

Turing to the second prong, Plaintiffs have shown a credible threat of prosecution. This standard is "quite forgiving," even at the preliminary injunction stage and outside the First Amendment context. *See Robinson v. Attorney General*, 957 F.3d 1171, 1177 (11th Cir. 2020) (citation omitted). At least one individual Plaintiff here will likely satisfy that forgiving standard as to each claim because Plaintiffs have shown more than a "sequence of uncertain contingencies." *Dream Defs.*, 57 F.4th at 888. They either own property in Florida, including near critical infrastructure or military installations, or have concrete plans to buy it. Their fears are not merely imaginative or speculative.[6]

---

[6] At the hearing, Plaintiffs' counsel indicated that they were willing to enter into a stipulation with State Defendants that the law did not apply to any individual

At least one Plaintiff, then, has the likelihood of a future concrete harm as to each claim. Plaintiffs have also shown traceability and redressability (which the State Defendants do not contest), because the State Defendants (along with the State Attorney Defendants) enforce the law.[7] *See Dream Defs.*, 57 F.4th at 889; *see also Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021) ("[W]here, as here, a plaintiff has sued to enjoin a government official from enforcing a law, he must show, at the very least, that the official has the authority to enforce the particular provision that he has challenged, such that an injunction prohibiting enforcement would be effectual."). Given that at least one Plaintiff likely has standing to pursue each claim, I will proceed to the merits.

## B.   Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Equal Protection Claim.

Plaintiffs' first claim is that the law violates the Fourteenth Amendment's equal protection guarantee. That guarantee "is essentially a direction that all persons

_____

Plaintiffs but that no such agreement was reached. Hearing Trans. at 6. This is not dispositive, but it does relate to the threat-of-enforcement inquiry. *Cf. Dream Defs.*, 57 F.4th at 887 ("We have inferred the existence of a credible threat of prosecution when a plaintiff challenged the law soon after it was enacted and the state 'vigorously defended' the law in court." (quoting *Wollschlaeger v. Governor, State of Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) (en banc))).

[7] The one exception is the Agriculture Commissioner, whose enforcement authority appears to relate only to the provisions addressing agricultural lands— provisions Plaintiffs do not now challenge, Reply at 9 n.1. This would provide an independent reason to deny relief against Commissioner Simpson.

similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). It applies to both citizens and noncitizens.[8] *Yick Wo v. Hopkins*, 118 U.S. 356, 368-69 (1886); *see also Plyler*, 457 U.S. at 210.

The Equal Protection Clause does not prohibit all classifications, of course. *Estrada v. Becker*, 917 F.3d 1298, 1308 (11th Cir. 2019) (citing *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)). Generally, state legislation is presumed valid and will be upheld if it is "rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440 (citations omitted). But that presumption sometimes gives way to strict judicial scrutiny. Certain laws classifying people to be treated differently, or facially neutral laws motivated by a discriminatory purpose, are subject to strict scrutiny. *Miller v. Johnson*, 515 U.S. 900, 920 (1995); *Graham v. Richardson*, 403 U.S. 365, 371-72 (1971); *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). When strict scrutiny applies, a challenged law is valid only if "narrowly tailored to achieve a compelling interest." *Miller*, 515 U.S. at 920 (citation omitted).

When a statute classifies persons "by race, alienage, or national origin," strict judicial scrutiny usually applies. *City of Cleburne*, 473 U.S. at 440. Race relates to ethnic or ancestry characteristics. *Students for Fair Admissions, Inc. v. President &*

---

[8] At least to noncitizens physically present in the United States. *See De Tenorio v. McGowan*, 510 F.2d 92, 101 (5th Cir. 1975).

*Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2162-63 (2023) (citing *Rice v. Cayetano*, 528 U.S. 495, 517 (2000)). "Alienage" refers to "not being a citizen of the United States." *United States v. Osorto*, 995 F.3d 801, 822 (11th Cir. 2021) (citations omitted). And "national origin" in the equal protection context means "the particular country in which one was born," which is distinct from citizenship. *Id.*

The Supreme Court's "cases generally reflect a close scrutiny of restraints imposed by States on aliens," but the Court has "never suggested" that *all* state alienage classifications are "inherently invalid" or "suspect." *Foley v. Connelie*, 435 U.S. 291, 294 (1978) (citing *Sugarman v. Dougall*, 413 U.S. 634, 648 (1973)). As to "matters firmly within a State's constitutional prerogatives," the Court's scrutiny has not been "so demanding." *Id.* at 296 (quoting *Dougall*, 413 U.S. at 648); *see also id.* at 295 (noting that applying strict scrutiny to "every statutory exclusion of aliens" would "depreciate the historic values of citizenship" (quoting *Nyquist v. Mauclet*, 432 U.S. 1, 14 (1977) (Burger, C.J., dissenting))).

So, for example, the Court has applied rational-basis review when states disqualified aliens from holding government positions. *Bernal v. Fainter*, 467 U.S. 216, 220-21 (1984) (citing cases). It has rejected the idea that "illegal aliens" are a suspect class. *Plyler*, 457 U.S. at 219 n.19. And, most relevant here, the Court has held that states could deny aliens ownership interests in land within their respective borders absent an arbitrary or unreasonable basis. *Terrace v. Thompson*, 263 U.S.

197, 216-22 (1923); *Porterfield v. Webb*, 263 U.S. 225, 232-33 (1923); *Webb v. O'Brien*, 263 U.S. 313, 324-26 (1923); *Frick v. Webb*, 263 U.S. 326, 332-34 (1923) (collectively, the *Terrace* Cases).

The parties dispute which level of scrutiny applies here. Plaintiffs maintain that strict scrutiny governs, arguing the law facially classifies people based on race, national origin, and alienage. Am. Compl. ¶¶ 89-98; MPI at 18-21, 24-25. Alternatively, they contend the law's enactment was motivated by discrimination against those classes. MPI at 22-23. The State Defendants, on the other hand, argue that the law satisfies equal protection principles under the *Terrace* Cases as to aliens and that it was not motivated by any unlawful animus. Resp. at 30-41.

The standard of review is critical. The State Defendants make no effort to meet the burden they would face if strict scrutiny applied, so if strict scrutiny applied, Plaintiffs would easily meet their burden of showing a substantial likelihood of success on the merits. But under rational basis, Plaintiffs have a substantial burden that they have not come close to meeting. Therefore, Plaintiffs' equal protection claim essentially stands or falls on the applicable level of scrutiny.

As explained below, Plaintiffs are unlikely to show that strict scrutiny applies.

    i.    *Plaintiffs Have Not Shown a Substantial Likelihood that Heightened Scrutiny Applies.*

To begin, the challenged law classifies based on where an alien is domiciled, Fla. Stat. § 692.201(4)(d), as Plaintiffs themselves recognize, *see* MPI at 19-20. It

does not facially discriminate against noncitizens based on race or ancestry. It does not discriminate against noncitizens based on "the particular country in which one was born." *Osorto*, 995 F.3d at 822. So contrary to Plaintiffs' arguments, the challenged law is facially neutral as to race and national origin. It would apply to a person of Chinese descent domiciled in China the same way it would apply to a person *not* of Chinese descent domiciled in China. And its application would never turn on a person's race.

To evade this textual reality, Plaintiffs rely on a "proxy" theory. They essentially argue that the law "singles out" noncitizens residing in China and therefore necessarily singles out people born there. Reply at 13-14; *see also* Hearing Trans. at 13. But residency and birthplace do not clearly overlap to the point where they are practically indistinguishable, and Plaintiffs cite no authority for the proposition that classifications based on aliens' residency should nonetheless be treated as birthplace classifications. Nor do they provide evidence supporting the conclusion that the law's "foreign principal" definition, specifically, is effectively a birthplace classification.[9]

---

[9] When the Court reasoned that an ancestry-based definition was in effect a racial definition in *Rice v. Cayetano*, it did not conclude that in the abstract. 528 U.S. at 514-15. The Court relied on "the historical and legislative context of the particular classification at issue, not on the categorical principle that all ancestral classifications are racial classifications." *Davis v. Guam*, 932 F.3d 822, 834 (9th Cir. 2019).

The challenged law does, though, facially classify by alienage. The State Defendants do not contend otherwise, *see* Resp. at 36, and they hardly could: the law applies only to one who is "*not a citizen* or lawful permanent resident of the United States." Fla. Stat. § 692.201(4)(d) (emphasis added). A United States citizen domiciled in a country of concern is not covered; a noncitizen (who is not a lawful permanent resident) with the same domicile *is* covered. That the law exempts some noncitizens—those not domiciled in countries of concerns—does not make the law neutral as to alienage. *See Nyquist*, 432 U.S. at 7-9; *Graham*, 403 U.S. at 367, 370-76.

The question is whether the alienage classification warrants strict scrutiny. Binding Supreme Court precedent controls this issue. The Court held in *Terrace v. Thompson* that the Fourteenth Amendment did not divest states of the "power to deny to aliens the right to own land within [their] borders." 263 U.S. at 217 (citing *Hauenstein v. Lynham*, 100 U.S. 483, 484, 488 (1879); *Blythe v. Hinckley*, 180 U.S. 333, 340 (1901)); *see also Hauenstein*, 100 U.S. at 484 ("The law of nations recognizes the liberty of every government to give to foreigners only such rights, touching immovable property within its territory, as it may see fit to concede. In our country, this authority is primarily in the States where the property is situated." (citation omitted)); *Blythe*, 180 U.S. at 340-41 ("This [C]ourt has held from the earliest times, in cases where there was no treaty, that the laws of the state where the

real property was situated . . . were conclusive in regard thereto."). The Court recognized that in exercising that power, derived from common-law restrictions on alien landownership, states possess "wide discretion." *Terrace*, 263 U.S. at 218 (quoting *Truax v. Corrigan*, 257 U.S. 312, 337 (1921)); *see also id.* at 217. Thus state laws restricting aliens' right to acquire real property satisfy equal protection so long as they are rational. *See id.* at 216-21; *see also Dougall*, 413 U.S. at 653 (Rehnquist, J., dissenting) (noting that the Court applied rational-basis review in the *Terrace* Cases).

Applying those principles, *Terrace* upheld a Washington law that barred most aliens from acquiring land interests. *See* 263 U.S. at 212-13. The law, which included criminal penalties, did not apply to aliens who declared a good-faith intent to seek United States citizenship. *Id.* Applying *Terrace* in three other cases decided right after it, the Court held that a similar California statute restricting landownership by ineligible aliens satisfied equal protection. *Porterfield*, 263 U.S. at 232-33 (rejecting that the classification "was arbitrary or unreasonable"); *O'Brien*, 263 U.S. at 324-26 ("No constitutional right of the alien is infringed."); *Frick*, 263 U.S. at 332-34 ("The state has power . . . to deny to ineligible aliens permission to own, lease, use, or have the benefit of lands within its [borders] for agricultural purposes." (citation omitted)). Each time, the Court reaffirmed that states must be afforded wide discretion when classifying aliens, *Porterfield*, 263 U.S. at 233; *Frick*, 263 U.S. at

20

333-34, because the "quality and allegiance of those who own, occupy and use" a state's lands "are matters of highest importance and affect the safety and power of the state itself," *Terrace*, 263 U.S. at 221; *see also O'Brien*, 263 U.S. at 324 (citing *Terrace*, 263 U.S. at 221).

The law challenged here is entitled to like deference. Like the statutes at issue in the *Terrace* Cases, Florida enacted the challenged law pursuant to states' long-recognized "power to deny to aliens the right to own land within [their] borders." *Terrace*, 263 U.S. at 217; *cf. Hauenstein*, 100 U.S. at 484. That means it satisfies equal protection so long its classification is not "arbitrary or unreasonable." *Porterfield*, 263 U.S. at 232-33.

In their opening brief, Plaintiffs made no real attempt to distinguish the *Terrace* Cases. *See* MPI at 24. But in their reply, Reply at 15-16, and at the hearing, they argued that the *Terrace* rule only permits "even-handed" discrimination against noncitizens at large. *See id.*; *see also Frick*, 263 U.S. at 333 (noting the statute "limit[ed] the privileges of all ineligible aliens"). In other words, they suggest that even if state laws applying to *all* noncitizens are valid under *Terrace*, state laws applying only to citizens of specific countries are not. But even accepting this premise (for argument's sake), it would not help Plaintiffs. The law here does not

21

treat aliens differently based on their country of foreign citizenship.[10] Instead, the law applies to *any* noncitizen *domiciled* in one of the specified countries.

Moreover, although the law necessarily restricts land ownership by some aliens (foreign principals) but not others, that does not mean the law lacks general application or escapes the *Terrace* Cases' holdings. *Terrace* itself upheld a law that allowed some aliens (those intending to become citizens) to own land but not others. Nonetheless, "[t]he inclusion of good faith declarants in the same class with citizens d[id] not unjustly discriminate against aliens who [we]re ineligible or against eligible aliens who have failed to declare." *Terrace*, 263 U.S. at 219-20; *cf. id.* at 218 (concluding law complied with due process because it "appl[ied] alike and equally to all aliens"). Nor did California's classification, which allowed some aliens (those eligible for citizenship) to own land but not others. *See Frick*, 263 U.S. at 333 ("The state has power . . . to deny to ineligible aliens permission to own, lease, use, or have the benefit of lands . . . .").

To be sure, the law's classification does differ from the classifications at issue in the *Terrace* Cases in a literal sense: Washington and California classified based on noncitizens' eligibility for citizenship, and Florida's law classifies based on the

---

[10] The statute at issue in *De Tenorio*, 510 F.2d at 101, by contrast, did: "Nonresident aliens *who are citizens of Syria or the Lebanese Republic*" may inherit land in Mississippi, but all other nonresident aliens cannot. Miss. Code § 89-1-23.

noncitizens' domicile. This, though, does not make *Terrace* inapplicable. The Court recognized in *Porterfield* that a state can tailor an alienage classification (as it relates to property ownership) to meet "its own problems, depending on circumstances existing there." 263 U.S. at 233 ("We cannot say that the failure of the California Legislature to extend the prohibited class [to the same extent as Washington] . . . was arbitrary or unreasonable."). After all, "[i]t is not always practical or desirable that legislation shall be the same in different states," and states are not bound by the alienage classifications adopted by others. *Id.*

The *Terrace* Cases cannot be meaningfully distinguished here. And to their credit, Plaintiffs acknowledge the obstacle those cases pose to their alienage-based equal protection claim.[11] *See* MPI at 24. They therefore argue that the *Terrace* Cases are no longer good law, that "those cases do not govern here" because later Supreme Court decisions "supersede[]" them. *Id.* But this argument, too, falls short.

The *Terrace* Cases are directly on point for the issue here—to what extent may Florida restrict aliens' landownership. *See Terrace*, 263 U.S. at 217. Those cases reaffirmed—in no uncertain terms—that states may "deny to aliens the right to own land within [their] borders" absent an arbitrary reason. *Id.* at 216-17 (citations omitted); *see also Porterfield*, 263 U.S. at 233. Moreover, the facts surrounding the

---

[11] The United States, on the other hand, ignores the *Terrace* Cases altogether in presenting its equal protection argument.

new law's classification "line up closely" with the *Terrace* Cases' facts. *Jefferson County v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). Florida's law, like the Washington and California laws, restrict alien landownership and impose criminal penalties for violations.

Because the *Terrace* Cases are on-point Supreme Court precedent, they bind this court. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 67 (1996); *see also Acker*, 210 F.3d at 1320. Lower courts "have a constitutional obligation to follow a precedent of [the Supreme] Court unless and until it is overruled by [that] Court." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring) (citation omitted). That the Court has overruled a precedent must be explicit—it "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000); *see also Solymar Invs., Ltd. v. Banco Santander S.A.*, 672 F.3d 981, 990 n.9 (11th Cir. 2012) ("[T]he Supreme Court has never explicitly overruled its holding . . . and we will not assume a case has been overturned in the absence of such explicit language . . . ." (citations omitted)); *Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1182 (11th Cir. 2021) ("[T]he Supreme Court is certainly capable of saying what it means . . . .").

The Plaintiffs—and others—have argued that the Supreme Court would not decide the *Terrace* Cases today the way it did in 1923. And perhaps they are right. But it is up to the United States Supreme Court to decide whether to overturn its own

precedents. Unless or until it does, lower courts must follow those precedents. *Rodriguez de Quijas v. Shearson/Am. Exp. Inc.*, 490 U.S. 477, 484 (1989); *Mallory v. Norfolk S. Ry. Co.*, 143 S. Ct. 2028, 2038 (2023) (reasoning state court erred by concluding intervening case law "implicitly overruled" Supreme Court precedent); *Acker*, 210 F.3d at 1320 ("[T]he Supreme Court has insisted on reserving to itself the task of burying its own decisions."); *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1263 (11th Cir. 2012); *United States v. Greer*, 440 F.3d 1267, 1275-76 (11th Cir. 2006); *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996). The *Terrace* decision thus binds this court even if its rule "cannot be squared with" the Court's later cases. *Evans*, 699 F.3d at 1264 (quoting *Agostini v. Felton*, 521 U.S. 203, 208-09 (1997)). This is so even if the decision has "increasingly wobbly, moth-eaten foundations." *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)). Or even if it has been "cut . . . back so far that it will not survive." *Brisentine v. Stone & Webster Eng'g Corp.*, 117 F.3d 519, 525-26 (11th Cir. 1997).

Plaintiffs have not suggested that the Court has overruled the *Terrace* Cases by name. In fact, the Court has repeatedly and expressly declined to reexamine those decisions. When the Court held in *Oyama v. California* that California's "Alien Land Law" violated a U.S. citizen's equal protection right as applied, the Court "deem[ed] it unnecessary and therefore inappropriate to reexamine" the *Terrace* Cases. 332

U.S. 633, 646-47 (1948).[12] The Court also deemed it unnecessary in *Takahashi v. Fish & Game Commission*, 334 U.S. 410, 422 (1948) ("[a]ssuming the continued validity of" the *Terrace* Cases), and *Graham v. Richardson*, 403 U.S. at 374 (declining to resolve "the contemporary vitality" of special public-interest cases such as *Terrace*)—two cases where the Court held state laws violated aliens' equal protection rights. Each time, the Court—at most—merely distinguished the *Terrace* rule. *See Takahashi*, 334 U.S. at 422 (noting *Terrace* "rested solely upon the power of states to control the devolution and ownership of land within their borders").

*Oyama*, on which Plaintiffs heavily rely (as well as state-court decisions interpreting it), involved an entirely different issue than the *Terrace* Cases and this one. *See* Am. Compl. ¶¶ 6-7; MPI at 24; Reply at 15-16. *Oyama* concerned only "the right of *American citizens* to own land," *Oyama*, 332 U.S. at 647 (emphasis added), and held California's statute discriminated against a *citizen* based on his parents' national origin, *see id.* at 640; *cf. Osorto*, 995 F.3d at 822. *Oyama* plainly did not overrule the *Terrace* Cases by outcome or otherwise. *See Oyama*, 332 U.S. at 647 ("[W]e do not reach [whether] the Alien Land Law denies ineligible aliens the equal protection of the laws.").

---

[12] The petitioners in *Oyama* challenged a different provision of the same statute that was at issue in *Porterfield*, *O'Brien*, and *Frick*. *See Oyama*, 332 U.S. at 641-42.

Unable to rely on any express overruling, Plaintiffs essentially argue *Takahashi* and the alienage cases that followed it have implicitly overruled the *Terrace* Cases. They rely heavily on the fact that the *Terrace* Cases predated the Court's modern two-tiered equal protection analysis, *see* MPI at 24, which generally treats aliens as a "discrete and insular" class for which strict scrutiny is appropriate, *Graham*, 403 U.S. at 372 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938)).

Plaintiffs are correct that, "[o]ver time, the Court's decisions gradually have restricted the activities from which States are free to exclude aliens." *Ambach v. Norwick*, 441 U.S. 68, 73 (1979). Besides *Takahashi* (exclusion from commercial fishing) and *Graham* (exclusion from welfare benefits), the Court has held states cannot discriminate against aliens seeking law licenses, *In re Griffiths*, 413 U.S. 717, 718 (1973), engineering licenses, *Examining Bd. of Eng'rs v. Flores de Otero*, 426 U.S. 572, 599-606 (1976), financial education assistance, *Nyquist*, 432 U.S. at 12, or certain public employment, *Dougall*, 413 U.S. at 646-49. But reconciling these later cases with the *Terrace* Cases is not difficult—none involved an equal protection challenge to states' power "to control the devolution and ownership of land within their borders, a power long exercised and supported on reasons peculiar to real property." *Takahashi*, 334 U.S. at 422; *see also Hauenstein*, 100 U.S. at 484; *Blythe*, 180 U.S. at 340-41; *cf. Chirac v. Chirac's Lessee*, 15 U.S. (2 Wheat) 259, 272 (1817)

27

(reasoning that, absent a federal treaty to the contrary, whether noncitizen could inherit land in Maryland "depend[ed] on the law of Maryland"). *Terrace*, *Porterfield*, *O'Brien*, and *Frick* did, as does this case. That the newer cases can be reconciled, though, is almost beside the point. Either way, I am bound to apply the on-point *Terrace* precedent.

At the end of the day, because the Supreme Court itself has not overruled the *Terrace* Cases, this court must apply them. This court has no power to declare the *Terrace* Cases "implicitly overruled" or superseded. *Mallory*, 143 S. Ct. at 2038; *see also Fla. League of Prof'l Lobbyists, Inc.*, 87 F.3d at 462. And applying the *Terrace* Cases, I conclude Plaintiffs have not shown it likely that heightened scrutiny would apply to the alienage classification.

There is also one additional, independent reason why I conclude Plaintiffs have not shown heightened scrutiny applies: the law exempts noncitizens who are lawful permanent residents. Fla. Stat. § 692.201(4)(d). Even in its more recent decisions, the Supreme Court has applied strict scrutiny only to laws affecting lawful permanent aliens. *See LeClerc v. Webb*, 419 F.3d 405, 415 (5th Cir. 2005); *see also League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 532-34 (6th Cir. 2007) ("There are abundant good reasons, both legal and pragmatic, why lawful permanent residents are the only subclass of aliens who have been treated as a

28

suspect class."). Thus, even putting the *Terrace* Cases aside, I would conclude that Plaintiffs have not shown a likelihood that heightened scrutiny would apply.

ii.   *Plaintiffs Are Unlikely to Show Strict Scrutiny Applies Under* Arlington Heights.

Plaintiffs alternatively claim that intentional racial, national-origin, and alienage discrimination motivated the new law. MPI at 21-23. Laws motivated by such discrimination can be subjected to heightened scrutiny. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-68 (1977); *Hunt*, 526 U.S. at 546; *see also Jean v. Nelson*, 711 F.2d 1455, 1483-1502 (11th Cir. 1983) (applying *Arlington Heights* in equal protection case concerning race, national origin, and alienage), *on reh'g*, 727 F.2d 957 (11th Cir. 1984) (en banc), *aff'd*, 472 U.S. 846 (1985). But Plaintiffs have not shown a substantial likelihood that unlawful animus motivated the Legislature.[13]

---

[13] For purposes of the *Arlington Heights* analysis alone, I will proceed as though the new law were facially neutral as to alienage. Cases discussing *Arlington Heights* suggest its application is limited to "facially neutral law[s]." *E.g.*, *Hunt*, 526 U.S. at 546; *cf. Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995) (noting challenge to statute explicitly classifying based on race "present[ed] none of the additional difficulties posed by laws that, although facially race neutral, result in racially disproportionate impact and are motivated by a racially discriminatory purpose" (citing *Arlington Heights*)). Plaintiffs cited no cases in which a court found intentional discrimination against a class under *Arlington Heights* after concluding the statute, on its face, lawfully treated that class differently. *See* Hearing Trans. at 93:2-16. And it is unclear how a facial alienage classification subject to rational-basis review under *Terrace* could nonetheless be subject to strict scrutiny under *Arlington Heights* because it was motivated by *citizenship-based* discrimination. Of

To succeed on this alternative claim, Plaintiffs have to prove discriminatory animus; impact alone is not enough. *Arlington Heights*, 429 U.S. at 264-65 (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)). Plaintiffs must prove, in other words, that the Legislature enacted the new law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

Discerning legislative purpose is not always easy. It "is an inherently complex endeavor" that demands a "sensitive inquiry." *Hunt*, 516 U.S. at 546 (quoting *Arlington Heights*, 426 U.S. at 266). And in undertaking this sensitive inquiry, courts must presume the Legislature acted in good faith. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (citing *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018)).

Direct evidence is rarely available to rebut that presumption, and Plaintiffs offered none here. Instead, Plaintiffs look to rely on objective, circumstantial indicators of intent—the so-called *Arlington Heights* factors: (1) disproportionate impact, (2) historical background, (3) departures from usual procedure, (4) substantive departures, and (5) legislative history, including decisionmakers' statements. 429 U.S. at 264-68. The Eleventh Circuit has supplemented this

---

course, this is not an issue as to Plaintiffs' intentional race- and origin-discrimination claims—the law is clearly facially neutral in those respects.

nonexhaustive list with three other factors: (6) foreseeability of the impact; (7) knowledge of that impact, and (8) availability of less discriminatory alternatives. *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021) (citing *Jean*, 711 F.2d at 1486).

Having considered those factors, I conclude Plaintiffs have not shown a substantial likelihood that the Florida Legislature enacted the law "because of," rather than merely "in spite of," foreign principals' protected characteristics. Plaintiffs point to no procedural or substantive departures, or any less discriminatory alternatives that Florida did not consider, *cf.* MPI at 23 (stating in passing that "far less discriminatory alternatives were available" without identifying any).

Plaintiffs primarily rely only on two varieties of the *Arlington Heights* factors—those regarding the law's impact and Legislators' statements. As for impact, Plaintiffs argue "[t]he overwhelming number of people in Florida" subject to the law are Chinese. *Id.* at 23. They cite no evidence supporting that, and they cite no evidence about the number of those subject to the law who are *not* of Chinese descent. Nor do Plaintiffs cite any evidence that the law will disproportionately impact people born in China.

The most relevant impact-related evidence that Plaintiffs offer are legislative committee reports. *E.g.*, ECF No. 21-39 at 21-22. At best, however, these reports evince awareness of the consequences for aliens domiciled in China. *Cf. Feeney*, 442

31

U.S. at 279. "Discriminatory purpose" requires more than that. *Id.* And as to race and national origin, the reports do not even show any awareness of consequences for those of Chinese descent or those born in China.

As for the statements from the Governor or Legislators, none evinces racial animus or any intent to discriminate based on race or where someone was born. Nor do they show any intent to discriminate against Chinese citizens "because of" their Chinese citizenship. Instead, the statements are consistent with motivations independent of any protected traits. *See, e.g.*, ECF No. 21-11 at 3 (statement that "[w]ith political upheaval and economic turmoil taking place in many foreign countries, Florida must act to insulate our food supply and . . . make sure that foreign influences like China will not pose a threat to [it]"); ECF No. 21-12 at 3 (statement that the law would "fight . . . efforts" to cause a "food and water" crisis in Florida).

Plaintiffs have not shown that these statements indicate animus against any protected group. Without more, these are not statements that can be "fairly read to demonstrate discriminatory intent by the state legislature." *League of Women Voters of Fla., Inc.*, 32 F.4th at 1373. This is especially so when considering the presumption of legislative good faith, which this court must afford. *Id.* Even without any such presumption, though, Plaintiffs' evidence falls short.

Moreover, even if these few actors' statements reasonably reflected unlawful animus (which they do not), the statements would be minimally probative at best.

"The Supreme Court has repeatedly cautioned against overemphasizing statements from individual legislators, which are not necessarily 'what motivates scores of others' to act (or, in this case, not act)." *Fusilier v. Landry*, 963 F.3d 447, 466 (5th Cir. 2020) (first quoting *United States v. O'Brien*, 291 U.S. 367, 384 (1968); then citing *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). The question is not whether a Legislator or two had discriminatory animus; the question is about the motivation of the Legislature as a whole.

Plaintiffs have not met their burden of showing a substantial likelihood of success on the merits of their discriminatory-intent claim.

    *v.    Plaintiffs Are Unlikely to Show the Law Lacks Any Rational Basis.*

Having concluded that Plaintiffs have not shown a substantial likelihood that strict scrutiny applies, I now turn to Plaintiffs' fallback argument—presented for the first time at the hearing—that the law cannot survive even rational basis. Hearing Trans. at 22:24-23:1.

State laws satisfy rational-basis review so long as "there is *any* reasonably conceivable state of facts" supporting a legitimate state purpose. *Estrada*, 917 F.3d at 1310-11 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). With rational-basis review, statutes have "a strong presumption of validity," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993), so Plaintiffs face a formidable burden. They must "negative every conceivable basis which might support" the law. *Id.* at 315 (quoting

*Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364 (1973)). Plaintiffs have not shown any likelihood that they can overcome that significant burden.

To the extent Plaintiffs contend the law is ill conceived or unlikely to provide Florida any real benefit, those arguments miss the point. "[E]qual protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313. "Moreover, because [courts] never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Id.* at 315.

Although the state has no burden to justify its classification, the State has offered justifications that are consistent with those recognized as sufficient in the *Terrace* Cases. *See Terrace*, 263 U.S. at 221 (reasoning that "[t]he quality and allegiance of those who own, occupy and use the farm lands within its borders are matters of highest importance and affect the safety and power of the state itself"); *O'Brien*, 263 U.S. at 324; *see also von Kerssenbrock-Praschma v. Saunders*, 121 F.3d 373, 378 (8th Cir. 1997); *Shames v. Nebraska*, 323 F. Supp. 1321, 1333-36 (D. Neb. 1971) (three-judge court). Regardless, Plaintiffs have not shown a substantial likelihood that they will meet their burden and negate every conceivable basis that might justify the law.

\*    \*    \*

34

In sum, Plaintiffs have not shown a substantial likelihood of success on their equal protection claim.

## C.   Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Fair Housing Act Claim.

Plaintiffs' next argument is that the law is preempted by—or otherwise violates—the Fair Housing Act. The FHA makes it unlawful to "refuse to sell . . . or to refuse to negotiate for the sale . . . or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). It also provides that any state law is invalid if it "purports to require or permit any action that would be a discriminatory housing practice." *Id.* § 3615. A "[d]iscriminatory housing practice" is "an act that is unlawful under section 3604" or certain other provisions. *Id.* § 3602(f).

The problem for Plaintiffs is that, as noted above, Florida's law does not make any classification based on "race, color, religion, sex, familial status, or national origin." It instead classifies based on alienage, citizenship, and lawful-permanent-resident status—none of which are covered by the FHA. *Cf. Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88, 95 (1973) (holding that Title VII—which forbids employment discrimination "because of . . . race, color, religion, sex, or national origin"—did not "make[] it illegal to discriminate on the basis of citizenship or alienage").

Plaintiffs correctly note that under the FHA, a state may not "facially single out [a protected class] and apply different rules to them." MPI at 26 (alterations in

MPI) (quoting *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995)). But, again, the FHA does not include alienage or citizenship as protected characteristics. This is therefore unlike the cases Plaintiffs cite. In *Bangerter*, the claim was that a zoning decision violated the FHA because it discriminated against the intellectually disabled plaintiff, 46 F.3d at 1494-95, and the FHA explicitly forbids housing discrimination "because of a handicap." 42 U.S.C. § 3604(f). Similarly, in *Larkin v. State of Michigan Department of Social Services*, the challenged statutes, "[b]y their very terms . . . appl[ied] only to [adult foster care] facilities which will house the disabled, and not to other living arrangements." 89 F.3d 285, 290 (6th Cir. 1996) (cited in MPI at 26).

The Plaintiffs also argue that—text aside—the new law's *purpose* was to discriminate based on national origin and race. MPI at 26. This argument fails for the same reason as the related equal protection argument failed: Plaintiffs have not shown a likelihood that they can prove any impermissible intent or purpose.

Finally, Plaintiffs suggest in a footnote that they could show an FHA violation solely based on disparate impact. *Id.* at 26 n.10. I decline to address an independent argument raised in a footnote. But Plaintiffs have not shown a likelihood of success on such a claim anyway. They have shown no evidence of disparate impact, asking the court instead to assume one. Reply at 20. Even if I assume the disparity, though, that alone is not enough to support a claim. "[D]isparate-impact liability has always

been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA . . . if such liability were imposed based solely on a showing of a statistical disparity." *Tex. Dept. of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc*., 576 U.S. 519, 540 (2015). Moreover, "[g]overnmental . . . policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'" *Id.* at 543 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971)); *see also id.* at 533 (holding that before rejecting a government's policy justification, "a court must determine that a plaintiff has shown that there is an available alternative practice that has less disparate impact and serves the entity's legitimate needs" (cleaned up) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009))). Although Plaintiffs' footnote does include the conclusory statement that the law "creates an 'artificial, arbitrary, and unnecessary barrier[]' to housing that virtually exclusively affects Chinese people and people from other 'countries of concern,'" MPI at 26 n.10 (quoting *Inclusive Cmtys.*, 576 U.S. at 540), Plaintiffs have not shown arbitrariness, as discussed above.

**D.   Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Void-for-Vagueness Claim.**

Plaintiffs next contend that three of the new law's terms are unconstitutionally vague as applied: "critical infrastructure facility," "military installation," and "domicile." Am. Compl. ¶ 105; MPI at 28-36.

The Fourteenth Amendment's Due Process Clause "encompasses the concepts of notice and fair warning." *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1349 (11th Cir. 2011). A statute violates that Clause as impermissibly vague where it "is so unclear . . . that persons of common intelligence must necessarily guess at its meaning and differ as to its application." *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1301 (11th Cir. 2013) (quoting *Mason v. Fla. Bar*, 208 F.3d 952, 958 (11th Cir. 2000)).

Preenforcement vagueness challenges are cognizable only under limited circumstances, namely when the challenged statute chills the litigant "from engaging in constitutionally protected activity." *Bankshot Billiards, Inc.*, 634 F.3d at 1350; *see also Indigo Room, Inc.*, 710 F.3d at 1301; *Woodruff v. U.S. Dept. of Labor, Off. of Workers Comp. Program*, 954 F.2d 634, 643 (11th Cir. 1992) ("A rule that does not reach constitutionally protected conduct is void for vagueness only if it is impermissibly vague in all its applications." (citing *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982))). There is no constitutionally protected activity here; Plaintiffs wish to engage in economic transactions. Nonetheless, the State Defendants do not contest Plaintiffs' ability to bring a preenforcement vagueness claim; they defend the vagueness challenge solely on the merits. Hearing Trans. at 43:25-44:7. Ultimately, the justiciability issue does not

matter, though, because I conclude Plaintiffs are unlikely to show that the challenged provisions are unconstitutionally vague.[14]

First, the law defines "critical infrastructure facility" and "military installation" in detail—giving fair notice of the specific facility types that qualify.[15] Refineries, power plants, airports, military camps, and so forth are plainly not such "broad, vague terms" so as to leave people guessing as to their meaning. MPI at 31. Plaintiffs fault the Legislature for not cataloging every facility that would satisfy these definitions—or including a "map" to that end. But through this argument, they demand far more than the Due Process Clause requires. *See High Ol' Times, Inc. v.*

---

[14] Plaintiffs' motion says that at this stage, they present only an as-applied vagueness claim, not a facial one. MPI at 29-30. Plaintiffs provided insufficient facts, though, to support any as-applied vagueness claim. *See United States v. Duran*, 596 F.3d 1283, 1290 (11th Cir. 2010) ("If a vagueness challenge to a statute does not involve the First Amendment, the analysis must be as applied to the facts of the case." (citations omitted)). Their purported limitation of their challenge to "people (1) who reside in the United States but are not U.S. citizens or legal permanent residents; (2) whose country of origin is a 'country of concern' under SB 264; and (3) who own or seek to purchase real property in Florida," MPI at 30—is not much of a limitation at all. It certainly does not provide the court a concrete set of facts against which a proper vagueness challenge could apply.

[15] "Critical infrastructure facility means . . . , if it employs measures such as fences, barriers, or guard posts," chemical manufacturing facilities, refineries, electrical power plants, water treatment plants, natural gas terminals, telecommunications central switching offices, gas processing plans, seaports, spaceports, and airports. Fla. Stat. § 692.201(2). "Military installation[s]" are any "base, camp, post, station, yard, or center encompassing at least 10 contiguous acres that is under the jurisdiction of the Department of Defense or its affiliates." *Id.* § 692.201(5).

*Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982) (noting that "absolute precision in drafting laws is not demanded" (citations omitted)).

Second, as the State Defendants point out, "domicile" is a legal term that many jurisdictions' statutes commonly use. Resp. at 28. And it has a settled meaning in Florida case law. *See supra* Part III.A; *see also* Mitchell J. Waldman, *"Legal Residence" or "Domicile"; Permanent or Primary Residence*, 20 Fla. Jur. 2d Domicile & Residence § 1 (June 2023 update). Plaintiffs rely heavily on the fact that the statute does not independently define the term, MPI at 28, 33-35, but that does not render it "so unclear" as to violate due process, *Indigo Room, Inc.*, 710 F.3d at 1301 (citation omitted); *see also Rose v. Locke*, 423 U.S. 48, 49-50 (1975) ("Even trained lawyers may find it necessary to consult . . . judicial opinions before they may say with any certainty what some statutes may compel or forbid.").

Finally, to the extent Plaintiffs are unsure whether the property they seek to buy is covered, it is not from some ambiguity in the statute but from Plaintiffs' own uncertainty about the facts. They note, for example, that they would have to determine measurements and find out—perhaps with some difficulty—whether specific installations "encompass at least 10 contiguous acres." MPI at 31 (citing Fla. Stat. § 692.201(5)). This argument misunderstands the vagueness inquiry. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather

the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008); *cf. also id*. at 305-06 (rejecting claim "that the mere fact that close cases can be envisioned renders a statute vague" because "[c]lose cases can be imagined under virtually any statute").

At bottom, Plaintiffs have fallen well short of showing a substantial likelihood of success on their void-for-vagueness claim. They point to no authority finding void any terms like those they argue about here.

**E    Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their CFIUS Preemption Claim.**

Plaintiffs' final argument is that the law is preempted by federal law restricting certain transactions involving foreign nationals. MPI at 37-47. Plaintiffs contend that "[i]n a carefully crafted set of statutes, regulations, and executive actions, a federal regime already addresses potential national security concerns related to real estate purchases." *Id.* at 37. And, they contend, Florida's new law stands as an obstacle to the implementation of that federal law. This issue is closer than the others, but Plaintiffs have not met their burden here either.

"Under the Supremacy Clause, the Constitution and the laws of the United States 'shall be the supreme Law of the Land.' From this Clause we have the preemption doctrine, and any state law that 'interferes with, or is contrary to,' federal law is preempted." *Estrada*, 917 F.3d at 1302 (cleaned up) (first quoting U.S. Const. art. VI, cl. 2, then quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)).

"Although preemption law cannot always be neatly categorized, [courts] generally recognize three classes of preemption." *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012) (citing *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008)). One category is express preemption, which arises when a statute explicitly states that it preempts state law. *Id.* The FHA, addressed above, provides an example of express preemption. *See* 42 U.S.C. § 3615 ("[A]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid."). Plaintiffs' claim here, though, is not express preemption.

The second category is field preemption, which "occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it.'" *Alabama*, 691 F.3d at 1281 (quoting *Browning*, 522 F.3d at 1167). The third type is conflict preemption, which comes in two forms: There is conflict preemption "when it is physically impossible to comply with both the federal and the state laws." *Id.* (quoting *Browning*). And there is also conflict preemption "when the state law stands as an obstacle to the objective of the federal law." *Id.* (quoting *Browning*). Plaintiffs here claim the latter but not the former.

When addressing any type of preemption, courts are guided by two principles. "First, the purpose of Congress is the ultimate touchstone in every preemption case," and that intent "primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1094 (11th Cir. 2021) (cleaned up) (first quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009); then quoting *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir. 2017)). "Second, we assume that 'the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress.'" *Id.* at 1095 (quoting *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939-40 (11th Cir. 2013)). "This principle particularly applies in a case in which Congress has legislated in a field which the States have traditionally occupied." *Id.* (cleaned up) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

With those principles in mind, I turn to the two forms of preemption Plaintiffs argue.

> i.   *Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Obstacle Preemption Claim.*

Plaintiffs first argue that the law stands as an obstacle to existing federal law addressing noncitizens' land purchases. MPI at 37-38 (contending that "[t]he federal government has a detailed and carefully calibrated system for monitoring, mitigating, and blocking certain real estate purchases if they threaten national

security"). As the Supreme Court has made clear, this claim requires a substantial showing. *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) ("Our precedents 'establish that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.'" (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 110 (1992) (Kennedy, J., concurring in part and concurring in judgment))).

To determine whether Florida's new law creates an unconstitutional obstacle to this federal law, the court must carefully analyze the federal laws at issue. *See Fresenius*, 704 F.3d at 939 ("We use our judgment to determine when state law creates an unconstitutional obstacle to federal law, and 'this judgment is informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" (quoting *Ga. Latino All. for Human Rts. v. Governor of Ga.*, 691 F.3d 1250, 1263 (11th Cir. 2012))); *see also Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1254 (11th Cir. 2022) (inquiry requires "examin[ing] the statutory text, its regulatory framework, and, if necessary, the legislative history . . . to determine whether Congress made a deliberate choice to exclude").

The ultimate issue is Congress's intent; the analysis therefore "does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather

than the courts that pre-empts state law.'" *Whiting*, 563 U.S. at 607 (quoting *Gade*, 505 U.S. at 111 (Kennedy, J., concurring in part and concurring in judgment)).

The federal regime at issue has its origins in The Defense Production Act of 1950, which Congress enacted to advance national security. The Act's purpose was "to ensure the vitality of the domestic industrial base" so the United States is prepared for and can "respond to military conflicts, natural or man-caused disasters, or acts of terrorism within the United States." 50 U.S.C. § 4502(a)(1), (2). Congress amended the Act several times. In a 1988 amendment, known as the Exon-Florio amendment, Congress added section 721, which gave the President authority to suspend or prohibit various transactions. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 302 (D.C. Cir. 2014) (describing the amendment). This codified the establishment of the Committee for Foreign Investment in the United States (CFIUS). *See id.* (explaining CFIUS background). Then, in 2018, through the Foreign Investment Risk Review Modernization Act of 2018 (FIRRMA), Congress further revised section 721 to (among other things) authorize the President to suspend or prohibit certain real estate transactions. 50 U.S.C. § 4565(d)(4).

Under the federal regime, CFIUS makes an initial determination about whether certain real estate transactions threaten national security, and the President can then issue an order prohibiting those transactions. *Id.* §§ 4565(b); 4565(d)(4). The categories of transactions at issue include a foreign person's purchase of land

"in close proximity to a United States military installation or another facility or property of the United States Government that is sensitive for reasons relating to national security," as well as land that "could reasonably provide the foreign person the ability to collect intelligence on activities being conducted at such an installation, facility, or property," or that "could otherwise expose national security activities at such an installation, facility, or property to the risk of foreign surveillance." *Id.* § 4565(a)(4)(B)(ii)(I)-(II). Notwithstanding these general categories, Congress carved out certain real estate transactions. A foreign person, for example, may purchase a single "housing unit" or real estate in "urbanized areas." *Id.* § 4565(a)(4)(C)(i)(I), (II).

In arguing that Florida's law serves as an obstacle to this federal regime, Plaintiffs rely principally on *Crosby v. National Foreign Trade Council*, 530 U.S. 363 (2000), and *Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation*, 715 F.3d 1268 (11th Cir. 2013). In each, the Court found that a state law designed to put economic pressure on foreign nations served as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 377 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *Odebrecht*, 715 F.3d at 1286 (quoting *Crosby* quoting *Hines*).

These cases offer little support for Plaintiffs' position. The relationship between the state laws and the federal regimes in those cases was quite different than

the relationship here. For one, the federal regimes in *Crosby* and *Odebrecht* dealt principally with international diplomacy. *Crosby*, 530 U.S. at 386; *Odebrecht*, 715 F.3d at 1285. Thus, as the Supreme Court later recognized, the law in *Crosby* involved a "uniquely federal area[] of regulation," namely the "foreign affairs power." *Whiting*, 563 U.S. at 604 (citing *Crosby*, among other cases). The Eleventh Circuit's *Odebrecht* decision—which tracked *Crosby*—recognized the same unique federal interest. And in both cases, the Courts found both that the state laws were themselves seeking to pressure the foreign governments and that their tactics stood as unmistakable obstacles to the federal government's diplomatic goals. *Crosby*, 530 U.S. at 386 (noting that "the state Act stands in the way of Congress's diplomatic objectives"); *Odebrecht*, 715 F.3d at 1285 ("It is hard to dispute that the Cuba Amendment undermines the President's capacity to fine-tune these sanctions and to direct diplomatic relations with Cuba."); *id.* at 1279 (finding that "the purpose of the Cuba Amendment is to use the lever of access to Florida's $8 billion-a-year public contracting market to exert additional economic pressure on the Cuban government and to influence American foreign policy").

The federal laws Plaintiffs point to here, on the other hand, address principally security issues. *See* 50 U.S.C. § 4502(a)(1), (2) (noting purpose "to ensure the vitality of the domestic industrial base" so the United States is prepared for and can "respond to military conflicts, natural or man-caused disasters, or acts of terrorism

within the United States"); 31 C.F.R. § 800.101(a) (explaining that 50 U.S.C. § 4565 "authorizes the Committee on Foreign Investment . . . to review any covered transaction, . . . , and to mitigate any risk to the national security of the United States that arises as a result of such transactions" and that the President can "suspend or prohibit" such transactions "when, in the President's judgment, there is credible evidence that . . . the foreign person engaging in a covered transaction might take action that threatens to impair the national security of the United States"). It is true, as Plaintiffs point out, Reply at 26, that in the comprehensive statutory list of factors the President may consider in determining whether to forbid a transaction, Congress included "the potential effects of the proposed or pending transaction on sales of military goods, equipment, or technology" to countries in certain categories. 50 U.S.C. § 4565(f)(4)(A)-(B). But the thrust of the federal regime is not to exert diplomatic pressure on foreign nations. And neither is that the purpose of the Florida law. *Cf. Fac. Senate of Fla. Int'l Univ. v. Winn*, 616 F.3d 1206, 1210-11 (11th Cir. 2010) (upholding Florida law precluding funding for state-employee travel to certain countries, rejecting comparison to *Crosby*, and noting that funding statute no "more than incidentally invades the realm of federal control of foreign affairs").[16]

---

[16] It is also noteworthy—and consistent with the diplomatic thrust—that *Crosby* and *Odebrecht* both relied on the fact that the United States received diplomatic objections to the state laws. *See Crosby*, 530 U.S. at 382-83; *Odebrecht*, 715 F.3d at 1285. These facts are "not controlling," *Fac. Senate of Fla. Int'l Univ.*,

Second, real estate transactions—or restrictions on real estate transactions—represent only one small part of the broader CFIUS regime. It covers commercial transactions—such as mergers, acquisitions, takeovers, or essentially any type of investment in a United States critical infrastructure business—as well as any sort of transaction designed to evade CFIUS review. 50 U.S.C. § 4565(a)(4) (defining "covered transaction"). In fact, as the State Defendants note, CFIUS's jurisdiction did not even reach standalone real estate sales until 2018. Resp. at 51 (citing Pub. L. No. 115-232, sec. 1703, § 721(a)(4)(B)(ii), 132 Stat. 2177 (codified at 50 U.S.C. § 4565(a)(4)(B)(ii))). The state laws in *Crosby* and *Odebrecht*, on the other hand, interfered directly with a primary purpose of the federal regime they affected. *See supra*.

Third, as noted above, there is a history of state regulation of alien landownership. There is no similar history of states using economic leverage to affect foreign policy. True, states' preexisting regulation in this area does not, alone, defeat the claim. *See Crosby*, 530 U.S. at 384-85 (invalidating Massachusetts law as providing an obstacle to subsequently enacted federal law). But longstanding state regulation of alien landownership counsels against a finding that Congress intended

---

616 F.3d at 1207, but it is worth noting that there are no similar complaints in this record. *Cf. id.* ("Nothing in the record suggests that the United States or any other government has complained about the Act to Florida or that some foreign government has complained to the federal government about the Act.").

to usurp all state authority in that area without explicitly saying so. *Cf. Wyeth*, 555 U.S. at 574 ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history.").

In short, Plaintiffs have not met the "high threshold" necessary to show a likelihood that Florida's law is an obstacle to the federal regime. *Whiting*, 563 U.S. at 607.[17]

> ii.   *Plaintiffs Have Not Shown a Substantial Likelihood of Success on Their Field Preemption Claim.*

As a fallback, Plaintiffs argue field preemption, which applies only when federal regulation is "so pervasive as to make the reasonable inference that Congress

---

[17] One additional note: The United States submitted a "Statement of Interest," arguing that Florida's law violates Equal Protection and the FHA. ECF No. 54. One would think that if Florida's law stood as a complete obstacle to the full implementation of federal law, the United States would have said so in that filing. But instead, the brief said the "United States does not take a position at this time on the merits of any claims not addressed in this Statement of Interest," including the obstacle-preemption claim. *Id.* at 6 n.5; *cf. Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 883 (2000) (considering federal agency view regarding preemption: "Congress has delegated to DOT authority to implement the statute; the subject matter is technical; and the relevant history and background are complex and extensive. The agency is likely to have a thorough understanding of its own regulation and its objectives and is 'uniquely qualified' to comprehend the likely impact of state requirements. . . . In these circumstances, the agency's own views should make a difference." (citations omitted)); *Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 335 (2011) ("Finally, the Solicitor General tells us that DOT's regulation does not pre-empt this tort suit. As in *Geier*, 'the agency's own views should make a difference.'").

left no room for the states to supplement it." *Alabama*, 691 F.3d at 1281 (marks omitted) (quoting *Browning*, 522 F.3d at 1167). *See* MPI at 47. Plaintiffs do little to develop this argument, which spans only a half page. But just as Plaintiffs have not shown a likelihood that the Florida law stands as an obstacle to the implementation of federal law, they have not shown that the federal law at issue is so pervasive as to demonstrate that Congress left no room for state regulation. Indeed, the federal law Plaintiffs rely on is not pervasive at all. Plaintiffs have again not met their high burden.

## CONCLUSION

Plaintiffs have not shown a substantial likelihood of success on the merits. That failure precludes preliminary injunctive relief, *ACLU of Fla.,* 557 F.3d at 1198, so I do not consider the remaining preliminary injunction factors.

The amended preliminary injunction motion (ECF No. 23) is DENIED.

Within 21 days, the parties must confer and submit a joint report stating their positions on whether the stay should continue, *see* ECF No. 48. If they do not agree the stay should continue, the report must set out each side's position on an appropriate litigation schedule.

SO ORDERED on August 17, 2023.

s/ *Allen Winsor*
United States District Judge